**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| GUY CHRISTENSEN, ) | |
| ) | |
| Plaintiff, ) | Case No. _____ |
| ) | |
| v. ) | Judge _____ |
| ) | |
| WALTER "TED" CARTER JR., *in his* ) | |
| *official capacity*, ) | |
| 15 East 15th Avenue, 5th Fl. ) | |
| Columbus, OH 43201, ) | |
| ) | |
| MELISSA SHIVERS, *in her official* ) | |
| *capacity*, ) | |
| 1739 N. High Street ) | |
| Columbus, OH 43210, ) | |
| ) | |
| and ) | |
| ) | |
| RYAN HUNT, *in his official capacity* ) | |
| 281 W. Lane Avenue, 5th Fl. ) | |
| Columbus, OH 43210 ) | |
| ) | |
| Defendants. ) | |
| ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

Plaintiff Guy Christensen brings this action for the violation of his First Amendment right to free speech because officials of The Ohio State University expelled him for engaging in protected political speech. He also sues for violation of his Fourteenth Amendment right to due process because OSU officials expelled him summarily, with no opportunity to be heard.

Mr. Christensen completed his first year as an undergraduate at the Ohio State University in late April of 2025. In his free time, Mr. Christensen is a political activist who posts his views

on Palestinian rights and independence on social media. A few weeks after returning to his home out of state, he posted a series of videos on his social media pages, expressing controversial political opinions relating to the Israel-Palestine conflict. Specifically, having previously condemned the May 21, 2025 shooting of two Israeli embassy staffers in Washington, D.C., he withdrew his condemnation of the gunman. In another post, he forcefully and graphically denounced U.S. Congressman Ritchie Torres for Rep. Torres' support for Zionism and associations with pro-Israel political entities. Though undoubtedly offering passionate political views on contentious and fraught topics, Mr. Christensen's videos contain no incitement to unlawful violence, nor do they contain any threats. Indeed, as Mr. Christensen emphasized in multiple subsequent videos, he did not incite or threaten any unlawful violence and did not intend to. The videos do not mention OSU and in no way target or even mention any member of the OSU community. In short, the videos constitute pure political speech on a matter of public concern, expressed off campus.

Mr. Christensen's social media accounts have a following of millions, and his controversial opinions soon drew a heated and highly visible response. Senior Trump administration officials threatened to investigate him. Rep. Torres publicly accused Mr. Christensen of antisemitism—a claim that Mr. Christensen denies—and called for an investigation by U.S. Capitol Police. Antisemitism watchdog groups and pro-Israel accounts on social media also called for Mr. Christensen to be investigated or punished, tagging law enforcement in their posts. After his critics discovered his OSU affiliation and disclosed it online, he quickly became the subject of a campaign urging OSU to take action against him for his views.

Like other universities, OSU is "peculiarly the 'marketplace of ideas,'" serving a critical role as a forum for vigorous discussion and debate on an enormous range of issues. *Healy v. James*,

2

408 U.S. 169, 180–81 (1972). *See also Meriwether v. Hartop*, 992 F.3d 492, 498 (6th Cir. 2021) (public universities have traditionally "prided themselves on being forums where controversial ideas are discussed and debated"). For Ohio universities, this obligation has been reinforced recently by the Ohio General Assembly, which enacted Ohio S.B. 1 to compel universities to "ensure the fullest degree of intellectual diversity," and to foster "multiple, divergent, and varied perspectives on an extensive range of public policy issues." Ohio Rev. C. 3345.0217(B)(3), (A)(2).

In Mr. Christensen's case, however, OSU officials could not abandon their supposed commitment to intellectual diversity quickly enough. They suspended him shortly after his connection to OSU became known, barred him from campus, and ordered him to schedule a meeting with the Office of Student Conduct. Then, without waiting for his scheduled meeting, they summarily disenrolled him, claiming that he posed a risk of harm to university safety.

Mr. Christensen was thus denied any meaningful opportunity to be heard. Afterwards, he petitioned for re-enrollment, arguing that he had never posed a safety risk and that the First Amendment protected his expression. OSU officials rejected his petition expressly on the basis that he was attempting to contest the accusations against him, "instead of providing evidence of a change in conditions."

Mr. Christensen is bringing this lawsuit for injunctive relief, including expungement of any disciplinary record or notation on his transcript. He also requests a declaration from this Court that his First and Fourteenth Amendment rights were violated, plus attorneys' fees as provided by law.

## JURISDICTION AND VENUE

1.     This case arises under the United States Constitution. This Court therefore has jurisdiction under Article III of the Constitution and 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1983. It also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to grant the declaratory relief requested.

2. This Court has personal jurisdiction over each Defendant because they all reside in the State of Ohio, and their actions as described herein took place in the State of Ohio.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)–(2). The actions giving rise to this suit took place in this judicial district, and Defendants reside in this district.

## PARTIES

### Plaintiff

4. Plaintiff Guy Christensen is a 19-year-old undergraduate student, social media influencer, and political activist. Until the events giving rise to this lawsuit, he was enrolled at the Ohio State University.

### Defendants

5. Defendant Walter "Ted" Carter Jr. is the President of the Ohio State University, in which position he has "the final responsibility and authority for the discipline of all students of the university[.]" Ohio Admin. C. 3335-23-22, 3335-11-01. He is sued in his official capacity.

6. Defendant Melissa Shivers is the Senior Vice President for Student Life for the Ohio State University, bearing delegated authority for the discipline of all students, and for the promulgation of rules governing student conduct. *See* Ohio Admin. C. 3335-23-22. She served a direct role in the violations that are the subject of this Complaint. She is sued in her official capacity.

7. Defendant Ryan Hunt is the Registrar for the Ohio State University, in which position he has the authority and/or responsibility to enter notations on students' official permanent records, including notations pertaining to discipline. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### Plaintiff Guy Christensen is an Undergraduate Student, Social Media Influencer, and Political Activist

8.     Plaintiff Guy Christensen enrolled in the fall of 2024 at the Ohio State University ("OSU") as a freshman. OSU is a public university.

9.     Even before his arrival at OSU, Mr. Christensen had begun building an active career as a social media commentator, influencer, and political activist. Across multiple platforms including TikTok, X, Substack, and Instagram, he posts videos and messages to an audience of millions of followers.

10.     Mr. Christensen's activism and commentary focus primarily on the Israel-Palestine conflict, the war in Gaza, and related political issues. He is firmly aligned with the cause of Palestinian self-determination and national independence, is a critic of Zionism, and routinely denounces actions of the Israeli government and its supporters in the strongest terms. Through his social media accounts and in other venues, he comments regularly on Israeli, Palestinian, American, and international news as it pertains to the war in Gaza and the cause of Palestinian liberation.

11.     Mr. Christensen also uses his platform for related charitable purposes, both through direct fundraising and through mobilizing campaigns to provide food and aid. For example, in one campaign, he helped to raise nearly a quarter million dollars in humanitarian aid for displaced Palestinians in Gaza and inspired a social media challenge called #FastForGaza, helping to raise awareness of the need for humanitarian assistance.

12.     Mr. Christensen anticipated that enrolling in OSU would help him expand his skills and impact as an activist and influencer. He planned to pursue a dual degree program in political

science and business administration, to help him better understand how to enact change in both policy and the public mind.

13.     Mr. Christensen maintained good academic standing while enrolled at OSU and was named to the Dean's List for spring 2025. His completed coursework included a class on the history of Zionism and Modern Israel, in which he engaged in lively civil discussions and debate with his peers and professor about the Israel-Palestine conflict and the war in Gaza.

14.     While at OSU, he participated at times in events on campus in support of Palestinian rights but conducted most of his advocacy on his online platforms, where he perceived that he could have a broader impact.

15.     Prior to the events giving rise to this action, Mr. Christensen was never the subject of any formal complaint or accusation that he had committed any disciplinary infraction at OSU.

16.     Upon information and belief, prior to the events giving rise to this action, Mr. Christensen was never accused of any disciplinary infraction at OSU in any form.

17.     Mr. Christensen continued to post videos to his social media accounts throughout his time at OSU regarding the Israel-Palestine conflict and related matters. In his online presence, he avoided mention of his affiliation with OSU. Until the events giving rise to this lawsuit, it was generally unknown among his online followers—whether supporters or critics—that Mr. Christensen was an OSU student.

18.     Final examinations for the spring 2025 semester at OSU concluded on or around April 29, 2025, with summer session classes beginning on May 6.

19.     Mr. Christensen did not enroll in summer classes at OSU. Once he had finished his exams for the spring semester, at or around the end of April, he left Ohio for the summer. He had no plan to return to OSU's campus over the summer, nor did he do so.

### Mr. Christensen Initially Condemned the Shooting of Two Israeli Embassy Staffers, then Withdrew His Condemnation

20.     On May 21, 2025, two employees of the Israeli embassy in Washington, D.C., Yaron Lischinsky and Sarah Lynn Milgrim, were killed by a gunman, Elias Rodriguez. The victims were shot as they exited an event hosted by the American Jewish Committee at the Capital Jewish Museum in Washington. After the shooting, Rodriguez reportedly chanted "free, free Palestine." The shooting was immediately investigated as a hate crime and was eventually charged as such. It was widely condemned by Israeli officials and others as an antisemitic terrorist attack. Following the shooting, a manifesto purportedly written by Rodriguez was posted on a social media account under his name.

21.     Early the next morning, on May 22, Mr. Christensen posted a video on his social media account in which he condemned the shooting but also opined that the two victims deserved to be tried and sentenced for participating in Israel's "genocide." He also denounced an anticipated response from the Trump administration and urged listeners to contribute to a fundraiser to provide food aid for Palestinians in Gaza.[1] He stated, in part:

> I want to condemn this attack for some obvious reasons and for some reasons that are not so obvious. * * *
>
> First off, I don't support the slaughter of civilians. That's not the way to go about it and bring justice. These people deserve to be tried and punished and sentenced to jail for their facilitation of this genocide and Israel's many, many, many crimes. Albeit these two did work in the Israeli Embassy, which is an arm of the propaganda machine Israel has set up to disseminate propaganda internationally. But that's beside the point. I'm also very afraid that the Trump regime is about to turn around tomorrow and use this attack as a pretext to violently crack down on the movement within this country. The Trump regime has already been deporting every student they can manage to justify deportation, so far, who support Palestine and criticize Israel. And Trump has publicly said he wants to go after civilians next and he's trying to figure out a way to do it. * * *

---

[1] Guy Christensen (@guychristensen), X (May 22, 2025, 6:55 AM), https://x.com/guychristensen_/status/1925505727734423617.

What this has been reminding me a lot of is the assassination of German diplomat Ernst vom Rath by a Jewish activist, which served as the Nazis' pretext to launch the Kristallnacht, a pogrom against Jewish people that was the transition between discriminatory policy in Nazi Germany to violence and destruction against Jews. The stage here in America has been set in a similar manner, with discriminatory policies surrounding free speech, freedom of protest, freedom of press, against everyone across the board who supports Palestinian human rights or criticizes Israel. Which really amount to the same thing. I am afraid this may serve as a pretext for a massive and violent crackdown against us here in this country. Like I said at the beginning of this video, these Zionist embassy workers deserved a trial, not being murdered in the streets.

22.     Later on May 22, Mr. Christensen posted another video (the "Rodriguez Video") in which he withdrew his earlier condemnation of the shooting, explained his beliefs that the shooting victims were "war criminal[s]," and explained that in his view, the attack was not motivated by antisemitism or terrorism.[2]

23.     He stated in the Rodriguez Video, in part:

I take it back. I do not condemn the elimination of those two Zionist officials who worked at the Israeli Embassy last night and here's why. Israel has live streamed a genocide to the entire world for the last two years. And I could talk to you for days—for days—about all of the crimes, all the atrocities I reported on, and when I'm finished you would still not know one percent of the Palestinian suffering. And you cannot expect to do such a thing in this world without the people standing up to fight to stop you in any way they can. To resist against you. And that is exactly what happened. Do not let yourself be fooled by the media, by the Zionists in this country who are telling you that this was an antisemitic terrorist attack. It was not. * * *

[Rodriguez] targeted these two because of their connection to the state of Israel. Because they are Zionists, not because they are Jews. * * *

And I want to remind you that while this attack took the lives of two human beings, Israel has murdered thousands of Palestinian civilians in cold blood without any shame, with pride, rejoicing in the streets of Israel over this, and they get no attention in this country. While this attack is being used to weaponize violence against the movement. But we will meet it with our own greater resistance and escalation.

---

[2] Guy Christensen (@yourfavoriteguy), *How Elias Rodriguez Was a Normal Reaction to Genocide*, SUBSTACK (May 22, 2025, 11:22PM), https://substack.com/@yourfavoriteguy/note/p-164212516.

24.     Mr. Christensen proceeded in the Rodriguez Video to read Rodriguez's published manifesto. He concluded, in part:

> You might have seen my update early this morning where I condemn this attack. And I reaffirm that I had a change of perspective after hearing critiques from people in the movement. It is like as they said, I am condemning Luke Skywalker for attacking the Death Star because the Empire might crack down on the Resistance. And while my point is that this attack will be used for a crackdown on the movement in the coming days, they're right. We must meet with escalation and stronger resistance. I hope my retracted condemnation does not allow our government to condemn me to a cell. But I don't know. Follow my page for more. Thank you and Free Palestine.

25.     At no point in the Rodriguez Video did Mr. Christensen urge his online followers, or anyone else, to engage in any imminent act of unlawful violence.

26.     At no point in the Rodriguez Video did Mr. Christensen urge his online followers, or anyone else, to engage in unlawful violence generally.

27.     At no point in the Rodriguez Video did Mr. Christensen threaten to personally perform any act of unlawful violence.

28.     At no point in the Rodriguez Video did Mr. Christensen state any intention or plan to personally perform any act of unlawful violence.

29.     The Rodriguez Video was not directed or targeted towards OSU, any member or members of the OSU community, any OSU student group, or any other OSU organization or entity.

30.     The Rodriguez Video contains no mention at all of OSU, the fact that Mr. Christensen was a student at OSU, any member or members of the OSU community, any OSU student group, or any other OSU organization or entity.

31.     Mr. Christensen was not on OSU's campus or taking classes at OSU when he recorded or posted the Rodriguez Video, having left Ohio for the summer.

**Mr. Christensen's Post Condemning Congressman Ritchie Torres**

32. Also on May 22, 2025, Mr. Christensen posted a video (the "Torres Video") condemning United States Congressman Ritchie Torres (D-NY).[3]

33. In the Torres Video, Mr. Christensen denounces Rep. Torres in vivid and harsh terms for, among other things, associating with the pro-Israel lobbying group the American Israel Public Affairs Committee (AIPAC), supporting Zionism, and denying that Israel's actions in Gaza constitute "genocide."

34. Mr. Christensen states in the Torres Video, in part:

Today, an AIPAC millionaire, an elected official, Ritchie Torres announced "There's no genocide in South Africa. There is no genocide in Gaza. Stop debasing the term 'genocide' by using it as ideological warfare." Now Ritchie, screenshots are forever and what you've said and done will haunt your family for eternity as you will eventually, if you're still alive, end up in a Nuremburg trial[] for all the elected officials in America who facilitated and protected this genocide. How many children have to die before the AIPAC money is outweighed by the crimes? How many hospitals and ambulances need to be bombed, or journalists sniped by Israel, for you to stop playing coverage for literally the worst crimes humanity will witness during our lifetimes? I hope. Ritchie, you are going to be in that courtroom when they start the trials to hold the Zionists who did this accountable. * * *

[T]he UN calls it a genocide. Amnesty International calls it a genocide. Genocide scholars and historians across the world have come to a consensus at this point that it's a genocide. * * * And our boy in the South Bronx Ritchie has the audacity to say "I'm an accidental advocate for Israel." What are you talking about? He flew to Israel to meet Yoav Gallant, the Israeli official who said, "We are fighting human animals," and [who] ordered the initial total siege on Gaza to starve out the people there. Two million people in mass punishment, mass starvation, that off the bat put Israel in violation of international law. He has an open arrest warrant against him from the ICC. But we don't talk about that. Ritchie's going to keep on meeting and sucking off the Zionist officials who are wanted for war crimes. So, shame on Ritchie. He is a Zionist scumbag. And I hope that the money he sleeps on at night stains his pajamas blood red. Thank you and Free Palestine.

---

[3] Guy Christensen (@guychristensen), X (May 22, 2025, 4:49 PM), https://x.com/guychristensen_/status/1925655240214196420.

35. At no point in the Torres Video did Mr. Christensen urge his online followers, or anyone else, to engage in any imminent act of unlawful violence.

36. At no point in the Torres Video did Mr. Christensen urge his online followers, or anyone else, to engage in unlawful violence generally.

37. At no point in the Torres Video did Mr. Christensen threaten to personally perform any act of unlawful violence.

38. At no point in the Torres Video did Mr. Christensen state any intention or plan to personally perform any act of unlawful violence.

39. The Torres Video was not directed or targeted towards OSU, any member or members of the OSU community, any OSU student group, or any other OSU organization or entity.

40. The Torres Video contains no mention at all of OSU, the fact that Mr. Christensen was a student at OSU, any member or members of the OSU community, any OSU student group, or any other OSU organization or entity.

41. Mr. Christensen was not on OSU's campus or taking classes at OSU when he recorded or posted the Torres Video, having left Ohio for the summer.

**Trump Administration Officials and Online Critics Called for Mr. Christensen to Be Investigated, and Disclosed His OSU Affiliation**

42. On May 23, 2025, the day after he posted the Rodriguez and Torres Videos, Mr. Christensen posted another short video underscoring that his previous comments were not intended as a threat of violence:[4]

> Since Zionists on Twitter are going rabid over what I just posted, I just want to disclaim that I'm not suicidal; I would never make a threat that would jeopardize my position to influence and educate people about the atrocity and evils that Zionism is currently bringing down upon the Palestinian people, especially in Gaza.

---

[4] Guy Christensen (@yourfavoriteguy), TikTok (May 23, 2025), https://www.tiktok.com/@yourfavoriteguy/video/7507714463055940910.

I hate Nazis and I hate Zionists. So. I don't have a problem with you much if you're not one of those things.

43.     Nonetheless, his comments were widely condemned by political opponents and critics, including Trump administration officials, several of whom called for Mr. Christensen to face investigation by law enforcement.

44.     On May 23, an X account for the watchdog group StopAntisemitism accused Mr. Christensen of "glorifying terrorism, spreading antisemitic propaganda, and most recently, celebrating the murder of Jews." It described the Rodriguez video as "not activism – it's incitement." It tagged the FBI, U.S. Attorney General Pam Bondi, and Senior Counsel to the Assistant Attorney General for Civil Rights Leo Terrell, calling for them to "take a hard look at Guy Christensen."[5]

45.     That same day, Mr. Terrell reposted StopAntisemitism's message with a comment "Will review all leads!"[6]

46.     Mr. Terrell leads the federal multi-agency Task Force to Combat Anti-Semitism, which serves "to root out anti-Semitic harassment in schools and on college campuses."[7]

47.     Also on May 23, Attorney General Bondi reposted Mr. Terrell's response to StopAntisemitism's post, adding "THANKS LEO!"[8]

48.     Also on May 23, the New York Post published an article about Mr. Christensen's posts. It noted: "Christensen, asked by The Post if this could be interpreted as saying he supports

---

[5] @StopAntisemites, X (May 23, 2025, 8:54 AM),
https://x.com/StopAntisemites/status/1925898098720506339 [https://perma.cc/98TE-F85C].
[6] Leo Terrell (@LeoTerrellDOJ), X (May 23, 2025, 12:32 PM),
https://x.com/LeoTerrellDOJ/status/1925953082199773267 [https://perma.cc/5UJF-M6N4].
[7] DEP'T OF JUST., OFF. OF PUB. AFF., *Justice Department Announces Formation of Task Force to Combat Anti-Semitism* (Feb. 3, 2025), https://www.justice.gov/opa/pr/justice-department-announces-formation-task-force-combat-anti-semitism.
[8] Pam Bondi (@PamBondi), X (May 23, 2025, 3:25 PM),
https://x.com/PamBondi/status/1925996602231058610 [https://perma.cc/4U9T-TVEC].

the killing of the victims, replied, 'I think the only people who are interpreting [that] as such are the people' who are using the slayings of 'those two Zionist officials … as a pretense to silence critics of Israel.'"[9]

49.    The same article described Mr. Christensen as "a college freshman who refused to say where he goes to school[.]"

50.    On the following day, May 24, an account on X posted a thread that—upon information and belief, for the first time in connection with Mr. Christensen's videos—publicly identified Mr. Christensen as an OSU student. It also publicly disclosed extensive personal information (much of which was inaccurate) about him and his parents, falsely described the Rodriguez Video as calling for violence, and speculated that he was under FBI investigation.

## OSU Suspended Mr. Christensen and Instructed Him to Schedule a Hearing

51.    On May 25, 2025, Mr. Christensen received two messages from OSU officials that, collectively, informed him that he had been suspended and would be afforded an opportunity to speak in his own defense.

52.    The first, signed by Associate Vice President Ryan Lovell, informed Mr. Christensen that AVP Lovell had decided to "suspend you, temporarily and immediately, from university premises and property as well as participation in all university activities[.]"

53.    AVP Lovell's letter cited Section 3335-23-20 of the Code of Student Conduct, which provides authority for interim suspension, and conveyed AVP Lovell's determination that "there is reasonable cause to believe your presence on university premises or at a university-related

---

[9] Kate Sheehy, *Baby-faced anti-Israel teen urges his 1M followers to support suspected DC terrorist in rant so vile TikTok pulled it —then doubles down on hate*, NY POST (May 23, 2025), https://nypost.com/2025/05/23/usnews/baby-faced-anti-israel-teen-urges-his-1m-followers-to-support-suspected-dc-terrorist-in-rant-so-vile-tiktok-pulled-it-then-doubles-down-on-hate/ [https://perma.cc/NEE2-GX4E].

or registered student organization activity poses a significant risk of substantial harm to the safety or security of yourself, others, or to property."

54. AVP Lovell's letter did not specify what alleged conduct by Mr. Christensen had given rise to this determination.

55. Upon information and belief, AVP Lovell's letter was issued in response to the Rodriguez Video, the Torres Video, and the responses to both the Rodriguez and Torres Videos.

56. The letter informed Mr. Christensen that his "interim suspension" would remain in effect until "the conclusion of the student conduct process, including any appeal," or AVP Lovell's written termination of the suspension.

57. The letter instructed Mr. Christensen that aside from any "pre-scheduled meeting with Student Conduct," he was required to make any requests for campus access to AVP Lovell, who would determine whether to grant such access. Absent permission, the letter stated, any entry on university premises by Mr. Christensen would be considered "criminal trespass … which may result in immediate arrest[.]"

58. The letter also informed Mr. Christensen that he was required to surrender any keys to university housing, that a hold would be placed on his student registration account, and that a notation would be placed on his transcript indicating a pending investigation.

59. Mr. Christensen complied with all terms, instructions, and requests in AVP Lovell's letter. He did not return to OSU's campus, with or without permission.

60. The second May 25 letter from OSU was signed by Director of Student Conduct Kelly Smith. Director Smith's letter stated that Student Conduct "received information alleging potential threats made to others on or around May 25, 2025," and stated "I want to hear from you about this report."

14

61.     Upon information and belief, the reference to "potential threats made to others" mentioned in Director Smith's letter intended to refer to the Rodriguez Video.

62.     Upon information and belief, the reference to "potential threats made to others" mentioned in Director Smith's letter intended to refer to the Torres Video.

63.     Director Smith's letter instructed Mr. Christensen to contact her on or before May 29, 2025, to schedule a meeting with her. The letter described such a meeting as "preliminary" but "not optional," and informed Mr. Christensen that failure to schedule the meeting could result in sanctions.

64.     Mr. Christensen timely scheduled a meeting with Director Smith, as instructed, to occur on June 4, 2025.

65.     On May 28, Director Smith emailed Mr. Christensen, asking him to reschedule their meeting because she had a scheduling conflict. Mr. Christensen agreed to postpone the meeting to June 5, 2025.

66.     Mr. Christensen was not asked to attend the meeting in person, nor did he plan to. Rather, Director Smith informed him that the meeting would occur by Zoom videoconference.

**Mr. Christensen's Critics Continued to Publicly Call for Investigation or Punishment**

67.     On May 26, Rep. Torres denounced the Rodriguez Video on X, calling Mr. Christensen "a man who defends the cold-blooded murder of an innocent young couple" and inviting viewers to "[l]ook into [his] troubled soul[.]"[10]

68.     On May 27, 2025, the New York Post reported that Congressman Torres had written a letter urging the United States Capitol Police to investigate Mr. Christensen in response to the Torres Video. According to the Post, Rep. Torres' letter stated that "The phrase 'if you're

_____

[10] Ritchie Torres (@RitchieTorres), X (May 26, 2025, 8:31 PM), https://x.com/RitchieTorres/status/1927160782640295942 [https://perma.cc/2GFZ-ZMRF].

still alive' carries a chilling and menacing implication—suggesting that I may be targeted or harmed." Rep. Torres' letter reportedly added that "[t]hese words raise serious concerns about whether Mr. Christensen is inciting violence or encouraging others to take action against me."[11]

69. Also on May 27, Rep. Torres accused Mr. Christensen in a post on X of being "intent on inciting violence against anyone who dares to be pro-Israel."[12]

70. On May 27, 2025, Mr. Christensen posted another video, partly responding to Rep. Torres.[13] Amid further denunciations of Rep. Torres' affiliations and positions, he denied accusations of antisemitism, and elaborated on the meaning of some of his statements in the Torres Video:

> So when I made a video about Ritchie and how he has taken blood-stained money, and raised awareness about the criminals who are in our government, he took notice. And he spent the last week slandering me as an antisemite, which is a claim that has no backing. There is no truth behind it whatsoever. Anybody who knows who I am, has heard what I have to say online, knows that I don't have any problem with Jewish people. At all. Nothing. Nothing.
>
> Now in complete honesty I thought it was kind of funny watching Ritchie freak out over what I had posted about him. His libel against me didn't bother me. But just an hour ago he went to the New York shitpost and gave them the scoop on how he's siccing the Capitol Police after me to investigate me for supposed threats of violence. Another claim which has no truth to it. In my video, and this is what he twists up, I say "Now Ritchie, screen shots last forever. What you have done will haunt your family for eternity. And if you are still alive you will end up in a Nuremburg trial." The meaning behind that is pretty obvious. I'm saying that when justice comes for Palestine, if Ritchie is still alive, meaning not old, and dead, and deceased or whatever, he will end up in the court alongside the rest of the people there. But there's some people, especially in our government, who are way too old that I don't expect to see at a Nuremburg trial. Like Joe Biden, has cancer, who

[11] Carl Campile, *Ritchie Torres urges Capitol Police to probe baby-faced, anti-Israel social media star who urged support for terror suspect*, NY POST (May 27, 2025), https://nypost.com/2025/05/27/us-news/ritchie-torres-urges-capitol-police-to-probe-baby-faced-anti-israel-social-media-star-who-urged-support-for-terror-suspect/ [https://perma.cc/SNE4-3TGQ].
[12] Ritchie Torres (@RitchieTorres), X (May 27, 2025, 7:59 PM), https://x.com/RitchieTorres/status/1927515043001671929 [https://perma.cc/3EXA-7R64].
[13] Guy Christensen (@yourfavoriteguy), TIKTOK (May 27, 2025), https://www.tiktok.com/@yourfavoriteguy/video/7509311311629651243.

unfortunately won't be alive by the time justice reaches the Palestinian people. And he won't have his day in court. That's an example of somebody who won't be alive to end up in a Nuremberg trial. And that's all I meant by that.

71.     In the same video, Mr. Christensen went on to emphasize that he did not intend to incite violence through his videos:

This is utterly ridiculous. * * * Anyone who sees my content knows that I do not incite violence, I do not tell anyone to make threats. I do not want anyone to make threats. Why would I call for people to make threats? All that would do is jeopardize my platform. I'm nonviolent.

72.     That same day, May 27, an Instagram account called "endjewhatred" posted a call to action against Mr. Christensen.[14] Identifying Mr. Christensen as "a student at Ohio State University," the account posted a model letter to Defendant Carter, which the account urged its followers to sign and send.

73.     The model letter circulated by "endjewhatred" urged Defendant Carter to "act decisively to expel freshman Guy Christensen and refer him to law enforcement for investigation due to his antisemitic hate speech, explicit support for terrorism, and anti-American rhetoric."

74.     On May 27, 2025, a rabbi and activist who had complained about Mr. Christensen to Defendant Carter published a message that he had received in response from Defendant Carter.[15]

75.     The message from Defendant Carter stated, in part: "Please let me assure you that the university is aware of and actively responding to this serious situation. * * * I want to affirm that the university strongly condemns antisemitism and all forms of discrimination. * * * I can share that the university has processes that we follow to address allegations or reports of antisemitism or other violations of university rules[.]"[16]

---

[14]@endjewhatred, INSTAGRAM (May 27, 2025),
https://www.instagram.com/reel/DKKvkerRkPp/?hl=en.
[15] Elchanan Poupko (@RabbiPoupko), X (May 27, 2025, 1:42 PM),
https://x.com/RabbiPoupko/status/1927420264305844513.
[16] *Id.*

76.     Upon information and belief, Defendant Carter was personally involved in deciding the university's course of action in disciplining Mr. Christensen.

77.     On May 29, United States Congressman Brian Mast (R-FL) reposted on X an article about Rep. Torres' call for Mr. Christensen to be investigated.[17] Rep. Mast added, in reference to Mr. Christensen, "[t]his isn't about left or right – antisemitism has no place in America."

78.     On May 30, StopAntisemitism denounced and profiled Mr. Christensen as "Antisemite of the Week," and urged readers to report him to social media platforms on which he was active.[18]

## OSU Canceled Mr. Christensen's Hearing, Summarily Expelled Him, and Quickly Assured Others That It Had Done So

79.     On May 30, 2025—just a few days prior to when his scheduled meeting with Director Smith was to occur, on June 5—Mr. Christensen received a letter from Defendant Shivers informing him that she was "moving to disenroll [him] pursuant to Section 3355-23-21 of the Code in lieu of moving forward under Section 3355-23-01."

80.     Defendant Shivers' letter stated that after OSU suspended Mr. Christensen, it learned of Rep. Torres' request that the Capitol Police investigate Mr. Christensen "following your social media posts, which he has interpreted to be threats of violence against him."

81.     Defendant Shivers' letter did not state whether she agreed with the interpretation that she attributed to Rep. Torres, nor did it expressly cite as a basis for disenrollment any independent finding by OSU that the Torres Video constituted a threat of violence.

---

[17] Brian Mast (@RepBrianMast) X (May 29, 2025, 11:27 AM), https://x.com/RepBrianMast/status/1928111054954844367 [https://perma.cc/HF8X-ST2Q].
[18] StopAntisemitism, *Antisemite of the Week: Guy Christensen* (May 30, 2025), https://stopantisemitism.org/as-week/guy-christensen/ [https://perma.cc/NDM2-JJD3].

82. Defendant Shivers' letter stated also that OSU had received "myriad communications" from "members of the university community" expressing their "fear of violence and for their personal safety based on your social media posts[.]"

83. Defendant Shivers' letter stated also that she had become aware that Mr. Christensen's posts "have resulted in the engagement of several law enforcement jurisdictions." Her letter did not elaborate on the nature of this "engagement" or the identity of the "law enforcement jurisdictions."

84. Defendant Shivers' letter specifies that "[b]ecause of" the three named "additional factors"—referring to Rep. Torres' request to Capitol Police, the complaints from community members, and the reported engagement of law enforcement—she had chosen to disenroll Mr. Christensen immediately, rather than following the disciplinary process that had previously been explained to him.

85. Defendant Shivers added that "[t]aken together," the Rodriguez Video, the Torres Video, Rep. Torres' report to Capitol Police, the "myriad" complaints from community members, and the "engagement" of law enforcement provided "clear and convincing evidence that your continued presence at the university poses a significant risk of substantial harm to the safety of the university community warranting your disenrollment."

86. As Defendant Shivers' letter concedes, the only actions or statements of Mr. Christensen's—as opposed to the responses of others—contributing to her decision to accelerate the matter to immediate disenrollment were the Rodriguez Video and the Torres Video. The remaining actions cited by Defendant Shivers as a basis for Mr. Christensen's disenrollment were exclusively responses or reported responses by others.

87.     Upon information and belief, Defendant Shivers and/or other OSU officials were aware of both the Rodriguez and Torres Videos prior to his suspension.

88.     Mr. Christensen took no action following his suspension that contributed to Defendant Shivers' finding or her decision to escalate his interim suspension directly to disenrollment.

89.     Defendant Shivers did not accuse Mr. Christensen of violating the terms of his suspension, or of failing to timely schedule a hearing with Director Smith, nor did she have any basis to make such an accusation.

90.     As Mr. Christensen's interim suspension had already barred him from campus or university events, Defendant Shivers' decision to immediately disenroll Mr. Christensen served no safety interest that was not already served by his suspension and upcoming hearing.

91.     Therefore, the decision to disenroll Mr. Christensen immediately was based entirely on responses to his speech. In other words, Defendants yielded to a heckler's veto.

92.     Defendant Shivers made no effort to discuss the Rodriguez Video or the Torres Video with Mr. Christensen prior to disenrolling him.

93.     Defendant Shivers made no effort to discuss with Mr. Christensen the substance of any of the "myriad" complaints against him, so as to offer him an opportunity to respond, prior to disenrolling him.

94.     Defendant Shivers did not give Mr. Christensen notice of any particular allegations of wrongdoing that had been made in the "myriad" complaints but stated only that the complaints "express[ed] fear of violence and for their personal safety based on your social media posts."

95.     At no time prior to Mr. Christensen's disenrollment did Defendant Shivers, Defendant Carter, or any other OSU official afford Mr. Christensen any opportunity to be heard in his own defense, in any form.

96.     At no time did Defendant Shivers, Defendant Carter, or any other OSU official afford Mr. Christensen the opportunity to contest the allegation that his presence posed a significant risk of substantial harm to the community.

97.     Defendant Shivers also did not offer Mr. Christensen an opportunity to contest her determination even after his disenrollment. Rather, Defendant Shivers' letter stated that Mr. Christensen could petition her for revision of his disenrollment status, but that the petition must include documents or evidence demonstrating that the "conditions found to have existed" that resulted in disenrollment "no longer exist and will not recur."

98.     Upon information and belief, within a few days of disenrolling Mr. Christensen, Defendant Carter, Defendant Shivers, and/or other OSU officials informed individuals or groups who had complained about Mr. Christensen that he was no longer an OSU student.

99.     That information, in conjunction with the complaints, was sufficient to convey the message that Defendants had disenrolled Mr. Christensen.

100.    That information was widely circulated on social media. On June 8, 2025, StopAntisemitism and other antisemitism watchdog groups shared and celebrated the fact that Defendants had disenrolled Mr. Christensen.

101.    That day, StopAntisemitism posted a screenshot of a message from an unspecified source stating that the source "wanted to follow up with you * * * to assure you that the university

took action immediately upon becoming aware of this serious situation," and that "[t]he individual you have reported is no longer enrolled at The Ohio State University."[19]

102.    Upon information and belief, and to all appearances, that message came from an OSU official.

## OSU Continued to Deny Mr. Christensen a Meaningful Opportunity to Defend Himself After His Disenrollment

103.    On June 2, 2025, Mr. Christensen emailed Director Smith to ask her to send a Zoom link for his previously-scheduled June 5 meeting with her. Director Smith responded that their meeting would not proceed because "you have been administratively disenrolled under Section 3355-23-21 of the Code, which is a different process."

104.    When Mr. Christensen asked what his options were, Director Smith stated that Mr. Christensen's only path forward was to request consideration for reenrollment under the terms described in Defendant Shivers' May 30 letter.

105.    On June 23, 2025, Mr. Christensen submitted a petition for re-enrollment. Mr. Christensen's petition explained, among other things, that the Rodriguez Video and Torres Video were protected by the First Amendment, and that his disenrollment violated his constitutional rights and OSU's Code of Student Conduct.

106.    Mr. Christensen's petition also explained that he had never posed a significant risk of substantial harm to himself or others.

107.    Defendant Shivers rejected Mr. Christensen's petition on the basis that it amounted to "a disagreement on" whether Mr. Christensen's actions constituted a significant risk of substantial harm to health and safety, "instead of providing evidence of a change in conditions."

---

[19] @StopAntisemites, X (Jun. 8, 2025, 9:40 PM), https://x.com/StopAntisemites/status/1931889139483607244/.

108.    Defendant Shivers' rejection letter thus confirmed that Mr. Christensen would be afforded no opportunity to contest the accusations against him, or the university's disenrollment decision.

109.    Defendant Shivers' rejection letter stated that Mr. Christensen "remains welcome to further reflect" and submit a petition demonstrating that he "no longer poses a significant risk of substantial harm to himself or others[.]"

## CAUSES OF ACTION

### COUNT ONE: RETALIATION
**Pursuant to 42 U.S.C. § 1983, Retaliation for Speech Protected by the First Amendment**

110.    Mr. Christensen incorporates the facts alleged in all preceding paragraphs as though fully set forth herein.

111.    "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). *See also, e.g.*, *Matal v. Tam*, 582 U.S. 218, 223 (2017) ("Speech may not be banned on the ground that it expresses ideas that offend.").

112.    Under the First Amendment, it is clearly established that "viewpoint discrimination is … an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or the perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

113.    Mr. Christensen's statements expressed in the Rodriguez Video and Torres Video were protected by the First Amendment.

114. The statements in these videos are pure political speech, comprising his opinions on matters of public concern. They are not targeted harassment, incitement to violence, or true threats, nor do they demonstrate that Mr. Christensen constituted a significant risk of substantial harm to the safety of the university community.

115. "[E]ven if … speech is deeply offensive to members of the school community and may cause a disruption, the school cannot punish the student who spoke out; that would be a heckler's veto." *Mahanoy Area Sch. Dist. v. B.L. by and through Levy*, 594 U.S. 180, 206 (2021) (Alito, J., concurring) (cleaned up). "This is true even if the student's off-premises speech on a matter of public concern is intemperate and crude." *Id.*

116. Defendants' disenrollment of Mr. Christensen constituted adverse action against him, sufficient to deter a person of ordinary firmness from continuing to engage in that conduct.

117. Defendants' adverse action was motivated at least in part by Mr. Christensen's protected speech.

118. As a direct result of the constitutional violations committed by Defendants, Mr. Christensen has suffered irreparable harm and will continue to suffer harm absent relief to which he is entitled under the United States Constitution and 42 U.S.C. § 1983.

### COUNT TWO: PROCEDURAL DUE PROCESS
**Pursuant to 42 U.S.C. § 1983, Violation of Fourteenth Amendment Right to Due Process**

119. Mr. Christensen incorporates the facts alleged in all preceding paragraphs as though fully set forth herein.

120. The Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law." These protections extend to a student's interest in pursuing an education. *E.g.*, *Flaim v. Med. Coll. Of Ohio*, 418 F.3d 629, 633–34 (6th Cir. 2005).

121.    Due process requires notice and an opportunity to be heard. Indeed, "[t]he fundamental requisite of due process is the opportunity to be heard." *Goss v. Lopez*, 419 U.S. 565, 579 (1975) (internal citation omitted).

122.    Defendants denied Mr. Christensen appropriate notice and/or a meaningful opportunity to be heard.

123.    Defendants' disenrollment of Mr. Christensen without a meaningful opportunity to be heard violated his right to due process.

124.    As a direct result of the constitutional violations committed by Defendants, Mr. Christensen has suffered irreparable harm and will continue to suffer harm absent relief to which he is entitled under the United States Constitution and 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

Plaintiff Guy Christensen demands judgment in his favor and against Defendants as follows:

1.    A declaration by this Court that:

   a.    Mr. Christensen's speech, for which Defendants disenrolled him from the Ohio State University, was protected by the First Amendment;

   b.    Defendants' disenrollment of Mr. Christensen therefore constituted a violation of his First Amendment rights;

   c.    Mr. Christensen was entitled to timely notice and opportunity to be heard in connection with any deprivation of his interest in continuing to pursue an education at OSU, and Defendants failed to provide the requisite notice and opportunity to be heard;

d.    Defendants' deprivation of Mr. Christensen's interest in continuing his
education constituted a violation of his Fourteenth Amendment due process
rights.

2.    Entry of preliminary and permanent injunctive relief, expunging from Mr.
Christensen's student records any representation that he violated the Code of Student Conduct,
committed any disciplinary infraction, or presented a risk to university safety; and restraining and
enjoining Defendants from making any such representation by way of Mr. Christensen's student
records or other communications.

3.    Costs, expenses, and reasonable attorneys' fees under 42 U.S.C. § 1988(b) and
other applicable law; and

4.    Any further relief this Court deems just, necessary, or appropriate.

Dated: September 17, 2025

Respectfully submitted,

/s/ David J. Carey
David J. Carey          (0088787)          Freda J. Levenson      (0045916)
Carlen Zhang-D'Souza (0093079)             Amy Gilbert            (0100887)
ACLU of Ohio Foundation, Inc.              ACLU of Ohio Foundation, Inc.
1108 City Park Avenue, Suite 203           4506 Chester Avenue
Columbus, Ohio 43206                       Cleveland, Ohio 44103
(380) 215-1972                             (216) 541-1376 (Levenson)
dcarey@acluohio.org                        (216) 770-6704 (Gilbert)
czhangdsouza@acluohio.org                  flevenson@acluohio.org
                                           agilbert@acluohio.org


*Counsel for Plaintiff Guy Christensen*