## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| GUY CHRISTENSEN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:25-cv-1062 |
| | ) | |
| v. | ) | Judge Sargus |
| | ) | Magistrate Judge Vascura |
| WALTER CARTER JR., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

## PLAINTIFF GUY CHRISTENSEN'S
## MOTION FOR PRELIMINARY INJUNCTION

---

Pursuant to Fed. R. Civ. P. 65, Plaintiff Guy Christensen hereby moves this court for a preliminary injunction requiring that Defendants expunge any mention of involuntary disenrollment from his academic transcript at the Ohio State University, and enjoining Defendants from making any equivalent representation through academic records or other means. This motion is based on the attached memorandum of law and Plaintiff Christensen's supporting declaration.

Plaintiff requests that this Court waive bond. *See, e.g.*, *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (district courts have discretion to waive bond); *Planned Parenthood Southwest Ohio Reg. v. Yost*, 2019 WL 1305762, at *4 (S.D. Ohio Mar. 21, 2019) (same).

Dated: September 19, 2025

Respectfully submitted,

/s/ David J. Carey
David J. Carey        (0088787)
Carlen Zhang-D'Souza (0093079)*
ACLU of Ohio Foundation, Inc.
1108 City Park Avenue, Suite 203
Columbus, Ohio 43206
(380) 215-1972
dcarey@acluohio.org
czhangdsouza@acluohio.org

Freda J. Levenson      (0045916)
Amy Gilbert          (0100887)
ACLU of Ohio Foundation, Inc.
4506 Chester Avenue
Cleveland, Ohio 44103
(216) 541-1376 (Levenson)
(216) 770-6704 (Gilbert)
flevenson@acluohio.org
agilbert@acluohio.org

*Admitted *pro hac vice*

*Counsel for Plaintiff Guy Christensen*

ii

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| GUY CHRISTENSEN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:25-cv-1062 |
| | ) | |
| v. | ) | Judge Sargus |
| | ) | Magistrate Judge Vascura |
| WALTER CARTER JR., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ vi

INTRODUCTION .......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 3

I.   Plaintiff Guy Christensen Is a University Student and Political Activist for Palestinian Rights .......................................................................................................................... 3

II.   Mr. Christensen Made No Threats or Incitement to Violence, But Voiced Controversial Political Opinions ...................................................................................................... 4

    A.   The Rodriguez Video ....................................................................................... 5

    B.   The Torres Video ............................................................................................. 7

III.  OSU Suspended Mr. Christensen After Public Criticism, and Scheduled a Hearing ......................................................................................... 9

IV.  Citing Responses of Others, OSU Canceled Mr. Christensen's Hearing and Summarily Disenrolled Him ........................................................................................................ 10

V.   OSU Refused Mr. Christensen a Post-Expulsion Hearing, Instead Inviting Him to "Reflect" on His Political Opinions ...................................................................... 13

VI.  OSU Has Placed a Notation on Mr. Christensen's Transcript .......................... 14

ARGUMENT ................................................................................................................ 15

I.   Mr. Christensen Has a Substantial Likelihood of Success on the Merits of His First Amendment Retaliation Claim ............................................................................... 15

    A.   The Rodriguez Video Does Not Constitute Incitement .............................. 16

The first element of retaliation is met because the Rodriguez and Torres Videos are protected speech. OSU is bound by the First Amendment and cannot discriminate against speech because of its message. *E.g.*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995); *Diei v. Boyd*, 116 F. 4th 637, 645 (6th Cir. 2024). OSU must rely on a specific exception to First Amendment protection. *E.g.*, *Sandul v. Larion*, 119 F.3d 1250, 1256 (6th Cir. 1997).

Contrary to Defendants' contention, the Rodriguez Video does not meet the test for incitement to unlawful violence, which requires: (1) the speech encourages violence or lawless action, (2) the speaker intends such action, and (3) such action is likely the imminent result of the speech. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 246 (6th Cir. 2015) (en banc). First, the video does not contain the requisite specific call to violence. Even if one were to construe it as advocating for violence at an indefinite future time—which it does not—that would not be enough. *Higgins v. Ky. Sports Radio, LLC*, 951 F.3d 728, 737 (6th Cir. 2020); *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 928 (1982). Plaintiff also neutralized any inciting tendencies of his words with subsequent statements. *See Nwanguma v. Trump*, 903 F.3d 604, 609–612 (6th Cir. 2018). Second, those statements and Plaintiff's declaration establish absence of intent. Third, imminent lawless action is not likely to result from a TikTok video to a general audience with no specific call to action.

B.   The Torres Video Does Not Contain A True Threat .................................................... 19

The Torres Video does not constitute a true threat, contrary to Congressman Torres' claims cited by OSU. Harsh and vulgar criticism of government officials is core protected speech. *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964); *McCurdy v. Montgomery Cty.*, 240 F.3d 512, 520 (6th Cir. 2001). Speech is not a true threat unless it meets both (1) a subjective mental element of recklessness and (2) an objective criterion that a reasonable observer would take it to be a threat. *Counterman v. Colorado*, 600 U.S. 66, 98 (2023); *United States v. Craft*, No. 23-5706, 2024 WL 5003231, at *4 (6th Cir. Dec. 6, 2024). The Torres Video does not meet either test. Objectively, its plain language demonstrates that it is mere criticism, even looking specifically to the out-of-context language cited by Rep. Torres. *Watts v. United States*, 394 U.S. 705, 706–08 (1969). Plaintiff also lacked the requisite mental state, as demonstrated by his words, his contemporaneous clarifying statements, and his declaration testimony.

C.   Neither the Rodriguez Video Nor the Torres Video Is Punishable on the Basis of Disruption ....................................................................................................................... 22

OSU could not punish Plaintiff based on any purported material disruption to educational activities, primarily because disruption—a standard used for in-school speech at the K-12 level— is not the proper inquiry. First, as a university student, Plaintiff enjoyed much greater leeway for speech than a K-12 student. *E.g.*, *Mahanoy Area Sch. Dist. v. B.L. by and through Levy*, 594 U.S. 180, 194 n.2 (2021) (Alito, J., concurring); *Diei v. Boyd*, 116 F. 4th 637, 645–46 (6th Cir. 2024). Unlike a K-12 or professional school, OSU has no pedagogical interest in suppressing speech merely because it is controversial; on the contrary, it has a strong interest in intellectual diversity. *Healy v. James*, 408 U.S. 169, 180 (1972); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967); Ohio Rev. Code § 3345.0217(A)(3), (B)(3).

Second, Plaintiff's speech occurred off campus, placing a much heavier burden on OSU to restrict it. Suppression of Plaintiff's speech off campus would prevent him from expressing it at any time or place; moreover, even K-12 schools have an interest in protecting unpopular expression. *Mahanoy*, 594 U.S. at 190; *Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 357 (6th Cir. 2023). Third, his speech was not directed to OSU, and is on a matter of public concern. Off campus, such speech is "almost always beyond" schools' regulatory authority even in K-12. *Mahanoy*, 594 U.S. at 205 (Alito, J., concurring); *Kutchinski*, 69 F.4th at 357–58 (K-12 schools "generally cannot regulate" such speech). Moreover, to punish speech because of complaints by others is a heckler's veto. Speech meeting the above characteristics is not punishable on that basis. *Mahanoy*, 594 U.S. at 206 (Alito, J., concurring).

Finally, even if the material disruption standard used for K-12 in-school speech somehow applied here, the mere complaints of offensiveness cited by OSU are not enough, even if they were presented in safety-related terms. *C1.G on behalf of C.G. v. Siegfried*, 38 F.4th 1270, 1278–79 (10th Cir. 2022); *Doe v. Univ. of Massachusetts*, 145 F.4th 158, 172 (1st Cir. 2025).

D.   OSU Cannot Punish Mr. Christensen as a "Significant Risk of Substantial Harm" Based on Political Speech Alone ........................................................................................ 26

The Rodriguez and Torres Videos are pure political speech directed to the community at large through generally accepted modes of communication. Such speech cannot subject Plaintiff

to punishment for creating a "risk" of "harm," as Defendants claim. *See Gartenberg v. Cooper Union for the Advancement of Sci. and Art*, 765 F. Supp. 3d 245, 264–65, 271–73 (S.D.N.Y. 2025). Where courts have upheld university discipline on the basis of such a risk, the university offered much more tangible evidence of a risk than mere political speech. *See, e.g.*, *Mbawe v. Ferris State Univ.*, 751 F. App'x 832, 834–837 (6th Cir. 2018); *Martinson v. Regents of Univ. of Mich.*, 562 F. App'x 365, 367–69 (6th Cir. 2014).

E.   The Second and Third Elements of Retaliation Are Satisfied ....................................... 29

Disenrollment satisfies the second element of retaliation, *i.e.*, action sufficient to deter a person of ordinary firmness. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394, 397 (6th Cir. 1999); *Diei v. Boyd*, 116 F.4th 637, 647 (6th Cir. 2024). Defendant Shivers' letter disenrolling Plaintiff establishes a causal link between his disenrollment and his speech, satisfying the third element.

II.   Mr. Christensen Has a Substantial Likelihood of Success on the Merits of His Fourteenth Amendment Due Process Claim ............................................................................................. 30

University disenrollment invokes due process protections, including an opportunity to be heard. *Goss v. Lopez*, 419 U.S. 565, 579 (1975); *Doe v. Miami Univ.*, 882 F.3d 579, 599 (6th Cir. 2018). "Before expelling [Plaintiff] for disciplinary reasons," OSU was required to provide him an opportunity to present his side of the story. *Ashiegbu v. Williams*, No. 97-3173, 1997 WL 720477, at *1 (6th Cir. Nov. 12, 1997). That must include a chance to "respond, explain, and defend." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005). OSU afforded Plaintiff no opportunity to be heard, of any kind, before his expulsion. Even afterwards he was afforded no such opportunity; Defendant Shivers expressly rejected his petition for re-enrollment on the basis that he attempted to defend himself rather than demonstrate a change in conditions.

III.   Mr. Christensen Will Suffer Irreparable Harm Absent Injunctive Relief......................... 32

Plaintiff has suffered loss of First Amendment freedom, which "unquestionably constitutes irreparable injury" even if brief, and including in the retaliation context. *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1489–90 (6th Cir. 1995) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989). He will also suffer irreparable harm from the notation on his transcript, as he plans to apply to a new university by February of 2026.

IV.   Balance of Harms and the Public Interest Weigh in Favor of an Injunction .................... 33

The third and fourth factors of the preliminary injunction inquiry hinge on likelihood of success on the merits. The public has a surpassing interest in protecting constitutional rights, and any harm to others is vastly outweighed by that interest. *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). Ohio law further recognizes that the public has a powerful interest in universities' protecting intellectual diversity. Ohio Rev. Code § 3345.0217(A)(2), (B)(3).

V.   The Relief Requested Is Available and Appropriate ........................................................ 34

Federal district courts have broad discretion to craft preliminary injunctions to meet the exigencies of a case. *Brown v. Yost*, 122 F.4th 597, 623 (6th Cir. 2024). Appropriate remedies

requested here include expungement of any relevant adverse notation in Plaintiff's academic records and enjoining OSU from communicating the same information by other means.

**CONCLUSION** ....................................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023) .................................................................................... 24

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) .................................................................................... 17

*Ashiegbu v. Williams*,
  No. 97-3173, 1997 WL 720477 (6th Cir. Nov. 12, 1997) ........................... 31

*Averett v. Hardy*,
  No. 23-5319, 2024 WL 5074868 (6th Cir. Dec. 11, 2024) ......................... 31

*Barnes v. Zaccari*,
  669 F.3d 1295 (11th Cir. 2012) .................................................................. 30

*Bart v. Telford*,
  677 F.2d 622 (7th Cir. 1982) ...................................................................... 29

*Bible Believers v. Wayne Cnty., Mich.*,
  805 F.3d 228 (6th Cir. 2015) .......................................................... 17, 18, 19

*Boos v. Barry*,
  485 U.S. 312 (1988) .................................................................................... 20

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969) .................................................................................... 17

*Brown v. Yost*,
  122 F.4th 597 (6th Cir. 2024) ..................................................................... 34

*C1.G on behalf of C.G. v. Siegfried*,
  38 F.4th 1270 (10th Cir. 2022) ................................................................... 26

*Cohen v. California*,
  403 U.S. 15 (1971) ................................................................................ 20, 25

*Counterman v. Colorado*,
  600 U.S. 66 (2023) ...................................................................................... 20

*D.T. v. Sumner Cty. Sch.*,
  942 F.3d 324 (6th Cir. 2019) ...................................................................... 15

*Dayton Area Visually Impaired Persons, Inc. v. Fisher*,
  70 F.3d 1474 (6th Cir. 1995) .......................................................... 32, 33, 34

*DeAngelis v. El Paso Mun. Police Officers Ass'n*,
  51 F.3d 591 (5th Cir. 1995) ........................................................................ 27

*Diei v. Boyd*,
  116 F.4th 637 (6th Cir. 2024) .............................................................. passim

*Doe v. Miami Univ.*,
  882 F.3d 579 (6th Cir. 2018) ...................................................................... 31

*Doe v. Ohio State Univ.*,
  136 F. Supp. 3d 854 (S.D. Ohio 2016) ....................................................... 31

*Doe v. Ohio State Univ.*,
  219 F. Supp. 3d 645 (S.D. Ohio 2016) ....................................................... 35

*Doe v. Ohio State Univ.*,
  239 F. Supp. 3d 1048 (S.D. Ohio 2017) ..................................................... 31

*Doe v. Univ. of Cincinnati*,
  872 F.3d 393 (6th Cir. 2017) ...................................................................... 31

*Doe v. Univ. of Mass.*,
    145 F.4th 158 (1st Cir. 2025) ............................................................... 26

*Elrod v. Burns*,
    427 U.S. 347 (1976) ............................................................................. 32

*Flaim v. Med. Coll. of Ohio*,
    418 F.3d 629 (6th Cir. 2005) ............................................................... 31

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*,
    23 F.3d 1071 (6th Cir. 1994) .......................................................... 33, 34

*Gartenberg v. Cooper Union for the Advancement of Sci. and Art*,
    765 F. Supp.3d 245 (S.D.N.Y. 2025) .............................................. 27, 28

*Gerber v. Herskovitz*,
    14 F.4th 500 (6th Cir. 2021) ............................................................... 25

*Goss v. Lopez*,
    419 U.S. 565 (1975) ............................................................................. 30

*Hamad v. Woodcrest Condo. Ass'n*,
    328 F.3d 224 (6th Cir. 2003) ............................................................... 15

*Healy v. James*,
    408 U.S. 169 (1972) ........................................................................ 23, 33

*Hess v. Bd. of Trustees of Southern Ill. Univ.*,
    839 F.3d 668 (7th Cir. 2016) ............................................................... 29

*Hess v. Indiana*,
    414 U.S. 105 (1973) ............................................................................. 17

*Higgins v. Ky. Sports Radio, LLC*,
    951 F.3d 728 (6th Cir. 2020) ................................................... 17, 18, 19

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988) ............................................................................... 20

*Keefe v. Adams*,
    840 F.3d 523 (8th Cir. 2016) ............................................................... 28

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967) ............................................................................. 23

*Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist.*,
    69 F.4th 350 (6th Cir. 2023) ............................................................... 24

*Liberty Coins, LLC v. Goodman*,
    748 F.3d 682 (6th Cir. 2014) ............................................................... 33

*Mahanoy Area Sch. Dist. v. B.L. by and through Levy*,
    594 U.S. 180 (2021) ........................................................... 22, 23, 24, 25

*Martinson v. Regents of Univ. of Mich.*,
    562 F. App'x 365 (6th Cir. 2014) ........................................................ 28

*Matal v. Tam*,
    582 U.S. 218 (2017) ............................................................................. 25

*Mbawe v. Ferris State Univ.*,
    751 F. App'x 832 (6th Cir. 2018) ........................................................ 28

*McCurdy v. Montgomery Cty.*,
    240 F.3d 512 (6th Cir. 2001) ............................................................... 20

*McNeilly v. Land*,
    684 F.3d 6110 (6th Cir. 2012) ............................................................. 32

vii

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ................................................................................... 33

*N.A.A.C.P. v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982) ................................................................................... 17, 18

*New York Times v. Sullivan*,
   376 U.S. 254 (1964) ................................................................................... 20

*Newsom v. Norris*,
   888 F.2d 371 (6th Cir. 1989) ................................................................................... 32

*Noakes v. Univ. of Cincinnati*,
   No. 24-3388, 2024 WL 4579453 (6th Cir. Oct. 25, 2024) ................................................ 34

*Nwanguma v. Trump*,
   903 F.3d 604 (6th Cir. 2018) ................................................................................... 17, 18

*OPAWL – Building AAPI Feminist Leadership v. Yost*,
   118 F.4th 770 (6th Cir. 2024) ................................................................................... 32

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) ................................................................................... 16

*Sandul v. Larion*,
   119 F.3d 1250 (6th Cir. 1997) ................................................................................... 16

*Sentinel Trust Co. v. Namer*,
   No. 98-5183, 1998 WL 887287 (6th Cir. Dec. 9, 1998) ................................................ 34

*Shah v. Univ. of Tex. Southwestern Med. Sch.*,
   129 F. Supp. 3d 480 (N.D. Tex. 2015) ................................................................................... 34

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ................................................................................... 25

*Speech First, Inc. v. Schlissel*,
   939 F.3d 756 (6th Cir. 2019) ................................................................................... 29

*Sweezy v. State of N.H. by Wyman*,
   354 U.S. 234 (1957) ................................................................................... 23

*Texas v. Johnson*,
   491 U.S. 397 (1989) ................................................................................... 16

*Thaddeus-X v. Blatter*,
   175 F.3d 378 (6th Cir. 1999) ................................................................................... 15, 16, 29, 30

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969) ................................................................................... 22

*United Food & Com. Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*,
   163 F. 3d 341 (6th Cir. 1998) ................................................................................... 34

*United States v. Craft*,
   No. 23-5706, 2024 WL 5003231 (6th Cir. Dec. 6, 2024) ................................................ 20

*United States v. Doggart*,
   906 F.3d 506, 511 (6th Cir. 2018) ................................................................................... 20

*United States v. Williams*,
   553 U.S. 285 (2008) ................................................................................... 17

*Virginia v. Black*,
   538 U.S. 343 (2003) ................................................................................... 16

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1942) ................................................................................... 24

*Watts v. United States*,
    394 U.S. 705 (1969) ........................................................................................... 20, 21

*Yeasin v. Durham*,
    719 F. App'x 844 (10th Cir. 2018) ............................................................................ 28

*Yelling v. St. Vincent's Health Sys.*,
    82 F.4th 1329 (11th Cir. 2023) ................................................................................ 27

**Statutes**

Ohio Rev. Code § 3345.0217 ................................................................................ 23, 33

## INTRODUCTION

Shortly after Guy Christensen completed his freshman year, the Ohio State University expelled him without a hearing for voicing disfavored political opinions on TikTok.

OSU officials made little secret of their reasoning: some people were deeply offended by Mr. Christensen's political views, which he voiced to his millions of followers in posts on social media. Specifically, Mr. Christensen publicly withdrew his initial condemnation of the May 21, 2025 shooting of two Israeli embassy staffers in Washington, D.C., and issued a scathing denunciation of Congressman Ritchie Torres' positions on Zionism and the war in Gaza. His posts drew heated criticism. Antisemitism watchdog groups demanded that he be investigated or silenced. Senior officials in the Trump administration and other national political figures also weighed in, promising to do just that. After one social media activist discovered his OSU affiliation and disclosed it online, other activists launched a campaign to demand that OSU's president, Defendant Ted Carter, punish him.

Initially, OSU claimed that it would at least hear him out. But within a few short days, it reversed course and decided instead to expel him without any opportunity to defend himself in any fashion. By Defendant Senior Vice President Melissa Shivers' own account in her letter expelling Mr. Christensen, this abrupt escalation and rush to punishment came not because he had committed any new act, but because OSU was yielding to a heckler's veto. She cited Congressman Torres' statement that he had reported Mr. Christensen to law enforcement, and referred to unspecified members of the university community who had complained that his political views made them "fear … violence and for their personal safety[.]" In OSU officials' view, the objections of others were sufficient to adjudge Mr. Christensen a substantial "risk" to campus safety, warranting his summary expulsion.

OSU cannot point to any First Amendment exception or compelling interest to justify its actions. Mr. Christensen's social media posts were recorded and published off campus, during the summer, through perfectly acceptable channels of public discourse. He made no threats and said nothing amounting to incitement of unlawful violence. He did not so much as mention OSU, much less target or harass any member of the campus community. In short, OSU simply decided that Mr. Christensen's pure political speech was so offensive that it could not be expressed *anywhere* through *any* means while he was enrolled as an OSU student.

OSU is Ohio's flagship public university. It is bound by S.B. 1, the Ohio General Assembly's recent legislation avowedly protecting "the fullest degree of intellectual diversity." Its treatment of Mr. Christensen reduces that lofty stated value to an ironic punch line. More to the point for immediate purposes, OSU is bound by the Constitution. Expelling Mr. Christensen violated his First Amendment right to express his political views, and denying him any opportunity to defend himself violated his Fourteenth Amendment right to due process.

Mr. Christensen does not wish to return to OSU after his treatment there, but he does seek to continue his career without the stain of an unconstitutional disenrollment on his record. In the near term, he plans to apply to a new university before its application deadline in February of 2026. He seeks preliminary injunctive relief expunging from his OSU transcript any notation signifying his involuntary disenrollment or OSU's reasons for it, and enjoining Defendants from making any equivalent representation through academic records or other means.

## STATEMENT OF FACTS

I.  **Plaintiff Guy Christensen Is a University Student and Political Activist for Palestinian Rights**

In the fall of 2024, Plaintiff Guy Christensen enrolled at the Ohio State University (OSU) as an undergraduate. Declaration of Guy Christensen ("Christensen Decl.") at ¶ 2.[1] By the time he enrolled at OSU, Mr. Christensen had already established a substantial presence and considerable online following as a political activist and social media influencer. He identifies himself as a strong supporter of the movement for Palestinian liberation and focuses his commentary and activism on that movement. He is a passionate and vociferous critic of Zionism and of Israel's conduct in the war in Gaza—and at times, levels criticisms at public figures or organizations who stand opposed to his positions on those matters. Across a range of platforms including TikTok, X (formerly Twitter), Instagram, and Substack, Mr. Christensen routinely posts videos of himself commenting on Palestinian rights, the Israel-Palestine conflict, and related subjects. He also uses his platforms for charitable work, such as by raising funds for Palestinians in Gaza who have been displaced over the course of the war. *Id.* at ¶¶ 3–7. By the end of his freshman year, his social media following exceeded three million on TikTok alone. *Id.* at ¶ 7. He had hoped his studies at OSU would deepen his substantive knowledge of political science and the Israel-Palestine conflict and help him develop the skills to further expand his reach as a professional activist and influencer. *Id.* at ¶ 12.

As a vocal commentator on such controversial subject matter, Mr. Christensen is certainly no stranger to vigorous disagreement and fierce criticism. As an OSU student, he did not shy away

---

[1] The Declaration of Guy Christensen includes several video exhibits, which cannot be filed using this Court's CM/ECF system. A motion for leave to manually file video exhibits is being filed concurrently with this motion. Should the Court grant leave, Plaintiff will manually deliver a flash drive containing these video exhibits and serve copies on counsel for all parties. In the meantime, the Declaration contains links to online versions of the same videos for the Court's convenience.

from voicing his opinions in appropriate forums, which could lead to intense—but civil—classroom debate. *Id.* at ¶ 12. He believes that his ability to have a political impact rests, above all, on his online platform. Recognizing that he may be targeted for his activism, he is careful to avoid publicizing much personal information on the social media accounts that he uses for political commentary. While he was a student at OSU, he refrained from mentioning his OSU affiliation on social media, and he has no reason to believe that it was widely known. *Id.* at ¶ 9–10. For much the same reason, he avoided any campus demonstration that might veer into unlawful behavior, and took precautions to make sure he did not inadvertently break campus rules. *Id.* at ¶¶ 13–15.

Over the course of his freshman year at OSU, Mr. Christensen maintained good academic standing, including being named to the Dean's List in his second semester. To the best of his knowledge, he was never accused of any disciplinary infraction. *Id.* at ¶¶ 2, 15. At the end of the semester—at or around the end of April 2025—he left OSU's campus, and the state, for the summer. He did not plan to return until the fall. *Id.* at ¶ 16.

## II. Mr. Christensen Made No Threats or Incitement to Violence, But Voiced Controversial Political Opinions

Officials at OSU, including Defendants, have identified only two statements or actions by Mr. Christensen—as opposed to responses by others—that played any role in his suspension and disenrollment: the Rodriguez Video and the Torres Video. Both were social media posts that he released on TikTok on May 22, 2025. Both were recorded and released off campus and outside of any OSU facility—indeed, outside of Ohio. *Id.* at ¶¶ 20, 27. Both were recorded and released outside of the regular academic year, during the summer. *Id.*; *id.* at ¶ 16. Neither includes any mention of OSU or any OSU administrator, student, faculty member, staff member, student organization or group, other campus organization or group, alumnus/a, parent, or other member of the OSU community. *Id.* at ¶¶ 20, 27; *see* Christensen Decl. Exs. 2–3.

Further, neither the Rodriguez Video nor the Torres Video contains any express or implicit call to unlawful violence, nor any threat that Mr. Christensen intends to, or even might, commit unlawful violence. Christensen Decl. Exs. 2–3. Mr. Christensen subsequently clarified, and now avers again, that he did not intend for them to convey any such threat or incitement. Christensen Decl. at ¶¶ 21, 28; Christensen Decl. Exs. 4–5.

    A.   <u>The Rodriguez Video</u>

On May 21, 2025, gunman Elias Rodriguez murdered two employees of the Israeli embassy in Washington, D.C. The victims were killed as they exited an event hosted by the American Jewish Committee at the Capital Jewish Museum in Washington. Rodriguez reportedly chanted "free, free Palestine" immediately after the shooting.[2] Within hours, authorities announced that the shooting was being investigated as a possible hate crime.[3] A manifesto purportedly written by Rodriguez was posted on X on the evening of the shooting.[4]

Mr. Christensen's first response was to condemn the shooting, "for some obvious reasons and for some reasons that are not so obvious." *See* Christensen Decl. ¶ 18 & Ex. 1. He stated in that video that "I don't support the slaughter of civilians. That's not the way to go about it and bring justice." Christensen Decl. Ex. 1. He explained that he believed Rodriguez's victims "deserve to be tried and punished and sentenced to jail for their facilitation of this genocide and Israel's many, many, many crimes." But, he explained, he believed that the shooting would provide the "Trump regime" with a "pretext to violently crack down on the [Palestinian liberation]

---

[2] *See, e.g.*, Andrew Jeong, et al.*, Two Israeli Embassy staffers killed in shooting near Jewish Museum in D.C.*, WASHINGTON POST (May 22, 2025), https://www.washingtonpost.com/dc-md-va/2025/05/21/dc-shooting-capital-jewish-museum/.
[3] *Id.*
[4] Julie Bosman*, Suspect in Shooting of Israeli Embassy Staff in Washington, D.C., Had Protested for Palestinian Rights*, NY TIMES (May 22, 2025),
https://www.nytimes.com/2025/05/22/us/politics/israeli-embassy-shooting-suspect.html.

movement within this country," which Mr. Christensen analogized to the Nazi regime's *Kristallnacht* attacks after the assassination of a German diplomat by a Jewish activist. *Id.*

Later that day, Mr. Christensen released the Rodriguez Video. There he echoed many of the same sentiments but withdrew his condemnation of Rodriguez. Christensen Decl. Ex. 2 (the Rodriguez Video). He stated that in his opinion, Rodriguez was not motivated by antisemitism. *Id.* ("He targeted these two because of their connection to the state of Israel. Because they are Zionists, not because they are Jews."). He further stated that in his opinion, Rodriguez was "not a terrorist. He's a resistance fighter. And the fact is that the fight against Israel's war machine, against their genocide machine, against their criminality, includes their foreign diplomats in this country and internationally." *Id.* He restated his belief that the shooting "is being used to weaponize violence against the [Palestinian rights] movement. But we will meet it with our own greater resistance and escalation." He read Rodriguez's manifesto, voiced agreement with it, and concluded:

> You might have seen my update early this morning where I condemn this attack. And I reaffirm that I had a change of perspective after hearing critiques from people in the movement. It is like as they said, I am condemning Luke Skywalker for attacking the Death Star because the Empire might crack down the Resistance. And while my point is that this attack will be used for a crackdown on the movement in the coming days, they're right. We must meet with escalation and stronger resistance. I hope my retracted condemnation does not allow our government to condemn me to a cell. But I don't know. Follow my page for more. Thank you and Free Palestine.

*Id.*

The following day, May 23, Mr. Christensen released a short video responding to criticism of the Rodriguez Video and further clarifying his meaning. *See* Christensen Decl. Ex. 4 ("Since Zionists on Twitter are going rabid over what I just posted"). He stated that he "would never make a threat," as to do so would "jeopardize my position to influence and educate people about the atrocity and evils that Zionism is currently bringing down upon the Palestinian people, especially in Gaza." *Id.*

That same day, the New York Post published a similar response from Mr. Christensen: "Christensen, asked by The Post if this could be interpreted as saying he supports the killing of the victims, replied, 'I think the only people who are interpreting [that] as such are the people' who are using the slayings of 'those two Zionist officials … as a pretense to silence critics of Israel.'"[5] The same article described Mr. Christensen as "a college freshman who refused to say where he goes to school[.]" *See also* Christensen Decl. at ¶ 35.

B.    The Torres Video

Also on May 22, Mr. Christensen released a video comprising political criticism of Congressman Ritchie Torres (D-NY), in vivid, harsh, and at times, vulgar terms. *See* Christensen Decl. Ex. 3. Mr. Christensen denounced Rep. Torres' position that the conflict in Gaza did not constitute "genocide," as well as Rep. Torres' affiliations with a prominent pro-Israeli lobbying group, the American Israel Public Affairs Committee (AIPAC), with Israeli public figures, and with the Zionist movement more generally:

> Today, an AIPAC millionaire, an elected official, Ritchie Torres announced "There's no genocide in South Africa. There is no genocide in Gaza. Stop debasing the term 'genocide' by using it as ideological warfare." Now Ritchie, screenshots are forever and what you've said and done will haunt your family for eternity as you will eventually, if you're still alive, end up in a Nuremburg trial[] for all the elected officials in America who facilitated and protected this genocide. How many children have to die before the AIPAC money is outweighed by the crimes?
>
> *        *        *
>
> [T]he UN calls it a genocide. Amnesty International calls it a genocide. Genocide scholars and historians across the world have come to a consensus at this point that it's a genocide. Even Israeli ones, who say that the only genocide scholars who don't label it a genocide are those whose work they do not respect at all. Ritchie,

---

[5] Kate Sheehy, *Baby-faced anti-Israel teen urges his 1M followers to support suspected DC terrorist in rant so vile TikTok pulled it —then doubles down on hate*, NY POST (May 23, 2025), https://nypost.com/2025/05/23/usnews/baby-faced-anti-israel-teen-urges-his-1m-followers-to-support-suspected-dc-terrorist-in-rant-so-vile-tiktok-pulled-it-then-doubles-down-on-hate/ [https://perma.cc/NEE2-GX4E].

even the Lemkin Institute for Genocide Studies says it's a genocide. Do you know who founded that? The man who coined the term genocide. But should we expect to see anything less than this out of our corrupted and captured political system here in the United States? Both parties have been captured by corporate interests. Ritchie has been captured by Zionist ones, like 99% of the rest of Democrats.

\* \* \*

He flew to Israel to meet Yoav Gallant, the Israeli official who said, "We are fighting human animals," and he ordered the initial total siege on Gaza to starve out the people there. Two million people in mass punishment, mass starvation, that off the bat put Israel in violation of international law. He has an open arrest warrant against him from the ICC. But we don't talk about that. Ritchie's gonna keep on meeting and sucking off the Zionist officials who are wanted for war crimes. So shame on Ritchie. He is a Zionist scumbag. And I hope that the money he sleeps on at night stains his pajamas blood red. Thank you and Free Palestine.

*Id.*

Several days later, on May 27, Mr. Christensen released a further explanation and clarification of the Torres Video. *See* Christensen Decl. Ex. 5. As discussed below, Rep. Torres had denounced Mr. Christensen as "antisemitic," and had accused Mr. Christensen of making threats, based on his statement in the Torres Video that "you will eventually, if you're still alive, end up in a Nuremburg trial[.]" Mr. Christensen elaborated further in his May 27 video, denying both allegations:

> So when I made a video about Ritchie and how he has taken blood-stained money and raised awareness about the criminals who are in our government, he took notice. And he spent the last week slandering me as an antisemite, which is a claim that has no backing. There is no truth behind it whatsoever. Anybody who knows who I am, has heard what I have to say online, knows that I don't have any problem with Jewish people. At all. Nothing. Nothing.
>
> Now in complete honesty I thought it was kind of funny watching Ritchie freak out over what I had posted about him. His libel against me didn't bother me. But just an hour ago he went to the New York shitpost and gave them the scoop on how he's siccing the Capitol Police after me to investigate me for supposed threats of violence. Another claim which has no truth to it. In my video, and this is what he twists up, I say "Now Ritchie, screen shots last forever. What you have done will haunt your family for eternity. And if you are still alive you will end up in a Nuremburg trial." The meaning behind that is pretty obvious. I'm saying that when justice comes for Palestine, if Ritchie is still alive, meaning not old, and dead, and

deceased or whatever, he will end up in the court alongside the rest of the people there. But there's some people, especially in our government, who are way too old that I don't expect to see at a Nuremburg trial. Like Joe Biden, has cancer, who unfortunately won't be alive by the time justice reaches the Palestinian people. And he won't have his day in court. That's an example of somebody who won't be alive to end up in a Nuremberg trial. And that's all I meant by that.

\*        \*        \*

This is utterly ridiculous. \* \* \* Anyone who sees my content knows that I do not incite violence, I do not tell anyone to make threats. I do not want anyone to make threats. Why would I call for people to make threats? All that would do is jeopardize my platform. I'm nonviolent.

*Id.*

### III.  OSU Suspended Mr. Christensen After Public Criticism, and Scheduled a Hearing

Perhaps unsurprisingly given the sensitivity of the subject matter and Mr. Christensen's pointed positions, a number of individuals and groups took offense to the Rodriguez and Torres Videos. Criticism and denunciation, however, swiftly turned to calls by major political figures for Mr. Christensen to be investigated or punished for his opinions. OSU, as discussed further below, promptly complied.

On Friday, May 23, the watchdog group StopAntisemitism denounced the Rodriguez Video on social media as "not activism – it's incitement." Its post tagged—and thus alerted—the FBI, U.S. Attorney General Pam Bondi, and Senior Counsel to the Assistant Attorney General for Civil Rights Leo Terrell, the latter of whom leads the Trump administration's multi-agency Task Force to Combat Anti-Semitism.[6] StopAntisemitism encouraged them all to "take a hard look at Guy Christensen."[7] They quickly announced their agreement: Mr. Terrell responded "Will review

---

[6] DEP'T OF JUST., OFF. OF PUB. AFF., *Justice Department Announces Formation of Task Force to Combat Anti-Semitism* (Feb. 3, 2025), https://www.justice.gov/opa/pr/justice-department-announces-formation-task-force-combat-anti-semitism (mission to "root out anti-Semitic harassment in schools and on college campuses").

[7] @StopAntisemites, X (May 23, 2025, 8:54 AM), https://x.com/StopAntisemites/status/1925898098720506339 [https://perma.cc/98TE-F85C].

all leads!"[8] Attorney General Bondi responded "THANKS LEO!"[9] Meanwhile, Mr. Christensen's identity and affiliation to OSU was discovered and disclosed online by a user on X. *See* Christensen Decl. at ¶ 36.

On Sunday, May 25, OSU delivered to Mr. Christensen an interim suspension. Christensen Decl. Exs. 6–7 (suspension letters). A letter signed by Associate Vice President Ryan Lovell informed Mr. Christensen that he was barred from campus and any OSU activity, on pain of potential "immediate arrest," based on Mr. Lovell's finding that "there is reasonable cause to believe your presence … poses a significant risk of substantial harm to the safety or security of yourself, others, or to property." Christensen Decl. Ex. 6. The interim suspension was to remain in effect until "the conclusion of the student conduct process, including any appeal[.]" *Id.* A second letter, signed by Director of Student Conduct Kelly Smith, instructed Mr. Christensen to make an appointment for a meeting with her. Christensen Decl. Ex. 7..

Mr. Christensen—who had no plans to return to campus over the summer in any event—complied with all instructions and scheduled a meeting by Zoom videoconference. Christensen Decl. ¶¶ 40–42 & Ex. 9.

## IV. <u>Citing Responses of Others, OSU Canceled Mr. Christensen's Hearing and Summarily Disenrolled Him</u>

Public criticism of the Rodriguez Video and Torres Video continued in the next several days after OSU suspended Mr. Christensen. Within less than a week—based on no new actions on Mr. Christensen's part, but only on the complaints of others—Defendants would elect to skip the disciplinary process and summarily disenroll him without any opportunity to be heard.

---

[8] Leo Terrell (@LeoTerrellDOJ), X (May 23, 2025, 12:32 PM),
https://x.com/LeoTerrellDOJ/status/1925953082199773267 [https://perma.cc/5UJF-M6N4].
[9] PamBondi (@PamBondi), X (May 23, 2025, 3:25 PM),
https://x.com/PamBondi/status/1925996602231058610 [https://perma.cc/4U9T-TVEC].

On May 26, Congressman Torres shared the Rodriguez Video on X in order to denounce it. He invited his followers to "[l]ook into the troubled soul of Guy Christensen—a man who defends the cold-blooded murder of an innocent young couple."[10] On May 27, Congressman Torres shared the Torres Video on X, calling Mr. Christensen "an unrepentant apologist for the murder of innocent Jews and Israelis" who "appears intent on inciting violence against anyone who dares to be pro-Israel." He described the Torres Video as containing "chilling menace," focusing on the out-of-context phrase "if you're still alive[.]"[11] Mr. Christensen, as noted above, responded with a clarification to remove any misperception that the Torres Video had contained any threat or incitement. *See supra*; Christensen Decl. Ex. 5. Nonetheless, the New York Post reported that Rep. Torres had requested that the U.S. Capitol Police investigate Mr. Christensen, on the basis that the words "if you're still alive" raised "serious concerns about" whether Mr. Christensen "is inciting violence or encouraging others to take action against me."[12]

Other critics on social media, having discovered Mr. Christensen's OSU affiliation, began a campaign to pressure OSU's administration to expel him. One account on Instagram under the name "endjewhatred"—which itself has no apparent OSU connection—called on its followers to write letters to Defendant Carter urging him to "act decisively to expel freshman Guy Christensen and refer him to law enforcement for investigation due to his antisemitic hate speech, explicit

---

[10] Ritchie Torres (@RitchieTorres), X (May 26, 2025, 8:31 PM), https://x.com/RitchieTorres/status/1927160782640295942 [https://perma.cc/2GFZ-ZMRF].
[11] Ritchie Torres (@RitchieTorres), X (May 27, 2025, 7:59 PM), https://x.com/RitchieTorres/status/1927515043001671929 [https://perma.cc/3EXA-7R64].
[12] Carl Campanile, *Ritchie Torres urges Capitol Police to probe baby-faced, anti-Israel social media star who urged support for terror suspect*, NY POST (May 27, 2025), https://nypost.com/2025/05/27/us-news/ritchie-torres-urges-capitol-police-to-probe-baby-faced-anti-israel-social-media-star-who-urged-support-for-terror-suspect/ [https://perma.cc/SNE4-3TGQ].

support for terrorism, and anti-American rhetoric."[13] Another activist, also with no apparent OSU affiliation, claimed to have complained to OSU and received a response from Defendant Carter describing the matter as a "serious situation" and assuring the complainant that "the university strongly condemns antisemitism" and "has processes that we follow to address allegations or reports of antisemitism or other violations of university rules[.]"[14]

Another United States Congressman, Brian Mast (R-FL) also publicly denounced Mr. Christensen, sharing Rep. Torres' call for a Capitol Police investigation and adding "[t]his isn't about left or right – antisemitism has no place in America."[15] StopAntisemitism, the group that had initially reported Mr. Christensen to the FBI and senior Department of Justice officials, named Mr. Christensen its "Antisemite of the Week" and urged its followers to "REPORT HIS X ACCOUNT."[16]

By May 30—just over a week after the Rodriguez and Torres Videos had been released, five days after OSU had suspended Mr. Christensen, and less than a week before his scheduled hearing—Defendant Shivers expelled him. On June 2, Mr. Christensen emailed Director of Student Conduct Kelly Smith to ask her for a Zoom link for their upcoming, previously-scheduled meeting. She responded that the meeting had been cancelled. *See* Christensen Decl. at ¶¶ 43–44 & Ex. 9. At no time prior to his disenrollment did Defendants or any other OSU officials afford Mr. Christensen an opportunity to defend himself or to be heard in any fashion. Neither Defendant

---

[13] @endjewhatred, INSTAGRAM (May 27, 2025),
https://www.instagram.com/reel/DKKvkerRkPp/?hl=en.
[14] Elchanan Poupko (@RabbiPoupko), X (May 27, 2025, 1:42 PM),
https://x.com/RabbiPoupko/status/1927420264305844513.
[15] Brian Mast (@RepBrianMast) X (May 29, 2025, 11:27 AM),
https://x.com/RepBrianMast/status/1928111054954844367 [https://perma.cc/HF8X-ST2Q].
[16] StopAntisemitism, *Antisemite of the Week: Guy Christensen* (May 30, 2025),
https://stopantisemitism.org/as-week/guy-christensen/ [https://perma.cc/NDM2-JJD3].

Shivers nor any other OSU official ever alleged that Mr. Christensen had failed to comply with the terms of his suspension.

Defendant Shivers' letter provides unambiguously that her decision to escalate from suspension to disenrollment was not a result of anything Mr. Christensen had done since his suspension. Rather, it was a response to the wave of public criticism. *See* Christensen Decl. Ex. 9. Her letter identifies three factors: (1) the fact that Rep. Torres had construed the Torres Video as a threat; (2) "myriad" communications, purportedly from OSU community members, expressing their "fear of violence and for their personal safety based on your social media posts," and (3) the unspecified "engagement" of unspecified "law enforcement jurisdictions" in the matter. *Id.* "Taken together" with the Rodriguez Video and the Torres Video, Defendant Shivers stated that these factors led her to find "clear and convincing evidence that your continued presence at the university poses a significant risk of substantial harm to the safety of the university community warranting your disenrollment." *Id.*

## V.   OSU Refused Mr. Christensen a Post-Expulsion Hearing, Instead Inviting Him to "Reflect" on His Political Opinions

Public criticism continued after Mr. Christensen's disenrollment. On June 1, StopAntisemitism called for Mr. Christensen to be removed from X.[17] In a June 2 appearance on Fox News, Anti-Defamation League CEO Jonathan Greenblatt hailed the Department of Justice for its "tough stance" on antisemitism, denounced Mr. Christensen by name, and called for him to be "stop[ped]."[18]

---

[17] @StopAntisemites, X (Jun. 1, 2025, 10:01 AM),
https://x.com/StopAntisemites/status/1929176419797516393 [https://perma.cc/8GE2-ZWKK].
[18] *ADL CEO condemns 'moral rot' on college campuses following Boulder terror attack,* Fox News, at 3:07 (Jun. 2, 2025), https://www.foxnews.com/video/6373797214112 ("whether it's social media influencers … or other … promoters of hate on YouTube and TikTok like Guy Christensen … we've got to stop it once and for all").

By June 8, news of Mr. Christensen's disenrollment had reached his critics. StopAntisemitism, among others, posted screenshots of messages that appeared to be from OSU officials, stating that the officials were "follow[ing] up" to share that Mr. Christensen was no longer enrolled at OSU.[19][20] StopAntisemitism credited Mothers Against College Antisemitism and Ohio State University Hillel for "exposing his presence and leading the charge." *Id.*

On June 23, Mr. Christensen submitted a petition for re-enrollment via counsel with Palestine Legal, as Defendant Shivers' letter had stated he could do. *See* Christensen Decl. Ex. 10. His petition, among other things, argued that he had never posed a threat to campus safety, and explained that his disenrollment violated his First and Fourteenth Amendment rights. *Id.*

Defendant Shivers rejected his petition. Christensen Decl. ¶ 47 & Ex. 11. She did so expressly on the basis that his petition amounted to an attempt to defend himself. Her rejection letter stated that Defendants would not entertain any attempt by Mr. Christensen to "disagree[]" with Defendant Shivers' finding that his "actions constituted a significant risk of substantial harm to health and safety." *Id.* Rather, he was required to provide "evidence of a change in conditions." *Id.* Defendant Shivers did not explain what "change in conditions" might be possible for Mr. Christensen—who, after all, had already published the speech that was the subject of discipline— but stated only that he was "welcome to further reflect" before submitting a petition again. *Id.*

## VI.    OSU Has Placed a Notation on Mr. Christensen's Transcript

OSU has placed a notation on Mr. Christensen's transcript, indicating that he was disenrolled on the basis of posing a risk to university safety. Christensen Decl. at ¶ 54. This notation poses a serious threat to his education prospects and future career. *Id.* at ¶ 55.

---

[19] @StopAntisemites, X (Jun. 8, 2025, 9:40 PM),
https://x.com/StopAntisemites/status/1931889139483607244/.
[20] @StopAntisemites, X (Jun. 8, 2025, 9:13 PM),
https://x.com/StopAntisemites/status/1931882255938371951 [https://perma.cc/GH7N-73K3].

Mr. Christensen now attends another university. *Id.* at ¶ 53. He anticipates, however, that he will soon apply to a different university abroad and will be required to provide his OSU transcript to that university. *Id.* at ¶ 54. Moreover, in addition to his concern about his transcript, he is concerned that OSU may represent by other means that Mr. Christensen was involuntarily disenrolled, and/or that he was found to constitute a risk to campus safety. *See id.* at ¶¶ 56–58.

## ARGUMENT

Four factors govern the Court's consideration of whether to grant a preliminary injunction: "(1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 230 (6th Cir. 2003) (internal citation omitted). District courts are to "weigh the strength of the four factors against one another." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019).

Each of these factors weighs strongly in favor of a preliminary injunction here. Moreover, the relief that Mr. Christensen seeks is appropriate in this context.

### I.   **Mr. Christensen Has a Substantial Likelihood of Success on the Merits of His First Amendment Retaliation Claim**

Retaliation, including for First Amendment protected speech, has three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Once a plaintiff has made an initial showing on the third element, the burden shifts to

15

the defendant to demonstrate "that he would have taken the same action in the absence of the protected activity." *Id.*

As discussed below, the Rodriguez Video and Torres Video are both protected by the First Amendment, satisfying the first prong of *Thaddeus-X*. The second prong is satisfied by Mr. Christensen's disenrollment, and Defendant Shivers' letter disenrolling him concedes the third prong conclusively.

A.  The Rodriguez Video Does Not Constitute Incitement

The government, including officials acting on behalf of a state university, "may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). *See also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional."). "This prohibition applies in the public-school setting—including public universities—as those entities are arms of the government." *Diei v. Boyd*, 116 F.4th 637, 645 (6th Cir. 2024) (internal citation omitted).

The government may restrict speech because of its content in only a few specifically delineated circumstances. *See, e.g.*, *Virginia v. Black*, 538 U.S. 343, 358–59 (2003); *Sandul v. Larion*, 119 F.3d 1250, 1256 (6th Cir. 1997) ("Sandul's First Amendment rights are guaranteed, absolute, and protected unless his speech falls within an exception"). Defendant Shivers' May 30, 2025 disenrollment letter attempts to invoke an exception to First Amendment protection by characterizing the Rodriguez Video as "inciting violence." *See* Christensen Decl. Ex. 8. Tellingly, however, her letter does not explain (1) what unlawful violence the Rodriguez Video was supposedly inciting, (2) by or against whom it was supposedly inciting violence, or (3) where or when such violence might possibly occur. It does not because it cannot: the Rodriguez Video does not constitute incitement to unlawful violence.

16

Advocacy may not be sanctioned as incitement unless it is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). The Sixth Circuit articulates the *Brandenburg* standard in three elements: "(1) the speech explicitly or implicitly encouraged the use of violence or lawless action, (2) the speaker intends that his speech will result in the use of violence or lawless action, and (3) the imminent use of violence or lawless action is the likely result of his speech." *Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 246 (6th Cir. 2015) (en banc); *accord Nwanguma v. Trump*, 903 F.3d 604, 609 (6th Cir. 2018). Importantly, even "advocacy of illegal action at some indefinite future time" lacks the particularity necessary to satisfy *Brandenburg*. *Higgins v. Ky. Sports Radio, LLC*, 951 F.3d 728, 737 (6th Cir. 2020) (citing *Hess v. Indiana*, 414 U.S. 105, 108 (1973)). "[T]he First Amendment protects endorsements of lawlessness that do not contain a specific call to action." *Id.* Even the "tendency of speech to encourage unlawful acts is not a sufficient reason for banning it," absent that specific call. *Bible Believers*, 805 F.3d at 245 (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002)). *See also, e.g.*, *United States v. Williams*, 553 U.S. 285, 298–99 (2008) ("[T]here remains an important distinction between a proposal to engage in illegal activity and the abstract advocacy of illegality."); *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 928 (1982) ("[T]he mere abstract teaching ... of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action") (internal citation omitted).

Controlling case law demonstrates that the bar for incitement is exceptionally high. In *Hess*, for example, a protester shouted "[w]e'll take the fucking street later (or again)" to a crowd at a protest, while sheriffs and deputies were attempting to clear the street. *Hess*, 414 U.S. at 107. In *Bible Believers*, a group of Christian speakers—one carrying a severed pig's head on a spike—

17

attended an Arab International Festival bearing messages such as "Islam is a Religion of Blood and Murder," "Turn or Burn," and "Your prophet is a pedophile." 805 F.3d at 238. In *Higgins*, radio station employees repeatedly aired and laughed at fans' abusive messages as part of a "trolling campaign" against a basketball referee, which escalated to the point where the referee received hundreds of threatening calls, his roofing business suffered, and he secured the protection of a bodyguard at a later game. 951 F.3d at 732–34. In *Nwanguma*, then-presidential candidate Donald Trump indicated a group of protesters at a political rally and stated five times to "get 'em out of here," after which audience members assaulted, pushed, shoved, and punched the protesters. 903 F.3d at 606. None of these instances qualified as incitement.

*Nwanguma* is especially illustrative. The statements at issue "may have encouraged the unlawful use of force in the ears of some supporters" and "did call for direct action," but "came only in response to a disturbance already underway and were addressed only to unidentified listeners in the crowd." *Higgins*, 951 F.3d at 737 (discussing *Nwanguma*, 903 F.3d at 610–12) (internal editing marks omitted). The Sixth Circuit also found that President Trump had "neutralized any inciting tendency of his words" by subsequently adding "don't hurt 'em." *Id.* (internal citations and editing marks omitted). Similarly, in *Higgins*, although the radio announcers did not "merit prizes for sensitivity and restraint, they did make at least six statements that discouraged the fans' conduct," which presented a "hurdle" for the claims against them. *Id.*

Especially against that backdrop, the Rodriguez Video falls squarely in the realm of protected speech. Even if it were construed as an endorsement of Rodriguez's violent acts, or an opinion that such violence might have been morally defensible or even necessary, that would not qualify it as incitement. *See Claiborne Hardware*, 458 U.S. at 928. It does not call for future violence, even abstractly. Even were one to construe words like "resistance" and "escalation" as

generalized advocacy for unlawful violence, they *still* would not be a "specific call" to identifiable, imminent lawlessness by an identifiable listener or group. *Higgins*, 951 F.3d at 737. If there were somehow any doubt remaining, Mr. Christensen subsequently "neutralized any inciting tendency" by his public clarifications, released within a few days and through the same medium as the original video. *Id.* (internal citations and editing marks omitted); *see* Christensen Decl. Exs. 4–5 (clarifications).

Moreover, even if the first element of *Brandenburg* were somehow met—contrary to decades of controlling precedent—the others are not. As Mr. Christensen stated contemporaneously and reaffirms here, his intent was to call for increased political activism or lawful resistance, not unlawful violence. *See* Christensen Decl. at ¶¶ 21–22. And it would beggar belief to suggest that "the imminent use of violence or lawless action is the likely result of" a TikTok video released to a general audience with no specific call to action. *Bible Believers*, 805 F.3d at 246. The Rodriguez Video meets none of the elements of incitement.

B.    The Torres Video Does Not Contain A True Threat

Next, Defendant Shivers' disenrollment letter claims that the Torres Video was "interpreted [by Rep. Torres] as a threat of violence" such that he "requested U.S. Capitol Police assistance." Christensen Decl. at Ex. 8. Again, tellingly, Defendant Shivers distances herself from Torres' interpretation of the video. She herself does not call the video a threat of violence. That is because the Torres Video contains no threat.

True, the Torres Video is replete with harsh criticism of Rep. Torres, some of which is in crude or graphic terms. But criticism of government officials, even where coarse or vulgar, is no peripheral matter for First Amendment protection; it is the heart of it. The First Amendment codifies "a profound national commitment to the principle that debate on public issues … may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and

19

public officials." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964). *See also McCurdy v. Montgomery Cty.*, 240 F.3d 512, 520 (6th Cir. 2001) ("Since the day the ink dried on the Bill of Rights, the right of an American citizen to criticize public officials and policies … is the central meaning of the First Amendment.") (cleaned up); *Cohen v. California*, 403 U.S. 15, 20 (1971) (profane political speech was protected). That is because "in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Boos v. Barry*, 485 U.S. 312, 322 (1988) (internal quotation marks omitted) (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988)).

Speech is not an actionable true threat unless it satisfies both (1) the subjective mental element of recklessness, that "a speaker [is] aware that others could regard his statements as threatening violence and deliver[s] them anyway[,]" *Counterman v. Colorado*, 600 U.S. 66, 98 (2023) (internal citations and editing marks omitted), and (2) the objective criterion that "a reasonable observer would take [the defendant's] words to be an authentic threat." *United States v. Craft*, No. 23-5706, 2024 WL 5003231, at *4 (6th Cir. Dec. 6, 2024) (post-*Counterman*, applying the two-part inquiry) (quoting *United States v. Doggart*, 906 F.3d 506, 511 (6th Cir. 2018)).

Heated criticism is not a true threat, nor is "political hyperbole." *Watts v. United States*, 394 U.S. 705, 708 (1969). Political criticism does not lose its protection by the fact that it is "often vituperative, abusive, and inexact." *Id.* Moreover, "statements that when taken in context do not convey a real possibility that violence will follow (say, 'I am going to kill you for showing up late')" are not true threats; rather, true threats are "serious expressions conveying that a speaker means to commit an act of unlawful violence." *Counterman*, 600 U.S. at 74 (cleaned up).

The plain language of the Torres Video could not lead a reasonable person to conclude that it contains a threat of violence—not even a vague or unserious one. Mr. Christensen is well within his rights to denounce Rep. Torres and to openly predict or hope that he will someday face prosecution. The brief aside "if you're still alive"—even if plucked out of the context of a minutes-long video—is not an expression of intent to harm Rep. Torres, either veiled or explicit. That is even clearer in the context of the rest of that sentence, in which Mr. Christensen predicts and hopes that "eventually" Rep. Torres will face a trial. *See* Christensen Decl. Ex. 3; *id.* at ¶¶ 29–30. Nothing in the Torres Video can be remotely construed as a suggestion that Mr. Christensen might personally harm Rep. Torres. *See, e.g.*, *Watts*, 394 U.S. at 706 (First Amendment protected a Vietnam War draftee's statement, "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J."). That analysis is unchanged by Rep. Torres' personal reaction to the video, including his choice to report it to the Capitol Police. The recipient of extended and scathing criticism is hardly positioned to offer an unbiased assessment; his subjective opinion is not a substitute for an objective reasonable person's assessment.

Moreover, as with the Rodriguez Video, Mr. Christensen subsequently confirmed that he intended no threat or incitement and offers consistent testimony to that effect here, including that he had no knowledge that anyone could interpret his words as a threat. Christensen Decl. at ¶ 30; Exs. 4–5 (clarifications).[21] Nothing about the content or circumstances of the video can satisfy *Counterman*'s recklessness standard.

---

[21] Defendants have not suggested that the Rodriguez Video constitutes a true threat, or that the Torres Video constitutes incitement. Even if they had, neither argument could succeed, for much the same reasons as discussed here: the Rodriguez Video does not convey a threat of violence, and the Torres Video does not approach the incitement standard of *Brandenburg* and its progeny.

C.   Neither the Rodriguez Video Nor the Torres Video Is Punishable on the Basis of Disruption

Any effort by Defendants to argue that the Rodriguez and Torres Videos were not protected speech because they caused or were likely to cause disruption on campus would fare no better. Disruption is not the standard for when a college or university can discipline a student for their expression—particularly when that expression takes place off campus, is not directed to the university, and is on a matter of public concern. Even if disruption were the standard, there is no evidence of an actual or potential material disruption here.

It is axiomatic across grades and ages that "students do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the schoolhouse gate.'" *Mahanoy Area Sch. Dist. v. B.L. by and through Levy*, 594 U.S. 180, 187 (2021) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). To be sure, K-12 schools do "have a special interest in regulating speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" *Mahanoy,* 594 U.S. at 188  (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969)).

But colleges are a different matter; *Tinker*'s material disruption framework makes little sense there "[f]or several reasons, including the age, independence, and living arrangements of [college and university] students[.]" *Id.* at 194 n.2 (Alito, J., concurring). The First Amendment does not "afford[] the same protection to speech by a high school freshman as it does to a graduate student. Rather, the First Amendment permits teachers, administrators, and courts to consider the level of maturity of the student" and the "special characteristics" of the particular school, including whether it has any "proper pedagogical reason for regulating [speech]." *Diei v. Boyd*, 116 F. 4th 637, 645–46 (6th Cir. 2024) (cleaned up). Professional schools may have an interest in "genuinely reflect[ing] the professional norm" for pedagogical reasons, *Diei*, 116 F.4th at 650, but universities

like OSU have no interest in regulating controversial or "disruptive" speech. On the contrary, they have a powerful interest in broad intellectual diversity and teaching students to think independently. *Healy v. James*, 408 U.S. 169, 180 (1972) (universities are "peculiarly the marketplace of ideas") (cleaned up); *see* Ohio Rev. Code § 3345.0217(A)(3), (B)(3) (Ohio universities are to encourage "the fullest degree of intellectual diversity").

Thus, any argument that Mr. Christensen's speech is not protected in the campus context because it did, or foreseeably could, cause a material disruption is simply inapposite. The question is whether speech is protected, not whether it is likely to cause a disruption on campus. On college campuses, "the critical line for First Amendment purposes must be drawn between advocacy [and other forms of speech], which [are] entitled to full protection, and action, which is not." *Healy*, 408 U.S. at 192. That is because "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (internal alterations omitted). "The essentiality of freedom in the community of American universities is almost self-evident." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957). On college campuses, "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Keyishian*, 385 U.S. at 603. OSU's students are adults who are present voluntarily, and the university environment entails vigorous discussion and intellectual diversity to a much greater degree than the K-12 environment addressed in *Tinker* and even *Mahanoy*. Speech there must therefore receive greater leeway than *Tinker*'s disruption framework provides. *Mahanoy*, 594 U.S. at 194 n.2 (Alito, J., concurring); *Diei*, 116 F.4th at 645.

Further, disruption would be an inapposite standard here even if K-12 doctrine extended to the university context, because Mr. Christensen's speech occurred off campus in every sense of that term: his posts were recorded and published outside of Ohio while he was out of classes for the summer. That context invokes more robust protections than *Tinker*. *Mahanoy*, 594 U.S. at 190. And for vital reasons: to regulate speech both on and off campus would "mean the student cannot engage in that kind of speech at all," an imposition that would require a "heavy burden to justify intervention" even at the K-12 level. *Id.* Indeed, even under *Mahanoy*'s framework for off-campus speech at the K-12 level, a school should weigh a more powerful countervailing consideration: its own "interest in protecting a student's unpopular expression, especially when the expression takes place off campus … [P]opular ideas have less need for protection." *Id.* at 190; *accord Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 357 (6th Cir. 2023). *See also, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570, 602 (2023) ("A commitment to speech for only *some* messages and *some* persons is no commitment at all."); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1942) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinions … If there are any circumstances which permit an exception, they do not now occur to us."). And again, a school's interest in protecting—and responsibility to protect— disfavored viewpoints is much stronger at the college level than in K-12. *See supra*.

Moreover, even in the K-12 context, off-campus speech that is "not expressly and specifically directed at the school," but pertains to a matter of public concern, is "almost always beyond the regulatory authority of a public school." *Mahanoy*, 594 U.S. at 205 (Alito, J., concurring) (collecting cases). *See also Kutchinski*, 69 F.4th at 357–58 ("schools generally cannot regulate" such speech). Mr. Christensen's speech is of that nature. It had nothing to do with OSU.

24

He did not identify himself as an OSU student, mention OSU or anyone in its community, or otherwise target or direct his speech towards the university. "The less the speech has to do with the curriculum and school-sponsored activities, the less likely any suppression will further a legitimate pedagogical concern[.]" *Diei*, 116 F.4th at 646 (cleaned up). And it was inarguably on a matter of public concern. *See, e.g.*, *Gerber v. Herskovitz*, 14 F.4th 500, 504 (6th Cir. 2021) (anti-Israel protesters spoke to a matter of public concern). It carries a heightened degree of protection as a result. *Mahanoy*, 594 U.S. at 191 (citing *Cohen v. California*, 403 U.S. 15, 24 (1971) and *Snyder v. Phelps*, 562 U.S. 443, 461 (2011)).

Defendant Shivers' disenrollment letter cites "myriad" complaints from the community, but in the context of off-campus speech on a matter of public concern unrelated to the school—particularly at the collegiate level—the school cannot rest on the complaints of others. "Even if … speech is deeply offensive to members of the school community and may cause a disruption, the school cannot punish the student who spoke out; that would be a heckler's veto." *Mahanoy*, 594 U.S. at 206 (Alito, J., concurring) (cleaned up). "The school may suppress the disruption [by those responding adversely to the speech in an impermissible fashion], but it may not punish the off-campus speech … This is true even if the student's off-premises speech on a matter of public concern is intemperate and crude." *Id. See also, e.g.*, *Matal v. Tam*, 582 U.S. 218, 244 (2017) (collecting cases for the "bedrock principle" that "the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers") (internal citation omitted); *Univ. of Md. Students for Just. in Palestine v. Bd. Of Regents of Univ. Sys. of Md.*, No. 24-2683 PJM, 2024 WL 4361863, at *10 (D. Md. Oct. 1, 2024) (even a "not unreasonable" concern that "violence might ensue" surrounding a controversial demonstration was not sufficient to revoke an event reservation for it). The fact that Congressman Torres—or anyone

else—may have reported the matter to law enforcement is, on its own, merely an extension of that same principle. Mr. Christensen cannot be punished because a listener chose to complain to authorities, whether school officials or law enforcement.

Finally, even if the "disruption" standard of *Tinker* somehow did apply in some form, no "disruption" occurred in this case—merely complaints that Mr. Christensen's speech was offensive. The fact that they were couched in language invoking "fear of violence and for their personal safety" does not transform them into a disruptive force. *See, e.g.*, *C1.G on behalf of C.G. v. Siegfried*, 38 F.4th 1270, 1278 (10th Cir. 2022) (where a high school student posted on social media "Me and the boys bout [sic] to exterminate the Jews," the school had not demonstrated a "reasonable forecast of substantial disruption" based on complaints to the principal, wide circulation of the post to the area's Jewish community, and the fact that the post "scared, angered, and saddened" a student's family); *id.* at 1279 ("Defendants cannot claim a reasonable forecast of substantial disruption … by simply invoking the words 'harass' and 'hate' when C.G.'s speech does not constitute harassment and its hateful nature is not regulable in this context."); *Doe v. Univ. of Mass.*, 145 F.4th 158, 172 (1st Cir. 2025) (where a resident advisor was found responsible for inappropriate sexual comments, finding insufficient evidence of substantial disruption because there was no evidence of disruption to "any class or classwork," that the accusers' discomfort alone did not suffice, and that "there is no evidence whatsoever that Doe's behavior degraded any individual's academic pursuits or the academic environment generally").

    D.    <u>OSU Cannot Punish Mr. Christensen as a "Significant Risk of Substantial Harm" Based on Political Speech Alone</u>

In the disenrollment letter, Defendant Shivers claims to have found "clear and convincing" evidence that Mr. Christensen's presence "poses a significant risk of substantial harm to the health and safety of … others[.]" But nothing cited in the letter clears that bar, either individually or in

the aggregate. As noted above, the mere fact that others took offense to Mr. Christensen's views is not a basis to punish him. Stripped of its reliance on a heckler's veto, Defendant Shivers' letter points only to the Rodriguez Video and the Torres Video themselves, but those are insufficient as a matter of law to support disenrollment on the basis of campus safety. Even where a university cites an otherwise important or compelling interest, such as prevention of harassment and discrimination—or here, safety—it cannot lawfully proscribe pure speech on a matter of public concern that is "directed to the community at large through generally accepted methods of communication." *Gartenberg v. Cooper Union for the Advancement of Sci. and Art*, 765 F. Supp.3d 245, 264–65 (S.D.N.Y. 2025); *accord Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1345 (11th Cir. 2023); *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 592–96 (5th Cir. 1995).

*Gartenberg* thoughtfully illustrates this principle. In that case, a university could proscribe some student conduct—and could even be obliged to do so by antidiscrimination laws—where that conduct was not pure speech: for example, when a physically threatening "mob" of protesters "forced their way past campus security guards," encircled the library while Jewish students huddled inside, and commenced "banging on and rattling the locked library doors and shouting 'let us in!' … while [waving] a Palestinian flag [and] holding up signs critical of Israel," for some twenty minutes. 765 F. Supp.3d at 271–72. Threatening or intimidating messages conveyed through vandalism, such as slogans denigrating Israelis scrawled on a bathroom wall in a font derived from *Mein Kampf*, were also unprotected. *Id.* at 273.

The university *could not*, however, punish pure political speech directed to the community at large through generally accepted methods of expression, even where other students personally found that speech harassing or intimidating. Such instances of pure speech in *Gartenberg* included

protest slogans about the Israel-Palestine conflict, flyers "[c]elebrat[ing] the 36th anniversary of the First Intifada," "articles … criticizing the 'conflation of Zionism and Judaism' as 'manipulative, exploitive, and racist,'" an art display with the words "RESIST COLONIALISM FROM THE BRONX TO PALESTINE 'BY ANY MEANS NECESSARY,'" and an alumni letter that "attempted to justify the sickening Hamas attack of October 7." *Id.* at 271.

Sixth Circuit and other circuits' case law is no different in the context of campus safety. Where courts have upheld university efforts to suspend, expel, or otherwise take disciplinary action in the name of campus safety, the university has offered a basis for its concern that well exceeded pure political speech. *See, e.g.*, *Mbawe v. Ferris State Univ.*, 751 F. App'x 832, 834–837 (6th Cir. 2018) (student with a diagnosed mental disorder who suffered from continuing paranoid delusions, believed he was being injected with foreign substances, and had been involuntarily committed to a mental institution); *Martinson v. Regents of Univ. of Mich.*, 562 F. App'x 365, 367–69 (6th Cir. 2014) (student accused of "threatening," "erratic," and aggressive behavior, such as putting her head into the windows of other students' cars to keep them from driving away, and declaring to administrators in an "angry" and "threatening" tone of voice that "something would be happening" but refusing to clarify); *Keefe v. Adams*, 840 F.3d 523, 526–27 (8th Cir. 2016) (student who posted specific threatening messages directed to specific classmates, such as "I give her a big fat F for changing the group power point … Not enough whiskey to control that anger," and "Im [sic] going to take this electric pencil sharpener in this class and give someone a hemopneumothorax with it before to [sic] long. I might need some anger management"); *Yeasin v. Durham*, 719 F. App'x 844, 845–847 (10th Cir. 2018) (student who was subject to a protection order and criminal charges after physically restraining his girlfriend, taking her phone, and threatening to commit suicide and spread rumors about her, and who subsequently violated the no-contact order by tweeting profane

28

messages about her); *Hess v. Bd. of Trustees of Southern Ill. Univ.*, 839 F.3d 668, 672 (7th Cir. 2016) (student who was subject to an arrest warrant after allegedly stabbing someone in a bar fight).

Mr. Christensen's videos easily fall on the protected side of the *Gartenberg* divide and contain nothing approaching the tangible safety concerns in *Mbawe*, *Martinson*, and similar cases. The videos address matters of public concern. They are general statements not targeted to any particular student or other university-affiliated person. They are conveyed through lawful, widely accepted methods of expression. They are, in short, pure political speech, and so OSU could not lawfully disenroll him for them on the basis of purported safety concerns.

E.  The Second and Third Elements of Retaliation Are Satisfied

Defendants' actions conclusively establish the second element of retaliation, and Defendant Shivers' disenrollment letter concedes the third.

For the second element, even leaving aside anything else, Defendants disenrolled Mr. Christensen. Disenrollment alone is well above the threshold of a materially adverse action sufficient to deter "a person of ordinary firmness" from speech. Indeed, "[the effect on freedom of speech] 'need not be great in order to be actionable.'" *Thaddeus-X*, 175 F.3d at 397 (citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) (Posner, J.)) (editing marks in original). A student need not even suffer actual punishment. For example, the Sixth Circuit found in one case that a student had plausibly alleged an adverse action where her college had investigated her and voted to expel her, even though she had then successfully appealed the expulsion. *Diei*, 116 F.4th at 647. *See also Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764 (6th Cir. 2019) ("the threat of punishment from a public official who *appears* to have punitive authority can be enough to produce an objective chill"). There can be no doubt that Defendants' expulsion of Mr. Christensen without a hearing constitutes an adverse action.

For the third retaliation element, Defendant Shivers' May 30 disenrollment letter to Mr. Christensen concedes that the Rodriguez Video and the Torres Video formed at least part of Defendants' motivation. *See* Christensen Decl. Ex. 8 (listing "your May 22, 2025 social media post inciting violence, for which you received an interim suspension on May 25, 2025; [and] your May 22, 2025 social media post about Congressman Torres"). Under *Thaddeux-X*, upon this initial showing, the burden shifts to Defendants to demonstrate that they would have taken the same action even without the protected conduct. 175 F.3d at 399. They plainly cannot make such a showing, however—every cited rationale that they offer for expelling Mr. Christensen stems from the Rodriguez and Torres Videos, which are protected.

## II. Mr. Christensen Has a Substantial Likelihood of Success on the Merits of His Fourteenth Amendment Due Process Claim

Even if OSU had some lawful basis to subject Mr. Christensen to disciplinary proceedings, its rush to disenroll him denied him even the most bare-bones opportunity to be heard in his own defense. That violated his procedural due process rights under the Fourteenth Amendment.

The government may not deprive a person of protected interests, whether in liberty or property, without due process. Any version of due process, in turn, requires some form of notice and the opportunity to be heard. *E.g.*, *Goss v. Lopez*, 419 U.S. 565, 579 (1975) ("The fundamental requisite of due process of law is the opportunity to be heard."). It is well established that expulsion from a university invokes due process protections: "no tenet of constitutional law is more clearly established than the rule that a property interest in continued enrollment in a state school is an important entitlement protected by the Due Process Clause of the Fourteenth Amendment." *Barnes v. Zaccari*, 669 F.3d 1295, 1305 (11th Cir. 2012). The Supreme Court, Sixth Circuit, and Southern District of Ohio have observed similarly, adding that university disenrollment implicates a student's liberty interest in their reputation. *E.g.*, *Goss*, 419 U.S. at 576; *Doe v. Miami Univ.*, 882

30

F.3d 579, 599 (6th Cir. 2018); *Doe v. Ohio State Univ.*, 136 F. Supp. 3d 854, 865 (S.D. Ohio 2016) (invoking due process requirements where student was placed on a "disciplinary hold" prohibiting him from scheduling classes or receiving a diploma).

Thus, "[b]efore expelling a student for disciplinary reasons, a public institution must provide: 1) notice of the charges against the student; 2) an explanation of the evidence that authorities have against the student; and 3) an opportunity for the student to present his side of the story." *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1080 (S.D. Ohio 2017) (quoting *Ashiegbu v. Williams*, No. 97-3173, 1997 WL 720477, at *1 (6th Cir. Nov. 12, 1997)). The hearing must be meaningful, and must allow the student to "respond, explain, and defend." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005) (internal citation omitted). *See also, e.g.*, *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017) (student faced with suspension is entitled to opportunity to be heard at a meaningful time and in a meaningful manner); *Averett v. Hardy*, No. 23-5319, 2024 WL 5074868, at *4 (6th Cir. Dec. 11, 2024) (similar).

The violation of Mr. Christensen's due process rights here is straightforward. Defendants gave Mr. Christensen no hearing of any kind—no chance to "respond, explain, and defend"— before they disenrolled him. Indeed, even after they disenrolled Mr. Christensen, Defendants expressly denied him any opportunity to defend himself. Defendant Shivers' July 9, 2025 rejection of Mr. Christensen's petition for re-enrollment removes any doubt as to OSU's position: Mr. Christensen's petition for re-enrollment was denied specifically on the grounds that he attempted to defend himself, rather than "reflect" and demonstrate that his conditions had somehow changed. *See* Christensen Decl. Ex. 11. A summary punishment process with no hearing, followed by what amounts to an invitation to contrition, is inconsistent with the dictates of due process.

### III.   Mr. Christensen Will Suffer Irreparable Harm Absent Injunctive Relief

"[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1489–90 (6th Cir. 1995) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)) (cleaned up); *accord, e.g.*, *OPAWL – Building AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 785 (6th Cir. 2024). The Sixth Circuit has joined the "majority of federal circuit courts" in extending this principle to retaliation claims, as the individual "continues to suffer irreparable injury even after termination of some tangible benefit such as employment." *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) (noting also that "The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief"). Direct retaliation by the state for one's expression "is particularly proscribed by the First Amendment," such that a plaintiff need not "prove actual, current chill" in order to demonstrate irreparable injury. *Id.* at 379 (internal citation omitted, collecting case law). The past deprivation is enough.

The irreparable harm factor thus points back to the merits inquiry. Having demonstrated a strong likelihood of success on the merits, Mr. Christensen has necessarily also demonstrated irreparable harm. *See, e.g.*, *OPAWL*, 118 F.4th at 785; *McNeilly v. Land*, 684 F.3d 611, 620 (6th Cir. 2012); *Dayton Area*, 70 F.3d at 1489–90.

Even beyond the principle set by *Elrod*, Mr. Christensen will suffer irreparable harm as a factual matter absent preliminary relief. Defendants have placed a notation on his transcript that informs readers of his involuntary disenrollment based on purported safety concerns. *See* Christensen Decl. at ¶ 54. Mr. Christensen plans to apply to another university by February of 2026; his application will include his transcript. *Id.* The presence of OSU's notation on his transcript will endanger his application. *Id.* at ¶ 55.

32

**IV.** **Balance of Harms and the Public Interest Weigh in Favor of an Injunction**

As with irreparable harm, the third and fourth factors in the preliminary injunction inquiry "often hinge on" likelihood of success on the merits in constitutional claims, and particularly cases implicating the First Amendment. *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994); *Dayton Area*, 70 F.3d at 1490 ("the public as a whole has a significant interest in … protection of First Amendment liberties").

The public interest in protecting constitutional rights is all the more acute here. Universities—perhaps above all a state's largest public university—are "peculiarly the 'marketplace of ideas[.]'" *Healy v. James*, 408 U.S. 169, 180–81 (1972) (internal citation omitted). They traditionally serve as "beacons of intellectual diversity and academic freedom," who have "tried not to stifle debate by picking sides." *Meriwether v. Hartop*, 992 F.3d 492, 498 (6th Cir. 2021). The public has a powerful interest in jealously guarding academic freedom, particularly with controversial and minority viewpoints that need protection.

Earlier this year, the Ohio General Assembly underscored the importance of that interest to this state by passing legislation to protect it. Ohio S.B. 1, the Advance Ohio Higher Education Act, was signed on March 28, 2025. Though certainly a subject of widespread disagreement, it unequivocally professes to "ensure the fullest degree of intellectual diversity" in Ohio universities, including protecting "multiple, divergent, and varied perspectives on an extensive range of public policy issues." Ohio Rev. Code § 3345.0217(A)(2), (B)(3). It does so in part by requiring OSU and other state universities to adopt those purposes as a mission and policy. *Id.* As discussed above, Mr. Christensen suffered serious deprivations of his First Amendment right to free speech and his Fourteenth Amendment right to procedural due process. The public interest favors injunctive relief

in order to protect these rights for all citizens—particularly college students, particularly when speaking on matters of public concern, and particularly when that speech is met with summary punishment. Any purported public "interest" in silencing Mr. Christensen and denying him a hearing, and any purported "harm" that might ensue to the university or third parties from allowing him to speak uninhibited, pales next to the public interest in protecting his constitutional liberties. *See, e.g.*, *G & V Lounge*, 23 F.3d at 1079; *Dayton Area*, 70 F.3d at 1490.

### V. The Relief Requested Is Available and Appropriate

Federal district courts "craft preliminary injunctions rather than merely approve them. And crafting a preliminary injunction is an exercise of discretion and judgment[.]" *Brown v. Yost*, 122 F.4th 597, 623 (6th Cir. 2024) (cleaned up). A court may "mold its decree to meet the exigencies of the particular case." *Id.* (internal citation omitted); *accord Sentinel Trust Co. v. Namer*, No. 98-5183, 1998 WL 887287, at *1 (6th Cir. Dec. 9, 1998) (courts have "the power to craft such equitable relief as is necessary").

Expungement of a disciplinary record "is, as a practical matter, prospective relief" that is properly the subject of an injunction. *Noakes v. Univ. of Cincinnati*, No. 24-3388, 2024 WL 4579453, at *2 (6th Cir. Oct. 25, 2024) (internal citation omitted). *See also, e.g.*, *United Food & Com. Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F. 3d 341, 348 (6th Cir. 1998) (internal citation omitted) (holding that, as "the purpose of a preliminary injunction is always to prevent irreparable injury," "the distinction between mandatory and prohibitory injunctive relief is not meaningful"). Moreover, where a plaintiff may suffer irreparable harm from a university disseminating wrongful disciplinary information to other schools—thereby imposing a continued deprivation—then a court may enjoin such action as well. *See Shah v. Univ. of Tex. Southwestern Med. Sch.*, 129 F. Supp. 3d 480, 496-7 (N.D. Tex. 2015).

Though reinstatement is also an available remedy, *see Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 654 (S.D. Ohio 2016), Mr. Christensen does not wish to return to OSU.

## CONCLUSION

For the foregoing reasons, Plaintiff Guy Christensen respectfully requests that this Court enter a preliminary injunction requiring that Defendants expunge any mention of involuntary disenrollment or OSU's reasons for it from his OSU academic records, and enjoining Defendants from making any equivalent representation through academic records or other means.

Dated: September 19, 2025

Respectfully submitted,

/s/ David J. Carey
David J. Carey          (0088787)
Carlen Zhang-D'Souza (0093079)*
ACLU of Ohio Foundation, Inc.
1108 City Park Avenue, Suite 203
Columbus, Ohio 43206
(380) 215-1972
dcarey@acluohio.org
czhangdsouza@acluohio.org

Freda J. Levenson       (0045916)
Amy Gilbert          (0100887)
ACLU of Ohio Foundation, Inc.
4506 Chester Avenue
Cleveland, Ohio 44103
(216) 541-1376 (Levenson)
(216) 770-6704 (Gilbert)
flevenson@acluohio.org
agilbert@acluohio.org

*Admitted *pro hac vice*

*Counsel for Plaintiff Guy Christensen*

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2025, a copy of the foregoing was filed electronically. Parties may access this filing through the Court's system. I hereby also certify that a copy of the foregoing is being served on Defendants via U.S. mail and email as addressed below:

President Walter "Ted" Carter
Sr. V.P for Student Life Melissa Shivers
Registrar Ryan Hunt

c/o Paula Paoletti, Deputy General Counsel & Sr. Assoc. Vice President
c/o Morgan Linn, Sr. Assoc. General Counsel
The Ohio State University
Office of Legal Affairs
1590 N. High St., Ste. 500
Columbus, OH 43201-2247
Paoletti.16@osu.edu
Linn.139@osu.edu

/s/ *David J. Carey*
David J. Carey        (0088787)
*Attorney for Plaintiff*

36