## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **GUY CHRISTENSEN,** | : | |
| | : | |
| *Plaintiff,* | : | **Case No. 2:25-CV-1062** |
| | : | |
| v. | : | **Judge Edmund A. Sargus, Jr.** |
| | : | |
| **WALTER "TED" CARTER JR., et al.** | : | **Magistrate Judge Chelsey M. Vascura** |
| | : | |
| *Defendants.* | : | |

---

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

DAVE YOST (0056290)
Ohio Attorney General

*/s/ Gregory A. Rustico*
GREGORY A. RUSTICO (0104103)
JULIE M. PFEIFFER* (0069762)
    *Counsel of Record*
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215-3428
Tel: (614) 466-1853
Fax: (855) 326-1696
Gregory.Rustico@OhioAGO.gov
Julie.Pfeiffer@OhioAGO.gov

*Counsel for Defendants*

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................. vi

Introduction .......................................................................................................................... 1

Background ............................................................................................................................ 3

    I.    In the wake of a political assassination, Ohio State administrators became aware of a viral video in which an Ohio State student endorsed the assassin and called for "greater resistance and escalation." .................................................................................................................. 3

    II.    After reviewing the viral video, the University acted swiftly to ensure the safety of the community, including conducting a well-being check on Plaintiff. .......................................... 4

    III. As more information became available, Ohio State administrators determined an interim suspension was necessary to ensure the safety of the community ........................................... 5

    IV.    Dr. Shivers determined an administrative disenrollment was appropriate after learning about additional concerning actions by Plaintiff, the engagement of multiple law enforcement agencies, and genuine fears about campus safety.  This non-punitive process would separate Plaintiff from the University until it was safe for him to return. ............................................... 7

    V.    Dr. Shivers considered Plaintiff's petition for re-enrollment.  She found it did not ameliorate the safety concerns that necessitated Plaintiff's administrative disenrollment, but she invited Plaintiff to re-petition if circumstances changed. ......................................................... 8

Law and Argument ............................................................................................................. 10

    I.    A preliminary injunction is an extraordinary remedy intended to preserve the status quo while a case proceeds .......................................................................................................... 10

    II.    Plaintiff is unlikely to succeed on the merits because his administrative disenrollment was not First Amendment retaliation, nor did it violate his due process rights. ............................. 11

        A.    Plaintiff is unlikely to succeed on his First Amendment retaliation claim because his administrative disenrollment was not intended to punish him for his speech, and regardless, his speech was not protected by the First Amendment. ......................................................... 11

            1.    Plaintiff has failed to prove causation: Dr. Shivers's decision to administratively disenroll Plaintiff was based on an honest belief that Plaintiff posed a risk to the safety of the Ohio State community; it was not a punishment for the content of his speech. ......... 12

i

**Summary:**  To establish First Amendment retaliation, a plaintiff must show that the alleged adverse action was motivated in substantial part by a desire to punish protected speech.  *See King v. Zamiara*, 680 F.3d 686 (6th Cir. 2012).  In this case, Dr. Shivers's decision to administratively disenroll Plaintiff was based on an honest belief that he posed a safety risk to the Ohio State community, not on a desire to punish his speech.  Courts have upheld similar actions where speech was a factor but not the sole or retaliatory motive, such as in *Lavine v. Blaine Sch. Dist.*, 257 F.3d 981 (9th Cir. 2001), where a student was expelled due to safety concerns stemming from a violent poem, and *Routledge v. Tennessee*, No. 06-1125-T-An, 2007 U.S. Dist. LEXIS 115679 (W.D. Tenn. Oct. 4, 2007), where a student's expulsion was upheld based on disruptive conduct rather than protected speech. The administrative disenrollment process used here, distinct from disciplinary procedures, mirrors the non-punitive approach in *Lavine*.  The evidence, most notably Dr. Shivers's testimony and correspondence, demonstrates that the decision was driven by safety concerns, not viewpoint discrimination.  Therefore, under *King*, Plaintiff is unlikely to establish the causation element necessary for his retaliation claim.

a.    In First Amendment retaliation cases, courts ask whether the adverse action was "motivated in substantial part by a desire to punish" the individual for their protected speech.................................................................................................................... 12

b.    The decision to administratively disenroll Plaintiff was motivated by concern for the safety of the Ohio State community, not a desire to punish Plaintiff for his speech. This explains why a non-punitive, administrative procedure was used, as opposed to the student misconduct process........................................................................................... 14

2.    Even assuming Plaintiff's speech was the cause of his administrative disenrollment, his speech was not protected............................................................................................. 19

a. Plaintiff's speech constitutes incitement under *Brandenburg* and is not protected by the First Amendment.................................................................................................... 19

**Summary:** Plaintiff's speech in the Rodriguez Video was not protected under the First Amendment because it satisfies all three prongs of the incitement test from *Brandenburg v. Ohio*, 395 U.S. 444 (1969): (1) it implicitly and explicitly encouraged violence, (2) it was intended to provoke violence, and (3) imminent lawless action was likely to result. Unlike the abstract advocacy in *Brandenburg*, Plaintiff praised the assassination of Israeli embassy staffers, read the shooter's manifesto aloud, and urged his 3.4 million social media followers to emulate the violence, using "greater resistance and escalation." This case is distinguishable from *Higgins v. Ky. Sports Radio*, *LLC*, 951 F.3d 728 (6th Cir. 2020), where the speaker discouraged unlawful conduct, and *Nwanguma v. Trump*, 903 F.3d 604 (6th Cir. 2018), where the speaker immediately clarified not to harm protestors. Plaintiff's later videos failed to retract or discourage violence and were not contemporaneous. As recognized in *United States v. Wheeler*, 776 F.3d 736 (10th Cir. 2015), the reach and immediacy of social media amplify the risk of incitement. Unlike *Hess v. Indiana*, 414 U.S. 105 (1973); *Bible Believers v. Wayne Cty.*, 805 F.3d 228 (6th Cir. 2015); and *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), Plaintiff's speech was not hyperbolic or merely offensive—it was a direct call to violent action in response to a perceived genocide, and thus it fell outside the protections of the First Amendment.

i. Plaintiff's speech explicitly or implicitly encouraged the use of violence or lawless action. .................................................................................................................. 20

ii. Plaintiff intended that his speech would result in the use of violence or lawless action. .................................................................................................................. 22

iii. Imminent use of violence or lawless action was the likely result of Plaintiff's speech to his 3.4 million followers given the context. ............................................... 25

iv. *Hess*, *Nwanguma,* and *Bible Believers* do not support the claim that Plaintiff's speech was not incitement. ...................................................................... 26

b. Plaintiff's speech is also unprotected under Tinker: administrators reasonably believed Plaintiff's calls for violence against Jews, in the context of a recent terrorist attack, could cause a substantial disruption on campus. ............................................... 28

iii

**Summary:** Defendants reasonably determined that Plaintiff's speech—calling for violence against Zionists in the immediate wake of a terrorist attack—posed a risk of substantial disruption to campus and was therefore unprotected under *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969). The substantial disruption test applies to public universities, *see Healy v. James*, 408 U.S. 169, 189 (1972), and courts have held that administrators need only a reasonable forecast of disruption, not certainty, *see Lowery v. Euverard*, 497 F.3d 584, 592 (6th Cir. 2007). Unlike the student in *Damsky v. Summerlin*, No. 1:25-cv-275-AW-MAF, 2025 U.S. Dist. LEXIS 232881 (N.D. Fla. Nov. 24, 2025), whose offensive post lacked disruptive impact, Plaintiff's massive online following and inflammatory content, combined with the involvement of multiple law enforcement agencies, justified Defendants' belief that it would cause disruption. The fact that the speech occurred off campus, standing alone, does not bring it outside the purview of *Tinker*. *See, e.g.*, *Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379, 391 (5th Cir. 2015).

i. *Tinker* applies to universities and permits universities to censure student speech if there is a reasonable likelihood of substantial disruption. ........................................ 28

ii. Considered in context, Plaintiff's statements called for violence against Zionists and Jews. Administrators reasonably believed that there would be a substantial disruption on campus given the content and Plaintiff's massive audience. .............. 29

iii. Plaintiff's attempts to evade *Tinker* and question the University's rationale for administratively disenrolling him lack merit. .......................................................... 32

B. Plaintiff's procedural due process claim is unlikely to succeed because he received the proper amount of process for an administrative disenrollment and has failed to show a deprivation of due process under that standard .................................................................... 34

**Summary:** Plaintiff's procedural due process claim is unlikely to succeed because his administrative disenrollment was non-punitive, responsive to an emergency, and accompanied by constitutionally sufficient process. Courts apply a flexible standard to due process claims, especially in educational settings, using the three-factor test from *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), which considers the private interest, risk of error, and administrative burden. Here, Plaintiff received notice and a meaningful opportunity to be heard satisfying the requirements outlined in similar cases as *Goss v. Lopez*, 419 U.S. 565, 579 (1975), and *Flaim v. Med. College of Ohio*, 418 F.3d 629, 635–36 (6th Cir. 2005). Because the disenrollment was not disciplinary, but aimed at protecting campus safety, it did not require the extensive formal procedures required of disciplinary actions. *Board of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 89 (1978). Plaintiff's failure to rebut the safety concerns or engage meaningfully in the re-enrollment process do not constitute a deprivation of due process.

1. In the educational context, the amount of process required varies depending on the nature of the deprivation, with non-punitive suspensions or dismissals requiring less process..................................................................................................................................... 35

2. Plaintiff's administrative disenrollment was not disciplinary in nature. .................. 36

3.  The *Mathews* factors weigh in favor of Plaintiff having received the proper degree of process.................................................................................................................................. 37

4.  Plaintiff fails to demonstrate deprivation of due process.......................................... 39

III.  Plaintiff is not facing irreparable harm: beyond pure speculation, he has not demonstrated how the notation on his transcript will harm him in any material way. ............. 41

**Summary:**  Plaintiff has failed to establish that he is facing irreparable harm. While the loss of constitutional rights can sometimes constitute irreparable injury, Plaintiff's alleged First Amendment and due process violations occurred in the past and are not ongoing.  *Conn v. Deskins*, 199 F. Supp. 3d 1172, 1174–75 (E.D. Ky. 2016) (Thapar, J.).  Plaintiff seeks injunctive relief to remove a transcript notation stating he was "Administratively disenrolled pursuant to 3335-23-21."  But unlike the "negative documentation" in *Lavine v. Blaine Sch. Dist.*, 257 F.3d 983, 992 (9th Cir. 2001), Plaintiff has not shown that this notation has caused or will cause him material harm.  To the contrary, Plaintiff has already applied to and been accepted to two other colleges, neither of which even asked him about this notation. "[S]peculative or theoretical" harm is insufficient to justify the extraordinary remedy of a preliminary injunction.  *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020).

IV.  Because Plaintiff is unlikely to succeed on the merits, a preliminary injunction would risk harming other institutions and the public interests by erasing any record of this incident.43

V.  The balance of the preliminary injunction factors weighs against Plaintiff. .................... 44

Conclusion…………………………………………………………………………………….46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*,
969 F.3d 12 (1st Cir. 2020)................................................................37

*Anderson v. True*,
CASE NO., 2017 U.S. Dist. LEXIS 122255 (E.D. Mich. Aug. 3, 2107) ..............................48

*Bell v. Itawamba Cty. Sch. Bd.*,
799 F.3d 379 (5th Cir. 2015) (en banc) ..................................38

*Bible Believers v. Wayne Cty., Mich.*,
805 F.3d 228 (6th Cir. 2015) (en banc) ..................................28, 35

*Board of Curators of Univ. of Missouri v. Horowitz*,
435 U.S. 78 (1978)................................................................45, 46

*Brandenburg v. Ohio*,
395 U.S. 444 (1969)................................................................28, 29, 30

*Conn v. Deskins*,
199 F. Supp.3d 1172 (E.D. Ky. 2016) (Thapar, J.)................................50

*Damsky v. Summerlin*,
No. 1:25-cv-275-AW-MAF, 2025 U.S. Dist. LEXIS 232881 (N.D. Fla. Nov. 24, 2025) ................................................................38, 39

*Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*,
158 F.4th 732, 2025 U.S. App. LEXIS 29181 (6th Cir. 2025) (en banc) ..................41, 42

*Diei v. Boyd*,
116 F.4th 637 (6th Cir. 2024) ................................................50

*Doe v. Univ. of Cincinnati*,
872 F.3d 393 (6th Cir. 2017) ................................................43

*Doe v. Valencia Coll.*,
903 F.3d 1220 (11th Cir. 2018) ................................................38

*Doninger v. Niehoff*,
527 F.3d 41 (2d Cir. 2008)................................................38

vi

*Firestone v. Galbreath*,
    976 F.2d 279 (6th Cir. 1992) ........................................................................... 20

*Flaim v. Med. College of Ohio*,
    418 F.3d 629 (6th Cir. 2005) ........................................................ 44, 46, 47, 48

*Friendship Materials, Inc. v. Mich. Brick, Inc.*,
    679 F.2d 100 (6th Cir. 1982) ........................................................................... 49

*Goss v. Lopez*,
    419 U.S. 565 (1975) ......................................................................... 43, 44, 46, 48

*Hall v. Edgewood Partners Ins. Ctr., Inc.*,
    878 F.3d 524 (6th Cir. 2017) ........................................................................... 19

*Healy v. James*,
    408 U.S. 169 (1972) ......................................................................... 36, 37, 40, 41

*Hess v. Indiana*,
    414 U.S. 105 (1973) ..................................................................................... 34, 35

*Higgins v. Ky. Sports Radio, LLC*,
    951 F.3d 728 (6th Cir. 2020) ........................................................................... 31

*Higuchi Int'l Corp. v. Autoliv ASP, Inc.*,
    103 F.4th 400 (6th Cir. 2024) .......................................................................... 19

*Ingraham v. Wright*,
    430 U.S. 651 (1977) ......................................................................................... 44

*Josephson v. Ganzel*,
    115 F.4th 771 (6th Cir. 2024) .......................................................................... 20

*Kentucky v. Biden*,
    57 F.4th 545 (6th Cir. 2023) ............................................................................ 49

*King v. Zamiara*,
    680 F.3d 686 (6th Cir. 2012) ........................................................ 21, 23, 27, 28

*Lavine v. Blaine Sch. Dist.*,
    257 F.3d 981 (9th Cir. 2001) ..................................................................... *passim*

*Leary v. Daeschner*,
    228 F.3d 729 (6th Cir. 2000) ..................................................................... 19, 51

*Lowery v. Euverard*,
    497 F.3d 584 (6th Cir. 2007) ..................................................................... 37, 40

vii

*Mahanoy Area Sch. Dist. v. B.L.*,
   594 U.S. 180 (2021) (Thomas, J., dissenting) .......................................................38

*Matal v. Tam*,
   582 U.S. 218 (2017)....................................................................................................42

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)....................................................................................................44

*Memphis A. Philip Randolph Inst. v. Hargett*,
   978 F.3d 378 (6th Cir. 2020) ...............................................................................49, 51

*Moms for Liberty - Wilson Cty. v. Wilson Cty. Bd. of Educ.*,
   155 F.4th 499 (6th Cir. 2025) ....................................................................................49

*Morse v. Frederick*,
   551 U.S. 393 (2007)....................................................................................................37

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
   429 U.S. 274 (1977)....................................................................................................21

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982)....................................................................................................34

*Nwanguma v. Trump*,
   903 F.3d 604 (6th Cir. 2018) .........................................................................32, 34, 35

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir.2012) ......................................................................................52

*Ohio v. Becerra*,
   87 F.4th 759 (6th Cir. 2023) ......................................................................................19

*Routledge v. Tennessee*,
   No. 06-1125-T-An, 2007 U.S. Dist. LEXIS 115679 (W.D. Tenn. Oct. 4, 2007)........22, 23, 24

*S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*,
   860 F.3d 844 (6th Cir. 2017) .....................................................................................52

*Schmitt v. LaRose*,
   933 F.3d 628 (6th Cir. 2017) .....................................................................................49

*SEC v. G. Weeks Secur., Inc.*,
   678 F.2d 649 (6th Cir. 1982) .....................................................................................20

*Snyder v. Phelps*,
   562 U.S. 443 (2011)....................................................................................................28

*Sunless, Inc. v. Palm Beach Tan, Inc.*,
  33 F.4th 866 (6th Cir. 2022) ...............................................19

*Thaddeus-X v. Blatter*,
  175 F.3d 378 (6th Cir. 1999) (en banc) ..........................................20, 21

*Tinker v. Des Moines InDep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969).............................................36

*United States v. Lidderdale*,
  No. 2:25-mj-00270, 2025 U.S. Dist. LEXIS 159613 (S.D. Ohio Aug. 18,
  2025) ..........................................24, 41

*United States v. Malik*,
  16 F.3d 45 (2d Cir. 1994)...............................................29

*United States v. Miselis*,
  972 F.3d 518 (4th Cir. 2020) ...............................................33

*United States v. Wheeler*,
  776 F.3d 736 (10th Cir. 2015) ...............................................33

*Widmar v. Vincent*,
  454 U.S. 263 (1981)...............................................36

*Women's Med. Prof'l Corp. v. Baird*,
  438 F.3d 595 (6th Cir. 2006) ...............................................43

ix

## INTRODUCTION

"[W]e live in a time when school violence is an unfortunate reality that educators must confront on an all too frequent basis." *Lavine v. Blaine Sch. Dist.*, 257 F.3d 981, 987 (9th Cir. 2001). "[W]e must take care when evaluating a student's First Amendment right of free expression against school officials' need to provide a safe school environment not to overreact in favor of either." *Id.* at 983.

In the immediate aftermath of a high-profile political assassination, Defendants were thrust into a crisis. One of their students, who had millions of social media followers, had posted a series of viral videos online about the shooting. In the videos, the student appeared angry, upset, and potentially unhinged. In one video, the student condemned the assassin. But then in a later video, he retracted the condemnation, endorsed the shooter, and incited violence by calling for "greater escalation and resistance" by fellow members of "the movement." He then proceeded to post more videos. This time turning his attention to a member of Congress, making veiled threats, and again appearing deeply troubled. As these videos spread across the internet, they reached members of the Ohio State community, as well as law enforcement. Community members understandably began to express serious concern for campus safety, and multiple law enforcement agencies started investigating.

As the crisis began to metastasize, Defendants felt it was necessary to take swift action to ensure the safety of the Ohio State community. Dr. Melissa Shivers, the Senior Vice President for Student Life, immediately asked for a well-being check on the student, out of concern for the student's mental and physical health. Next, she directed that the student be placed on an interim suspension from the University. This was a temporary, non-punitive mechanism to allow for additional information gathering about the situation. Over the next few days, Dr. Shivers continued

1

to receive more concerning information: the student was unresponsive to the well-being check, the U.S. Capitol Police was now investigating him, and the safety concerns from community members were only growing.

Based on this new information, Dr. Shivers believed that the student's continued affiliation with the University posed a significant risk of substantial harm to the health or safety of himself, others, or to property. For this reason, Ohio State decided administratively to disenroll him, a non-punitive administrative procedure that allows the University to disenroll a student who poses a danger to the community. Administrative disenrollment is not part of the student misconduct process. It is not a finding of a violation of the Code of Student Conduct. It is not a punishment. It is not an expulsion. It is a safety mechanism used to disenroll a student until a danger has subsided.

Now, long after the dust has settled on this safety crisis, that student, Plaintiff, asks this Court to second-guess Defendants' difficult decisions made in a heated and uncertain time. Plaintiff, armed with the benefit of hindsight, argues there was never a threat at all. Instead, he believes this whole incident was either a coordinated plot to punish him for his political beliefs, a response to a pressure campaign from the current presidential administration, or both. This Court should resist Plaintiff's conspiratorial instincts and see this situation for what it was: a safety and security crisis thrust upon school administrators whose responses were motivated by a desire to protect the community, not to punish Plaintiff.

Plaintiff now seeks an injunction to remove the transcript notation of his administrative disenrollment, effectively asking the Court to erase any record of the University's safety-driven response. But this Court should decline that request. The balance of the injunction factors weigh against Plaintiff. First, he is unlikely to succeed on the merits of his claims: his administrative disenrollment was not retaliation for his speech, which was itself unprotected by the First

2

Amendment; nor were his due process rights violated because he was given ample opportunity to seek re-enrollment. Second, Plaintiff has not proven that the notation he challenges will cause him irreparable harm. Third and finally, because Plaintiff is unlikely to succeed on the merits, granting him full relief while the case is pending would risk harm to other parties and violate the public interest by whitewashing this incident away.

In a climate where heated rhetoric, political violence, and campus violence continue to rise, school administrators find themselves in an unenviable position, seeking to balance free speech and due process with safety and security. Here, when faced with a fastmoving crisis, Defendants acted lawfully to mitigate the perceived danger to their community by using a non-punitive, administrative procedure, and Plaintiff had the opportunity to petition for his return to the University. This was not First Amendment retaliation or a due process violation. It was an educational institution seeking to preserve the safety and security of its community. Accordingly, this Court should deny Plaintiff's motion for a preliminary injunction.

## BACKGROUND

### I. In the wake of a political assassination, Ohio State administrators became aware of a viral video in which an Ohio State student endorsed the assassin and called for "greater resistance and escalation."

In the evening of May 21, 2025, Elias Rodriguez murdered two staffers from the Israeli Embassy when they exited an event at the Capital Jewish Museum in Washington, DC. Compl. ¶ 20, ECF No. 1 at PageID 7. News reports stated the shooter shouted "free, free Palestine." *Id.* The attack was widely condemned as a terrorist attack. *Id.*

Sometime over the next few days, Dr. Melissa Shivers, Ohio State's Senior Vice President for Student Affairs, was alerted that an Ohio State student, Plaintiff, had posted a video on social media about the shooting. Ex. A, Shivers Dep. 54:12–55:25. She immediately watched the post.

3

*Id.*  In the video, Plaintiff retracted a previous condemnation of Rodriguez: "I take it back.  I do not condemn the elimination of those two Zionist officials who worked at the Israeli Embassy . . . ."  Compl. ¶ 23.  He asserted the shooting was not "an antisemitic terrorist attack," *id.*, and Rodriguez was "a resistance fighter," Ex. B, Christensen Dep. 158:15–159:1.  Plaintiff discussed what he perceived as atrocities and genocide committed by "Israel's war machine."  Christensen Dep. Ex. B at 1.  He stated the attack was "being used to weaponize violence against the movement.  But we will meet it with our own greater resistance and escalation."  *Id.*  Plaintiff then read Rodriguez's manifesto aloud to his audience.  *Id.* at 1–4.

Dr. Shivers found the video deeply concerning, both the content and the "elevated tone and tenor" of Plaintiff.  Shivers Dep. 56:4–8.  Dr. Shivers interpreted Plaintiff's call for "resistance and escalation," along with his "escalated nature in the video," as "explicitly encourag[ing] unlawful violence."  Shivers Dep. 91:2–92:15.  She concluded that Plaintiff had intended to incite violence against members of the Ohio State community who identified as Zionists.  Shivers Dep. 92:12–20, 94:4–10.  And she was "[v]ery concerned" that the Rodrigeuz Video "was actually likely to incite imminent violence," especially considering he had roughly 3.4 million social media followers.  Shivers Dep. 97:15–24.

## II. After reviewing the viral video, the University acted swiftly to ensure the safety of the community, including conducting a well-being check on Plaintiff.

Dr. Shivers's initial response was to contact Monica Moll, the Associate Vice President for Public Safety, and ask her office to conduct a wellness check on Plaintiff.  Shivers Dep. 56:6–20.  Dr. Shivers was concerned about Plaintiff's "health and safety and well-being and the call for escalation."  Shivers Dep. 57:25–58:3.  Because the semester had recently ended, she believed Plaintiff had gone home to Pennsylvania.  Shivers Dep. 59:15–20.  Director Moll also reached out

4

to the FBI and the Director of the Ohio Department of Public Safety about Plaintiff. Shivers Dep. 60:14–61:1, 66:17–19.

At the time of this incident, Dr. Shivers had some awareness of Plaintiff. Shivers Dep. 36:12–14. She first heard about Plaintiff in November 2024 when he was suspected of sending bomb threats to synagogues. Shivers Dep. 36:12–16; Pl.'s Mot. Prelim. Inj. Ex. 10 at 4, ECF No. 8-2 at PageID 155. As far as Dr. Shivers understood, that allegation turned out to be unsubstantiated. Shivers Dep. 44:12–45:7. The other time Dr. Shivers had heard about Plaintiff was in March 2025, when the university received complaints about some of the content Plaintiff was posting on social media. Shivers Dep. 53:16–24.

### III. As more information became available, Ohio State administrators determined an interim suspension was necessary to ensure the safety of the community.

Dr. Shivers became increasingly concerned about the potential impact of the Rodriguez Video on the Ohio State community. She noted that because Plaintiff had roughly 3.4 million social media followers, there was "no way [she] could know exactly who the message was for or intended." Shivers Dep. 77:9–10. "[T]here's the ability for anyone, whether they live in Columbus or somewhere else, to be responsive to the messaging in that video, which could also include people who live in Columbus or who are somehow connected to Ohio State, or not at all, but feel compelled to be responsive to [Plaintiff]'s narrative." Shivers Dep. 77:12–19. She was concerned that Plaintiff's call for "escalation" could be interpreted by "someone who is listening" as a "call to action." Shivers Dep. 77:22–24.

Dr. Shivers also began to receive messages from the Ohio State community, including students and parents, expressing concerns about threats to the safety of the community, especially Plaintiff's "call for action." Shivers Dep. 80:20–81:20. Dr. Shivers then spoke with the Associate

Vice President for the Civil Rights Compliance Office, Keesha Mitchell. Shivers Dep. 82:15–18. Ms. Mitchell expressed similar concerns that the videos had crossed "the protected speech line." Shivers Dep. 84:3–5. Around this time, Dr. Shivers also informed the Ohio State President and Ohio State Provost about the situation, but she did not ask for, and they did not offer, any input. Shivers Dep. 89:19–90:18.

Dr. Shivers also spoke with Ryan Lovell, the Associate Vice President for Holistic Student Support and Well-Being, about the situation and whether it warranted an interim suspension. Shivers Dep. 99:3–100:2. An interim suspension is a preliminary procedural mechanism that allows the University to take some action to protect the community while an investigation of a situation unfolds. Ex. C, Smith Dep. 30:19–31:5; Ex. D, Lovell Dep. 59:22–60:24, 61:15–20. Such action is authorized "[w]hen the vice president for student life or designee has reasonable cause to believe that the student's presence on university premises or at a university-related or registered student organization activity poses a significant risk of substantial harm to the safety or security of themselves, others, or to property." Shiver Dep. Ex. 1 at 19–20. Interim suspensions are typically issued under exigent circumstances, often within a day or two of receiving a report. Smith Dep. 43:16–44:12.

Dr. Shivers and Mr. Lovell agreed that an interim suspension was warranted in this case to ensure campus safety. Shivers Dep. 100:11–21; Lovell Dep. 44:23–45:20. On May 25, 2025, Mr. Lovell sent Plaintiff a letter explaining the terms of his interim suspension. Christensen Decl. Ex. 6, ECF No. 8-2 at PageID 129–31. The Director of Student Conduct, Kelly Smith, also sent Plaintiff a letter informing him about the student conduct process and asking him to set up an initial meeting. Christensen Decl. Ex. 7, ECF No. 8-2 at PageID 133–37.

**IV. Dr. Shivers determined an administrative disenrollment was appropriate after learning about additional concerning actions by Plaintiff, the engagement of multiple law enforcement agencies, and genuine fears about campus safety. This non-punitive process would separate Plaintiff from the University until it was safe for him to return.**

Following Plaintiff's interim suspension, Dr. Shivers began to learn about more troubling behavior by Plaintiff. For instance, she learned that Plaintiff had posted a video about Congressman Ritchie Torres. Shivers Dep. 115:25–116:9. In this video, Plaintiff angrily discussed Congressman Torres's support for Israel and made concerning statements that could be interpreted as threats. *See* Compl. ¶ 34, ECF No. 1 at PageID 10. Specifically, he directed some of his comments directly at Congressman Torres: "Now Ritchie, screenshots are forever and what you've said and done will haunt your family for eternity as you will eventually, if you're still alive, end up in a Nuremburg trial[] for all the elected officials in America who facilitated and protected this genocide." *Id.* Plaintiff also stated "I hope that the money he sleeps on at night stains his pajamas blood red." *Id.*

Dr. Shivers was also informed that, in response to this video, Congressman Torres had asked the Capitol Police to investigate. Shivers Dep. 116:22–117:2. This "level of engagement of police [and law] enforcement [became] very concerning" to Dr. Shivers. Shivers Dep. 127:24–25. It led her to believe the situation was serious. *See* Shivers Dep. 126:11–13 ("The fact that there were police, law enforcement engagement there led me to concerns.").

Additionally, Dr. Shivers took note of the "[e]scalation in [Plaintiff's] tone of voice" in the videos, observing that he was "[s]eemingly very frustrated, angry, [and] disappointed." Shivers Dep. 118:22–23. This reenforced her belief that a well-being check was needed, Shivers Dep. 118:23–25, but Plaintiff never responded to the well-being check, Shivers Dep. 150:19–23; Christensen Dep. 185:15–187:2.

Around this time, Dr. Shivers became increasingly aware that more members of the Ohio State community had contacted the University to voice concerns about "the tone, tenor[,] and rhetoric" of Plaintiff.  Shivers Dep. 122:13–19.  They "perceived [a] level of incitement of violence, calling for, in particular resistance and escalation."  Shivers Dep. 122:16–19.  These safety concerns contributed to Dr. Shivers's growing perception that a dangerous situation was unfolding.  *See* Shivers Dep. 122:13–19.

After considering this new information, Dr. Shivers decided administrative disenrollment was the next appropriate step.  An administrative disenrollment is a non-punitive administrative action that separates a student from the University where there is "clear and convincing evidence that the student's continued presence poses a significant risk of substantial harm to the health or safety of themselves, others, or to property."  Shivers Dep. Ex. 1 at 20 (Ohio State Code of Student Conduct); Christensen Decl. Ex. 8 at 1, ECF No. 8-2 at PageID 139.

Dr. Shivers sent Plaintiff a letter explaining her decision on May 30, 2025.  Christensen Decl. Ex. 8 at 1, ECF No. 8-2 at PageID 139.  In the letter, she explained that a confluence of factors led her to believe an administrative disenrollment was warranted.  *Id.*  These factors included: (1) the Rodriguez Video "inciting violence"; (2) the Torres Video that Congressman Torres "interpreted as a threat of violence and requested U.S. Capitol Police assistance"; (3) "myriad communications from members of the university community expressing fear of violence based on your posts"; and (4) "the engagement of several law enforcement jurisdictions in response to your actions."  *Id.*

**V.  Dr. Shivers considered Plaintiff's petition for re-enrollment.  She found it did not ameliorate the safety concerns that necessitated Plaintiff's administrative disenrollment, but she invited Plaintiff to re-petition if circumstances changed.**

The letter informing Plaintiff of his administrative disenrollment invited him to submit a petition for re-enrollment with "supporting documentation or evidence that the conditions found to

8

have existed that resulted in the disenrollment no longer exist and will not recur." Christensen Decl. Ex. 8 at 2, ECF No. 8-2 at PageID 140.

Plaintiff submitted such a request on June 23, 2025. Christensen Decl. Ex. 10, ECF No. 8-2 at PageID 152. In the request, Plaintiff argued that he believed he was never a threat to the University community. Christensen Decl. Ex. 10 at 8–9, ECF No. 8-2 at PageID 159–60. He believed his First Amendment and due process rights had been violated. Christensen Decl. Ex. 10 at 8–10, ECF No. 8-2 at PageID 159–61. He did not retract any of his previous statements or acknowledge that they could have created a dangerous environment at the University. Christensen Decl. Ex. 10 at 8–10, ECF No. 8-2 at PageID 159–61.

Dr. Shivers considered this petition and found that it did not meet the threshold under the Code of Student Conduct to authorize Plaintiff's re-enrollment. Christensen Decl. Ex. 11, ECF No. 8-2 at PageID 166. Specifically, she noted that no "documentation or evidence that [Plaintiff] no longer poses a significant risk of substantial harm to the safety of the university community" was included in the petition. Christensen Decl. Ex. 11 at 1, ECF No. 8-2 at PageID 166. "The petition amounts to a disagreement on what 'clear and convincing evidence' of conduct that constitutes a significant risk of substantial harm to health and safety is instead of providing evidence of a change in conditions supporting the reasons that [Plaintiff] should be re-enrolled at the university." Christensen Decl. Ex. 11 at 1, ECF No. 8-2 at PageID 166.

As Dr. Shivers explained in her testimony, administrative disenrollment "provide[d] an opportunity for [Plaintiff] to be able to share additional information [and submit a] petition that could outline what things have changed that will allow for you to return to be a student at Ohio State." Shivers Dep. 168:15–24. "Unfortunately, [Plaintiff's] petition response did not—was not in

9

response to or did not align with what the expectations are or the criteria might be."  Shivers Dep. 168:21–24.

At the close of her letter, Dr. Shivers invited Plaintiff "to further reflect and submit a petition that includes documentation or evidence that he no longer poses a significant risk of substantial harm to himself or others for consideration."  Christensen Decl. Ex. 11 at 2, ECF No. 8-2 at PageID 167. Plaintiff made no such attempt and did not contact the University again before filing the instant lawsuit.  Christensen Dep. 14:18–18:10.

## LAW AND ARGUMENT

## I.  A preliminary injunction is an extraordinary remedy intended to preserve the status quo while a case proceeds.

"[T]he preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it."  *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (cleaned up).  It is "reserved only for cases where it is necessary to preserve the status quo until trial."  *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526 (6th Cir. 2017) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008), and *Univ. of TEx. v. Camenisch*, 451 U.S. 390, 395 (1981)).  "The issuance of a preliminary injunction is the exception, rather than the rule."  *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 404 (6th Cir. 2024) (citing *Hall*, 878 F.3d at 526).

To determine whether Plaintiff is entitled to this extraordinary relief, this Court must weigh four factors: (1) whether Plaintiff has a strong likelihood of success on the merits; (2) whether Plaintiff would suffer irreparable injury absent the injunction; (3) whether issuance of an injunction would cause substantial harm to others; and (4) whether the public interest would be served by

issuance of an injunction. *Ohio v. Becerra*, 87 F.4th 759, 768 (6th Cir. 2023) (quoting *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam) (en banc)).

**II. Plaintiff is unlikely to succeed on the merits because his administrative disenrollment was not First Amendment retaliation, nor did it violate his due process rights.**

The likelihood of success on the merits is "typically the most important factor of a preliminary injunction analysis." *Higuchi*, 103 F.4th at 409 (citing *Sunless, Inc. v. Palm Beach Tan, Inc.*, 33 F.4th 866, 868 (6th Cir. 2022)). This is because the resolution of this factor "is usually dispositive." *Sunless, Inc. v. Palm Beach Tan, Inc.*, 33 F.4th 866, 871 (6th Cir. 2022) (citing *Enchant Christmas Light Maze & Mkt. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020)). Under this factor, courts ask "whether the party seeking the injunction has shown a substantial likelihood of success on the merits." *SEC v. G. Weeks Secur., Inc.*, 678 F.2d 649, 653 (6th Cir. 1982) (citing *Mason County Medical Assn. v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977)).

**A. Plaintiff is unlikely to succeed on his First Amendment retaliation claim because his administrative disenrollment was not intended to punish him for his speech, and regardless, his speech was not protected by the First Amendment.**

"To prove a First Amendment retaliation claim, a plaintiff must show: (1) he engaged in protected speech; (2) the defendant took an adverse action against him; and (3) there is a causal connection between the protected speech and the adverse action." *Josephson v. Ganzel*, 115 F.4th 771, 783 (6th Cir. 2024) (citing *Richards v. Perttu*, 96 F.4th 911, 917 (6th Cir. 2024)).

Here, Plaintiff has failed to establish that he is likely to prevail on the first and third elements of his First Amendment retaliation claim. Because this Court can avoid ruling on any constitutional questions by addressing the third element first, Defendants will do the same. *Cf. Firestone v. Galbreath*, 976 F.2d 279, 285 (6th Cir. 1992) (noting that courts "ought not to pass

11

on questions of constitutionality unless such adjudication is unavoidable" (quoting *Jean v. Nelson*, 472 U.S. 846, 854 (1985))).

> **1. Plaintiff has failed to prove causation: Dr. Shivers's decision to administratively disenroll Plaintiff was based on an honest belief that Plaintiff posed a risk to the safety of the Ohio State community; it was not a punishment for the content of his speech.**
>
> > **a. In First Amendment retaliation cases, courts ask whether the adverse action was "motivated in substantial part by a desire to punish" the individual for their protected speech.**

The third element of a retaliation claim asks whether there is "a causal connection between the protected conduct and the adverse action." *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999) (en banc). "Protected speech does not cause an adverse action in the traditional sense because protected speech does not act, but we say protected speech causes an adverse action if the speech motivates an individual actor to take acts that then proximately cause an adverse action." *King v. Zamiara*, 680 F.3d 686, 694–95 (6th Cir. 2012). Thus, in retaliatory claims, the causation analysis has two parts: "A plaintiff must show both (1) that the adverse action was proximately caused by an individual defendant's acts, but also (2) that the individual taking those acts was 'motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.'" *Id.* at 695 (quoting *Thaddeus-X*, 175 F.3d at 386) (citing *Siggers-El v. Barlow*, 412 F.3d 693, 702 (6th Cir. 2005)).

Because courts consider whether the "the protected conduct played a 'substantial part' in the actual decision," *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285 (1977), this inquiry requires considering "the subjective motivation of the defendants," *Thaddeus-X*, 175 F.3d at 399. To analyze motivation, courts borrow the familiar burden-shifting scheme from the employment context. "Once the plaintiff has met his burden of establishing that his protected

conduct was a motivating factor behind any harm, the burden of production shifts to the defendant"
to provide a lawful basis for the decision. *Id.* (citing *Mount Healthy City Sch. Dist. Bd. of Educ.
v. Doyle*, 429 U.S. 274 (1977)).

A helpful example comes from *Lavine v. Blaine Sch. Dist.*, 257 F.3d 981 (9th Cir. 2001).
There, a high school student wrote a poem that appeared to be about committing a school shooting.
*Id.* at 983–84.  This poem, when combined with past suicidal ideations and disciplinary issues,
was sufficient for school officials to contact law enforcement.  *Id.* at 984–85.  Law enforcement
checked on the student but found no probable cause to commit the student involuntarily, and a
consulting psychiatrist did not believe the student "was in imminent danger of causing serious
harm to himself and others."  *Id.* at 985.  Nevertheless, the school decided to "emergency expel"
the student, which was permissible where "the superintendent or designee has good and sufficient
reason to believe that the student's presence poses an immediate and continuing danger to the
student, other students, or school personnel or an immediate and continuing threat of substantial
disruption of the educational process."  *Id.* at 985 & n.3.  The student was readmitted after he was
cleared by a psychiatrist.  *Id.* at 986.

The student sued, claiming the school had expelled him for writing a poem that was
protected by the First Amendment.  *Id.* at 988.  The school countered that the student "was not
disciplined because of the poem, but was expelled based upon a confluence of factors, including
the poem, that indicated he was a danger to the safety of the school and to himself."  *Id.*  The court
agreed with the school officials, finding they "acted with sufficient justification and within
constitutional limits, not to punish [the plaintiff] for the content of his poem, but to avert perceived
potential harm."  *Id.* at 983.  Although the content of the poem "was a factor" in the decision to

13

expel the student," school officials "considered other factors beyond the poem in deciding to emergency expel." *Id.* at 991.

Another instructive case is *Routledge v. Tennessee*, No. 06-1125-T-An, 2007 U.S. Dist. LEXIS 115679, at *11 (W.D. Tenn. Oct. 4, 2007). There, a nursing student reported an incident where a patient was injured. *Id.* at *4. Shortly after making this report, the student was expelled for "disorderly conduct," despite "no prior disciplinary problems." *Id.* at *4. The student sued, alleging the expulsion was retaliation for his protected First Amendment speech about the patient-safety issue and a violation of due process. *Id.* at *4–5. The defendants conceded that the student's report of the patient-safety issue was protected speech, but they argued there was not a causal connection between the report and the expulsion. *Id.* at *10–11. Rather, the student was expelled because he "cursed at an instructor and acted in a threatening manner toward her" during a conversation after he made the report. *Id.* at *11. Applying "a modified honest-belief approach," the court found the defendants' stated reason for the expulsion was not "foolish, trivial, or baseless," even though no other student had been dismissed for cursing. *Id.* at *11–13. The student thus had failed to "establish a causal connection between his discharge from the nursing program and his protected speech." *Id.* at *13–14.

  **b. The decision to administratively disenroll Plaintiff was motivated by concern for the safety of the Ohio State community, not a desire to punish Plaintiff for his speech. This explains why a non-punitive, administrative procedure was used, as opposed to the student misconduct process.**

Here, as in *Lavine* and *Routledge*, the decision to administratively disenroll Plaintiff was not "motivated in substantial part by a desire to punish" Plaintiff for the content of his speech. *King*, 680 F.3d at 695. As Dr. Shivers's letter explains, the decision was motivated by a desire to protect the safety of the campus community. ECF No. 8-2 at PageID 139. As in *Lavine*, it is true

that Plaintiff's decision to post the Rodriguez and Torres videos "was a factor" in the decision; but the decision was "based upon a confluence of factors," all related to campus safety. 257 F.3d at 988, 991. Dr. Shivers's letter references this multifactor approach, listing four different reasons, including "myriad communications from members of the university community expressing fear of violence based on your posts," and "the engagement of several law enforcement jurisdictions." ECF No. 8-2 at PageID 139.

Dr. Shivers's testimony buttresses this health-and-safety rationale. She stated it plainly: "[T]his was less about viewpoint. It was more about health and safety risk." Shivers Dep. 95:5–6. Her "primary role and responsibility is to protect the health, safety[,] and well-being of [the Ohio State] campus community." Shivers Dep. 130:6–13. "Based on the information that [Plaintiff] shared, via his social media sites, the ongoing . . . collaborat[ion] of a number of law enforcement agencies, in addition to members of our community being fearful of what [the Rodriguez Video] called for, created a level of fear in the community created by [Plaintiff]." Shivers Dep. 130:6–13. And based on the size of Plaintiff's audience, roughly 3.4 million followers on TikTok alone, Dr. Shivers honestly and reasonably believed that the danger was legitimate: "[T]here's the ability for anyone, whether they live in Columbus or somewhere else, to be responsive to the messaging," and interpret the call for escalation and resistance as "a call to action." Shivers Dep. 77:12–24. These concerns for the safety of the community were the motivation behind the administrative disenrollment, not a desire to punish Plaintiff for his viewpoint or opinions.

Even if Plaintiff were to argue that the stated safety concerns were pretextual, Defendants are likely to prevail. Just as the school officials in *Routledge* honestly believed the plaintiff had been disruptive and threatening, Dr. Shivers had an honest belief that Plaintiff was a threat to campus safety. Dr. Shivers had a justifiable concern that such violence could spread to Ohio

15

State's campus because these events were coming on the heels of a brazen political assassination endorsed by Plaintiff to roughly 3.4 million followers. *See United States v. Lidderdale*, No. 2:25-mj-00270, 2025 U.S. Dist. LEXIS 159613, at *9 (S.D. Ohio Aug. 18, 2025) ("Research has shown that 'the more public support there is for political violence, the more common it is.'" (quoting Robert A. Pape, *We May Be on the Brink of an Extremely Violent Era in American Politics*, N.Y. Times (June 16, 2025), https://www.nytimes.com/2025/06/16/opinion/political-violence-minnesota.html)). In hindsight, this Court may even believe that Dr. Shivers's concerns were overblown, but because they were not "foolish, trivial, or baseless," they constitute an honest belief that this Court should countenance. *Routledge*, 2007 U.S. Dist. LEXIS 115679, at *12.

Nor is there evidence to support Plaintiff's claims that pressure from Attorney General Pam Bondi or other political figures influenced Dr. Shivers's decision. *See* Pl.'s Mot. Prelim. Inj. at 9–11, ECF No. 8 at PageID 81. When asked about comments from outside Ohio State, all the witnesses were unequivocal that they were not aware of such comments (other than from Congressman Torres)—let alone influenced by such comments. Shivers Dep. 121:16–21: 173:10–174:12; Smith Dep. 90:14–22; Lovell Dep. 69:4–20; Mitchell Dep. 108:6–109:4. There is simply no evidence that any political opinion played a role in the decision to disenroll Plaintiff. This decision was based solely on the health and safety of the University. *See, e.g.*, Shivers Dep. 130:3–13.

The lack of punitive intent is also reflected in the procedures employed in this case. Plaintiff was never charged with any student misconduct or routed through the student misconduct process; instead, he was administratively disenrolled for health and safety reasons. *See* Smith Dep. 130:17–22, 131:12–17. This non-punitive procedure is akin to the one used in *Lavine*. There, the school officials used an emergency expulsion procedure that applied where "the superintendent

16

or designee has good and sufficient reason to believe that the student's presence poses an immediate and continuing danger to the student, other students, or school personnel." 257 F.3d at 985 n.3.

Similarly, here, Section 3335-23-21 of the Code of Student Conduct allows for administrative disenrollment where "the vice president for student life or designee finds that there is clear and convincing evidence that the student's continued presence poses a significant risk of substantial harm to the health or safety of themselves, others, or to property." Christensen Decl. Ex. 8 at 1, ECF No. 8-2 at PageID 139. Just as the emergency expulsion procedure in *Lavine* was intended not to punish the student "but to avert perceived potential harm," 257 F.3d at 983, the administrative disenrollment here was intended not to punish Plaintiff but to ameliorate "a significant risk of substantial harm to the health or safety of [Plaintiff], others, or to property," Christensen Decl. Ex. 8 at 1, ECF No. 8-2 at PageID 139.

The Director of Student Conduct, Kelly Smith, confirmed the differences between the misconduct process and administrative disenrollment in her testimony. *See, e.g.*, Smith Dep. 130:17–18 ("Mr. Christensen doesn't have a record of a conduct violation."). She explained that he was not "investigated, charged[,] or adjudicated of any violations of the Code of Student Conduct." Smith Dep. 130:20–22. She elaborated: "Administrative disenrollment is not an adjudication process for any of those prohibited behaviors [in the Code of Student Conduct], so it is not a conduct violation for resolution. . . . It's its own thing." Smith Dep. 131:12–17.

Dr. Shivers stated much of the same: "[An] expulsion or suspension[] happens through the conduct process. A disenrollment happens through [an] administrative process. So this was an administrative process versus a [student] code of conduct process." Shivers Dep. 129:2–6; *see also*

Shivers Dep. 168:13–15 ("The disenrollment, again, was more of an administrative safety measure based on safety concerns.").

Plaintiff largely breezes by the causation element in his brief, devoting just one paragraph to the issue. Pl.'s Mot. Prelim. Inj. at 30, ECF No. 8 at PageID 100. He believes that Dr. Shivers's references to the Rodriguez and Torres videos in her letter mean that Plaintiff's speech "formed at least part of Defendants' motivation." *Id.* But this oversimplifies the causation analysis. As *Lavine* demonstrates, a student's speech can be "a factor" in a removal decision without being proof of a retaliatory motive. 257 F.3d at 991. Instead, as is the case here, the speech is merely one among a constellation of factors that demonstrated Plaintiff was a health and safety risk to himself and others. As Dr. Shivers explained in her testimony, it was not so much the content of Plaintiff's videos that concerned her as it was his tone, his agitation, and his erratic behavior. Shivers Dep. 56:6–8, 96:1–6, 118:13–119:3. This is why one of her first actions was to request a well-being check on Plaintiff. Shivers Dep. 56:4–16. And any claim of viewpoint or content discrimination is belied by the vast amount of other pro-Palestinian, anti-Zionist speech that was permitted on campus. *See, e.g.*, Christensen Dep. 125:18–131:14 (discussing on-campus pro-Palestinian, anti-Zionist advocacy). In fact, Plaintiff had been making pro-Palestinian, anti-Zionist content on social media since 2023—predating his time as a student at Ohio State—and it was not until his speech began to endorse and encourage violence that the University took any action. *See* Christensen Dep. 49:2–7, 93:21–94:7, 187:20–188:1. Dr. Shivers's reference to Plaintiff's videos is not, by itself, sufficient evidence that she was "motivated in substantial part by a desire to punish" Plaintiff for the content of his speech. *King*, 680 F.3d at 695.

At the end of the day, much of Plaintiff's retaliation claim appears to rest on a misunderstanding of the nature of administrative disenrollment. Plaintiff seems to assume that

18

administrative disenrollment is a punitive action.  *See, e.g.*, Pl's Mot. Prelim. Inj. at 31, ECF No. 8 at PageID 101 (citing case law about disciplinary expulsion).  But the evidence in this case belies that interpretation.  The administrative disenrollment process sits separate and apart from the student misconduct process.  Smith Dep. 131:12–17.  This explains, for instance, why administrative disenrollment does not include filing charges or a pre-disenrollment hearing— unlike the student conduct process.  *See* Smith Dep. 130:20–22, 131:12–17.  Instead, administrative disenrollment is a mechanism for diffusing a dangerous situation, with the opportunity to re-enroll when the threat has been ameliorated.  *See* Shivers Dep. 168:15–24.

Administrative disenrollment is solely concerned with the health and safety of the university community, not punishment.  Because Dr. Shivers honestly believed that Plaintiff's "continued presence at the university pose[d] a significant risk of substantial harm to the safety of the university community," Christensen Decl. Ex. 11 at 1, ECF No. 8-2 at PageID 166, she used administrative disenrollment, "not to punish [Plaintiff] for the content of his [videos], but to avert perceived potential harm."  *Lavine*, 257 F.3d at 983.  Therefore, because Defendants were not "motivated in substantial part by a desire to punish [Plaintiff] for exercise of a constitutional right," the causation element of Plaintiff's claim is lacking, and he is unlikely to succeed on the merits. *King*, 680 F.3d at 695.

**2. Even assuming Plaintiff's speech was the cause of his administrative disenrollment, his speech was not protected.**

**a. Plaintiff's speech constitutes incitement under *Brandenburg* and is not protected by the First Amendment.**

"The *Brandenburg* test precludes speech from being sanctioned as incitement to riot unless (1) the speech explicitly or implicitly encouraged the use of violence or lawless action, (2) the speaker intends that his speech will result in the use of violence or lawless action, and (3) the

19

imminent use of violence or lawless action is the likely result of his speech." *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 246 (6th Cir. 2015) (en banc) (footnote omitted). Plaintiff's speech satisfied all three elements.

### i. Plaintiff's speech explicitly or implicitly encouraged the use of violence or lawless action.

In determining whether speech is protected courts must consider "content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder v. Phelps*, 562 U.S. 443, 454 (2011) (reviewing whether speech was on matters of public or private concern).

"[T]he mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969). Determining whether speech is unprotected does not require "rigid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience." *United States v. Malik*, 16 F.3d 45, 50 (2d Cir. 1994) (discussing threats).

In *Brandenburg*, the Supreme Court clarified that First Amendment protections extended to "advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." 395 U.S. 444, 447 (1969). There, an invited cameraman recorded a twelve-person Ku Klux Klan meeting on an Ohio farm. *Id.* at 445–46. The Klan's messages were later broadcast through a local and a national network. *Id.* The televised portions included a speech by the organizer stating that "if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance taken." *Id.* at 446. The

organizer stated that they would march on Congress on July Fourth "four hundred thousand strong" and then split into two groups "to march on St. Augustine, Florida" and the other "into Mississippi." *Id.* Another clip showed a speaker state his personal racist and antisemitic beliefs. *Id.* at 447. Some of the "figures in the films carried weapons," but the speakers did not. *Id.* The Court overturned the speaker's criminal convictions based on his speech and struck down the law criminalizing speech where "mere advocacy [was] not distinguished from incitement to imminent lawless action." *Id.* at 449.

Unlike *Brandenberg*, where the video's context did not lend itself to "steeling" a group to violent action, Plaintiff's Rodriguez Video did. Plaintiff began his video by withdrawing his earlier condemnation of "the elimination of those two Zionist officials who worked at the Israeli embassy last night." Christensen Dep. Ex. B at 1. Plaintiff withdrew his condemnation because "Israel has live streamed a genocide to the entire world for the last two years." *Id.* Plaintiff supported Rodriguez's murder of the two embassy staffers because "you cannot expect to do such a thing [genocide] in this world without the people standing up to fight to stop you in any way they can to resist against you." *Id.* The killings were justified because the two staffers were "Zionist[s]" and "war criminal[s]." *Id.* The assassin was "part of the [pro-Palestine] movement" and is not a terrorist but "a resistance fighter." *Id.*

The shooter's manifesto, which Plaintiff read aloud during the Rodriguez Video, described his murder of the two staffers as "the only sane thing to do" because of Israel's genocide in Palestine. *Id.* at 3. The manifesto expressed that rhetoric and talk were ineffective given the history of the genocide and that action akin to murder was necessary. *Id.* (approvingly discussing an attempt to kill U.S. Defense Secretary Robert McNamara during the Vietnam War). Plaintiff "wholeheartedly agree[d]" with Rodriguez's manifesto and actions. *Id.* at 1. He encouraged his

21

supporters to emulate Rodriguez by meeting any opposition to the movement with "greater resistance and escalation." *Id.*

In *Brandenburg*, the speaker did not incite anyone to violence when he called for some vague notion of possible "reveangance" if politicians did not stop "suppress[ing] the white, Caucasian race." 395 U.S. at 446. But the context in which Plaintiff made the Rodriguez Video was anything but vague: two civilians had just been assassinated. Plaintiff intended to incite violence when he told his millions of online followers to emulate the murderer because the situation in Palestine was dire. An agitated, yelling Plaintiff exhorted his followers to action in the mold of Rodriguez by decrying the genocide of innocent Palestinians. Plaintiff's painting of such a dire situation, coupled with his overt support for Rodriguez's murders, encouraged anyone on the side of Palestine to immediately do the same.

### ii. Plaintiff intended that his speech would result in the use of violence or lawless action.

In *Higgins v. Ky. Sports Radio, LLC*, 951 F.3d 728 (6th Cir. 2020), the Sixth Circuit found a radio show host's strong criticism of a referee was protected speech, despite the negative impact on the referee's business, because the host had repeatedly discouraged any harassment. *Id.* at 732. There, the radio host vilified a college basketball referee after a questionable call caused the local team to be eliminated from the championship playoff. *Id.* In the coming days, listeners wrote in the show's online comments section about the referee's roofing business. *Id.* The fans asked the show host about leaving bad reviews of the referee's business to retaliate for the basketball game. *Id.* The referee ultimately received thousands of negative reviews and calls, severely harming his business and harassing his family. *Id.* at 733. But the host repeatedly told his listeners that leaving bad reviews was a "bad thing to do" and constituted "harassment," even though at times it was

condemned in a sarcastic manner. *Id.* at 732, 737–38. Although the host "did a poor job dissuading listeners from mischief," the host's speech was not incitement because the speaker never "specifically advocate[d]" for unlawful action. *Id.* at 736–38.

Here, unlike in *Higgins*, multiple aspects of the Rodriguez Video demonstrate Plaintiff intended to incite imminent violence or lawless action against "Zionists." Plaintiff's agitated state, visible anger, and raised voice demonstrated he meant to arouse the passions of his viewers and steel them to action. *See* Christensen Decl. Ex. 2, ECF No. 8-2 at PageID 139–40. The timing of the video—roughly twenty-four hours after the shooting—was intended to capitalize on the publicity of the murders and encourage copycats. Plaintiff painted the situation in Palestine as especially dire given the "genocide" in Israel's ongoing war. *Id.* Plaintiff characterized the terrorist Rodriguez as a hero for murdering the two Israeli staffers. Plaintiff read Rodriguez's manifesto and encouraged others to "resist" like he did—through violence and murder because it is "the only sane thing to do." Christensen Dep. Ex. B at 3.

Plaintiff himself even suggested that his speech was unprotected when he expressed concern that his post may "allow our government to condemn me to a cell, but I don't know." *Id.* at 4. Notably, Instagram and TikTok removed the Rodriguez Video for violating their standards. Christensen Dep. at 65:15–24, 67:6–25, 163:15–21. And Meta banned Plaintiff from Instagram within weeks of Plaintiff posting the Rodriguez Video. Christensen Dep. 65:25–66:24. These actions from independent actors are additional evidence of the dangerousness of Plaintiff's rhetoric.

Unlike the radio host in *Higgins* who dissuaded further action, Plaintiff never discouraged any of his followers from committing murder like Rodriguez. Plaintiff claims that a later video he posted clarified that his statements were nonviolent. Pl.'s Mot. Prelim. Inj. at 8–9, ECF No. 8 at

23

PageID 78–79.  But this is belied by the video itself.  Plaintiff's video, posted a day after the Rodriguez Video, does not tell his followers to be nonviolent.  Christensen Dep. Ex. D.  Plaintiff only claims that he "hate[s] Zionists," that he would not make "threats" that would jeopardize his "position," and that he was "not suicidal."  *Id.*

This case is also distinguishable from *Nwanguma*.  There, then-candidate Donald Trump told supporters at a rally to "get [protestors] outta here" immediately followed by "don't hurt 'em."  *Nwanguma v. Trump*, 903 F.3d 604, 608 (6th Cir. 2018).  Reviewing those statements in context showed those "words were self-evidently said in order to quell the disturbances by removing the protesters" not to "specifically advocate [a violent] response."  *Id.* at 611–12.

Unlike Trump's instant clarification in *Nwanguma*, Plaintiff did not post his follow-up video until the next day.  *Compare* Christensen Dep. Ex. B, *with* Christensen Dep. Ex. D.  Plaintiff never denounced, clarified, or recanted any of his earlier statements supporting the terrorist Rodriguez or encouraging his followers to emulate him.  *See* Christensen Dep. Ex. D.  The same goes for Plaintiff's May 27th video discussing his earlier video vilifying Congressman Richie Torres.  Christensen Dep. Ex. E.  Plaintiff claimed *he* is "nonviolent" but never discussed Rodriguez or disclaimed his earlier Rodriguez Video.  Christensen Dep. Ex. E at 1–3.  Moreover, unlike Trump's contemporaneous statements to the crowd in *Nwanguma*, there was no guarantee that Plaintiff's followers would see these later videos or think that Plaintiff was intending to discourage violence against Jews.  Indeed, none of the Ohio State administrators recalled seeing the later videos.  Shivers Dep. 117:21–118:4; Ex. E, Mitchell Dep. 106:9–13; Smith Dep. 87:15–24.

### iii. Imminent use of violence or lawless action was the likely result of Plaintiff's speech to his 3.4 million followers given the context.

"Several attributes of the Internet substantially amplify the fear an individual can instill via threats or incitement. Such threats have the ability to reach a vast audience—far more than the traditional speaker or author published in a single venue." *United States v. Wheeler*, 776 F.3d 736, 745 n.4 (10th Cir. 2015). "And, given the prevalence and diversity of Internet fora and discussion boards, such exhortations may often find a receptive audience of like-minded individuals— perhaps audiences more willing to do the bidding of one urging violent action." *Id.* (upholding a true threats conviction for posts calling for deaths of police officers). Additionally, it is important to note that, for speech to be unprotected, *Brandenburg* requires only that unlawful violence is a likely result of speech, not that the violence actually occur. *See United States v. Miselis*, 972 F.3d 518, 536–38 (4th Cir. 2020) (describing an anti-riot law as "narrower" than *Brandenburg* as "it require[d] lawlessness to *occur*, not just be likely").

The rise of social media platforms and their ubiquitous "influencers" who have the ability to instantly reach millions in minutes does not fit neatly into the traditional *Brandenberg* test. It makes this case distinct from previous incitement cases. *See e.g. NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 888 (1982) (finding speaker's statement that the crowd should "break [nonsupporters] damn neck[s]" was hyperbole given context of speech and not incitement); *Nwanguma*, 903 F.3d at 606 (finding the candidate's statement to crowd to get protestors "outta here" not incitement given context and later statement of "don't hurt 'em"). As opposed to the televised Klan statements in *Brandenburg* or in-person speakers limited to a crowd, Plaintiff's speech was instantly available on demand to the world through multiple social media platforms. And as the size of the audience grows, the possibility of someone actually being incited grows. As

25

a result of the sheer scope of Plaintiff's audience, roughly 3.4 million followers on TikTok alone, Shivers Dep. 77:8–10, the risk of incitement through his massive social media following is far greater than the means of yesteryear.

Plaintiff's means of transmitting his message, his language encouraging violence in the mold of Rodriguez, the immediate need for violence given Israel's alleged genocide in Gaza, and his massive following all demonstrate that imminent use of violence or lawless action was the likely result of Plaintiff's speech.

### iv. *Hess*, *Nwanguma,* and *Bible Believers* do not support the claim that Plaintiff's speech was not incitement.

Plaintiff's reliance on *Hess*, *Nwanguma*, and *Bible Believers* is misplaced. Pl.'s Mot. Prelim. Inj. at 17–19, ECF No. 8 at PageID 87–89. None of these cases encouraged others to commit violence. The contested speech in *Hess* concerned a protestor saying "[w]e'll take the f****** street again" after police had broken up a peaceful, street protest. *Hess v. Indiana*, 414 U.S. 105, 108 (1973) ("[A]t worst, it amounted to nothing more than advocacy of illegal action at some indefinite future time.").

*Bible Believers* dealt with evangelical Christians attempting to proselytize Muslims by crudely insulting Islam. *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 244 (6th Cir. 2015) ("Islam is a Religion of Blood and Murder," "Turn or Burn," and "Your prophet is a pedophile."). Those statements were not encouraging others to be violent against Muslims or any group. Indeed, their picketing occurred at a Muslim festival. *Id.* at 238, 252–53 (noting the only resulting violence was crowd hostility against the evangelical picketers, a heckler's veto).

This case presents a unique example of incitement in the digital age. Here, a social media "influencer" used the language of a terrorist movement that appeared to encourage worldwide

violence against Jews by his millions of followers. Different from those three cases, or frankly any other, Plaintiff's speech did advocate imminent violence. In the Rodriguez Video, Plaintiff spent several minutes ranting to his millions of followers about the need for violence emulating the terrorist Rodriguez. Unlike *Hess*'s one-off statement in the context of a peaceful street protest, Plaintiff's passionate speech was in the context of the murder of Israeli embassy staffers by a pro-Palestinian terrorist. *Hess* called for more disruptive, but peaceful, protest; Plaintiff, on the other hand, called for further resistance and escalation in the context of the murder of two Israeli embassy staffers. *See* 414 U.S. at 108; Christensen Dep. Ex. B.

Candidate Trump's two lines in *Nwanguma* about the removal of protestors during a rally differ widely from Plaintiff's speech encouraging his followers to target "Zionist" civilians. *Nwanguma*, 903 F.3d at 608; Christensen Dep. Ex. B. Plaintiff's speech explained that attacking Jews, like Rodriguez did, was immediately necessary and justified because of the mass "atrocities" being committed by the Israeli "genocide machine." Christensen Dep. Ex. B. The speakers in *Bible Believers*'s crude attempts at converting Muslims at an Arab festival pale in comparison to Plaintiff's calls for global violence against Jews. In the face of the Palestinian genocide, Plaintiff encouraged his followers to target Jews the world over now to "bring[] the war home" like Rodriguez. Christensen Dep. Ex. B. Plaintiff's case is distinct from the cases he cites for support due to the length of his speech, the context, and the inherent call for violence to his massive following.

**b. Plaintiff's speech is also unprotected under *Tinker*: administrators reasonably believed Plaintiff's calls for violence against Jews, in the context of a recent terrorist attack, could cause a substantial disruption on campus.**

**i. *Tinker* applies to universities and permits universities to censure student speech if there is a reasonable likelihood of substantial disruption.**

There is "no doubt that the First Amendment rights of speech and association extend to the campuses of state universities." *Widmar v. Vincent*, 454 U.S. 263, 269 (1981). However, the Supreme Court has recognized that public schools can regulate speech they deem "might reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities" or that intrudes upon "the rights of other students to be secure and to be let alone." *Tinker v. Des Moines InDep. Cmty. Sch. Dist.*, 393 U.S. 503, 508, 513 (1969). Potentially disruptive speech is "not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513.

The Supreme Court has extended the *Tinker* substantial-disruption test to public universities. *Healy v. James*, 408 U.S. 169, 189 (1972) (remanding case involving college's denial of student group that would not disclaim campus violence during application). In the university context, the government could prohibit both "lawless action" and that which could "'materially and substantially disrupt the work and discipline of the school.'" *Id.* (quoting *Tinker*, 393 U.S., at 513).

The Sixth Circuit has upheld universities' use of *Tinker*'s substantial disruption test to censure student speech. In applying *Tinker*, the Sixth Circuit has held that "*Tinker* does not prescribe a uniform, 'one size fits all' analysis. The Court must consider the content and context of the speech, and the nature of the school's response." *Lowery v. Euverard*, 497 F.3d 584, 588 (6th Cir. 2007). "*Tinker* does not require certainty, only that the forecast of substantial disruption

28

be reasonable." *Lowery*, 497 F.3d at 592 (further explaining that *Tinker* "does not require disruption to have actually occurred").

> ii. **Considered in context, Plaintiff's statements called for violence against Zionists and Jews. Administrators reasonably believed that there would be a substantial disruption on campus given the content and Plaintiff's massive audience.**

"First Amendment rights must always be applied 'in light of the special characteristics of the . . . environment' in the particular case." *Healy*, 408 U.S. at 180 (quoting *Tinker*, 393 U.S. at 506). "Courts generally defer to school administrators' decisions regarding student speech so long as their judgment is reasonable." *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 30 (1st Cir. 2020) (citations omitted); *see Morse v. Frederick*, 551 U.S. 393, 403 (2007) ("*Tinker* held that student expression may not be suppressed unless school officials reasonably conclude that it will 'materially and substantially disrupt the work and discipline of the school.'" (quoting *Tinker*, 393 U.S. at 513)).

Various courts have found *Tinker*'s off-campus or on-campus distinction blurred when it comes to the internet and social media. "The pervasive and omnipresent nature of the Internet has obfuscated the on-campus/off-campus distinction . . . making any effort to trace First Amendment boundaries along the physical boundaries of a school campus a recipe for serious problems in our public schools." *Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379, 391, 395–96 (5th Cir. 2015) (en banc) (quotation marks and alterations omitted); *Doe v. Valencia Coll.*, 903 F.3d 1220, 1231 (11th Cir. 2018) (quoting same); *Doninger v. Niehoff*, 527 F.3d 41, 48 (2d Cir. 2008) (noting students can be disciplined for off-campus, expressive conduct "when this conduct would foreseeably create a risk of substantial disruption within the school environment . . . [and] might also reach campus"); *see also Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 218 (2021) (Thomas, J.,

29

dissenting) ("[O]ff-campus speech made through social media can be received on campus (and can spread rapidly to countless people), it often will have a greater proximate tendency to harm the school environment than will an off-campus in-person conversation.").

Recall that in *Lavine v. Blaine Sch. Dist.*, a student brought a poem to class detailing an imaginary school shooting. 257 F.3d at 983–84. The student wrote the poem, "Last Words," during a time when "several school shootings had occurred" nationwide and were widely publicized. *Id.* at 984. The poem, coupled with the student's history of problems at home, led the school to emergency expel the student. *Id.* at 985–86. The school later allowed the student to finish the academic year after a psychiatrist evaluated the student and found that he would not be a threat to the school. *Id.* at 986. "Given the potential for substantial disruption," the court could not "fault the school's response" and held the school did not violate the student's First Amendment rights. *Id.* at 990. The court looked to "the totality of the relevant facts" and found the school acted reasonably given the poem's text and the student's history. *Id.* at 989–90.

Recently, in *Damsky v. Summerlin*, No. 1:25-cv-275-AW-MAF, 2025 U.S. Dist. LEXIS 232881 (N.D. Fla. Nov. 24, 2025), a district court found the University of Florida likely violated a law student's First Amendment rights. *Id.* at *1–2, *17. The school expelled the student after he posted "Jews must be abolished by any means necessary" on social media in reference to an academic discussion. *Id.* That student, who had "almost no following" online, referenced "abolish[ing] the Jews" in the larger context of a Harvard professor's proposal to "abolish the White race by any means necessary." *Id.* at *6. The court found that, while offensive, the student's "statement did not, in context, constitute a true threat." *Id.* at *15. And, because the statement was not a "school-directed threat," the University had no basis to claim substantial disruption under *Tinker. Id.* at *25.

Unlike the pseudo-academic ramblings in *Damsky*, and more like the "Last Words" poem in *Lavine*, Ohio State had multiple grounds to support its belief that Plaintiff would cause substantial disruption on campus. First, Ohio State received "myriad communications from members of the university community expressing fear of violence based on [Plaintiff's] posts". Christensen Decl. Ex. 8 at 1, ECF No. 8-2 at PageID 139. These included members of the campus Jewish community who felt threatened. Shivers Dep. 129:17–130:13. Second, administrators also became aware of the "engagement of several law enforcement jurisdictions in response to [Plaintiff's] actions." Christensen Decl. Ex. 8 at 1, ECF No. 8-2 at PageID 139. Third, administrators viewed the Rodriguez Video and believed that, taken in the context of the violent murders in DC, Plaintiff intended to incite violence. *Id.*; Shivers Dep. 56:4–8, 92:12–93:5, 93:21–94:10; Lovell Dep. 75:11–14, 77:4–9. Fourth, the administration found that Congressman Torres had interpreted Plaintiff's "Torres Video" as a threat of violence against him. Christensen Decl. Ex. 8 at 1, ECF No. 8-2 at PageID 139. Fifth, Plaintiff was nonresponsive to law enforcement's attempts to contact him about his concerning actions and speech. Shivers Dep. 56:4–20; Christensen 185:12–21, 186:3–187:5. Sixth, Plaintiff's extensive online presence, which included roughly 3.4 million online followers, made administrators believe there was a strong likelihood Plaintiff's calls to action against Jews and Israel supporters would substantially disrupt campus. Christensen Decl. Ex. 8 at 1, ECF No. 8-2 at PageID 139; Shivers Dep. 77:9–24, 92:12–20, 94:4–10, 97:15–24, 110:20–23; Lovell Dep. 74:11–75:6, 75:11–17, 76:3–13.

Taking all of this in totality, Dr. Shivers determined that Plaintiff posed a "clear and convincing" threat of substantial disruption on campus. Christensen Decl. Ex. 8 at 1, ECF No. 8-2 at PageID 139. While administrators came to believe that Plaintiff may be residing outside Ohio, Plaintiff was scheduled to return to campus for the fall semester. Shivers Dep. 76:2–13. The

31

global reach of social media made his location irrelevant as any one of his millions of online followers could reasonably become a copycat of the DC shooter on Ohio State's campus. Shivers Dep. 77:9–24, 92:12–20, 94:4–10, 97:15–24; Lovell Dep. 77:23–78:10, 79:10–80:9. While Plaintiff was content to hide behind his keyboard, he had no issue steeling his followers to commit violence against anyone associated with the State of Israel. On Ohio State's campus that would naturally include any pro-Israel or Jewish student groups. Shivers Dep. 77:9–24, 92:16–20, 93:23–94:10. Ohio State reasonably concluded that Plaintiff's speech could cause a substantial disruption on campus, so his speech was not protected under *Tinker* and its progeny. *Healy*, 408 U.S. at 189 (quoting *Tinker*, 393 U.S., at 513) (noting universities have power to prohibit speech that could cause "lawless action" and "materially and substantially disrupt the work and discipline of the school").

### iii. Plaintiff's attempts to evade *Tinker* and question the University's rationale for administratively disenrolling him lack merit.

"*Tinker* does not require school officials to wait until the horse has left the barn before closing the door. Nor does *Tinker* 'require certainty that disruption will occur.'" *Lowery*, 497 F.3d at 591–92 (quoting *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 767 n.17 (9th Cir. 2006) (citation omitted)).

Plaintiff's claim that *Tinker* is an irrelevant consideration for his speech merely because it is cloaked in a matter of public concern is illogical. Pl.'s Mot. Prelim. Inj. at 23–24, ECF No. 8 at PageID 93–94. While "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas'" it is hard to say that the portions of Plaintiff's off-campus social media diatribes which encourage the imminent murder of Jews, immediately following a terrorist attack, qualify as such. *Healy*, 408 U.S. at 180. Under Plaintiff's framework, if a university student had

32

brought in a frightening essay or poem like *Lavine*, but cloaked in the language of politics, a university would be helpless to act under *Tinker*.  Plaintiff would have this Court hamstring universities from preventing a substantial disruption even though a speaker would be fomenting unlawful action on campus, or themselves present a danger through mental instability.  Given the potential for politically motivated violence, *see, e.g.*, *Lidderdale*, 2025 U.S. Dist. LEXIS 159613, at *9, universities must retain the ability to censure speech that could foreseeably cause a substantial disruption, *see, e.g.*, *Lavine*, 257 F.3d at 984–86.

Plaintiff's claim that the University acceded to a heckler's veto also lacks merit.  Pl.'s Mot. Prelim. Inj. at 25–26, ECF No. 8 at PageID 95–96.  At the outset, Plaintiff's overbroad conception of a heckler's veto would vitiate the substantial-disruption test from *Tinker*.  If schools cannot consider the disruptive effect of a speaker in any way lest they succumb to a heckler's veto, *Tinker* means nothing.  The Sixth Circuit recently acknowledged this uncertainty: "[T]he Court's cases leave unclear when (if ever) schools may silence nondisruptive speakers because of the way that listeners will react to their message."  *Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 2025 U.S. App. LEXIS 29181, at *30–31 (6th Cir. 2025) (en banc).  But it did "find two extremes clear": (1) "schools may not ban student speech just because the audience will suffer 'discomfort and unpleasantness' from hearing ideas they dislike"; and (2) "schools may ban student speech that resembles statements that generally fall outside the First Amendment because of their likely effects on their audience."  *Id.* at *31.

This case is much closer to the second extreme than the first.  Dr. Shivers did not administratively disenroll Plaintiff "merely because [his] ideas are themselves offensive to some of their hearers."  *Matal v. Tam*, 582 U.S. 218, 244 (2017) (citations omitted).  To the contrary, she administratively disenrolled Plaintiff because she believed he was inciting violence that would

33

cause material disruption to the University. *See* Shivers Dep. 24:25–25:9, 95:7–15, 97:15–24, 114:4–6, 136:19–137:4. The involvement of multiple law enforcement agencies, coupled with an outpouring of safety concerns from the broader Ohio State community, confirmed her belief that Plaintiff's speech threatened a substantial disruption. Shivers Dep. 116:16–117:2. Dr. Shivers had concerns that Plaintiff's speech would directly affect campus. Indeed, Plaintiff himself admitted he was "famous" and "frequently" recognized for his anti-Israel platform on campus, which reflected the breadth of his potential influence. Christensen Dep. 33:22–35:8.

Thus, although Dr. Shivers' initial concerns were bolstered by third parties that became involved in either decrying the seriousness of Plaintiff's inciting speech or investigating him, this did not constitute a heckler's veto. Third parties merely confirmed what Dr. Shivers already believed about the potential for disruption, which explains why she cited them as reasons for her decision to administratively disenroll him. Christensen Decl. Ex. 8 at 1, ECF No. 8-2 at PageID 139.

**B. Plaintiff's procedural due process claim is unlikely to succeed because he received the proper amount of process for an administrative disenrollment and has failed to show a deprivation of due process under that standard.**

The defects in Plaintiff's due process claim stem from a misunderstanding of the section of the Code of Student Conduct that establishes and authorizes administrative disenrollment. An administrative disenrollment under section 3335-23-21 is separate and distinct from disciplinary suspensions or disenrollments. In a time when fatal events are all too common on college campuses, universities like Ohio State need a mechanism to swiftly remove students who may present a threat to campus safety, while still affording those students a meaningful opportunity to be heard afterwards. Plaintiff received all the process that he was due under 3335-23-21. His refusal or inability to present information to rebut the finding that he presented a danger to Ohio

34

State's campus is not an indictment of the process that he received, but rather reflective of the threat that he posed to the safety of Ohio State's campus and its community.

1. **In the educational context, the amount of process required varies depending on the nature of the deprivation, with non-punitive suspensions or dismissals requiring less process.**

A procedural due process claim has three elements: (1) a life, liberty, or property interest requiring protection under the Due Process Clause; (2) a deprivation of that interest; and (3) the deprivation is effectuated without adequate process. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). Due process protections have long-shielded access to education, including higher education. *See, e.g.*, *Goss v. Lopez*, 419 U.S. 565, 574 (1975); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 396 (6th Cir. 2017). Additionally, Defendants concede that their administrative disenrollment deprived Plaintiff of his interest, though not without a valid reason. This leaves only the third element—what process Plaintiff was due—at issue in this case.

The practical analysis of due process is not a "technical conception" that strictly sets forth the manner or type of hearing required. *Ingraham v. Wright*, 430 U.S. 651, 675 (1977). Rather, procedural due process is "flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

To evaluate the sufficiency of a particular process, including in the education context, courts apply the three-factor test from *Mathews*. *See Ingraham v. Wright*, 430 U.S. 651, 675 (1977). The *Mathews* test considers: "(1) the nature of the private interest affected—that is, the seriousness of the charge and potential sanctions, (2) the danger of error and the benefit of additional or alternate procedures, and (3) the public or governmental burden were additional procedures mandated." *Flaim v. Med. College of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005) (citing

35

*Ingraham*, 430 U.S. at 676–82). "The stronger the private interest," the greater the due process protection. *Flaim*, 418 F.3d at 635 (citation omitted).

Additionally, the nature of the proceeding is relevant to the degree of due process protections. In the educational context, the Supreme Court has distinguished between the due process protections required for disciplinary suspensions versus academic suspensions. Procedures that are disciplinary in nature enjoy stronger protection. For instance, in *Goss v. Lopez*, 419 U.S. 565 (1975), the Court held that for disciplinary suspensions, at the very minimum, "students facing suspension and the consequent interference with a protected property interest must be given *some* kind of notice and afforded *some* kind of hearing." *Id*. at 579 (emphasis in original). The Court refused to impose standards regarding the form of either the notice or the hearing, only requiring "some kind" of both. Instead, the "kind" of notice and hearing are determined by the "competing interests involved." *Id*. (citations omitted).

In contrast, dismissals or suspensions that are academic in nature need not bear "resemblance to the judicial and administrative factfinding proceedings to which . . . have traditionally attached a full-hearing requirement." *Board of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 89 (1978).

### 2. Plaintiff's administrative disenrollment was not disciplinary in nature.

Plaintiff's due process claim rests on the assumption that his administrative disenrollment was a disciplinary procedure. Pl.'s Mot. Prelim. Inj. at 30, ECF No. 8 at PageID 100. As addressed above, this is incorrect. *See supra* Section II.A.1.b. An administrative disenrollment is not punitive in nature; it is a process used in exigent circumstances to ensure the safety of the student in question, other students, and the campus community. *See* Shivers Dep. 129:2–6, 168:13–13; Smith Dep. 131:12–17. Administrative disenrollments are purposefully streamlined to allow

36

the University to address pressing concerns with immediacy. When a student demonstrates a present or ongoing danger to themselves and others, the University's first concern is not punishment but restoring and maintaining safety. The purpose of Plaintiff's administrative disenrollment was to ensure campus safety, not to punish his speech. *See* Shivers Dep. 167:1–16.

It is important to reiterate that Plaintiff was not disenrolled using the disciplinary procedures of the Code of Student Conduct. *See* Smith Dep. 130:12–131:12. The disciplinary process includes protections that resemble more formal hearings and administrative procedures, often lasting months at a time. *Id*. at 37:19–38:12, 39:15–24. In contrast, administrative disenrollment is a procedure meant only to address emergency situations. *Id*. at 168:13–15. To administratively disenroll a student, the Senior Vice President of Student Life must find, by clear and convincing evidence, that a "student's continued presence poses a significant risk of substantial harm to the health or safety of themselves, others, or to property." Shivers Dep. Ex. 1 at 19–20. As the name implies, this procedure is necessarily responsive rather than adjudicative. It is not punitive, does not attribute or determine guilt, and there are no formal charges or preliminary investigations. It is solely to maintain safety and order on Ohio State's campus.

### 3. The *Mathews* factors weigh in favor of Plaintiff having received the proper degree of process.

Given the non-punitive nature of administrative disenrollments, the post-disenrollment process Plaintiff received was constitutionally sufficient under the *Mathews* test. First, Plaintiff had a private interest in re-enrolling as a student, while Ohio State had a strong interest in ensuring the safety of its campus and community. Second, there was a minimal danger of error, considering any disenrollment could be undone well before the new semester started, but there was a potentially disastrous risk posed by any delays that would be caused by additional or alternate procedures.

37

Again, when considering the degree of due process, a court is to consider the nature of the process. *See Horowitz*, 435 U.S. at 88; *Flaim v. Med. College of Ohio*, 418 F.3d at 634. ("Because Flaim's case is a disciplinary expulsion, rather than an academic one, we conduct a more searching inquiry."). The nature of administrative disenrollment is not disciplinary or even academic—it is responsive to emergencies. Adding further complexity or alternate procedures would not reduce the risk of error and would only inhibit swift responses in situations when time is of the essence.

Third and finally, it would be burdensome for universities to be required to follow additional court-mandated procedures. Courts have expressed skepticism for requiring extensive procedural protections of schools as they are not "courtrooms or administrative hearing rooms." *Id.*; *Goss*, 419 U.S. at 583 ("[F]urther formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process."); *Flaim*, 418 F.3d at 640 ("While the additional safeguard of professional advocacy may lessen the risk of erroneous expulsion by improving the quality of the student's case, the administrative burdens to a university, in the business of education, not judicial administration, are weighty."). This reluctance is evident in the context of past, single-occurrence infractions, which are common under disciplinary and academic codes of conduct. *See e.g. Flaim*, 418 F.3d 629. It should be all the more so in the context of emergency responses to present, ongoing threats on college campuses. The University's Code of Student Conduct vests the authority to administratively disenroll in a single person or designee, enabling expedient decisions in emergent situations. Imposing more onerous procedures would not undermine the purpose of the administrative disenrollment process. It would be not only burdensome but also dangerous.

### 4. **Plaintiff fails to demonstrate deprivation of due process**

Plaintiff alleges he received insufficient notice and an insufficient opportunity to be heard. Compl. ¶ 122, ECF No. 1 at PageID 25; Pl.'s Mot. Prelim. Inj. at 30, ECF No. 8 at PageID 100. Yet, Plaintiff makes no substantive argument regarding a lack of notice. Pl.'s Mot. Prelim. Inj. at 30, ECF No. 8 at PageID 100. Nor could he. Dr. Shivers's letter informing Plaintiff of his administrative disenrollment included the code section detailing administrative disenrollment, a list of specific factors Dr. Shivers considered in making her decision, and an explanation of the process for petitioning for re-enrollment.

It matters little that Plaintiff was provided notice following the decision to administratively disenroll him. *See* Christensen Decl. Ex. 8, ECF No. 8-2 at PageID 139–40. Generally, notice should precede removing the student from school, however, "[s]tudents whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school. In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable." *Goss*, 419 U.S. at 582–83. The basis for Plaintiff's disenrollment was the belief that he constituted a threat to Ohio State's campus community. Accordingly, Ohio State's post-deprivation notice does not offend Plaintiff's due process rights.

Plaintiff was also given a meaningful opportunity to be heard. Section 3335-23-21 provides that a disenrolled student may submit a petition to the "vice president of student life for revision of that status." Christensen Decl. Ex. 8, ECF No. 8-2 at PageID 139–40. Plaintiff claims he was given no meaningful opportunity to defend himself, while in the same breath admitting that he availed himself of the re-enrollment petition. Pl.'s Mot. Prelim. Inj. at 30, ECF No. 8 at PageID 100. Dr. Shivers considered his petition, though it was rejected for failure to meet the standard required by the code section. Christensen Decl. Ex. 11, ECF No. 8-2 at PageID 166;

Shivers Dep. 168:21–24. But the Fourteenth Amendment does not entitle Plaintiff to a favorable outcome—only the "meaningful opportunity to be heard." *See Anderson v. True*, CASE NO., 2017 U.S. Dist. LEXIS 122255, at *3 (E.D. Mich. Aug. 3, 2107) (citing *RBIII, L.P. v. City of San Antonia*, 713 F.3d 840, 845 n.4 (5th Cir. 2013); *Ctr. For Powell Crossing, LLC v. City of Powell, Ohio*, 173 F. Supp.3d 639, 655 (S.D. Ohio 2016)).

"An accused individual has the right to respond and defend, which will generally include the opportunity to make a statement and present evidence." *Flaim*, 418 F.3d 636. Plaintiff had his opportunity to respond and defend himself, and he availed himself of that opportunity. Christensen Decl. Ex. 10, ECF No. 8-2 at PageID 152. Plaintiff's inability to demonstrate or provide evidence that he did not present a safety risk is not a violation of due process. Indeed, the record shows that Plaintiff was invited to submit a second petition for re-enrollment, Christensen Decl. Ex. 11, ECF No. 8-2 at PageID 166, but he declined, Christensen Dep. 231:4–25. Plaintiff proffers no specific evidence that he would have but was unable to present in his petition for re-enrollment. Nor does Plaintiff indicate the precise form of hearing he believes he was entitled to but did not receive. Plaintiff was given a meaningful opportunity to be heard in accordance with due process; he simply chose to minimally participate in that process.

Recall that Plaintiff's erratic behavior, including his endorsement of the murder of civilians and his call for "greater escalation and resistance" put members of the Ohio State community in danger. Shivers Dep. 130:6–13. The administration understandably felt it needed to act quickly and decisively to maintain campus safety and security. Shivers Dep. 167:1–16. Considering these exigent circumstances and the non-punitive nature of administrative disenrollments, Plaintiff is unlikely to succeed in his claims that he received constitutionally deficient process.

### III. Plaintiff is not facing irreparable harm: beyond pure speculation, he has not demonstrated how the notation on his transcript will harm him in any material way.

"Even with a high likelihood of success on the merits, a preliminary injunction is not warranted unless the plaintiff[] [is] likely to suffer irreparable injury in the absence of interim relief." *Kentucky v. Biden*, 57 F.4th 545, 555 (6th Cir. 2023) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008); *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019)). Thus, a plaintiff's failure to demonstrate a risk of irreparable harm precludes the granting of a preliminary injunction. *See Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982).

For an injury to be considered "irreparable" there must be "no adequate remedy at law." *See Schmitt v. LaRose*, 933 F.3d 628, 637 (6th Cir. 2017). And the alleged injury "'must be both certain and immediate,' not 'speculative or theoretical.'" *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (quoting *D.T. v. Summer Cnty. Schs.*, 942 F.3d 324, 326-27 (6th Cir. 2019)); *see also Moms for Liberty - Wilson Cty. v. Wilson Cty. Bd. of Educ.*, 155 F.4th 499, 514 (6th Cir. 2025) ("[A] 'possibility' of harm does not entitle Plaintiffs to a preliminary injunction." (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008))).

"[L]osing a constitutional right—however briefly—is sometimes an irreparable injury." *Conn v. Deskins*, 199 F. Supp.3d 1172, 1174 (E.D. Ky. 2016) (Thapar, J.) (collecting cases). But when a plaintiff fails to allege "an imminent or ongoing constitutional violation," this factor is not automatically satisfied. *Id.* at 1175. For instance, in *Conn v. Deskins*, the plaintiff alleged his due process rights were violated when he was fired from his public employment. 199 F. Supp. 3d at 1173. The plaintiff sought a preliminary injunction to reinstate him while the case proceeded. *Id.* Judge Thapar denied the motion because the plaintiff was not facing irreparable harm. *Id.* at 1173–75. The existence of constitutional claims was not enough: "Conn does not allege an imminent or

41

ongoing constitutional violation. If his due process rights were violated, it was in the past." *Id.* at 1175 (citing *Bob Jones Univ. v. Simon*, 416 U.S. 725, 750 (1974)).

Here, as in *Conn*, Plaintiff has not alleged an ongoing constitutional violation.  He claims he suffered First Amendment retaliation and was not afforded due process, Compl. ¶¶ 110–24, ECF No. 1 at PageID 23–25, but those alleged constitutional violations occurred in the past.  *See Conn*, 199 F. Supp. 3d at 1175.  Just as the plaintiff in *Conn* could have sought monetary damages rather than a preliminary injunction, there is nothing precluding Plaintiff from doing the same. *See, e.g.*, *Diei v. Boyd*, 116 F.4th 637, 642 (6th Cir. 2024) (requesting damages for First Amendment retaliation claim).

Instead, Plaintiff has decided to seek only injunctive and declaratory relief.  Compl. at 25–26, ECF No. 1 at PageID 25–26.  Specifically, he requests a preliminary injunction ordering Defendants to remove a notation from Plaintiff's transcript saying he was administratively disenrolled.  Pl's Mot. Prelim. Inj. at 35, ECF No. 8 at PageID 105.  But it is unclear how the removal of this notation would remedy the alleged constitutional violations.  This is so because Plaintiff has not proven that this notation harms him in any material way.  After being administratively disenrolled, Plaintiff applied to and was accepted to two different colleges. Christensen Dep. 234:12–15.  Since leaving Ohio State, Plaintiff has not been rejected from any college or university—based on this notation or otherwise.  Christensen Dep. 236:23–25.  None of the academic institutions he applied to flagged the issue or asked him about during the application process.  Christensen Dep. 237:1–18.  The only evidence of injury that Plaintiff can offer is the opinion of his academic advisor that this notation may be an issue for him, but no such issues have arisen.  Christensen Dep. 240:24–246:2.

Notably, this situation is distinguishable from *Lavine*. There, the court noted that although the emergency expulsion was not a constitutional violation, the inclusion of "negative documentation," about the incident in the student's file was inappropriate because it would "permanently blemish [the student's] record and harm his ability to secure future employment." 257 F.3d at 992. Here, Plaintiff has not proven that the transcript notation is "negative documentation." The notation simply says: "Administratively disenrolled pursuant to 3335-23-21." Ex. F. There is no implication of Plaintiff's wrongdoing or misconduct from that notation. An uninformed observer could easily think this meant Plaintiff voluntarily disenrolled. Indeed, at least two other colleges have already reviewed Plaintiff's transcript. Neither one asked about this notation, and they both accepted him.

Plaintiff asks this Court to provide him an "extraordinary remedy," *Leary*, 228 F.3d at 739, based solely on his own speculation that this notation will harm him in the future, *see Hargett*, 978 F.3d at 391 (requiring a "certain and immediate" injury, not a "speculative or theoretical one"). This Court should demand more to demonstrate irreparable harm.

## IV. Because Plaintiff is unlikely to succeed on the merits, a preliminary injunction would risk harming other institutions and the public interests by erasing any record of this incident.

"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir.2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)). For all the reasons stated above, Plaintiff is unlikely to succeed on the merits. *See supra* Section II.

But even setting the first factor aside, a preliminary injunction would risk harm to other parties and would not serve the public interest. This is because a preliminary injunction in this case

43

would functionally give Plaintiff the full relief he seeks.  While this case is pending, he would be able to request a transcript without any notation of this incident.  It would be as if none of this ever happened.  Regardless of whether the notation has a negative connotation, other academic institutions or employers are entitled to some explanation of why Plaintiff is no longer at Ohio State.  But a preliminary injunction would leave them in the dark.

Again, "[t]he purpose of a preliminary injunction is to preserve the status quo until a trial on the merits." *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 848 (6th Cir. 2017) (citing *Univ. of TEx. v. Camenisch*, 451 U.S. 390, 395 (1981)).  Here, the status quo is that Plaintiff was administratively disenrolled from the University.  Plaintiff's requested preliminary injunction would preserve neither the current status quo nor the status quo before he was administratively disenrolled.  Instead, it would construct an alternate reality where Plaintiff is no longer a student at the University with no explanation of why on his transcript.  This is not preservation of the status quo; it is full merits relief.  This Court should decline Plaintiff's request to grant him full relief at this preliminary stage of the litigation.  Instead, it should preserve the status quo by denying Plaintiff's Motion.

## V. The balance of the preliminary injunction factors weighs against Plaintiff.

Plaintiff has not carried his heavy burden to obtain the extraordinary remedy of a preliminary injunction.  He is unlikely to prevail on the merits because the University did not retaliate against him based on his unprotected speech, and he received sufficient process.  He has failed to demonstrate irreparable harm because he merely speculates that the notation will harm him.  And a preliminary injunction risks harm to others and would be contrary to the public interest because the relief he seeks would disrupt the status quo and undermine the University's ability to safeguard its community.  Accordingly, the Court should deny Plaintiff's Motion.

44

**CONCLUSION**

For the reasons stated above, Defendants respectfully request this Court deny Plaintiff's Motion for Preliminary Injunction.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Gregory Rustico*
GREGORY RUSTICO (0104103)
JULIE M. PFEIFFER* (0096762)
  *\*Counsel of Record*
Assistant Attorneys General
Constitutional Offices Section
30 E. Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: 614-466-2872 | Fax: 614-728-7592
Gregory.Rustico@OhioAGO.gov
Julie.Pfeiffer@OhioAGO.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties have access to this filing through the Court's system.

*/s/ Gregory Rustico*
GREGORY RUSTICO (0104103)
Assistant Attorney General