# Exhibit A

Deposition of Melissa Shivers

```
                                                  Page 1

 1             UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF OHIO

 3                  EASTERN DIVISION

 4                      - - -

 5

 6   GUY CHRISTENSEN,            :

 7      Plaintiff,               :

 8           vs.                 :  Case No. 2:25-CV-01062

                                    JUDGE SARGUS

 9   WALTER CARTER, JR., ET AL:

10      Defendants.             :

11                      - - -

12           DEPOSITION OF MELISSA SHIVERS

13                      - - -

14              DATE: NOVEMBER 17, 2025

                  TIME:  9:00 A.M.

15   LOCATION:  OSU OFFICE OF LEGAL AFFAIRS, 1590 NORTH

        HIGH STREET, SUITE 500, COLUMBUS, OHIO 43201

16

17

18

19

20

21

22

23

24

25
```

Exhibit A

```
                                              Page 2
 1      APPEARANCES:
 2      REPRESENTING PLAINTIFF GUY CHRISTENSEN:
        Mr. David J. Carey, Esq. and
 3      Ms. Amy Gilbert, Esq.
        ACLU of Ohio Foundation, Inc.
 4      1108 City Park Avenue
        Suite 203
 5      Columbus, Ohio 43206
        614-586-1972
 6      dcarey@acluohio.org
 7      REPRESENTING DEFENDANTS WALTER CARTER, JR.,
        ET AL.:
 8      Mr. Thomas J. Gillen, Esq. and
        Mr. Tyler W. Blair, Esq,.
 9      Mr. Greg A. Rustico, Esq.
        Office of Ohio Attorney General
10      Thomas.Gillen@ohioAGO.gov
        Tyler.Blair@OhioAGO.gov
11      Gregory.Rustico@OhioAGO.gov
12      and
13      Ms. Amy Nash Golian, Esq.
        Ohio State University
14      Senior Assistant Vice President
        Senior Associate General Counsel
15      golian.7@osu.edu
16
17
18                          - - -
19
20
21
22
23
24
25
```

Page 3

1                    EXAMINATION

2    WITNESS:  MELISSA SHIVERS                    PAGE

3

4    EXAMINATION:

     By Mr. Carey ............................  5

5

6    By Mr. Rustico .......................... 185

7

8    CONFIDENTIAL SEALED ATTORNEYS EYES

9    Page 187, Line 14 through Page 189, Line 19

10

11                         - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit A

Page 4

EXHIBITS

PLAINTIFF'S                                         PAGE

1  - Student Code of Conduct .............. 27

2  - Email Dated 5/21/2025 ................ 46

3  - OSU-1534 ............................. 60

4  - OSU-1812 to OSU-1820 ................. 102

5  - OSU-929 to OSU-931 ................... 105

6  - OSU-1633 to OSU-1634 ................. 112

7  - OSU-1751 to OSU-1753 ................. 139

8  - OSU-346 .............................. 140

9  - OSU-986 to OSU-989 ................... 142

10 - OSU-1548 ............................. 149

11 - OSU-479 .............................. 157

12 - OSU-481 to OSU-489 ................... 157

13 - OSU-1120 ............................. 162

14 - OSU-1170 ............................. 178

15 - OSU-1486 to OSU-1487 ................. 180

16 - 3335-23-21 to be Rescinded ........... 181

17 - Filings for Rule No. 3335-23-1 ....... 182

18 - OSU-1700 to OSU-1702 ................. 184

EXHIBITS RETAINED BY COUNSEL

- - -

Page 5

```
 1                    MELISSA SHIVERS
 2     having been duly sworn, testified as follows:
 3                    EXAMINATION
 4     BY MR. CAREY:
 5        Q    Good morning.
 6        A    Good morning.
 7        Q    My name is David Carey, attorney with
 8     the ACLU of Ohio, and I represent the plaintiff
 9     in the case, Guy Christensen.  Could you please
10     state your name for the record?
11        A    Melissa Shivers.
12        Q    With me is my colleague, Amy Gilbert.
13     Have you been deposed before?
14        A    Yes.
15        Q    How many times?
16        A    Once.
17        Q    What kind of case was that?
18        A    It was during a time I was at the
19     University of Iowa, related to students
20     organizations.
21        Q    Great.  All right.  Well, it's probably
22     in time for refresher on how this works.
23             I'm going to be asking you a series of
24     questions for you to answer under oath.  Your
25     answers and my questions will be recorded.
```

Page 6

```
 1          I ask that you give verbal answers.
 2     Make sure you verbalize your answers.  I'll
 3     also ask you to do -- sorry to avoid doing what
 4     you might normally do in conversation where you
 5     see where I'm going with one of my long-winded
 6     questions and then you jump in with an answer
 7     before I finish speaking.  Just to try to avoid
 8     speaking over me, and I'll try to avoid doing
 9     that for you; is that fair?
10       A    Yes.
11       Q    Great.  If you don't understand a
12     question that I have asked, which is entirely
13     possible, please just let me know, and I will
14     rephrase as best I can.
15          If you do answer the question, I'll
16     assume that you understood it; is that fair?
17       A    Yes.
18       Q    You can take a break any time you like
19     as long as there's no question pending.  If I
20     have asked you a question, I'll ask that you
21     answer that question before we take a break.
22     Does that work for you?
23       A    Yes.
24       Q    Great.  Any questions before any of
25     that?
```

1    A    No.  Thank you.

2    Q    Great.  Are you on any medications that

3    might affect your ability to understand my

4    questions and answer them truthfully?

5    A    No.

6    Q    Did you do anything to prepare for this

7    deposition?

8    A    No.  In terms of meeting with my

9    counsel.

10   Q    Sorry --

11   A    Yes.  In terms of meeting with my

12   counsel.

13   Q    You met your counsel?

14   A    Sure.

15   Q    Did you meet with anyone else?

16   A    No.

17   Q    How many times did you meet with your

18   attorney?

19   A    Twice.

20   Q    About how long were those meetings?

21   A    Thirty minutes.  Thirty to maybe 30 to

22   an hour, hour and a half.

23   Q    So I'm not asking you to discuss

24   anything that you discussed with your attorney,

25   but were any documents shown to you?

Exhibit A

Page 8

1    A    Yes.

2    Q    What documents were they?

3    A    I'm sorry.  There were no documents

4    shown to me during the prep.

5    Q    Okay.  Were documents shown to you at

6    some other time?

7    A    No.  Just my own documentation.

8    Q    What documents did you review?

9    A    Certainly looking at the materials

10   relative to the appeal.

11   Q    Okay.

12   A    For sure.  As well as the document that

13   you all submitted in terms for litigation.

14   Q    Got it.  You mentioned materials

15   relative to an appeal.  What do you mean

16   specifically?

17   A    The appeal from Guy Christensen's

18   attorney for the petition from disenrollment.

19   Q    So you're referring to the petition for

20   re-enrollment.

21   A    Yes.

22   Q    Okay.  Aside from what you have already

23   mentioned did you review any other documents or

24   electronically stored information to prepare

25   for this deposition?

```
                                      Page 9

 1       A     No.
 2       Q     Have you used any AI program as a tool
 3    to prepare for this deposition?
 4       A     No.
 5       Q     Have you read the complaint that was
 6    filed in this lawsuit?
 7       A     Yes.
 8       Q     Have you read any other documents
 9    relating to the lawsuit itself.
10       A     No.  Just the ones I referred to
11    earlier.
12       Q     Who was your current employer?
13       A     Ohio State University.
14       Q     What is your current job title?
15       A     Senior vice president for student life.
16       Q     How long have you held the position of
17    senior vice president for student life?
18       A     I held the position of senior vice
19    president for five years.  I was hired for
20    senior vice president of student life.  I was
21    promoted after that.
22       Q     You were hired approximately six years
23    ago, and you have served in your current
24    position for five years?
25       A     Correct.
```

1      Q    Could you briefly summarize your

2    responsibilities in your current role?

3      A    Yes.  So I serve as the senior vice

4    president for student life.  I provide

5    oversight and direction for over 35 departments

6    all those depends really focus on student

7    engagement, student health, safety, and

8    blogging.  So everything from housing, dining

9    to counseling services to student organizations

10   and everything in between.

11     Q    Is Holistic Student Support and

12   Well-being one of the departments that you

13   oversee?

14     A    Yes.

15     Q    Is that the correct term, department?

16     A    So it's -- we have an associate Vice

17   President for Holistic Student Development and

18   Well-being, and he has a host of departments

19   that report up through him.

20     Q    Okay.  So his holistic support and

21   well-being is actually a department or just one

22   person who supervises departments?

23     A    It's one person who supervises various

24   departments.

25     Q    And that person is Ryan Level, correct?

```
                                           Page 11
 1       A     Correct.
 2       Q     Does Mr. Level report directly to you?
 3       A     Yes.
 4       Q     Do you have regular check-ins or
 5    meetings with Mr. Level?
 6       A     I do.
 7       Q     How often?
 8       A     Probably every two weeks.
 9       Q     Do you meet in person or through some
10    other means?
11       A     We oftentimes meet in person, but
12    occasionally we will meet via Zoom.
13       Q     About how long do those meetings take?
14       A     We are scheduled for 30 minutes.
15       Q     The Student Conduct Department is a
16    subsidiary of Holistic Student Support and
17    Well-being; is that correct?
18       A     Correct.
19       Q     I apologize.  And correct me if my
20    terminology is not right.
21       A     It reports through to Ryan level.
22       Q     The director of student conduct is Kelly
23    Smith; is that correct?
24       A     Correct.
25       Q     So Ms. Smith reports to Mr. Level?
```

```
                                            Page 12

 1      A     Correct.

 2      Q     And Mr. Level reports to you?

 3      A     Correct.

 4      Q     Who is your immediate superior at OSU?

 5      A     President Carter.

 6      Q     Do you have regular meetings or

 7   check-ins with President Carter?

 8      A     Once a month, we meet once a month.

 9      Q     Is there a particular time of the month

10   when you meet?

11      A     No.  It just varies, depending on our

12   schedule.

13      Q     Do you meet in person or through some

14   other means?

15      A     In person.

16      Q     About how long do those meetings take?

17      A     They are also scheduled for 30 minutes.

18      Q     Setting aside your regular check-in

19   meetings about how often would you say that you

20   speak directly with President Carter?

21      A     Only when there is an immediate timely

22   issue or situation.

23      Q     About how often would you say that is on

24   average?

25      A     Maybe once a month.
```

Page 13

1      Q     All right.  How often would you say you
2    discuss something with President Carter by
3    email?
4      A     Hardly ever.  In terms of -- yes, hardly
5    ever.
6      Q     Aside from your in-person discussions
7    and email of course, are there other means by
8    which you communicate with President Carter?
9      A     No.
10     Q     Do you ever talk to him on the phone?
11     A     Yes.
12     Q     Do you ever exchange texts?
13     A     Rarely do we exchange texts.  We
14   typically, if there's something that I'm
15   reaching out to the president about, it
16   warrants more of a discussion.
17     Q     Could you briefly summarize your role in
18   student discipline generally?
19     A     Typically, I am made aware of when an
20   interim suspension is being at least proposed
21   or and Ryan level would be the person
22   responsible for issuing the interim suspension.
23   So I am made aware of the interim suspension,
24   and then Ryan level is the person who sets
25   forward the suspension.

Page 14

1    Q    Setting aside interim suspension, what

2    other role do you serve in connection with

3    student discipline?

4    A    That is essentially it.  If something

5    that rises to my level and just for awareness,

6    the team does a good job in making me aware of

7    that.  That is essentially the role from a

8    student discipline perspective.

9    Q    You have final authority for the

10    discipline of all students; is that correct?

11    A    Correct.

12    Q    Would it be accurate to say that

13    President Carter and only President Carter has

14    the authority to override any decisions you

15    make about student discipline?

16    A    He certainly could weigh-in.  Yes.

17    Q    Is there anyone else who has the

18    authority to override a decision that you have

19    made regarding student discipline?

20    A    Not sure.  I don't think that the board

21    could.  I think the president could certainly

22    weigh-in, but I think I'm the final authority.

23    Q    Okay.  So when you say the president

24    could weigh-in, do you mean that the president

25    lacks the authority to supersede your

Page 15

1   decisions?

2      A    The president has the opportunity to

3   share his perspective, but I don't know that I

4   would say that he would.  Certainly, probably

5   has the authority, but I don't think that he

6   would.

7      Q    So setting aside what he would do, he

8   could at least in theory, override a decision

9   that you have made?

10     A    Sure.

11          MR. CAREY:  Coaching the witness?

12  BY MR. CAREY:

13     Q    Under what circumstances do you become

14  personally involved in an instance of student

15  discipline under the code of conduct?

16     A    Would you mind repeating that question?

17     Q    Under what circumstances do you become

18  personally involved in an instance of student

19  discipline under the code of conduct?

20     A    If there is something that rises to the

21  level of the team needing additional support,

22  guidance or perspective, then I could become

23  involved.  And involved means just having a

24  conversation to understand what the issue is

25  particularly if they are moving toward an

```
 1      interim suspension.
 2        Q     In the course of your career at OSU,
 3      about how many times would you estimate that
 4      you have personally made the final decision as
 5      to student discipline?
 6        A     I can only recall this particular
 7      situation.
 8        Q     I'm sorry.  Would you repeat that?
 9        A     I can only recall this particular
10      situation.
11        Q     Would you consider it part of your job
12      as a senior University administrator to do
13      everything that you can to ensure campus
14      safety?
15        A     Yes.
16        Q     If you became aware of an immediate
17      threat of violence on campus, would you -- if
18      you became aware of an immediate threat of
19      violence on campus would you request an
20      immediate response from law enforcement?
21        A     Do you mind repeating that question.
22        Q     I garbled that a bit.  If you become
23      aware of an immediate threat of violence on
24      campus, would you request an immediate response
25      from law enforcement?
```

Page 17

1    A    I would have engaged with law

2    enforcement.

3    Q    Would you request an immediate response

4    from law enforcement?

5    A    I'm not sure I understand what you mean

6    by immediate response.

7    Q    Would you request that law enforcement

8    dispatch officers or agents immediately?

9    A    Typically the way that it works is that

10   law enforcement would be aware and they would

11   inform me of issues or concerns.  However, if I

12   was made aware first, I would certainly reach

13   out to them along with legal to best understand

14   what the next steps should be.

15   Q    If you became aware of a bomb threat on

16   campus, what would you do?

17   A    Certainly contact OSUPD.

18   Q    Would you make any particular request of

19   them?

20   A    To investigate to learn more at the

21   validity of the request.

22   Q    If you became aware of a student

23   inciting a riot, what would you do?

24   A    Because we work collaboratively with

25   OSUPD, and legal, I would do the exact same, to

Exhibit A

1     investigate --
2        Q    You would not ask for any particular
3     response?
4        A      -- the issue.  I would ask for them to
5     investigate and to be as responsive as they
6     deem they need to be based on the allegation.
7        Q    If you became aware of an immediate
8     threat of violence on campus that was targeted
9     to a specific student or group of students,
10    would you notify that student or group of
11    students?
12       A    Can you repeat that question again?
13       Q    If you became aware of an immediate
14    threat of violence targeted towards a student
15    or group of students, would you make that
16    student or group of students aware of that?
17       A    I would leverage OSUPD to provide
18    guidance and direction on what the next steps
19    should be in consultation with legal affairs.
20       Q    So you don't see it as your
21    responsibility to request that a particular
22    student or student group be warned if they are
23    the target of a threat?
24       A    I would want to have that done through
25    the official channels, which would be OSUPD.

Page 19

1      Q    But you don't see it as your

2    responsibility to request that specifically?

3      A    Yes.  I would want to make sure that

4    they are aware and would proceed accordingly.

5      Q    Have you ever been in a position to

6    request that OSUPD respond to an immediate

7    threat of violence?

8      A    I have not been in a position yet to

9    request OSUPD to respond.  As I said, earlier,

10   typically they could reach out to me.

11     Q    Have you ever requested that OSUPD

12   conduct a well-being check?

13     A    Yes.

14     Q    How many times?

15     A    I don't know the exact number.

16     Q    More than approximately 10?

17     A    I don't know the exact number.

18     Q    I'm not asking for an exact number I'm

19   asking for ballpark, would you say more than

20   approximately 10?

21     A    I would say probably not more than 10.

22     Q    More than five?

23     A    Three to five.

24     Q    Would you agree that the purpose of a

25   well-being check is to ensure the well-being of

Page 20

1    the person being checked on?

2       A    And to make sure that -- yes, and to

3    make sure that they are the person we have

4    received concerns about making sure that their

5    own health and safety is taken care of as well

6    as recognizing if there's any additional threat

7    to others.

8       Q    So in your mind, the purpose of a

9    well-being check is not necessarily different

10   from the purpose of an investigation?

11      A    I'm sorry?

12      Q    Are well-being check and investigation

13   two different things?

14      A    Yes.

15      Q    Can you explain the difference in your

16   understanding?

17      A    As a senior leader who is concerned

18   about a student, safety and health and

19   well-being that is the approach that we will

20   look at just to understand whether or not a

21   student is doing well.  Okay.  A threat to

22   themselves or others.  That is separate to me

23   from -- I don't coordinate investigations.

24      Q    So you do agree that a well-being check

25   is not necessarily the same thing as an

1    investigation?

2      A    I think that certainly through a

3    well-being check, there could be -- they could

4    receive additional information that could

5    inform whatever happens next.

6      Q    Do you believe that you have the

7    authority to expel a student at any time for

8    any reason?

9      A    I think I have the authority to leverage

10   3335-23-21 when they are in particular risk of

11   safety.

12     Q    Do you believe you have the authority to

13   expel a student at any time for any reason?

14     A    I think that I, executing leveraging

15   3335-23-21, to determine -- to use that as a

16   way to address safety and risk concerns.

17     Q    It's not what I'm asking.  I understand

18   that you have a response about that particular

19   provision of the code of conduct.  What I'm

20   asking is, setting aside that particular

21   provision, in general, can you simply decide to

22   expel a student for any reason at any time?

23     A    I would do that.  I would consider that

24   in collaboration with legal affairs and

25   certainly wanting to understand the totality of

Page 22

1    the situation.
2        Q    I'm not asking about a process.  I'm not
3    asking about whether you would investigate, I'm
4    not asking who you would talk to.  I'm asking,
5    do you have the authority under whatever
6    authority, to expel a student at any time for
7    any reason?
8        A    Through the appropriate channels, yes.
9        Q    What do you mean by through the
10   appropriate channels?
11       A    Certainly leveraging the information
12   that we have to make that determination.
13       Q    To make what determination?
14       A    If expelling a student is the
15   appropriate response.
16       Q    Have you ever disenrolled a student in a
17   way that was not expressly authorized by the
18   Code of Student Conduct?
19       A    No.
20       Q    Would you?
21       A    No.
22       Q    Why not?
23       A    Why wouldn't I?
24       Q    Correct.
25       A    Could you repeat the question again,

Page 23

1    please.

2       Q    You just testified that you would not

3    expel a student in a manner that was not

4    authorized by the Code of Student Conduct, my

5    question is, why wouldn't you?

6       A    It's the process that we use.

7       Q    Is it your testimony that you could

8    choose to ignore the Code of Student Conduct

9    and expel a student for any reason?

10      A    No.

11      Q    Fair to say then that you are bound by

12   the Code of Student Conduct?

13      A    Correct.

14      Q    What role, if any, does President Carter

15   generally play in student discipline?

16      A    Since I have been here, he has not

17   played any role in a student conduct issue.

18      Q    Do you usually keep him informed as

19   investigations unfold?

20      A    He is made aware if there's something

21   happening, but it is not on a regular basis as

22   you can imagine, there are a ton of student

23   conduct cases that happen at Ohio State.  It

24   would require a different level to make him

25   aware of the situation.

Page 24

1    Q    What constitutes a different level?

2    A    If it is, so for example, when we have a

3    Greek conduct issue, because of the size and

4    the stature of the organization, it will be

5    important that he has some awareness that that

6    is being pursued, meaning that we have

7    determined what an outcome is.  He's not

8    consulted on the outcome, but made aware of the

9    outcome.

10   Q    Can you describe generally the kinds of

11   cases where you would choose to keep President

12   Carter informed?

13   A    That one relating to Greek, and

14   certainly, this one that we are speaking about

15   today.

16   Q    Is there any general rule of principal

17   that you would extract from that?

18   A    I think it would probably be the level

19   and the type of concerns, the awareness given

20   to that particular potential issue, but beyond

21   that, yeah.

22   Q    Through what means do you usually keep

23   him informed?

24   A    Calling him.

25   Q    If you make a decision to disenroll a

Page 25

1    student, do you keep him informed as to the

2    basis for your decision?

3       A    He has awareness of the particular

4    situation and certainly he is aware of the

5    concerns that have me to the point of

6    disenrolling a student.  I think it's important

7    to note, this is the first time I've

8    disenrolled a student.  So we only had one

9    experience.

10      Q    I was going to be asking that

11   eventually, I assure you?

12      A    Okay.

13      Q    Does President Carter typically have an

14   opportunity to review any decision to disenroll

15   a student and the basis for it before the

16   decision is final?

17      A    He is made aware that this is the

18   pathway that we are moving toward and that this

19   is going to be my recommendation.

20      Q    Is he made aware of your reasoning?

21      A    Yes.

22      Q    Has President Carter ever disagreed on

23   your decision on a matter of student

24   discipline?

25      A    This is the only one he has been a part

Page 26

1     of.  So no, he is not -- he did not disagree.

2         Q     Is your understanding that a student who

3     is disciplined has a right to know why they are

4     being disciplined?

5         A     Yes.  The process used here for

6     3335-23-21, was related to risk.

7         Q     Let me ask that differently.  Is it your

8     understanding that a student who is disciplined

9     has a right to know the specific reasons why

10    they are being disciplined?

11        A     Yes.

12        Q     Watch the cross-talk, sorry I'm guilty

13    of it too.  Setting aside what the rules

14    provide, do you believe that a student who's

15    being disciplined should be informed of why?

16        A     Could you repeat that question, please.

17        Q     Yeah, let me try that again, do you

18    believe -- setting aside what the rules

19    provide, that a student who is being

20    disciplined should be informed of why?

21        A     Yes.

22        Q     Would you ever give a student a false

23    reason for why they are being disciplined?

24        A     No.

25        Q     Would you ever discipline a student and

Page 27

1      state only part of your reasoning for

2      discipline while keeping other reasons

3      concealed?

4          A      No.

5      (Plaintiff's Exhibit No.  1 was marked for the

6               purpose of identification.)

7      BY MR. CAREY:

8          Q      I'm going to try to keep myself

9      organized with exhibits.  They do have a habit

10     of growing legs and walking away.

11             I'm marking as Plaintiff's Exhibit 1, a

12     document that has at the top of it, Code of

13     Student Conduct.  Take a moment and look at

14     that document, if you would.  Let me know, when

15     you are ready to proceed.

16             MS. GOLIAN:  David, do you have another

17     one?

18             MR. CAREY:  I do.  Dr. Shivers, I ask

19     that you not markup the exhibit unless we

20     discuss it.  Try not to mark it up, if you

21     would.

22     BY MR. CAREY:

23         Q      Are you ready to proceed?

24         A      Just a moment, please.

25             MR. RUSTICO:  It's a long document.

Page 28

1        MR. CAREY:  Presumably, she's seen it
2    before.
3    BY MR. CAREY:
4      Q    Are you ready?
5      A    Yes.
6      Q    What is this document?
7      A    Code of Student Conduct.
8      Q    Would you say that you are generally
9    familiar with this Code of Student Conduct?
10     A    I am.
11     Q    Would you agree with me that Exhibit 1,
12   is the version of the Code of Student Conduct
13   that OSU maintains on its website?
14     A    Yes.  We have several versions based on
15   updating it from year to year.
16     Q    Do you have any reason to think that
17   this is not the current version?
18     A    I do not think so.  I think this is the
19   current version.
20     Q    Are you generally familiar with section
21   3335-23-20 of the Code of Student Conduct?
22     A    Did you say dash 20?
23     Q    Yes, I did.
24        MR. RUSTICO:  Can you direct her to
25   where it is?

```
 1     BY MR. CAREY:
 2       Q    It's sequentially ordered within the
 3     document.  Right now I'm just asking if she is
 4     generally familiar with it.
 5            MS. GOLIAN:  Maybe if you gave her the
 6     title?  You gave her a series of numbers and
 7     dashes.  I mean, we have all -- we have all
 8     gotten lost in the code before.
 9     BY MR. CAREY:
10       Q    Let me back up then.  Dr. Shivers, are
11     you generally familiar with the Code of Student
12     Conduct?
13       A    Yes.
14       Q    Are you familiar with the section
15     governing interim suspension, which is
16     3335-23-20?
17       A    Yes.
18       Q    Okay.  I'm going to call that section
19     Section 20 for the sake of brevity.  Can we
20     agree on that?
21       A    Yes.
22       Q    What is the purpose of an interim
23     suspension under Section 20 as you understand
24     it?
25       A    The opportunity for us to learn more, or
```

Exhibit A

Page 30

1      the Conduct Office to learn more about the

2      particular situation based on the concerns that

3      have been raised.

4              It provides us an opportunity to

5      communicate with the student that there have

6      been concerns raised and allows us again the

7      opportunity to be able to determine if there's

8      any additional information to inform, quote on

9      quote, take a pause for the student engagement.

10     Q    Is part of the purpose of an interim

11     suspension to allow you to hear from the

12     student?

13     A    It would allow for the conduct office to

14     hear from the student.

15     Q    Fair enough.  Do you review all relevant

16     information that is readily available to you

17     before making the decision to suspend a

18     student?

19     A    Would you mind repeating that again?

20     Q    Do you review all relevant information

21     that is readily available to you before making

22     the decision to suspend a student?

23     A    Ryan Level is the associate vice

24     president to whom student conduct reports, who

25     is the designee.  So Ryan Level would have had

1    the opportunity to review the information.

2       Q     Is it your expectation that he will do

3    so?

4       A     Sure, of course.

5       Q     Would you agree that an important

6    function of a hearing under the Code of Student

7    Conduct is to provide the accused student an

8    opportunity to defend themselves?

9       A     They have the opportunity to be

10   responsive to the allegations.

11      Q     Would you agree that that is an

12   important function of a hearing under the Code

13   of Student Conduct?

14      A     Yes.

15      Q     Would you agree that students need to

16   know in advance of a hearing what it is that

17   they are accused of doing wrong?

18      A     There certainly should be some awareness

19   as to why interim suspension is being engaged.

20      Q     Would you agree that if information

21   emerged at a hearing that demonstrates that a

22   student did not pose a significant risk of

23   substantial harm to health or safety then that

24   student should not be disciplined on that

25   basis?

Exhibit A

```
                                                  Page 32
  1            MR. RUSTICO:  Objection.  Form of the
  2      question is so complex and speculative.
  3            MR. CAREY:  It's not speculative, but go
  4      ahead.
  5            THE WITNESS:  Would you repeat the
  6      question differently?
  7      BY MR. CAREY:
  8         Q    Would you agree, that if information
  9      emerged at a hearing demonstrating that a
 10      student was not a significant risk of
 11      substantial harm then that student should not
 12      be disciplined on that basis?
 13         A    I think it would -- the process would
 14      allow for that information to come forward.
 15            However, there's oftentimes information
 16      that comes that requires a different level of
 17      assessment.
 18         Q    Let me try again.  If information
 19      emerged at a hearing that exonerated a student,
 20      would you agree with me that that student
 21      should not be disciplined?
 22         A    If the process and the outcome calls for
 23      that.
 24         Q    Is there a situation where information
 25      would emerge at a hearing exonerating a student
```

Page 33

1     and yet the process would call for them to be

2     disciplined anyway?

3              MR. RUSTICO:  Objection.  Speculation.

4              MR. CAREY:  You can answer.  You have to

5     answer, please.

6              THE WITNESS:  I don't know.

7     BY MR. CAREY:

8       Q    To your knowledge, has it ever happened

9     that a hearing turned up in information that

10    led to a student not being disciplined?

11      A    I'm not aware.

12      Q    Are you generally familiar with Section

13    3335-23-21 of the Code of Student Conduct

14    entitled, Administrative Disenrollment and

15    Other Restrictions?

16      A    Yes.

17      Q    I'm going to call this section, Section

18    21 just for the sake of brevity.  Can we agree

19    on that?

20      A    Yes.

21      Q    How many times have you administratively

22    disenrolled a student pursuant to Section 21?

23      A    Once.

24      Q    How many times have you reviewed a

25    petition for re-enrollment under Section 21?

Exhibit A

Page 34

```
 1       A    Once.
 2       Q    What kind of documentation might a
 3    student offer to demonstrate that the
 4    conditions found to have existed --
 5            MR. CAREY:  Sorry, strike that.
 6    BY MR. CAREY:
 7       Q    Let me start over.  In the context of a
 8    petition for re-enrollment, what kind of
 9    document or documentation might a student offer
10    to demonstrate that the conditions found to
11    have existed leading to their disenrollment in
12    the first place no longer exist?
13       A    Could you repeat that, please?  Thank
14    you.
15       Q    Yeah.  I'll try to simplify that.
16            What kind of documentation, in your
17    mind, would satisfy the threshold for a
18    petition for re-enrollment?
19       A    What we have outlined here.  What the
20    code has outlined here is we are -- the person
21    has provided us with information that suggests
22    the issue for which they were disenrolled is no
23    longer in play.  There has been some sort of
24    adjustment that would suggest that there's no
25    longer a risk or a concern, and here are the
```

Page 35

1    things that they have done to address that.

2        Q    Can you give me an example of what that

3    might look like?

4        A    I can't.

5        Q    Is it your understanding that a student

6    who was disenrolled under Section 21 cannot use

7    the petition for reenrollment as a vehicle to

8    contest your finding that they posed a risk of

9    substantial harm?

10       A    The requirement through the code

11   suggests that they are able to tell us what has

12   been put in place to ensure that the behavior

13   or the incident, whatever it was, that occurred

14   will not happen again.

15       Q    Once a student is disenrolled under

16   Section 21, is a notation placed on their

17   transcript indicating that?

18       A    Can you ask me that again, please?

19       Q    Once a student is disenrolled under

20   Section 21, is a notation placed on their

21   transcript indicating that?

22       A    Yes.

23       Q    Are there any other means by which OSU

24   might communicate to anyone that a student was

25   administratively disenrolled?

Page 36

```
 1      A     Not that I'm aware of.

 2      Q     Who else might know?

 3      A     Certainly members of our office of legal

 4   affairs would probably have some awareness.

 5      Q     What about student conduct?

 6      A     I'm not exactly certain how that works

 7   with the registrar's office.

 8      Q     Are you aware of any disciplinary

 9   proceedings that were conducted against Guy

10   Christensen prior to May of 2025?

11      A     I don't recall.

12      Q     Prior to May of 2025, had you heard of

13   Guy Christensen?

14      A     Yes.

15      Q     In what context have you heard of him?

16      A     An outreach back in November of '24.

17      Q     Anything else?

18      A     Sorry.  I'm trying to get the dates in

19   my head.  And then certainly there was

20   awareness, I think, brought to the University

21   in March.  I can't recall any exact dates.  I'm

22   sorry.

23      Q     Not necessarily asking for exact dates.

24   I'm asking for general context.  You said you

25   had heard of him in the context of something
```

Exhibit A

Page 37

1        that happened in 2024, and then something that
2        happened approximately -- that happened in
3        March 2025?
4           A    Some awareness brought to the University
5        about -- and I don't remember exactly what it
6        was about.
7           Q    Anything else?
8           A    No.
9           Q    What impression had you formed of Guy
10       Christensen, if any, prior to May of 2025?
11          A    I don't know that I had any impression
12       of him, per say, but certainly aware of
13       behaviors but not an impression of him
14       personally.
15          Q    What behaviors were you aware of?
16          A    I think the engagement on social media.
17       Do you mean, May of 2025; is that correct?
18          Q    What did I say?
19          A    For some reason I keep thinking you said
20       March.  Maybe I'm getting my Ms --
21          Q    My question was, what impression you had
22       formed of him, if any, prior to May?
23          A    Oh, no.  Sorry about that.
24          Q    Let's take that from the top.  To be
25       clear, for the record, you testified that prior

Page 38

1     to May of 2025, you were aware of him in the

2     context of some occurrence in November 2024,

3     and, again, a communication in March of 2025.

4     My question is, what impression, if any, had

5     you formed of him?

6        A    I had not formed any impression of him.

7     Thank you for restating the question.

8        Q    Are you aware of any incidents relating

9     to Guy Christensen that happened in November of

10    2024?

11       A    I know that members of OSUPD reached out

12    to do a wellness check on him, that's all I

13    know.

14       Q    What is your understanding -- apologies.

15    The crosstalk thing.  I'm sorry.

16       A    Sorry.

17       Q    No.  No.  That was me.  So it's your

18    understanding that OSUPD had reached out to

19    him?

20       A    Yes.

21       Q    What is your understanding of why?

22       A    Concerns about messaging, I think, on

23    social media.  I'm not one hundred percent

24    sure.

25       Q    Okay.  How did you become aware that

Page 39

1    OSUPD had contacted Mr. Christensen in November

2    of 2024?

3        A    Through OSUPD.

4        Q    When was that?

5        A    Oh, I don't remember when that was.

6        Q    Would it have been around the time of

7    the events in question?

8        A    Oh, for sure.  I just -- yeah.

9        Q    Is it your understanding that

10   Mr. Christensen was suspected of any wrongdoing

11   at that time?

12       A    I don't know.  I don't want to

13   speculate.

14       Q    I was just asking what your

15   understanding was?

16       A    I don't know.

17       Q    Aside from the OSUPD outreach that you

18   had mentioned.  How did OSU respond to whatever

19   happened in November?

20       A    Reached out to him to check in with him.

21       Q    Is that referring to OSUPD?

22       A    Yes.

23       Q    Aside from OSUPD, was there any response

24   by OSU?

25       A    Not that I'm aware of.

Page 40

1     Q     Did OSUPD report back to you around that
2   time?
3     A     No.
4     Q     Did they report back to anyone under
5   your jurisdiction?
6     A     Not that I'm aware of.
7     Q     Did they create any kind of written --
8   excuse me.  Did they create any kind of written
9   incident report or documentation?
10    A     I -- I don't know.
11    Q     Do you recall reviewing any written
12  report or documentation?
13    A     No.  I do not.
14    Q     What is your understanding of what OSUPD
15  concluded in connection to this incident?
16    A     I can't recall.
17    Q     Is it your understanding that any
18  disciplinary proceedings were commenced?
19    A     I don't know.
20    Q     Earlier, you testified that you were not
21  aware of any disciplinary proceedings against
22  Mr. Christensen prior to May of 2025.
23         So is it fair to say that you are not
24  aware of any disciplinary proceedings being
25  commenced in connection with November?

Page 41

```
 1      A    Yes.  Can we take a break?
 2           MR. RUSTICO:  Sure.
 3           MR. CAREY:  Sure.  Five minutes?  Ten
 4      minutes?
 5           THE WITNESS:  Ten would be great.
 6           MR. CAREY:  All right.  Ten.
 7        (Thereupon, a brief break was taken.)
 8      BY MR. CAREY:
 9      Q    Back on.  Dr. Shivers, I want to go back
10      to something we were discussing before, which
11      is sort of your general role in student
12      discipline.
13           In the context of student disciplinary
14      proceedings that do not lead to disenrollment,
15      can you summarize your role generally?
16      A    I would typically be the person who --
17      on the appellate side.  So if there is an
18      appeal that is warranted or that is requested,
19      then I or my designees, which would include
20      Ryan Level, would be on the appellate side.
21      That's typically the level of involvement.
22      Q    Are you typically involved in
23      investigation?
24      A    No.
25      Q    Do you ever interview witnesses?
```

```
                                            Page 42

 1      A     No.

 2      Q     Do you ever interview an accuser?

 3      A     No.

 4      Q     Do you ever interview an accused

 5   student?

 6      A     No.  I have not.

 7      Q     Do you collaborate with the OSU police

 8   department or other law enforcement?

 9      A     Regularly.

10      Q     The context of student discipline?

11      A     No.  Sorry.

12      Q     What context do you collaborate with

13   them?

14      A     So we spend a lot of time partnering on

15   issues that, in particular, protest and

16   demonstrations in terms of having a

17   collaborative partnership with members of my

18   team and our campus engagement team, that's

19   really the extent of collaboration, more of

20   awareness of issues of import.

21      Q     In the context of suspensions under the

22   Code of Student Conduct?

23      A     Uh-huh.

24      Q     Who primarily conducts interviews with

25   witnesses?
```

Page 43

```
 1      A    It would be either a staff member -- it
 2   would be a staff member in the office of
 3   student conduct and depending on the situation,
 4   there could be others that have been involved.
 5      Q    What others?
 6      A    If there was an investigation done by
 7   the police, they might not investigate the
 8   person in the session that perhaps they have
 9   had some sort of interaction with the person,
10   the student prior to.
11      Q    Would the staff of student conduct also
12   generally be tasked with interviewing an
13   accuser?
14      A    I don't know.
15      Q    Who would be tasked with interviewing
16   the accused student?
17      A    I'm not one hundred percent certain.
18      Q    Have you ever been involved, prior to
19   this case, in student disciplinary proceedings
20   that resulted in a suspension?
21           MR. RUSTICO:  Objection.  What do you
22   mean by involved?  I mean, she -- she testified
23   that she -- like, all the agencies or
24   departments are under her so.
25           MR. CAREY:  I'm not going to argue the
```

Page 44

1    questions with you, Greg.  Can you read back?
2    (Thereupon, the last question was read back.)
3            THE WITNESS:  I can't recall.
4    BY MR. CAREY:
5      Q    Meaning you can't recall one way or the
6    other or there are none that you can recall?
7      A    I cannot recall one way or the other.
8      Q    Do you think it's likely that you would
9    have been involved in suspending a student and
10   not remember it?
11     A    I can't recall.
12     Q    Before we took a break, we were
13   discussing an occurrence or incident that took
14   place in November of 2024.  Are you aware of
15   any finding from any law enforcement agency,
16   including OSUPD, finding that Mr. Christensen
17   constituted a credible threat at that time?
18     A    I can't recall.
19     Q    So fair to say you're not aware of any?
20     A    I can't recall.
21     Q    As you sit here, are you aware of any?
22     A    I cannot recall.
23     Q    You cannot recall whether you are aware
24   of any --
25            MR. RUSTICO:  Objection.  She answered

Page 45

1    the question.
2         MR. CAREY:  No.  She hasn't.
3         THE WITNESS:  I can't recall.
4    BY MR. CAREY:
5      Q    You cannot recall if you are aware of
6    any as we sit here?
7      A    Correct.
8      Q    Who is Jessica Eveland, if I'm
9    pronouncing that correctly?
10     A    Secretary to the board of trustees.
11     Q    If Ms. Eveland sent an email to the
12   board of trustees, copying you, and it
13   contained information that you knew to be
14   false, is it fair to say that you would make
15   sure it was corrected?
16     A    That's speculative.  I don't know.
17     Q    Is there any circumstance where
18   Ms. Eveland would say something to the board
19   that you knew to be false and you would not
20   correct it?
21     A    I would -- if -- if there was something
22   incorrect in a communication, I would clarify
23   if I know for certain that it is incorrect.
24     Q    Okay.
25

Exhibit A

Page 46

1      (Plaintiff's Exhibit No. 2 was marked for the
2            purpose of identification.)
3     BY MR. CAREY:
4        Q    I'm marking a document as Plaintiff's
5     Exhibit 2.  It is an email dated May 21st,
6     2025.  The top email in the chain is from Jeff
7     Kaplan.
8            MS. GOLIAN:  Thank you.
9            MR. RUSTICO:  Oh, it's the same, sorry.
10           MR. CAREY:  Yeah.
11           MR. RUSTICO:  You have the same thing.
12    I noticed yours has a staple, and mine is one
13    page.  I was checking.
14           MR. CAREY:  The unofficial versions are
15    double-sided.
16           MR. RUSTICO:  Gotcha.
17    BY MR. CAREY:
18       Q    What is this document?  Just asking
19    generally.  I'm not asking about the details.
20           MR. RUSTICO:  Can you give us a second
21    to look at it?  Well, there's a pending
22    question.  We can at least -- yeah.  We would
23    like to take a break.
24           MR. CAREY:  There's a pending question.
25           MR. RUSTICO:  I'm sorry.  I know.  As

Page 47

1    soon as she answers.  You asked what this is.
2    BY MR. CAREY:
3        Q    Just for purposes of identification,
4    I'll state for the record, the Bates No. is
5    OSU-1512.
6            And, again, my question is, what is this
7    document?
8        A    Could you repeat the question?
9        Q    What is this document?  Let me rephrase.
10   This document is an email chain on which you
11   appear, correct?
12       A    Correct.
13           MR. CAREY:  You want to take your break?
14           MR. RUSTICO:  Yep.
15           MS. GOLIAN:  Yep.
16      (Thereupon, a brief break was taken.)
17           MR. RUSTICO:  So we object to the use of
18   this.  It's clearly privileged and
19   confidential.  We are going to claw this back.
20           It's attorney-client privilege.  There's
21   attorneys on this email.  It is marked
22   prominently, "Confidential."  It clearly
23   slipped through document review.  We are not
24   going to answer any questions.  We don't think
25   you should be using this.

Page 48

1          MR. CAREY:  Let me take a minute with
2     that before we go any further.
3          One other matter, I'm going to ask that
4     when you leave the room on a break, you not
5     take the exhibits with you.
6          MS. GOLIAN:  What's -- what?
7          MR. CAREY:  The official --
8          MS. GOLIAN:  Oh, the official.
9          MR. CAREY:  The official copy of the
10    exhibit.  This is -- no sinister intent here.
11    I just want to keep track of the paperwork.
12         MR. RUSTICO:  Sure.  I got you.
13         MR. CAREY:  Yeah.  I can't agree with
14    your assertion of privilege over the portion
15    I'm going to ask about.
16         I don't think there's any indication
17    that the portion I'm going to ask about is a
18    communication for purposes of legal advice.
19    I'm going to ask the question, and then you can
20    object and direct the witness as you see fit.
21         MR. RUSTICO:  Sure.
22         MR. CAREY:  All right.
23         MS. GOLIAN:  The whole document is about
24    legal advice.
25         MR. RUSTICO:  He can ask his questions,

Exhibit A

```
                                             Page 49

 1     and then we will object.  It's fine.

 2            MR. CAREY:  I haven't asked the question

 3     yet.

 4            MR. RUSTICO:  I know.

 5     BY MR. CAREY:

 6      Q    All right.  On page 1513, which is the

 7     second page of Exhibit 2.  You'll see on --

 8     under the first bullet point, Ms. Eveland

 9     states -- and I'm reading -- Last November,

10     OSUPD and an FBI task force officer spoke with

11     the student in person after receiving a report

12     about his social media activity and determined

13     that there were no credible threats at that

14     time.

15            My question to you, if Ms. Eveland was

16     misstating information to the board of

17     trustees, and you knew it, is it fair to say

18     you would have corrected her?

19            MR. RUSTICO:  Objection.  This is

20     privileged material.  Don't answer the

21     question.

22     BY MR. CAREY:

23      Q    Is it fair to say that you have no

24     information to contradict the assertion that in

25     November OSUPD and an FBI task force officer
```

Exhibit A

Page 50

```
1      found that there was no credible threat

2      associated with Mr. Christensen?

3              MR. RUSTICO:  Objection.  Don't answer.

4              MR. CAREY:  That is not asking for

5      privileged information.  That is asking for her

6      understanding I'm not asking about the

7      document.

8              MR. RUSTICO:  Your question is based on

9      the document.

10             MR. CAREY:  Facts are not privileged.

11     Communications are.  I'm asking for her

12     understanding.

13             MR. RUSTICO:  Okay.  Can

14     you --Objection.  Yeah.

15             MR. CAREY:  On what basis?

16             MR. RUSTICO:  For one, that question is

17     insanely complicated, but it's based on your

18     use of privileged and confidential information.

19             MR. CAREY:  Any action -- you disclosed

20     it to us.  You are playing like the fruit of

21     the poisonous tree doctrine to attorney-client

22     privilege?

23             MR. RUSTICO:  No.  I'm saying that this

24     document should not have been disclosed.  We

25     want to claw it back for attorney-client
```

Page 51

1    privilege.

2           MR. CAREY:  All right.  Let's set aside

3    the document.  I'll ask it a different way.

4    BY MR. CAREY:

5      Q    If I was to say to you that law

6    enforcement concluded that Mr. Christensen in

7    November of 2024 constituted no credible

8    threat, would you have any information to the

9    contrary?

10     A    Could you repeat that question?

11          MR. CAREY:  Could you read back the

12   question?

13       (Thereupon, the record was read back.)

14          THE WITNESS:  I would not, no.

15   BY MR. CAREY:

16     Q    Thank you.  Have you ever spoken with

17   Mr. Christensen about whatever occurred in

18   November of 2024?

19     A    No.

20     Q    To your knowledge, did anyone from OSU

21   administration, other than the OSU police

22   department, speak with Mr. Christensen about

23   November 2024 incident?

24     A    I do not know.

25     Q    Was Mr. Christensen suspended in

Page 52

1      connection with the November 2024 incident?

2      A    I am not aware --

3      Q    You're not aware --

4      A    -- if he was suspended.

5      Q    So it's your testimony that he could

6      have been suspended and you would not know?

7           MR. RUSTICO:  Objection.  You are

8      testifying for her now.

9           MR. CAREY:  No.  I'm asking her a

10     question, Greg.  And I'm not going to argue

11     every question with you.  If she doesn't

12     understand the question, she can say so.

13          MR. RUSTICO:  Okay.

14          MS. BUCHANAN:  Mr. Carey --

15          MR. RUSTICO:  It's fine.

16          MS. BUCHANAN:  -- you don't need to

17     yell.

18          MR. CAREY:  He doesn't need to yell over

19     me, ma'am.

20          MS. GOLIAN:  And let's be considerate of

21     her.

22          MR. CAREY:  Can you read back?

23        (Thereupon, the record was read back.)

24          THE WITNESS:  I do not recall him being

25     suspended based on the November 2024 situation.

Page 53

1    BY MR. CAREY:

2       Q    To your knowledge, were any disciplinary

3    charges of any kind brought against

4    Mr. Christensen in connection with the

5    November 2024 incident?

6       A    I am not aware.

7       Q    Are you aware of whether the OSU police

8    department continued its investigation of the

9    November 2024 incident after speaking with

10   Mr. Christensen back in November?

11      A    I'm not aware.

12      Q    Do you have any understanding of what

13   findings the OSU police department made in

14   connection with the November 2024 incidents?

15      A    I'm not aware.

16      Q    You mentioned the communication in or

17   around March of 2025.  What is your

18   understanding of what happened?

19      A    Of course, that's been a long time ago,

20   but I recall -- maybe it was not March of 2025.

21   If I recall correctly, there were concerns

22   raised about -- raised from individuals in the

23   community regarding Guy Christensen's social

24   media posts and concerns relative to safety.

25      Q    What is your recollection about the

Page 54

1      nature of those concerns?

2      A     I can't remember the details.

3      Q     To your knowledge, were any disciplinary

4      charges brought as a result of those concerns?

5      A     I can not recall.

6      Q     Other than the November 2024 incident

7      and the communications in March, was there

8      anything else that contributed to any

9      impression you had of Mr. Christensen from

10     prior to May of 2025?

11     A     No.

12     Q     How did you first become aware that

13     Mr. Christensen had made online posts

14     discussing the shooting of two Israeli embassy

15     staffers in Washington, D.C.?

16     A     I can't recall who shared that

17     information, but someone did.

18     Q     Do you know when that was?

19     A     I do not remember.

20     Q     How did you become aware that

21     Mr. Christensen was an OSU student?

22     A     Certainly there were, the information

23     that we received suggested that he was a

24     student, and then we were able to verify that

25     he had been enrolled spring of 2025.

Page 55

1    Q    Did you learn about the posts themselves
2    and the fact that he was a student at the same
3    time?
4    A    We knew he was a student back in
5    November of 2024, and then in spring, we
6    verified that he was also a student involved at
7    that time as well.
8    Q    Fair enough.  For ease of reference, I
9    would like to refer to Guy Christensen's
10   May 22nd, 2025, video in which he draws his
11   condemnation of the D.C. shooting as the
12   Rodriguez video.  Just for purposes of
13   terminology.  Can we agree on that?
14   A    Yes.
15   Q    Have you watched the Rodriguez video?
16   A    I have awareness.  Yes.
17   Q    Have you watched it?
18   A    Yes.
19   Q    When did you first watch it?
20   A    May 21st or 22nd, whenever it was
21   posted.
22   Q    So it's your testimony that you watched
23   it immediately upon it being posted?
24   A    Upon having awareness that it had been
25   posted so it could have been May 24th, 25th.

Page 56

1      Q     Did you watch it before he was

2      suspended?

3      A     I can't recall.

4      Q     What was your immediate reaction to the

5      Rodriguez video?

6      A     Concern for the elevated tone and tenor

7      of Mr. Christensen, hence, when I requested a

8      well-being check shortly that.

9      Q     So that was my next question.  Did you

10     contact any law enforcement that day?

11     A     Yes.

12     Q     Who did you contact?

13     A     I don't recall.  It would have been

14     maybe Monica Moll with OSUPD.  I can't remember

15     exactly who it went to.  But I requested a

16     well-being check.

17     Q     Monica Moll is the director of public

18     safety at OSU; is that correct?

19     A     Associate vice President for public

20     safety.

21     Q     Associate vice president for public

22     safety.  Is she a police officer?

23     A     She was.  I don't know.  I think so.

24     Q     I don't either.  That's why I'm asking,

25     is Monica Moll a police officer, to your

Page 57

1    knowledge?

2       A    Currently, I don't think she is a police

3    officer at this point.  She presides over

4    public safety.

5       Q    Does she preside over the OSU police

6    department?

7       A    Yes.  Which is a part of public safety.

8       Q    Aside from Monica mall, did you contact

9    anyone else associated with law enforcement?

10   On that day?

11      A    I can't remember who I communicated with

12   on that day to request a well-being check.

13      Q    So, let's talk about your discussion

14   with Monica Moll that day.  You said that you

15   requested a well-being check from her; is that

16   correct?

17      A    Yes.

18      Q    Did you tell her anything else?

19      A    Monica was also aware of the videos --

20   video.  I don't know if she watched the video,

21   but I certainly requested, based on what I saw,

22   a well-check.

23      Q    Did you ask her to do anything else?

24      A    No.

25      Q    Did you express any particular concerns

Page 58

1    or opinions about the video?

2      A    His health and safety and well-being and

3    the call for escalation.

4      Q    Did you say to Ms. Moll, that you

5    believed there was imminent unlawful violence

6    about to occur on OSU's campus?

7      A    I don't recall that being the language I

8    used.

9      Q    What language did you use?

10     A    Concerns about his call for escalation.

11     Q    Did you ask Ms. Moll if she could

12   arrange for Mr. Christensen to be arrested?

13     A    No.

14     Q    Did you ask that anyone else at OSU

15   contact law enforcement that day?

16     A    I don't recall doing that.  No.

17     Q    To your knowledge, did anyone else at

18   OSU contact law enforcement that day?

19     A    Contact OSUPD?

20     Q    Any law enforcement?

21     A    Oh, I don't -- I don't know.

22     Q    So what you requested from OSUPD, by way

23   of Ms. Moll, was a well-being check; is that

24   correct?

25     A    Correct.

Page 59

1      Q     Did you at any time ask them for
2   anything else?
3      A     This is prior to May 25 or May --
4      Q     At any time?  At any time associated
5   with Mr. Christensen.
6      A     Certainly wanted to make sure that we
7   understood if there were any other engagements
8   with law enforcement.  That came to light that
9   there had been.  I don't recall that I
10  requested it specifically.
11     Q     I'm not sure I'm following.  Is it your
12  testimony that you asked OSU Police Department
13  to look into whether there was other law
14  enforcement engagement?
15     A     No.  I specifically asked OSUPD to
16  conduct a welfare check, understanding that
17  Mr. Christensen was in Pennsylvania, because he
18  was not here physically on campus, and that was
19  the extent of my request to OSUPD regarding law
20  enforcement engagement.
21           Certainly, there were -- if there were
22  more, we would want to know that.
23     Q     Do you recall that Ms. Moll contacted
24  the FBI?
25     A     I think that is accurate.  Someone

Page 60

1      contacted the FBI.

2    (Plaintiff's Exhibit No. 3 was marked for the

3              purpose of identification.)

4    BY MR. CAREY:

5      Q    I'm going to mark as Plaintiff's Exhibit

6    3.  A document Bates numbered OSU-1534.  This

7    is an email exchange.  The most recent email is

8    dated May 31st from Jessica Eveland to, among

9    others, Melissa Shivers.  This document is an

10   email chain including you; is that correct?

11     A    Yes.  I am included.

12     Q    Could you turn to page 1540, please?

13     A    Did you say 1540?

14     Q    Yes, I did.  I'm going to direct your

15   attention to the bottom of the page.  It

16   says -- this is an email from you.  It says,

17   Out of an abundance of caution, Monica Moll

18   contacted the FBI supervisory special agent for

19   the Joint Terrorism Task Force in Columbus on

20   Sunday evening to share our concerns directly.

21          While the FBI is limited in what action

22   it can take based on the posts, they have

23   confirmed that they will continue to monitor.

24          My question is, was that a truthful

25   statement to the best of your recollection?

```
                                                    Page 61

  1      A     To the best of my recollection, yes.
  2      Q     Okay.  You can still --
  3            MS. GOLIAN:  This is still a privileged
  4      document.  I'm sorry.  We need to go off the
  5      record.
  6            MR. CAREY:  We are not going off the
  7      record.
  8            MS. GOLIAN:  Okay.  You know what?
  9      These are privileged.  They are clearly marked
 10      confidential and privileged and --
 11            MR. CAREY:  There are redactions.
 12            MS. GOLIAN:  There are some, but this
 13      entire -- Confidential and Privileged.
 14      Attorney-Client Privileged and Confidential.
 15            And I guess, whenever I was provided
 16      with -- with privileged information, I felt
 17      like I had an obligation to let opposing
 18      counsel know that that had been disclosed.  I'm
 19      very surprised by this.
 20            MR. RUSTICO:  Can we take a break?
 21            MR. CAREY:  You want to take a break?
 22            MR. RUSTICO:  Yep.
 23            MR. CAREY:  Five minutes.
 24            MR. RUSTICO:  Sure.
 25            MR. CAREY:  It's 10:40.  Let's say
```

Exhibit A

Page 62

1    10:45.

2         MS. GOLIAN:  We will be back in due

3    time.

4       (Thereupon, a brief break was taken.)

5    BY MR. CAREY:

6    Q    Dr. Shivers, you can set aside the

7    exhibit, if that's all right with you.

8         Dr. Shivers, to your understanding, did

9    the FBI ever initiate contact with OSU about

10   Mr. Christensen, or did it only go the other

11   way?

12   A    I don't recall.

13   Q    So as you sit here, can you recall any

14   instance in which the FBI contacted OSU about

15   Mr. Christensen?

16   A    I can't recall.

17   Q    Is it your understanding that the FBI

18   was monitoring Mr. Christensen prior to OSU

19   contacting the FBI?

20   A    I can't recall.

21   Q    Who would know?

22   A    The only person that I could think, our

23   office, would be Public Safety.

24   Q    Would it be fair so say then, that you

25   have no reason to believe that the FBI was

Page 63

1    monitoring Mr. Christensen prior to OSU's
2    outreach to the FBI?
3       A    Can you repeat that question please?
4            MR. CAREY:  Can you read back the
5    question?
6        (Thereupon, the record was read back.)
7            THE WITNESS:  I don't know, beyond OSU,
8    what other agencies may have been monitoring
9    Mr. Christensen prior to our engagement.
10   BY MR. CAREY:
11      Q    After OSU contacted the FBI, the FBI
12   agreed to monitor his social media posts; is
13   that correct?
14      A    I think that's accurate.
15      Q    To your knowledge, did Ms. Moll tell the
16   FBI that there was imminent violence about to
17   occur on OSU's campus?
18      A    I am not aware.
19      Q    To your knowledge, did Ms. Moll request
20   that agents be dispatched to campus immediately
21   to respond to imminent violence?
22      A    I don't think so.
23      Q    Did you ask Ms. Moll to say that?
24      A    No.
25      Q    To your knowledge, did Ms. Moll or

Page 64

1    anyone else follow-up with the FBI to ascertain
2    whether they had drawn any conclusions or made
3    any findings about Mr. Christensen?
4        A    Can you repeat that?
5        Q    To your knowledge, did Ms. Moll or
6    anyone else from OSU follow-up with the FBI
7    later to ascertain whether they had drawn any
8    conclusions or made any findings about
9    Mr. Christensen?
10       A    I imagined that there was follow-up with
11   the FBI from Ohio State or vice versa, or the
12   FBI may have followed up.  I don't know
13   exactly.
14       Q    Yeah.  I'm not asking you to speculate
15   to be clear.
16       A    Okay.
17       Q    Are you aware of any follow-up?
18       A    I can't recall.
19       Q    So just for clarity, is it fair to say
20   that as you sit here, you are not aware of any
21   follow-up?
22            MS. GOLIAN:  It's not what she said.
23            MR. CAREY:  Please refrain from coaching
24   the witness.
25            MS. GOLIAN:  I'm not coaching the

Exhibit A

Page 65

1       witness.

2              MR. CAREY:  Please refrain from speaking

3       to the witness while I have a pending question.

4              MS. GOLIAN:  I'm not speaking to the

5       witness.

6              THE WITNESS:  She didn't talk to me.

7              MR. CAREY:  Sorry.  I thought I heard

8       her say something.  Let's repeat the question

9       back.  Could you repeat that?

10         (Thereupon, the record was read back.)

11      BY MR. CAREY:

12       Q    So let me try again.  As you sit here,

13      is it fair to say that you are not aware of any

14      follow-up by OSU with the FBI to ascertain

15      whether they had drawn any conclusions or made

16      any findings about Mr. Christensen?

17       A    I am not aware.

18       Q    You stated that the FBI is limited in

19      what action it can take based on these posts.

20      In what way did you understand the FBI to be

21      limited?

22       A    I don't want to speculate what measures

23      they use to determine whether or not they

24      believed that there was anything actionable.  I

25      don't want to speculate.

Page 66

1      Q    Okay.  Well, just to be clear, I'm not
2   asking you to speculate.  I'm just asking for
3   your understanding.  You stated that the FBI
4   was limited in what action it could take.  What
5   was your understanding of the nature of that
6   limitation?
7      A    That -- that was the communication back
8   is that they were limited without going into
9   any additional detail.
10     Q    Did you have any understanding of why
11  the FBI was limited?
12     A    I did not.
13     Q    Do you have any reason to believe that
14  the FBI found a credible threat in the
15  Rodriguez video?
16     A    Oh, I don't know.
17     Q    Do you recall that Monica Moll contacted
18  the state director for public safety?
19     A    She did alert us to that contact.
20     Q    Do you recall when that contact was
21  specifically --
22          MR. CAREY:  Withdraw that.
23  BY MR. CAREY:
24     Q    Do you recall whether that contact was
25  before or after Mr. Christensen was suspended?

Page 67

1      A      I don't recall.

2      Q      Do you recall that the DPS director,

3   meaning the state --

4           MR. CAREY:   Take that back.

5   BY MR. CAREY:

6      Q      Do you recall that the state director

7   for public safety committed to monitoring

8   Mr. Christensen's social media?

9      A      I think I recall seeing that in a

10   communication.

11     Q      So is it fair to say that OSU asked the

12   Department of Public Safety --

13          MR. CAREY:   Strike that.

14   BY MR. CAREY:

15     Q      Is it fair to say that OSU asked the

16   state director for public safety to monitor

17   Mr. Christensen's social media, and they

18   agreed?

19     A      I'm not sure exactly what they asked.

20     Q      What OSU asked?

21     A      Correct.

22     Q      To your knowledge, did the state

23   director for public safety report any

24   concerning activity?

25     A      I don't know.

Page 68

1    BY MR. CAREY:

2        Q    Referring back to Exhibit 3 at the

3    bottom of page 1540, which was the section we

4    were talking about before.  I'm going read a

5    section to you.

6            Additionally, Monica spoke with the DPS

7    Director for the State of Ohio, who committed

8    to having state analyst staff proactively

9    monitor the student's social media and report

10   any concerning activity.  OSUPD's analysts

11   will -- will be doing the same.  Did I read

12   that correctly?

13       A    You did.  Thank you.

14       Q    Who is OSUPD's analyst?

15       A    I don't know who exactly the person is.

16       Q    What is your understanding of their

17   role?

18       A    To pay attention to what's happening

19   across social media and other spaces.

20       Q    To the best of your recollection, who

21   spoke with OSUPD to ask them to involve an

22   analyst?

23       A    I -- I don't know who from the team

24   requested that.

25       Q    Is it fair to say that OSUPD was

Exhibit A

Page 69

1    monitoring Mr. Christensen's social media at

2    OSU's administration's request?

3        A    I wasn't in on the conversation that

4    Monica had with the DPS director.  Nor the

5    conversation that Monica would have had with

6    the OSUPD's analyst.  So -- or Monica or team

7    member would have had a conversation to request

8    that.  I don't know.

9        Q    So you have no understanding of the

10   nature of the discussion?

11       A    I don't.

12       Q    Beyond presumably what you wrote in this

13   email?

14       A    Correct.

15       Q    Thank you.  You can set that aside.  Are

16   you familiar with OSU Hillel?

17       A    Yes.

18       Q    What is OSU Hillel?

19       A    It's our end unit, not connected to Ohio

20   State, but their role is to support and provide

21   community for Jewish students and for them to

22   provide education to others about the Jewish

23   community.  They are not connected to Ohio

24   State.

25       Q    To your knowledge, is OSU Hillel a

Exhibit A

1    pro-Zionist organization?

2        A    Oh, I don't -- I don't know.

3        Q    Upon learning of the Rodriguez video,

4    did you contact OSU Hillel to tell them you

5    believe that there was a threat of imminent

6    violence against them or their members?

7        A    No, I did not.

8        Q    To your knowledge, did anyone from OSU?

9        A    I don't know.

10       Q    Are you familiar with the Chabad House

11   or the Chabad Center at OSU?

12       A    What is the correct term.

13       Q    Chabad?

14       A    Chabad.

15       Q    House or center?

16       A    House, I think.

17       Q    What is the Chabad House?

18       A    It's a place for also Jewish students to

19   build and create community for one another.

20       Q    To your knowledge, is Chabad House a

21   pro-Zionist organization?

22       A    I don't know.

23       Q    Did you contact the Chabad House at OSU

24   to tell them you believe there was an imminent

25   violence or danger against them?

Page 71

1      A     No.

2      Q     To your knowledge, did anyone from OSU

3   do so?

4      A     I don't know.

5      Q     Are you familiar with the organization

6   Students Supporting Israel at the Ohio State

7   University?

8      A     Yes.

9      Q     Would you agree with me that this is an

10  expressly pro-Zionist student organization at

11  OSU?

12     A     I don't know their exact view point or

13  their narrative or whatever that might be.

14     Q     Okay.  I'll represent to you that on the

15  directory of student organizations at OSU that

16  organization identifies itself as being

17  pro-Zionist.  Do you have any basis to disagree

18  with that?

19     A     I do not.

20     Q     Did you contact Students Supporting

21  Israel at the Ohio State University to tell

22  them that you believed there was a danger of

23  imminent violence against them or their

24  members?

25     A     I did not.

Page 72

```
 1        Q    To you're knowledge, did anyone from OSU
 2    do so?
 3        A    I don't know.
 4        Q    Did you contact any student or student
 5    organizations to tell them that you believed
 6    there was a danger of imminent violence against
 7    them or their members after you saw the
 8    Rodriguez video?
 9        A    No.  I did not.
10        Q    To your knowledge, did anyone from OSU
11    administration or OSU Police contact any
12    students or student organizations to tell them
13    that there was a threat of imminent violence
14    against them or their members?
15        A    Not that I'm aware of.
16        Q    Did you attempt to initiate an
17    evacuation of OSU's campus at any time as a
18    result of any statements by Mr. Christensen?
19        A    No, I did not.
20        Q    To your knowledge, did anyone attempt to
21    evacuate OSU's campus as a result of any
22    statements by Mr. Christensen?
23        A    Not that I'm aware of.
24        Q    Do you think it's possible that campus
25    would be evacuated and you wouldn't know about
```

```
                                        Page 73
 1    it?
 2       A    No.
 3       Q    To your knowledge, was a warrant issued
 4    for Mr. Christensen's arrest at any time for
 5    any reason?
 6       A    Not that I'm aware of.
 7       Q    To your knowledge, was a search warrant
 8    issued in connection to Mr. Christensen at any
 9    time for any reason?
10       A    Not that I'm aware of.
11       Q    To your knowledge, was any attempt made
12    to arrest Mr. Christensen at any time?
13       A    Not that I'm aware of.
14       Q    To your knowledge, did anyone obtain or
15    attempt to obtain a protection order or
16    restraining order against Mr. Christensen?
17       A    Not that I would be aware of.
18       Q    To your knowledge, was Mr. Christensen
19    the subject of a civil commitment order?
20       A    I am not aware of that.
21       Q    To your knowledge, did Mr. Christensen
22    receive any kind of law enforcement sanction in
23    connection with any statements he made or
24    actions he took in May of 2025?
25       A    Could you repeat that?
```

Page 74

1      Q    To your knowledge, did Mr. Christensen

2   receive any kind of law enforcement sanction in

3   connection with any statements he made or

4   actions he took in May of 2025?

5      A    Not that I'm aware of.

6      Q    What videos of Mr. Christensen's did you

7   watch before he was suspended?

8      A    I can't recall.

9      Q    To the best of your recollection, did

10  you watch his video from the morning of

11  May 22nd, in which he condemned the shooting

12  prior to suspending him?

13     A    I don't know which video it was.

14     Q    Okay.  Did you watch that video at any

15  time?

16     A    Yes.

17     Q    And you can't recall when?

18     A    I can't.

19     Q    To the best of your recollection, prior

20  to Mr. Christensen's suspension, did you watch

21  the video that he posted on May 22nd,

22  discussing Congressman Ritchie Torres?

23     A    No.

24     Q    Were you aware that that video existed

25  prior to his suspension?

Page 75

```
 1      A     Not until afterwards.  For the interim
 2   suspension, correct?
 3      Q     Was there more than one suspension?
 4      A     Well, there's suspension and then
 5   interim suspension.
 6      Q     Got it.
 7      A     I think he was interim suspended.
 8      Q     It's my understanding that he was
 9   interim suspended.  Is that also your
10   understanding?
11      A     Yes, correct.
12      Q     Thank you.  So when I say "suspension,"
13   I'm referring to his interim suspension.  Can
14   we agree on that?
15      A     Yes, we can.
16      Q     Great.  To the best of your
17   recollection, prior to Mr. Christensen's
18   suspension, did you watch the video that he
19   posted on May 23rd in which he stated, quote,
20   I'm not suicidal.  And also, quote, I would
21   never make a threat that would jeopardize my
22   position?
23      A     No.  You asked if I watched that video,
24   correct?
25      Q     Correct.
```

Page 76

1      A     I did not.

2      Q     Did you determine where Mr. Christensen

3  was physically located at the time that he

4  recorded or published the Rodriguez video?

5      A     No.  But I knew he was back in

6  Pennsylvania.  I don't know how long he had

7  been there.

8      Q     Did you have any reason to believe that

9  he would be on campus at any time before the

10  fall semester?

11      A     Students can come back and forth without

12  ever making us aware.  So I don't know that I

13  would know that.  There's 67,000 of them.

14      Q     Sure.  Just for clarity.  Did you have

15  any reason to think that Mr. Christensen, in

16  particular, had plans to come back to OSU's

17  campus?

18      A     I did not have any indication of that.

19  Again, there's 67,000, and they can come back

20  and forth to Columbus as much as they would

21  like.

22      Q     Of course.  And I'm not asking you to

23  speculate about what they did or did not know,

24  I am just asking what you knew.  Did you have

25  any reason to believe that anything in the

Page 77

```
 1      Rodriguez video, was targeted at any member or
 2      members of the OSU campus community?
 3        A     So interesting, in reviewing that
 4      particular video -- and I'm sure because of
 5      your awareness of our Code of Student Conduct
 6      and prohibited conduct, it reaches well beyond
 7      the lines of the four walls of Ohio State.
 8            And so with 3.4 million followers,
 9      there's no way I could know exactly who the
10      message was for or intended.  But, certainly,
11      it being so widespread, and there's that level
12      of awareness, there's the ability for anyone,
13      whether they live in Columbus or somewhere
14      else, to be responsive to the messaging in that
15      video, which could also include people who live
16      in Columbus or who are somehow connected to
17      Ohio State, or not at all, but feel compelled
18      to be responsive to Mr. Christensen's
19      narrative.
20        Q     What do you mean by "responsive" in this
21      context?
22        A     When you are calling for escalation,
23      there could be someone who is listening to that
24      to feel like it is a call to action.  That is
25      certainly the viewpoint and lens of which was
```

Page 78

1    part of the assessment of the situation.

2        Q    Did you have any reason to believe that

3    anything in the Rodriguez video called for

4    action specifically against any member or

5    members of the OSU campus community?

6        A    As I stated earlier, anyone could be

7    watching that video.  And certainly the notion

8    of inspiring or encouraging someone, whether

9    that's real or perceived, I believe was

10   present.

11       Q    Mr. Christensen did not mention his OSU

12   affiliation from the Rodriguez video, correct?

13   To the best of your recollection?

14       A    To the best of my recollection.

15       Q    Okay.  Are you aware of any online post

16   or video by Mr. Christensen where he mentions

17   an OSU affiliation?

18       A    Not where he mentions an OSU

19   affiliation.

20       Q    Did you read any media reports or news

21   stories about Mr. Christensen or his videos

22   prior to his suspension?

23       A    No.  Those reports came in afterwards,

24   if I recall correctly.  It's been a long time.

25       Q    Prior to Mr. Christensen's suspension,

Page 79

1    were you aware of any public officials or

2    elected officials commenting on him or his

3    videos?

4       A    Not until after -- you mean the

5    Rodriguez video?  Correct?

6       Q    Yes.

7       A    Yeah.  After.

8       Q    I'm sorry.  I'm not sure we got a clear

9    answer there.  Prior to Mr. Christensen's

10   suspension.

11          I just -- I want to make sure that we

12   didn't get crosstalk on the record here.

13          Prior to Mr. Christensen's suspension,

14   were you aware of any public officials or

15   elected officials commenting on Mr. Christensen

16   or the Rodriguez video?

17      A    If I recall, the Rodriguez -- sorry.

18   Torres commentary came after the interim

19   suspension.  Yes.

20      Q    So were you aware of any such commentary

21   by public or elected officials prior to his

22   suspension?

23      A    I can't recall the order of things, I

24   apologize.

25      Q    Prior to Mr. Christensen's suspension,

Page 80

1    were you aware of any complaints received from

2    the public or from the OSU community about the

3    Rodriguez video?

4        A    Yes.  About the Rodriguez video.  Sorry

5    I'm tracking between Rodriguez and Torres.

6    Sorry.

7        Q    Well, just to clarify, I believe you

8    testified that you were not aware of the Torres

9    video until after his suspension?

10       A    Correct.

11       Q    So for right now I want to talk about

12   the Rodriguez video.  So were you aware of

13   any -- I believe you just testified that you

14   were aware of complaints received from the

15   public or the OSU community about the Rodriguez

16   video before his suspension?

17       A    Correct.

18       Q    Great.  What do you recall about those

19   complaints?

20       A    Concerns about threat of and safety,

21   concerns feeling like there was a call for

22   action and fear created by members of the

23   community.  And, community, I'm using that term

24   very broadly around his -- around the video.

25       Q    Do you recall any such complaints being

Page 81

1    received from then current OSU students?

2       A    If I recall, yes.  There were some

3    concerns shared by students.

4       Q    Do you recall the names of those

5    students?

6       A    I don't.

7       Q    But it's your understanding that there

8    were complaints from then current OSU students

9    about the Rodriguez video prior to his

10   suspension?

11      A    Again, I can't remember the order of

12   things here.  We have a host of parents and

13   community members and others, but I'm almost

14   certain that there was a complaint or a concern

15   shared by at least one student, and perhaps

16   they were a former student at that point.  I

17   can't remember.  It was May, so I can't

18   remember if graduation, in alignment with -- I

19   think graduation was prior to, so they would

20   have been a former student.

21      Q    Do you recall whether that complaint was

22   in writing?

23      A    I can't recall.  I think so.

24      Q    Do you recall what specifically that

25   current or former student said?

Page 82

1     A    Essentially what I shared earlier just
2    about being fearful, anti-Semitism, promoting
3    violence.
4     Q    And you testified that you don't recall
5    the name of the student?
6     A    I cannot recall the name of the student.
7     Q    In the time between initially becoming
8    aware of the Rodriguez video and
9    Mr. Christensen's suspension, who did you
10   discuss the matter with?
11    A    Can you repeat that, please?
12         MR. CAREY:  Can you read back the
13   question?
14     (Thereupon, the record was read back.)
15         THE WITNESS:  Certainly, the CRCO
16   office, legal affairs of course.  Those would
17   have been the two offices that I would have
18   consulted with after viewing the video.
19   BY MR. CAREY:
20    Q    So I'm not asking you to divulge any
21   conversations that were for the purposes of
22   obtaining legal advice, but, excluding that,
23   what was discussed?
24         MR. RUSTICO:  Objection.  Are you -- so
25   you don't want her to discuss anything in

Page 83

```
 1      content but you just asked.
 2            MR. CAREY:  I'm trying to exclude
 3      privilege.
 4            MR. RUSTICO:  I know, but she is not an
 5      attorney.  She cannot necessarily determine
 6      what is attorney-client privilege and who
 7      isn't.  Which conversation do you want to know
 8      about?
 9            MR. CAREY:  Well, let's --
10            MR. RUSTICO:  Her conversation with
11      legal, that's going to be privileged.  She is
12      not going to answer that question.  CRCO,
13      perhaps.  Depends what you are asking.
14            MR. CAREY:  Okay.  Let's start with
15      CRCO.
16      BY MR. CAREY:
17        Q    What conversations do you recall having
18      with CRCO?
19        A    I knew based on that that he had been
20      reviewing the particular -- I don't want to
21      call it a report, but communication with
22      concerns about Guy Christensen, and so I wanted
23      to hear from Keisha Mitchell.  Specifically,
24      about her review and take on what it is that
25      she understood to be the primary issues that
```

Page 84

1     she viewed.

2        Q    What did she say?

3        A    That she was concerned that this did

4     cross the line -- the free speech line.  The

5     protected speech line.

6             MR. CAREY:  Could you read back the last

7     two answers?

8        (Thereupon, the record was read back.)

9     BY MR. CAREY:

10       Q    What did you understand to be the reason

11    that this crossed what you described as the

12    free speech line?

13       A    I think the call for escalation.  Can we

14    take a break?

15            MR. RUSTICO:  Sure.

16            MR. CAREY:  Sure.  I mean we can take an

17    early lunch if you want.

18            MR. RUSTICO:  That would be fine.  No?

19            MS. GOLIAN:  How much longer do you

20    have?

21            MS. BUCHANAN:  How much longer do you --

22            MR. CAREY:  I'm slightly less than half

23    way through, we have been on the clock for

24    something like a little less than two hours, I

25    would say so.  I mean, it just depends on how

Exhibit A

Page 85

```
 1      many breaks you take from here out.  I would
 2      estimate I have two to three hours of material.
 3            We can go off the record.
 4        (Thereupon, a brief break was taken.)
 5            MR. CAREY:  Go ahead.
 6            MR. RUSTICO:  So for 2 we will be
 7      looking to claw that back.  This was
 8      inadvertent disclosure of attorney-client
 9      material.
10            MR. CAREY:  Okay.  Go ahead.
11            MR. RUSTICO:  Yeah.  And so we don't
12      want that included with the transcript, you
13      know, we are going to be looking to claw that
14      back.
15            MR. CAREY:  All right.  Well, we don't
16      agree that it's a privileged document.
17            In particular, the provision that was
18      discussed in the deposition.  I don't believe
19      that this is a communication for the purposes
20      of obtaining legal advice.  So, you know, I
21      don't -- I think we reached a place with
22      questioning where she was asked independently
23      of the document.
24            MR. RUSTICO:  Right.  So the document
25      doesn't need to be included is what I'm saying.
```

Page 86

1          We want to protect our claim of
2      privilege over it, and so we just don't want
3      the document included.
4          MR. CAREY:  Okay.
5          MR. RUSTICO:  So we can claw that back.
6          MR. CAREY:  For right now, I'll just say
7      that we will not concede that it's a privileged
8      document.
9          MR. RUSTICO:  Fine.  We can disagree.  I
10      don't want it included if we didn't need it as
11      an exhibit.
12          MR. CAREY:  As an exhibit?
13          MR. RUSTICO:  Because it's then just
14      extending the spillage.
15          MR. CAREY:  By including it as an
16      exhibit, you mean offered into evidence with
17      the court?
18          MR. RUSTICO:  Right.  It will be
19      attached -- all the exhibits will be attached
20      to the deposition transcript.  So we ask that
21      it not be because it will be on the public
22      docket and further spillage of attorney-client
23      privilege.
24          MR. CAREY:  I'll have to get back to you
25      on that.

Page 87

1          MR. RUSTICO:  Okay.

2          MR. CAREY:  I appreciate your position.

3          MR. RUSTICO:  We can go back off the

4     record to discuss plans.

5      (Thereupon, a brief lunch break was taken.)

6          MR. CAREY:  Do we have all the exhibits?

7     I'm notorious for letting them walk away, just

8     want to make sure.  1, 2 and 3.

9          THE WITNESS:  Yes.

10          MR. CAREY:  Great.

11     BY MR. CAREY:

12      Q    So I would like to follow-up on

13     something you mentioned earlier regarding

14     possibly a complaint by a then current or

15     former student regarding Mr. Christensen.

16          Please correct me if I'm misstating.  I

17     understood your testimony to be that you

18     believe there may have been a then current

19     student or recent former student who had

20     complained regarding Mr. Christensen?

21      A    Yes.

22      Q    But you can't recall the name of that

23     student?

24      A    I cannot.

25      Q    Who would know?

Page 88

1      A     I can't recall who all received the
2    message.   I just remember receiving it.  So I
3    don't know who else would -- I can't recall who
4    else would have been on the email
5    communication.
6      Q    And you don't recall whether it was a
7    current student or a former student?
8      A    And the only reason I can't recall the
9    timing of the email because with graduation
10   commencement being early May, I just can't
11   recall when the email was sent.  So would it
12   have been after they graduated or before they
13   graduated?
14     Q    So to the best of your recollection, it
15   was a 2025 graduate?
16     A    Yes.
17     Q    Other than that one, do you recall
18   receiving any complaint from then current
19   students regarding Mr. Christensen?
20     A    Not that I can recall.
21     Q    We were discussing, before the break,
22   who you had discussed the matter of
23   Mr. Christensen with prior to his suspension.
24   You had mentioned CRCO and legal affairs.  Was
25   there anyone else who you discussed

Page 89

1     Mr. Christensen or the Rodriguez video with?
2         A     After I spoke with Keisha Mitchell,
3     CRCO, I reached out to Kelly Smith director of
4     conduct to get an understanding from her of
5     this current situation.
6         Q     What did you tell her?
7         A     I just asked her based on what she was
8     reviewing, or the conversation that she had had
9     with Keisha, to just give me a sense of her
10    perspective.
11        Q     What was her perspective?
12        A     Certainly that it was troubling, but she
13    had not weighed in on whether or not she
14    thought it was a violation of free speech or if
15    there was a crossover of it being beyond free
16    speech/protected speech.
17        Q     Did she say why she found it troubling?
18        A     She did not.
19        Q     Other than CRCO, legal affairs and
20    Ms. Smith, did you discuss the matter with
21    anyone else prior to Mr. Christensen's
22    suspension?
23        A     Did not discuss but certainly made, as I
24    would, with a case like this one, making the
25    president and the provost aware.

Page 90

1      Q    Do you recall President Carter making

2    any comments at that time?

3      A    No.

4      Q    Do you recall the provost making any

5    comments at that time?

6      A    No.

7      Q    And you say a case like this one, what

8    are you referring to?

9      A    Just in terms of the public nature of

10   the situation.  With 3.4 million followers,

11   it's important that someone has an awareness

12   that this could become something bigger.

13     Q    Did President Carter ask you to keep him

14   informed about this case?

15     A    No.

16     Q    Did the provost ask you to keep him

17   informed about this case?

18     A    No.

19     Q    In the course of your considerations,

20   prior to Mr. Christensen's suspension, did

21   anyone suggest that he should not be suspended?

22     A    I don't recall that.

23     Q    Did you conclude that Mr. Christensen

24   had explicitly encouraged unlawful violence in

25   the Rodriguez video?

Page 91

1      A     Can you repeat that again?

2      Q     Did you conclude that Mr. Christensen

3   explicitly encouraged unlawful violence in the

4   Rodriguez video?

5      A     Certainly calling for escalation, yes.

6      Q     When did you reach that conclusion?

7      A     After watching the video.

8      Q     Immediately after watching the video?

9      A     Oh, yeah.

10      Q     What statement or statements in the

11   videos led you to that conclusion?

12      A     The specific statement around that we

13   need to -- this calls for escalation, and I

14   don't remember the other term.  Not

15   accountability.  I can't remember the other

16   term.

17      Q     Was it resistance?

18      A     Resistance and escalation.

19      Q     Aside from his mentions of resistance

20   and escalation, was there anything else in the

21   video that led you to the conclusion that he

22   was explicitly encouraging unlawful violence?

23      A     It was the use of those two terms,

24   resistance and escalation, and then also, his

25   escalated nature in the video.

Page 92

```
 1      Q    Do you recall anything that he said
 2   specifically, aside from the mention of
 3   resistance and escalation, that led you to
 4   believe that he was explicitly encouraging
 5   unlawful violence?
 6      A    Resistance and escalation.
 7      Q    Anything else?
 8      A    Those two terms.
 9      Q    Sorry.  Was there anything other than
10   resistance and escalation?
11      A    No.
12      Q    Did you conclude that Mr. Christensen
13   intended for the Rodriguez video to incite
14   violence?
15      A    Yes.
16      Q    What violence did you believe he
17   intended to incite?
18      A    I think there was support for the two
19   Jewish people being murdered and to suggest
20   escalation could mean more of that.
21      Q    In your understanding, when did he
22   intend that violence occur?
23      A    When?  I don't know that it was timed
24   out.
25      Q    Where specifically do you believe he
```

Exhibit A

Page 93

1    intended violence to occur?

2      A    I don't know that there was a call out

3    specifically where it should happen, but

4    talking to 3.4 million people, that could be

5    interpreted differently.

6      Q    Who specifically do you believe that he

7    intended to be the targets of that violence?

8           MR. RUSTICO:  I'm going to object.  I

9    let this go for a while.  You are asking her to

10   speculate about what your client thought.

11          MR. CAREY:  No.  I'm asking her

12   understanding.  Can you read that question

13   back?

14      (Thereupon, the record was read back.)

15          MR. RUSTICO:  So her belief about his

16   intentions?

17          MR. CAREY:  Yeah.

18          MR. RUSTICO:  Okay.

19          MR. CAREY:  You can answer the question.

20   BY MR. CAREY:

21      Q    Who specifically do you believe he

22   intended to be the target of that violence?

23      A    Because the video was connected to the

24   two Jewish people, the narrative would have

25   been or at least the message that he was

Page 94

```
 1      sending, I don't know for certain what he was
 2      thinking, but certainly could have been toward
 3      the Jewish community.
 4        Q    So was it your belief that he intended
 5      to target the Jewish community?
 6        A    Based on the resistance and escalation
 7      comment, yes.
 8        Q    Any particular members of the Jewish
 9      community?
10        A    Well, who he has identified as Zionists.
11        Q    Any particular subset of Zionists?
12        A    Not that I'm aware of.
13        Q    You've never spoken with
14      Mr. Christensen; is that correct?
15        A    Correct.
16        Q    You've never seen him interviewed or
17      questioned about the Rodriguez video, correct?
18        A    Correct.
19        Q    What information led you to the
20      conclusions that you drew about his intent?
21        A    To the questions that I've already
22      answered relative to that?
23        Q    Yes.  Yes.
24        A    The resistance and escalation, and we
25      are talking about the video, correct?
```

Page 95

1    Q    Let me ask again.  What information led

2  you to the conclusion or understandings that

3  you've drawn about his intent?

4    A    The -- the ongoing narrative, but, for

5  me, this was less about viewpoint.  It was more

6  about health and safety risk.

7    Q    Let me ask it another way.  You've

8  mentioned his mention of resistance and

9  escalation.  You've mentioned the ongoing

10  narrative.  Was there any other information

11  that led you to conclude that he intended to

12  incite unlawful violence?

13    A    The information that he shared is -- is

14  what informed my perspective on potential

15  violence -- escalating violence.

16    Q    So when you say the information that he

17  shared, are you referring --

18    A    The video.

19    Q    The Rodriguez video specifically?

20    A    Correct.

21    Q    Anything else?

22    A    Certainly the information shared with us

23  about other posts that he had made using his

24  own words of really wanting to ensure that

25  there was accountability.

Page 96

1        His viewpoint -- not viewpoint.  His
2    perspective on how does one continue to
3    advocate for various communities, and the tone
4    and the demeanor in which he expressed his
5    feelings are also what led to a desire for a
6    welfare check -- well-being check.
7      Q    All right.  Earlier I believe I asked
8    what videos you watched prior to his
9    suspension, and I recall your answer.  It was
10   that you watched the Rodriguez video, and you
11   could not remember any others; is that correct?
12     A    Correct.
13     Q    And you asked for the welfare check
14   before the suspension, correct?
15     A    Well, the interim suspension, yes.  And
16   at the same time, asking for a well-being
17   check.
18     Q    I guess what I'm trying to understand
19   is, what other videos came into play in your
20   mind at the time when the interim suspension
21   was being considered and at the time you called
22   for a well-being check?
23     A    That was the primary video
24   specifically --
25     Q    Okay.

Page 97

1    A    -- for the interim suspension.

2    Q    And, again, was there another suspension

3    other than the interim suspension?

4    A    No.  I just want to continue to clarify

5    it was interim.

6    Q    Got it.  At the time that you suspended

7    him, were you aware that Mr. Christensen had

8    publically denied any intent to threaten anyone

9    in a subsequent video?

10    A    No.

11    Q    If you had been, do you believe that

12    would have affected your understanding of his

13    intent?

14    A    I don't know.

15    Q    Did you conclude that the Rodriguez

16    video was actually likely to incite imminent

17    violence?

18    A    Very concerned about it doing so.

19    Q    Where did you believe that violence

20    would occur?

21    A    I didn't have a sense of where.  Again,

22    with 3.4 million followers and individuals who

23    are receiving that information, they could be,

24    I imagine, all over the world.

25    Q    When did you believe that violence would

Page 98

1    occur?

2        A    I didn't have a sense of the when.

3        Q    Who did you believe would commit that

4    violence?

5        A    I don't know.  3.4 million followers it

6    would be anyone.

7        Q    Why did you believe that in --

8             MR. CAREY:  Strike that.

9    BY MR. CAREY:

10       Q    Why did you believe that violence

11   incited by the Rodriguez video would be

12   imminent as opposed to something that might

13   happen eventually?

14       A    When someone is, again, with 3.4 million

15   followers, how they hear and interpret what is

16   being shared with them, I have no way of

17   gauging whether that is for five days or right

18   now.

19       Q    Let's return to Exhibit 1, if we could.

20   This is the Code of Conduct.  Could you turn to

21   Section 20?  The interim suspension section.

22   Let me know when you're ready.

23       A    Ready.

24       Q    Would you agree with me that Section 20

25   provided the authority that OSU invoked to

Page 99

1     suspended Mr. Christensen?

2        A     Yes.

3        Q     Section 20 authorizes a finding to be

4     made by the vice president for student life or

5     designee upon reasonable cause.  Do you see

6     where it says that?

7        A     Yes.

8        Q     And in this case, was the finding made

9     by you or designee?

10       A     Ryan and I discussed it --

11       Q     You are referring to Ryan Level?

12    Apologies.  Please continue.

13       A     Ryan Level.  Yes.  There's also a

14    portion of the code that falls under prohibited

15    conduct and prohibited conduct also can include

16    social media.

17       Q     Okay.  Here the designee then was Ryan

18    Level, correct?

19       A     Yes.

20       Q     So the two of you mutually discussed the

21    situation and reached a decision jointly?

22       A     We discussed the interim suspension as

23    the next path in order for us to get a -- to

24    pause and to get a better understanding of the

25    depth and breadth of this potential issue.

Page 100

```
1      Q     Okay.
2      A     So we discussed it together.
3      Q     Is there any formal process by which
4    either you or a designee would make a finding
5    under Section 20?
6      A     No.  We are basing it on the data that
7    we have at the time to issue an interim
8    suspension.
9      Q     In this case, who made the final
10   decision?
11     A     We agreed that this was -- an interim
12   suspension was appropriate and in consultation
13   with legal affairs.
14     Q     So where it says in Section 20 that the
15   vice president for student life or designee,
16   must have reasonable cause, and so forth.
17     A     Uh-huh.
18     Q     If I'm understanding correctly, in this
19   case, that finding was made mutually by both
20   you and Ryan Level; is that correct?
21     A     Correct.
22     Q     Were you privy to all the information
23   that Mr. Level might have used in reaching that
24   finding?
25     A     I don't know that I know everything that
```

Page 101

1    Ryan is assessing.  We were both included on

2    all of the communications, but I can't -- I

3    don't know.

4       Q    Do you have any reason to believe that

5    he had information that you didn't?

6       A    Not that I would be aware of.

7       Q    Did you agree with the finding that was

8    made?

9       A    The finding for an interim suspension,

10   the recommendation for an interim suspension.

11      Q    Yes?

12      A    Yes.

13      Q    To your knowledge, did anyone disagree?

14      A    Disagree or needing more information?

15   Kelly Smith wanted more information.

16      Q    More information prior to issuing an

17   interim suspension?

18      A    Oh, I don't know about that.  Just more

19   information to determine -- just to understand

20   more about what had occurred.

21      Q    What additional information do you

22   understand that she wanted?

23      A    I don't know exactly.

24      Q    What leads you to think she wanted more

25   information?

Page 102

1     A    Well, she -- she just said I'm not sure
2     that this crosses the line.
3     Q    When she made the statement, had she
4     seen the Rodriguez video?
5     A    I don't know.
6     Q    Had you discussed the Rodriguez video
7     with her?
8     A    No.
9     Q    What information do you understand that
10    she had at that time?
11    A    Kelly was aware of the various reports
12    that were coming in, to my knowledge, and that
13    she and Keisha had discussed prior to my
14    awareness of the situation.  So I can't say for
15    certain whether or not she watched the video,
16    but they certainly had enough conversations
17    about the situation.
18         MR. CAREY:  Can't find my exhibit
19    stickers.  Off the record.
20         (Thereupon, a brief break was taken.)
21    (Plaintiff's Exhibit No. 4 was marked for the
22           purpose of identification.)
23    BY MR. CAREY:
24    Q    I'm going to mark Exhibit 4 --
25    Plaintiff's Exhibit 4.  This is a document with

Exhibit A

Page 103

1    Bates number beginning OSU-1812 continuing

2    through OSU-1820.  I accidentally gave you the

3    double-sided one, but we will just have to go

4    through with it.

5        A    Oh.

6             MS. GOLIAN:  Thank you.

7    BY MR. CAREY:

8        Q    Let me know when you are ready to

9    proceed.

10       A    Ready.

11       Q    What is this document?

12       A    The notification of the interim

13   suspension.

14       Q    So I understand that pages 1812 through

15   1814 are the notification of a suspension, and

16   pages 1815 through 1816 are communication from

17   Kelly Smith regarding scheduling a meeting.  Is

18   that consistent with your understanding?

19       A    It seems that way.

20       Q    You reviewed the letters in Exhibit 4

21   before they were sent out, is that correct?

22       A    Reviewed 18 -- I can't recall.

23   Typically I reviewed the letters that come from

24   Ryan, but I don't often receive the letters

25   from Kelly.

Page 104

1      Q    Okay.

2      A    So I can't recall.

3      Q    Do you recall reviewing the letter from

4  Mr. Level at pages 1812 to 1814?

5      A    Yes.

6      Q    Put that away.  You authorized the

7  letter from Mr. Level to be sent out; is that

8  correct?

9      A    Correct.

10     Q    Presumably, you did not find the letter

11 from Mr. Level to be false or misleading,

12 correct?

13     A    No, I did not.

14     Q    You had an opportunity to review it

15 before it was sent out, correct?

16     A    Yes.

17     Q    Did you suggest any edits or changes at

18 that time?

19     A    I don't recall doing so.

20     Q    Okay.  Could you please turn to page

21 1815, and I'm going to read a section of this

22 to you starting at the beginning of the letter.

23 Quote, Student conduct received information

24 alleging potential threats made to others, on

25 and around May 25th, 2025, end quote.  To your

Page 105

1    knowledge, is that a truthful and complete
2    statement of the reason for Mr. Christensen's
3    interim suspension?
4        A    Yes.  To my knowledge.
5        Q    All right.  You can set Exhibit 4 aside
6    for now.
7    (Plaintiff's Exhibit No. 5 was marked for the
8             purpose of identification.)
9    BY MR. CAREY:
10       Q    I'm going to mark as Plaintiff's Exhibit
11   5 the documents Bates Nos. OSU-929 through 931.
12   This is an email chain with the most recent
13   email dated May 25th from Melissa Shivers.  I
14   feel like a card dealer.  This is an email
15   chain that you were on and the most recent
16   email is from you dated May 25th, 2025; is that
17   correct?
18       A    Yes.
19       Q    To line here includes Ravi Bellamkonda.
20   Mr. Bellamkonda is the executive vice president
21   and provost of Ohio State University, correct?
22       A    Yes.
23       Q    And it also includes Chris Kabourek.
24   Mr. Kabourek is senior vice president of
25   administration and planning?

Page 106

1      A     That's correct.
2      Q     And JR Blackburn, on the to line,
3    Mr. Blackburn is President Carter's chief of
4    staff; is that correct?
5      A     Correct.
6      Q     And Elizabeth Parkinson, who is on the
7    To line is a senior vice president at Ohio
8    State; is that correct?
9      A     At the time, yes, that was her role.
10     Q     Is she no longer there?
11     A     I think that she -- she is no longer --
12   I don't know exactly.  She's -- they have split
13   the departments between comms and marketing.
14   So it has different leadership now.
15     Q     So she may have a new title.  Is she
16   still at Ohio State University?
17     A     I think she is still with us.  Yes.
18     Q     Hannah Bechtold is a senior director in
19   the Office Of the President; is that correct?
20     A     I don't know her exact title, but she is
21   in the Office of the President.
22     Q     Monica Moll, you have mentioned before.
23   She's associate vice president in charge of
24   public safety; is that correct?
25     A     Yes.

Page 107

1     Q    And Dennis Jeffrey is the chief of the

2     OSU Police Department, correct?

3     A    Correct.

4     Q    I'm going to read part of Exhibit 5.

5     You wrote, quote, I want to inform you that

6     following a review of recent concerns, we will

7     enact an interim suspension for Guy

8     Christensen.  This stems from the recent post

9     to include the specific statement, We will meet

10    with our own greater resistance and escalation

11    as well as a prior incident from November that,

12    when taken together, suggests a concerning

13    pattern of behavior.  Out of an abundance of

14    caution, I have requested a well-being check.

15    This is a precautionary measure while we assess

16    the situation further, end quote.  Did I read

17    that correctly?

18    A    Yes.

19    Q    You wrote that, correct?

20    A    Correct.

21    Q    Was the November incident one of the

22    reasons that Mr. Christensen was suspended?

23    A    It was those two pieces taken together.

24    Q    Why was he not informed in the letter

25    suspending him that the November incident was a

Page 108

1     factor in his suspension?

2         A     I'm not certain.

3         Q     Should he have been?

4               MR. RUSTICO:  I'm going to object.  Are

5     you asking her to make a legal determination,

6     the should, is it a morale should or legally

7     required?

8     BY MR. CAREY:

9         Q     Just answer the question, the best you

10    can.

11        A     Certainly, we want to ensure that

12    students have all of the information they need

13    to understand how we landed where we did.

14        Q     So is it your testimony then that the

15    incident in November was, in fact, a reason why

16    he was suspended?

17        A     Taken together.

18        Q     But it was a contributing reason?

19        A     Sure.

20        Q     You testified earlier, I believe that

21    you couldn't recall exactly what happened in

22    the November incident; is that correct?

23        A     When OSUPD reached out to him, with

24    Cassi Shaffer, to understand what it was that

25    he was posting or saying --

Page 109

1          MR. RUSTICO:  I'm going to object.  She

2     said she could not remember it now.  She didn't

3     say she could not remember it in May of 2025.

4     I'm just clarifying.

5          THE WITNESS:  Correct.  Correct.

6     BY MR. CAREY:

7     Q    I believe that earlier you testified

8     it's important for a student to know where they

9     are being disciplined.  Does this case present

10    a reason to make an exception?

11    A    I don't recall what question was asked

12    that, that was the response that I gave.

13    Q    Do you believe it's important for a

14    student to know the reason that they are being

15    suspended?

16    A    Yes.

17    Q    Is there any reason that this case would

18    be an exception to that?

19    A    No.

20    Q    What was it about the November incident

21    that made it a contributing factor to his

22    suspension, to the best of your recollection?

23    A    Again, the post and the concerns that

24    were raised which warranted OSUPD, staff at

25    OSUPD to reach out to him just to make -- I

Page 110

1     guess, to understand more about his intention

2     and I think also his well-being.

3         Q     But you don't know what that post was?

4         A     I can't remember exactly what that was

5     at this point.

6         Q     And you're not aware of any disciplinary

7     actions being taken at that time?

8         A     I'm not aware.

9         Q     Other than what we have discussed, was

10    there any other information that played a role

11    in the decision to suspend Mr. Christensen?

12        A     No.

13        Q     Spending Mr. Christensen meant that he

14    was barred from campus, correct?

15        A     Yes.

16        Q     And he was informed that he would be

17    subject to arrest if he came to campus,

18    correct?

19        A     Yes.

20        Q     Did you believe on May 25th, that

21    suspending Mr. Christensen was sufficient to

22    ensure campus safety?

23        A     At that point, yes.

24        Q     Mr. Christensen's scheduled a meeting

25    with Kelly Smith following his interim

Page 111

1    suspension, correct?

2        A    Yes.  I think that's accurate.

3        Q    Did you have any discussions with

4    Ms. Smith about what that meeting would entail?

5        A    No.

6        Q    Did you have any discussions with anyone

7    else about what that meeting would entail?

8        A    No, I did not.

9        Q    What information did you anticipate

10   might be gathered from Mr. Christensen?

11       A    I don't know that I thought about

12   anything in particular.  Kelly runs that

13   student conduct process and would be best

14   situated to determine what information would be

15   helpful.

16       Q    Do you have any personal experience with

17   meetings of this nature following an interim

18   suspension?

19       A    In terms of my involvement or

20   participation, no.

21       Q    Did you anticipate any particular

22   questions being asked of Mr. Christensen?

23       A    I did not.

24       Q    Was there any information at that point

25   that you would want to gather from

Page 112

1      Mr. Christensen?

2        A    I would leave that to Kelly and her team

3      to determine what would be informative.

4        Q    Were you aware that Ms. Smith and

5      Mr. Christensen had arranged to meet remotely?

6        A    I think so.

7        Q    Would you agree with me that with a

8      remote meeting there was no concern for

9      Ms. Smith's safety associated with the meeting

10     itself?

11       A    Sure.

12            MR. CAREY:  I would like to take a

13     five-minute break.

14            MR. RUSTICO:  Sure.

15            MR. CAREY:  Let's go off.  It's 1:00.

16     Get back here at 1:05.

17            MR. RUSTICO:  All right.

18            MR. CAREY:  Thank you.

19        (Thereupon, a brief break was taken.)

20     (Plaintiff's Exhibit No. 6 was marked for the

21            purpose of identification.)

22     BY MR. CAREY:

23       Q    Go ahead and mark Plaintiff's Exhibit 6.

24     This is a document Bates No. OSU-1633 through

25     1634.  Let me know when you are ready to

Page 113

1       proceed.

2          A    Ready.

3          Q    What is this document?

4          A    This is the notification of

5       disenrollment to Mr. Christensen.

6          Q    And is that your signature at the bottom

7       or rather on page 1634?

8          A    Yes.

9          Q    Did you review Exhibit 6 carefully

10      before it was sent out?

11         A    Yes.  I reviewed this document for the

12      content and the facts of the disenrollment.

13         Q    To the best of your knowledge, is

14      everything in Exhibit 6 true and accurate?

15         A    In terms of the content and the

16      reasoning for the disenrollment, yes.

17      Absolutely.

18         Q    When you say the content and the

19      reasoning for the disenrollment, are you

20      excluding --

21         A    It's kind of the same.

22         Q    Well, I'm asking what else is there,

23      other than the content and --

24         A    That's it.

25         Q    Okay.  So just for clarity, to the best

Page 114

1     of your knowledge, is everything in Exhibit 6

2     true and accurate?

3          A     Yes.

4          Q     Does Exhibit 6 truthfully state the full

5     basis for Mr. Christensen's disenrollment?

6          A     Yes.

7          Q     Does Exhibit 6 falsely identify anything

8     as a reason for Mr. Christensen's disenrollment

9     when it was not in fact a reason?

10         A     Can you repeat that, please?

11         Q     Does Exhibit 6 falsely identify anything

12    as a reason for Mr. Christensen's disenrollment

13    when it was not, in fact, a reason?

14         A     No.

15         Q     Does Exhibit 6 fail to disclose or give

16    notice to Mr. Christensen of any information or

17    considerations that formed part of the basis

18    for his disenrollment?

19         A     Not that I'm aware of.

20         Q     You can set that aside for now.  I would

21    like to return back to Exhibit 1, Code of

22    Conduct.  And if we can turn to Section 21,

23    which is on the second to last page of the

24    exhibit.  Let me know when you are there.

25         A     Yes.

Page 115

1      Q    Section 21 authorizations disenrollment
2   based a finding by the vice president for
3   student life or designee on the third line of
4   the provision; do you see that?
5      A    I'm sorry.  Can you tell me again?
6      Q    Let me -- let me simplify this.  In
7   Exhibit 6, the disenrollment letter, you write,
8   I am moving to disenroll you, and I find and so
9   on, using the first person.  So in this case,
10  would I be correct in thinking that the finding
11  under Section 21 authorizing disenrollment was
12  made by you?
13     A    Yes.
14     Q    Okay.  Are you aware of any other code
15  of conduct provision or rule that give also you
16  the authority to disenroll Mr. Christensen in
17  the way that you did other than Section 21?
18     A    No.  This is the provision that we
19  utilized.
20     Q    We talked earlier about what videos of
21  Mr. Christensen that you have watched prior to
22  his suspension.  I would like to move the time
23  line forward now.
24     A    Okay.
25     Q    What videos of Mr. Christensen's did you

Page 116

1    watch after he was suspended on May 25th, but

2    before the disenrollment letter was sent on

3    May 30th?

4        A    Certainly became aware of the Ritchie

5    Torres, the video by Guy Christensen regarding

6    Ritchie Torres.  So that is one that I viewed

7    post -- sorry.  I'm trying to -- post-interim

8    suspension that led to as a part of what led us

9    to disenroll.  I hope that answers your

10   question.

11       Q    Prior to Mr. Christensen's

12   disenrollment, did you watch his video that he

13   posted from the morning of May 22nd,

14   condoning the shooting?

15       A    I don't recall that one.

16       Q    Prior to Mr. Christensen's

17   disenrollment, you testified that you watched

18   the -- what I'll call the Torres video, which

19   is the May 22nd video discussing Congressman

20   Ritchie Torres; is that correct?

21       A    Prior to the disenrollment, yes.

22       Q    Did that video, what I'll call the

23   Torres video, have any impact on your

24   assessment of the situation?

25       A    Certainly realizing that there was other

1    law enforcement agencies being involved,

2    absolutely heightened concerns.

3      Q    Anything else?

4      A    That's all that I can recall at this

5    time.

6      Q    Did you watch the video then

7    Mr. Christensen posted on May 23rd in which

8    he stated, quote, I'm not Suicidal, and, quote,

9    I would never make a threat that would

10   jeopardize my position?

11     A    No.  I did not go and scan his social

12   media pages for any extended period of time.

13   So I don't recall that video.

14     Q    To your knowledge, did anyone else watch

15   that video?

16         MR. CAREY:  Sorry, strike that.

17   BY MR. CAREY:

18     Q    To your knowledge, did anyone else at

19   OSU watch that video?

20     A    I don't know.

21     Q    Did you watch the video that

22   Mr. Christensen posted on May 27th in which he

23   stated, quote, Anyone who sees my content knows

24   that I do not incite violence.  I do not tell

25   anyone to make threats.  I do not want anyone

Page 118

1    to make threats.  Why would I call for people

2    to make threats?  All that would do is

3    jeopardize my platform.  I'm nonviolent, end

4    quote.

5        A    I did not watch that video.

6        Q    To your knowledge, did anyone else at

7    OSU watch that video prior to his

8    disenrollment?

9        A    I'm not aware.

10       Q    Other than the Rodriguez video and the

11   Torres video, do you recall watching any other

12   videos hosted by Mr. Christensen?

13       A    There were other videos that I -- that

14   pop up as you're -- particularly on TikTok,

15   where it was not necessarily that I went in to

16   listen to every video, but I did pay a lot of

17   attention to the escalation or the response or

18   the behaviors of Mr. Christensen in those

19   videos.  But I can't tell you from a content

20   perspective what they said verbatim.

21       Q    What behaviors are you referring to?

22       A    Escalation in tone of voice.  Seemingly

23   very frustrated, angry, disappointed, all the

24   things that prompted me to say, I would like a

25   well-being check on this student.

Page 119

1    Q    When you say escalation, what are you
2    referring to?
3    A    Tone and tenor.  Yes, thank you.
4    Q    So just to close the loop on this.  As
5    we sit here, you can't recall the specific
6    content or date of any other videos that you
7    may have watched from Mr. Christensen?
8    A    No.  Correct.
9    Q    Watch the crosstalk if you would.  I
10   know I'm guilty of it too.
11        MR. RUSTICO:  He just means answering
12   before he was done with the question.
13        MR. CAREY:  Oh, I'm sorry.  I don't mean
14   to be rude.  When you start to do the thing
15   where I'm going on one of my long-winded
16   questions and you answer because it's obvious
17   where I'm going, it can lead to a muddled
18   transcript.  So just wait until I'm finished
19   with the question.
20   BY MR. CAREY:
21   Q    Prior to Mr. Christensen's
22   disenrollment, did you read any media reports
23   or news stories about him or any of his videos?
24   A    Yes.  I was made aware of two stories.
25   One was about a conference in which I think he

1    was planning to attend.  I don't remember all
2    of the details.  And then I think there was an
3    interview that he conducted.
4        Q    What do you recall about the conference
5    that he was planning to attend or the coverage
6    of it?
7        A    It's the only thing that I can recall is
8    that he, in his reporting, that he was on the
9    way to a conference and perhaps was met with
10   or -- I can't remember exactly, but he felt
11   like police were engaged, and his -- not his
12   participation, but in his attendance.
13       Q    Did you ask any law enforcement,
14   including OSU, for more information about that?
15       A    No.
16       Q    Fair to say that article didn't have any
17   bearing on the decision to disenroll him?
18       A    Sure.  Yes.
19       Q    What do you recall about the interview
20   that you mentioned having seen coverage of?
21       A    It was just a transcript of an
22   interview, so I didn't see a video.
23       Q    Was it a media interview?
24       A    Yeah.  I think someone was hosting,
25   maybe it was a podcast.  I can't remember

Page 121

1     exactly who it was that was the interviewer.

2        Q    What do you recall him saying in that

3     interview?

4        A    I think he was trying to explain his

5     approach.  Meaning, Mr. Christensen, was trying

6     to explain his approach and viewpoint on the

7     situation in Gaza.

8        Q    Fair to say that that interview or the

9     transcript that you saw of it, did not play any

10    role --

11       A    No.

12       Q    -- in the decision to disenroll him?

13       A    Correct.

14       Q    Sorry.  It's okay.  I do it too.

15    Unfortunately, we're human.

16            Prior to Mr. Christensen's

17    disenrollment, were you aware of any public

18    officials or elected officials commenting on

19    him or his videos?

20       A    The only one that I was aware of is the

21    Torres.

22       Q    What was your understanding of what

23    Congressman Torres said?

24       A    I don't know exactly the content, but I

25    think concerned about how Mr. Christensen was

                                          Page 122

1     positioning him and perhaps putting him in --
2     in harm's way with false allegations.
3        Q    Do you believe that Mr. Christensen was
4     making false allegations towards Congressman
5     Torres?
6        A    I have no idea.  Again, this is not
7     about their viewpoints.
8        Q    After Mr. Christensen's suspension, but
9     prior to his disenrollment, did you receive any
10    other information that led you to conclude that
11    the Rodriguez video encouraged unlawful
12    violence?
13       A    This is where we were starting to get
14    concerns from the community, and I mean
15    community in general, about the -- the tone,
16    tenor and rhetoric regarding, in particular,
17    that video and a perceived level of incitement
18    of violence, calling for, in particular,
19    resistance and escalation.
20       Q    Are you aware --
21            MR. CAREY:  Strike that.
22    BY MR. CAREY:
23       Q    Were you aware, prior to his
24    disenrollment, that Mr. Christensen had
25    publically denied any intent to threaten

Page 123

1    anyone?
2         MR. RUSTICO:  Objection.  That's
3    characterizing what he said.
4         THE WITNESS:  No.
5         MR. RUSTICO:  You can quote from his
6    videos if you would like.  You have done that
7    already.
8         MR. CAREY:  I appreciate the help.
9    Thank you.
10        MR. RUSTICO:  Live to serve.
11        MR. CAREY:  You're a great guy.
12   BY MR. CAREY:
13    Q    Did you have any understanding, prior to
14   his disenrollment, that Mr. Christensen had
15   made any statement tantamount to denying an
16   intent to threaten anyone?
17    A    No.
18    Q    You don't recall anything of that
19   general nature coming up?
20    A    I do not.
21    Q    Did any violence actually occur anytime,
22   anywhere that you believe was incited by the
23   Rodriguez video?
24    A    I have no idea.
25    Q    Did you conclude, prior to

Page 124

1    Mr. Christensen's disenrollment, that the
2    Rodriguez video contained threats that
3    Mr. Christensen would personally engage in
4    unlawful violence?
5        A    I had concerns that the message posted,
6    whether it was by Mr. Christensen or those that
7    follow him, had the risk of being harmful to
8    the community.
9        Q    Did you understand him to be making any
10   threat or promise that he personally would be
11   committing violence?
12       A    I don't think he said, I am going to,
13   but when you call for escalation and
14   resistance, if I were to, that certainly caused
15   me pause for concern.
16       Q    What concern specifically did you have?
17       A    About making that sort of statement and
18   not knowing who the 3.4 million people are that
19   are on the other side of that computer screen,
20   understanding whether or not he was saying, I
21   will or I charge you to, that's not always
22   easily discernable.
23       Q    Did you believe at that time that he
24   would commit violence?
25       A    I believed that his actions and his

Exhibit A

Page 125

1       words could absolutely incite violence.

2          Q     Did you believe at that time, that he

3       personally would commit violence?

4          A     I -- I didn't think so much necessarily

5       just about him.  It's in totality.

6          Q     When did you first become aware of the

7       Torres video?

8          A     Somewhere in May 21st/22nd.  I can't

9       recall.

10         Q     Safe to say, some time in between his

11      suspension and his disenrollment?

12         A     For sure.  Yes --

13         Q     Did you watch it?

14         A     -- after the suspension.

15         Q     Sorry.  I did it again.  That was my

16      fault.  After the suspension but before the

17      disenrollment?

18         A     Yes.

19         Q     Did you watch it -- did you watch the

20      Torres video?

21         A     Yes.

22         Q     Did you conclude that the Torres video

23      constituted an authentic threat of violence

24      against Congressman Torres?

25                MR. RUSTICO:  Objection.  You are asking

Page 126

1    for a legal conclusion.

2             MR. CAREY:  No, I'm not.

3             MR. RUSTICO:  Authentic threat.  Okay.

4             MR. CAREY:  If she doesn't understand

5    what authentic threat is then I believe she can

6    testify to that.

7             MR. RUSTICO:  Okay.  Just clarifying for

8    the record.

9             MR. CAREY:  Can you repeat it back?

10        (Thereupon, the record was read back.)

11            THE WITNESS:  The fact that there were

12   police, law enforcement engagement there led me

13   to concerns.

14   BY MR. CAREY:

15     Q    Did you ever draw your own conclusion

16   that the Torres video contained a threat of

17   violence against Congressman Torres?

18     A    I don't recall that.

19     Q    Do you recall that Kelly Smith spoke

20   with the Capitol Police about the situation

21   involving Mr. Christensen and Congressman

22   Torres?

23     A    No, I do not.

24     Q    So would you have been aware of that if

25   she did?

Page 127

1     A     Not necessarily.

2     Q     Do you recall her reporting to you

3     anything about the Capitol Police

4     investigation?

5     A     No, I do not.

6     Q     Do you have any reason to believe that

7     the Capitol Police found any credible threat by

8     Mr. Christensen against Congressman Torres?

9     A     I do not know.

10    Q     Setting aside the Torres video itself,

11    is it your understanding that Mr. Christensen

12    could be disenrolled because Congressman Torres

13    reported him to Capitol Police?

14    A     Could you repeat that, please?

15    Q     Setting aside the Torres video itself,

16    is it your understanding that Mr. Christensen

17    could be disenrolled because Congressman Torres

18    reported him to Capitol Police?

19    A     No.  That is not the rationale for a

20    disenrollment.  If you recall, this

21    disenrollment occurred because there was a

22    request for an investigation by Capitol Police,

23    and that has been the basis, primarily, of

24    this, is the level of engagement of police

25    enforcement becoming very concerning.

Page 128

1      Q    What is your understanding of the nature
2    of the Capitol Police investigation?
3      A    I didn't inquire to the great detail of
4    that.
5            MR. CAREY:  Could you read back not this
6    answer but the one before?
7        (Thereupon, the record was read back.)
8    BY MR. CAREY:
9      Q    Let's go back to Exhibit 6, which is the
10   disenrollment letter.  Let me know when you
11   have it?
12     A    I have it.
13     Q    In the second paragraph you mention,
14   quote, The myriad communications from members
15   of the University community expressing fear of
16   violence based on your posts.
17           Can you explain why communications
18   expressing fear of violence can form a basis to
19   expel a student?
20     A    There was enough --
21           MR. RUSTICO:  I want to object.  Sorry.
22   There's not an expulsion.  Can we be precise?
23           MR. CAREY:  Sure.
24   BY MR. CAREY:
25     Q    What's the difference between a

Page 129

1     disenrollment and an expulsion?

2        A      The expulsion or suspension, happens

3     through the conduct process.  A disenrollment

4     happens through administrative process.  So

5     this was an administrative process versus a

6     conduct code of conduct process.

7        Q      Would I be correct in understanding, in

8     the event of a disenrollment, the student is

9     not able to return to the University without

10    further action by the University?

11       A      If they submit a petition and it's

12    approved, correct.

13       Q      Without an approved petition they are no

14    longer welcome at the University, correct?

15       A      Correct.

16       Q      Thanks for the clarification.

17              Going back to my question about Exhibit

18    6.  In the second paragraph, you mention,

19    quote, The myriad communications from members

20    of the University community expressing fear of

21    violence based on your posts --

22       A      Uh-huh.

23       Q      -- end quote.

24       A      Uh-huh.

25       Q      Can you please explain why

                                        Page 130

1       communications expressing fear of violence can

2       form a basis to disenroll a student?

3        A    My primary role and responsibility is to

4       protect the health, safety and well-being of

5       our campus community.

6             Based on the information that

7       Mr. Christensen shared, via his social media

8       sites, the ongoing and the collaborative nature

9       of a number of law enforcement agencies, in

10      addition to members of our community being

11      fearful of what that video, the Rodriguez

12      video, called for, created a level of fear in

13      the community created by Mr. Christensen.

14       Q    I think you -- I think you answered this

15      earlier.  I want to be clear, so I apologize if

16      it's redundant.

17            Are you aware of any then or current OSU

18      students who expressed to you or to any other

19      OSU administrator a fear of violence or for

20      their personal safety based on

21      Mr. Christensen's social media posts aside from

22      the one person who you mentioned before?

23       A    I was copied on the email from the

24      student.  I was included on that email.  I --

25      the members of the community go beyond just our

Page 131

1    students.

2      Q    Right now I'm just asking about

3    students.

4      A    That is the one email that I was copied

5    on.

6      Q    To your knowledge, was anyone else

7    copied on that email?

8      A    Yes.  There were others copied on the

9    email.  I just don't recall who -- everybody

10   that would have been on that email.

11     Q    OSU received a number of communications

12   about Mr. Christensen from people identifying

13   themselves as parents of OSU students; is that

14   correct?

15     A    Yes.  That is correct.

16     Q    Did OSU administration follow-up with

17   the students whose parents wrote those letters

18   to see if they agreed with their parents?

19     A    I am not aware.

20     Q    Are you aware of whether any of those

21   students, whose parents had written letters,

22   responded or otherwise communicated with OSU

23   administration about this?

24     A    Can you ask me that again?

25          MR. CAREY:  Can you read it back?

```
                                              Page 132
 1        (Thereupon, the record was read back.)
 2              THE WITNESS:  You are asking, if we
 3      wrote back to the parents?
 4      BY MR. CAREY:
 5        Q    No.  I'm asking if the students ever
 6      spoke to you.  Read back again.
 7              THE WITNESS:  Thank you.  I do not know
 8      for sure.
 9      BY MR. CAREY:
10        Q    Who would know?
11        A    I'm imagining the individuals that were
12      recipients of those emails.
13        Q    Is there any particular person in the
14      OSU administration who would be able to answer
15      that question?
16        A    I don't know that anyone could answer
17      the question across the board of all the people
18      that would have received the email.  As you can
19      imagine, they tend to just copy everybody.  But
20      I can't recall right now, who in particular
21      would have received those particular emails --
22        Q    If there were any?
23        A    -- if there were any, yes.
24        Q    Crosstalk.  We both did it.  I will
25      plead the fifth on that one.
```

```
                                            Page 133

 1           Would you ever disenroll a student
 2      solely because other students contacted OSU
 3      administration to complain about that student
 4      and demand that they be disenrolled?
 5      A     No.
 6      Q     Why not?
 7      A     We would take those concerns and learn
 8      more, particularly, if there's a whole host of
 9      concerns shared, similar concerns.  We would
10      absolutely want to know more.
11           But because one student contacts our
12      office and suggests that one person should be
13      disenrolled, does not occur.  Again, I have
14      been here almost six years, and this has been
15      the first time that I have issued a
16      disenrollment.  And I get a lot of emails, with
17      a lot of concerns about a lot of different
18      things.
19      Q     Would you agree that if OSU receives a
20      communication containing an allegation that a
21      student poses a risk to campus safety, it is
22      incumbent on OSU to investigate that and draw
23      its own conclusions rather than taking the
24      complainant's word for it?
25           THE WITNESS:  Can you repeat that?
```

Exhibit A

1      (Thereupon, the record was read back.)

2           THE WITNESS:  Yes.

3    BY MR. CAREY:

4      Q    Would you agree that it's best to gather

5    as much information as reasonably possible

6    before disenrolling a student?

7      A    I think it depends on the situation.

8      Q    How so?

9      A    I think it depends on what we -- what we

10   have been able to gather.  Particularly, we may

11   not, as I said earlier, have a sense of the

12   time bound in nature of the concern, so we want

13   to gather as much as we can, but we also want

14   to be timely in our response, in particular, if

15   there is, indeed, a risk of threat.

16     Q    If information is readily available to

17   you, and not especially time consuming, would

18   it be fair to say that that information should

19   be reviewed before disenrolling the student?

20     A    If we have a whole host of information

21   that allows for us to make a decision, based

22   what we have, we will -- we will move forward

23   with the disenrollment just like we would do

24   with a formal investigation within the code of

25   conduct.

Page 135

1      Q    With due respect, I'm not sure that
2      answered my question.
3           MR. CAREY:  Could you read back?
4        (Thereupon, the record was read back.)
5           THE WITNESS:  When you say especially
6      time consuming --
7      BY MR. CAREY:
8      Q    Well, you said that there might be
9      concerns about time frame and that -- this is
10     my paraphrase -- you testified that there might
11     be concerns about time frame, and that might
12     lead you to not conduct further investigation.
13          My question is, if you have information
14     available to you that is readily available, and
15     not especially time consuming to review, would
16     it be fair to say that you should review that
17     information before disenrolling a student?
18     A    Let me clarify --
19          MR. RUSTICO:  I was just going to
20     object.  Again, like, should, under what?  Are
21     you asking her a legal question about her
22     obligation?
23          MR. CAREY:  I'm not asking a legal
24     question.  You can go ahead and answer.
25          THE WITNESS:  When I said timeliness, we

Exhibit A

Page 136

1    have to assess whether or not we believe that

2    there could be, whether it's time-bound or not,

3    the timeliness of the issue.

4         If there is a -- what is perceived to be

5    or could be imminent, we need to respond

6    quickly in a timely fashion.  Not necessarily

7    saying that a process would take forever to

8    gather in terms of timely, that's not -- I

9    meant just timely in terms of responsiveness,

10   and how quickly we need to respond as we did in

11   this case.

12   BY MR. CAREY:

13     Q    Would you agree that you should review

14   all relevant information that does not endanger

15   the necessary timeline before disenrolling the

16   student?

17     A    I think if that is present and readily

18   available, then certainly.

19     Q    Would you ever disenroll a student

20   solely because parents of other students

21   contacted OSU administration and claimed that

22   the student posed a risk to campus safety?

23     A    Not singularly.  And that would also

24   need to be assessed by the proficient bodies,

25   OSUPD and others and certainly a consultation

Page 137

1     with legal.

2       Q     Is that also true of members of the

3     general public?

4       A     Sure.

5       Q     In the time before Mr. Christensen was

6     disenrolled, were there any significant

7     demonstrations or protests on campus that

8     pertained to him or to the Rodriguez video?

9       A     Not that I can recall.

10      Q     Did you have any specific reason at that

11    time to anticipate any large-scale

12    demonstrations or protests about

13    Mr. Christensen or his videos?

14      A     You never know.  3.4 million followers.

15    We don't know what we can anticipate.

16          MR. RUSTICO:  Want to take a break?

17          THE WITNESS:  Yes.  That would be great.

18          MR. RUSTICO:  Yes.  Let's take a break.

19    How about ten minutes?

20          MR. CAREY:  Sure.  It's 1:47, so you

21    want to just take until 2:00?

22          MR. RUSTICO:  Yeah, why not.

23          MR. CAREY:  I think we are making good

24    time.

25        (Thereupon, a brief break was taken.)

Exhibit A

Page 138

1    BY MR. CAREY:

2        Q    I'm going to briefly revisit something

3    you testified about before.  Would you ever

4    disenroll a student -- try that again.  Would

5    you ever disenroll a student solely because a

6    large number of other students contacted OSU

7    administration to complain about that student

8    and to demand that they be disenrolled?

9        A    We would assess the complaints that we

10   receive.

11       Q    So you would not disenroll them solely

12   on that basis?

13       A    Correct.

14       Q    Prior to Mr. Christensen's disenrollment

15   did any faculty or staff quit their jobs or

16   threaten to quit their jobs over his social

17   media posts?

18       A    Not to me.

19       Q    Are you aware of any?

20       A    I am not.

21       Q    Did anyone in particular threaten to

22   commit any unlawful act such as vandalism or

23   violence because of Mr. Christensen or his

24   posts?

25       A    Not that I'm aware of.

Page 139

1    Q   Did you have any reason to believe that

2    OSU classes would be unable to continue as a

3    result of anything that Mr. Christensen did or

4    said?

5    A   I think it would depend on the response

6    from many of the followers if we believed that

7    there could be an impact on the function,

8    action, of the University based on the data

9    that we would be receiving.  So I can't say

10    absolutely yes or absolutely no.  I think it

11    would depend on the response.

12  (Plaintiff's Exhibit No. 7 was marked for the

13        purpose of identification.)

14  BY MR. CAREY:

15    Q   Going to mark as Plaintiff's Exhibit 7,

16    a document Bates No. OSU-1751 through 1753.

17    This is an email chain.  The most recent email

18    is May 27th from Melissa Shivers.  Let me know

19    when you are ready to proceed.

20    A   Ready.

21    Q   This document, Exhibit 7, is an email

22    exchange between you and Naomi Lamb, correct?

23    A   Correct.

24    Q   Ms. Lamb is the CEO of OSU Hillel; is

25    that correct?

Exhibit A

Page 140

1      A      Yes.

2      Q      She is not a student; is that correct?

3      A      No.  She is not a student.  She advises

4      students, but she is not a student.

5      Q      I'm going to read you a section of her

6      email on page 1752.  She writes, quote, I've

7      now heard from several Jewish students that

8      this student was in a class with them about the

9      history of Zionism taught by faculty member,

10     Ori Yehudai.  They indicated he was combative

11     and aggressive.  I have reached out to them to

12     learn more, as well as to Ori, end quote.  Did

13     I read that correctly?

14     A      Yes.

15     Q      Did this information in Exhibit 7 have

16     any impact on your decision to disenroll

17     Mr. Christensen?

18     A      No.

19     Q      You can set that aside.

20     (Plaintiff's Exhibit No. 8 was marked for the

21            purpose of identification.)

22     BY MR. CAREY:

23     Q      We are going to mark as Plaintiff's

24     Exhibit 8, a document that's been Bates

25     numbered OSU-346.  Have you seen Exhibit 8

Exhibit A

Page 141

1    before?

2        A    I have not.

3        Q    Have you seen anything --

4             MR. CAREY:  Strike that.

5    BY MR. CAREY:

6        Q    Have you seen emails that are

7    substantially similar to this before?

8        A    Similar in terms of concerns about

9    threats of violence or concerns about violence,

10   yes.  But not anything to this degree.

11       Q    Let me be more specific, have you seen

12   messages sent to OSU about Mr. Christensen sent

13   on behalf of Mothers Against Anti -- Campus

14   anti-Semitism?

15       A    No.

16       Q    You have not?

17       A    No.

18       Q    Were you aware that OSU received

19   messages from Mothers Against College

20   anti-Semitism?

21       A    I think this is the first time I've seen

22   this document.  It did not come to my account.

23       Q    Well, setting aside this specific

24   document, were you aware that Mothers Against

25   College anti-Semitism was conducting a

Page 142

1     letter-writing campaign?

2        A     No.

3        Q     To your knowledge, did anyone from OSU

4     administration ever communicate with Elizabeth

5     Rand the person identified at the end of

6     Exhibit 8?

7        A     I am not aware.

8        Q     Okay.  You can set Exhibit 8 aside.

9     (Plaintiff's Exhibit No. 9 was marked for the

10               purpose of identification.)

11    BY MR. CAREY:

12       Q     I'm going to mark as Exhibit 9 a

13    document that's been Bates numbered OSU-986

14    through 989.

15            It's an email chain the most recent

16    email is dated May 28th from Melissa Shivers.

17    This is an email forwarding an external message

18    among OSU personnel including you; is that

19    correct?

20       A     Yes.  I think Kelly brought me into --

21    no, Monica brought me into it.

22       Q     If you could turn to page 988.  This is

23    another form letter message; is that correct?

24       A     I can't verify if it's a form letter.

25       Q     Are you aware that OSU received a number

1       of communications that were substantially

2       similar to this one?

3          A    I imagined so, but I would not have been

4       copied on all of them.  The reason I was

5       brought into this one was because Monica

6       brought me in, so there may be others that I'm

7       not aware of.

8          Q    Were you aware that there was a

9       letter-writing campaign connected with an

10      organization --

11              MR. CAREY:  Strike that.

12      BY MR. CAREY:

13         Q    Were you aware that there was a letter

14      writing campaign pertaining to Mr. Christensen,

15      connected with a social media account called,

16      End Jew Hatred?

17         A    End Jew Hatred?  I don't recall that.

18      No.

19         Q    You can set aside Exhibit 9.  Your

20      letter disenrolling Mr. Christensen mentions

21      the engagement of several law enforcement

22      jurisdictions as one of the reasons for

23      disenrolling him.  What jurisdictions were you

24      referring to?

25         A    Our outreach to Cranberry Township -- or

Page 144

1    their outreach to Cranberry Township to engage

2    on a wellness check.  The situation with Torres

3    as well as the interactions that OSUPD had with

4    Guy back in November and then the

5    recommendations or the outreach that Monica

6    made to -- I can't recall the name of it.  Here

7    in Ohio where she requested them to keep in

8    touch if they continued to learn more.  I just

9    can't remember the name of the agency, but it

10   was a law enforcement agency.

11       Q    Could you turn back to Exhibit 6 please?

12   Take a moment and read to yourself the

13   paragraph that begins under Section 3355-23-21.

14   Let me know when you're finished.

15       A    Ready.

16       Q    That paragraph identifies the reasons

17   for Mr. Christensen's disenrollment, correct?

18       A    Correct.

19       Q    Would you agree with me that the

20   incident in November is not mentioned there?

21       A    Yes.

22       Q    So would you agree with me that the

23   incident in November, whatever it was, was not

24   a basis for his disenrollment?

25       A    The engagement with law enforcement, so

1    it would be encompassed in the law enforcement
2    engagement.
3        Q    Can you explain to me the difference?
4        A    This outlines the fact that the
5    engagement of several law enforcement
6    jurisdictions in response to your actions, that
7    would include the engagement from OSUPD from
8    November.
9        Q    So that portion of the reasoning for
10   Mr. Christensen's disenrollment, was not any
11   action that he under took but the fact that
12   there was law enforcement engagement --
13       A    Correct.
14       Q    -- am I understanding?
15       A    Correct.  Correct.
16       Q    We discussed earlier Monica Moll's
17   outreach to the FBI.  To your knowledge, were
18   there any other conversations between the FBI
19   and OSU about Mr. Christensen other than the
20   one that Ms. Moll had around the time of his
21   suspension?
22       A    I am not sure other than any well-being
23   checks that would have certainly following up
24   to know if there had been any response to the
25   well-being check.  I was very curious about

Page 146

1    that.  If they had heard from him or if he had

2    responded to the well-being check conducted by

3    the Cranberry Township.

4        Q    Well, to be clear, I'm talking about the

5    FBI right now.

6        A    I'm sorry.

7        Q    So let's try that again.  To your

8    knowledge, were there any other conversations

9    between the FBI and OSU about Mr. Christensen

10   other than the one we discussed earlier

11   involving Ms. Moll?

12       A    I'm not aware.

13       Q    Okay.

14       A    Thank you for the clarification.

15       Q    Sure.  Earlier, you mentioned CRCO,

16   that's the Civil Rights Compliance Office at

17   OSU; is that correct?

18       A    Yes.

19       Q    Did they conduct an assessment in

20   connection with Mr. Christensen?

21       A    An assessment, can you say more about

22   that?

23       Q    Sure.  Mark -- could you turn back to

24   Exhibit 3?

25       A    Did you say 3?

Page 147

1      Q    Yes.  Turn to page 1540.  In the middle

2   of page 1540 right under the bolded text, Guy

3   Christensen Ongoing Review and Safety

4   Assessment.  You see where it says, Assessment

5   conducted by CRCO and OSUPD?

6      A    Yes.

7      Q    What is your understanding of any

8   assessment that CRCO undertook with respect to

9   Mr. Christensen?

10     A    CRCO was looking specifically at any

11  violations of freedom of speech or if there was

12  an overstep there.

13     Q    Is that a legal analysis in your

14  understanding?

15     A    I don't know that CRC -- I imagine that

16  it was a legal lens in which they reviewed it.

17     Q    Who at CRCO would have untaken such an

18  analysis?

19     A    I don't know exactly who on Keisha's

20  team would have conducted that.

21     Q    What did they conclude to your

22  knowledge?

23     A    They did not come back and say whether

24  or not there was a violation of free speech.

25  We wanted to know if there was any sort of

Exhibit A

Page 148

1    assessment of Guy specifically.

2          That's why we were also asking OSUPD if

3    they had any insight or additional information

4    about recent things that may have happened

5    between the date of the interim suspension and

6    the date of this Wednesday 28 p.m. meeting.

7    Q    Let's break that down one item at a time

8    starting with CRCO.  What is your understanding

9    of any findings or assessment that they made

10   prior to Mr. Christensen's disenrollment?

11   A    They were, they had provided their

12   perspective around whether or not this was

13   relative, I think, more so to the interim

14   suspension, and they were asked to bring up if

15   there's anything new information that we have

16   relative to this May 28th meeting.  Does

17   that -- if I can recall, I can't remember

18   everything that was discussed in that meeting.

19   Q    What information did they identify as

20   part of that assessment, if any?

21   A    I can't recall exactly the information

22   they shared.

23   Q    Did OSUPD identify any new relevant

24   information in between Mr. Christensen's

25   suspension and the May 28th meeting?

1        A     There we really did talk about the

2     well-being check and if there had been any

3     responses to that.  As well as if there had

4     been any new information.

5        Q     Was there?

6        A     I don't recall exactly what was shared

7     in that meeting.

8        Q     You can set Exhibit 3 aside.

9     (Plaintiff's Exhibit No. 10 was marked for the

10              purpose of identification.)

11    BY MR. CAREY:

12       Q     I'm marking as Plaintiff's Exhibit 10, a

13    document Bates numbered OSU-1548.  It's an

14    email exchange the most recent email dated

15    May 30th, from Melissa Shivers.  This is an

16    email chain between you and detective Brian

17    Thompson of the OSU Police Department, is that

18    correct?

19       A     Correct.

20       Q     Detective Thompson was the same person

21    who spoke with Mr. Christensen back in November

22    and found no credible threat at that time; is

23    that correct?

24       A     I don't recall.  I don't think it was

25    Thompson.

1      Q     Are you sure?

2      A     I'm almost certain it wasn't Thompson in

3   November.  I could be wrong.  I know that

4   Cassie Schaffer was involved.  I just can't

5   recall if Brian was also involved.

6      Q     Who is Cassie Schaffer?

7      A     She works for OSUPD, I don't know her

8   exact title.

9      Q     Sorry, is she an officer?

10     A     I'm not sure.  I imagine that she is an

11  officer, but I don't know what her exact

12  titling role is within the department beyond

13  being an officer.

14     Q     You asked Detective Thompson to do a

15  well-being check in connection with the

16  Rodriguez video; is that correct?

17     A     Just in general of Guy, since this

18  incident started since --

19     Q     What did he -- sorry.  It's fine.  What

20  did Detective Thompson report back regarding

21  Mr. Christensen's well-being check?

22     A     He has not been able to reach

23  Mr. Christensen.

24     Q     How did that impact your assessment of

25  the situation?

Exhibit A

Page 151

1      A    It was a little bit concerning that he
2    was not being responsive.
3      Q    Did that play a role in the decision to
4    disenroll him?
5      A    That he was not responsive to the
6    well-being check?
7      Q    Yes?
8      A    No.  But just more concerning behavior.
9      Q    What concerning behavior?
10     A    In terms of not being responsive and
11   just letting us know how he is doing.
12     Q    I'm confused.  Was it or was it not a
13   part of the reasoning for disenrolling
14   Mr. Christensen that he hasn't responded to the
15   well-being check?
16     A    No.  The rationale was not based on
17   whether or not he responded to a well-being
18   check.  It's the fact that we, as a university,
19   had reached out to make sure that he was okay,
20   and there was no response.  But that did not
21   have to do -- that didn't inform the
22   disenrollment.
23     Q    Did you ask Detective Thompson or any
24   other member of the OSU Police Department to do
25   anything other than that well-being check in

                                            Page 152

1        connection with Mr. Christensen?

2            A     No.

3            Q     Did Detective Thompson report back with

4        any other information besides what's in this

5        email?

6            A     This is the last communication.

7            Q     Is this the only communication?

8            A     Yes.

9            Q     To your knowledge, did Detective

10       Thompson ever speak with Mr. Christensen?

11           A     I don't know.

12           Q     To your knowledge, did any law

13       enforcement ever speak with Mr. Christensen?

14           A     I don't know if Cranberry Township was

15       able to make contact with him, so I don't know.

16           Q     Fair to say that you have no knowledge

17       that any law enforcement did speak with

18       Mr. Christensen?

19           A     In terms of the well-being check, based

20       on what Mr. Thompson has said, this is what I

21       know.

22           Q     Let me try to phrase this more clearly.

23       Do you have any specific reason to believe that

24       any law enforcement spoke with Mr. Christensen?

25           A     I don't know.

Exhibit A

Page 153

1      Q    Do you know whether anyone went to
2    Mr. Christensen's home?
3      A    This email suggests that they have
4    been -- that Perry Township had been made
5    aware, and it doesn't say that they actually
6    were able to make contact.
7          And, certainly, Brian said that he did
8    conduct outreach, but Guy did not respond, so
9    based on those two data points that I have, I
10   can't confirm whether or not anyone spoke
11   directly to Mr. Christensen based on the
12   well-being check requested.
13     Q    Would it be fair to say that Detective
14   Thompson did not conclude that there was a
15   credible threat in connection with the
16   Rodriguez video, or if he did he did not
17   communicate such a conclusion to you?
18     A    This is the primary messaging and
19   communication that Brian and I had was
20   primarily around the well-being check.
21         MR. CAREY:  Could you read back my
22   question, please?
23      (Thereupon, the record was read back.)
24         MR. RUSTICO:  I'm going to object to the
25   form of the question because you kind of

                                        Page 154

1      changed midstream.  Can you try again?

2              MR. CAREY:  I'll decompound it for you.

3      BY MR. CAREY:

4        Q    Would it be correct to say that,

5      Detective Thompson never communicated to you

6      that he found a credible threat in connection

7      with Mr. Christensen?

8        A    To me, correct.

9        Q    Do you see where it says in Exhibit 10,

10     in Mr. Thompson's email, quote, The local PD,

11     Cranberry Township PD, has been made aware of

12     our concerns regarding check-ins, unquote.

13       A    Yes.

14       Q    What do you understand him to be

15     referring to when he says, Our concerns

16     regarding check-ins?

17       A    I think -- I think relevant to what

18     Brian and I have been discussing, the

19     well-being checks.  Specifically wanting to

20     know if they have been able to make contact

21     with Mr. Christensen.

22       Q    So the concerns that he's identifying

23     there is just the fact that you wanted to do a

24     well-being check?

25       A    Yes.  That was exactly the focus of our

Page 155

1    conversations and our requests.

2       Q    Who is Stacey Renker?

3       A    She is the director for risk and

4    emergency management in the Office of Student

5    Life.

6       Q    Do you know who the roommate is who

7    Detective Thompson refers to in this email?

8       A    I don't know the roommate's name.  I

9    cannot recall his name.

10      Q    To your knowledge, why was Detective

11   Thompson trying to attempt Mr. Christensen's

12   former roommate?

13      A    I could speculate.  I think it was just

14   to learn more about Guy, and, primarily, if he

15   was in, if -- I guess, it's primarily to learn

16   about Guy, but I don't know for certain.

17      Q    To your knowledge, did anyone from OSU

18   including the OSU Police Department ever make

19   contact with Mr. Christensen's roommate?

20      A    I don't know.

21      Q    Did any interaction between

22   Mr. Christensen and any roommate of his form

23   part of the basis of your decision to disenroll

24   him?

25      A    No.

Page 156

1       Q    To your knowledge, did the Cranberry
2   Police Department do anything at all in
3   connection with Mr. Christensen?
4       A    I cannot confirm.
5       Q    Earlier, we discussed a message that was
6   sent to OSU's board about Mr. Christensen in
7   March of 2025; do you recall that?
8       A    Yes.
9       Q    Did that message play any role in the
10  decision to disenroll Mr. Christensen?
11      A    That was certainly information in
12  totality of all the things that we looked at in
13  terms of awareness -- them raising awareness of
14  Mr. Christensen.
15      Q    So fair to say it raised awareness but
16  didn't in and of itself constitute any basis to
17  disenroll him?
18      A    Correct.  Certainly, was not the sole
19  rationale.
20      Q    Well, I'm not asking if it was the sole
21  rationale.  I'm asking if it was any rationale?
22      A    Concerns shared from the community were
23  very broad, including some of the
24  communications you have shared with me today.
25  That would also have been a piece of the

Page 157

1      communication or the information shared from

2      members of the community.

3    (Plaintiff's Exhibit Nos. 11 & 12 were marked for

4              the purpose of identification.)

5      BY MR. CAREY:

6      Q     I'm going to mark as Plaintiff's Exhibit

7      11, a document with Bates No. OSU-479.  This

8      appears to be an email, most recent was

9      May 26th from Melissa Shivers.

10            And I'm going to mark as Exhibit 12 at

11     the same time, a document Bates numbered

12     OSU-481 through 489.  This document has at the

13     top of it, a handwritten note stating

14     Mr. Zeiger.  Exhibit 11 is an email exchange

15     between you and a number of other individuals

16     in the OSU administration, with the most recent

17     email dated May 26th; is that correct?

18     A     Correct.

19     Q     And in Exhibit 11 Jessica Eveland emails

20     a group of people on March 24th, 2025,

21     attaching a document.  I'll represent to you

22     that Exhibit 12 is that attachment.  Then, in

23     Exhibit 11, on page 479, it appears that you

24     forwarded Exhibit 12 to Chris Kabourek and Ann

25     Garcia; do you see that?

Page 158

1     A     Yes.

2     Q     Ann Garcia is an attorney; is that

3     correct?

4     A     Correct.  General counsel.

5     Q     Who is Chris Kabourek?

6     A     He is the associate vice president,

7     senior vice president for administration and

8     planning.

9     Q     Could you describe his role generally?

10    A     Public safety reports up through to him,

11    as does facilities.  All kinds of other comms.

12    All kinds of other stuff.

13    Q     So Monica Moll reports to him?

14    A     Yes.

15    Q     I'm not asking about any request for

16    legal advice that you may have been making in

17    the email itself, so my question here is very

18    specific.  Why did you forward Exhibit 12 to

19    Chris Kabourek on May 26th?

20    A     Chris is a newer member of our campus

21    community.  So he was not as up to speed

22    relative to Guy Christensen, so this was more

23    of awareness perspective for Chris.

24    Q     Okay.  You can set that aside.

25          Did Mr. Christensen violate the terms of

Page 159

1     his interim suspension at any time?

2        A     Not that I'm aware of.

3        Q     Did you have any specific reason to

4     believe that he would?

5        A     I did not have any information that came

6     to me that would suggest that he had or would.

7        Q     You were aware of the Rodriguez video

8     before his suspension, correct?

9        A     Yes.

10       Q     And prior to his suspension, OSU

11    administration had already communicated with

12    law enforcement and asked them to monitor his

13    social media, correct?

14       A     I can't recall the order if that was

15    before the suspension or prior to the

16    disenrollment.

17       Q     All right.  I would like to turn back to

18    Exhibit 3, page 1540.  This email is dated

19    Wednesday, May 28th from you; do you see that?

20       A     Yes.  I do.

21       Q     And the final paragraph on the end of

22    page 1540 states that Monica Moll contacted the

23    FBI also the DPS director for the State of

24    Ohio, and that OSUPD's analysts was also

25    involved, and it says that she did so on Sunday

Page 160

1    evening; do you see that?

2        A    Yes.

3        Q    So Sunday evening refers to Sunday,

4    May 25th, correct, if Wednesday was May 28th?

5        A    Yes.

6        Q    Do you recall that Mr. Christensen was

7    suspended on the evening of Sunday, May 25th?

8        A    Yes.

9        Q    So fair to say, then, that Ms. Moll's

10   conversation with law enforcement occurred

11   prior to Mr. Christensen's suspension?

12           MR. RUSTICO:  I'm going to object.  You

13   are asking her to speculate.  She said she was

14   not part of that conversation.  She doesn't

15   know when it happened.

16           MR. CAREY:  You can answer.

17           THE WITNESS:  I don't know.

18           MR. CAREY:  I'm going to ask that you

19   stop coaching the witness.

20           MR. RUSTICO:  I'm not doing that.

21           MR. CAREY:  You are doing speaking

22   objections, Greg.  Thank you.

23   BY MR. CAREY:

24       Q    All right.  I'll represent to you based

25   on all the information made available to us,

1    that OSU communicated with law enforcement

2    prior to Mr. Christensen's suspension.  Do you

3    have any reason to believe that's not the case?

4        A    I don't know.

5        Q    Did Mr. Christensen take any action or

6    say anything after his suspension that caused

7    you to believe he posed an immediate threat to

8    campus safety?

9        A    I'm not certain.

10       Q    Were you aware at that time of him doing

11   or saying anything after his suspension that

12   led you to the conclusion that he was a threat

13   to campus safety?

14       A    It was the overall -- all of the

15   information that we received between the time

16   of the interim suspension to the date of the

17   disenrollment, which is outlined in the letter.

18       Q    To the best of your recollection, did

19   that information that you received include any

20   reports of something that he had said and done?

21       A    Beyond his video message?

22       Q    Correct.

23       A    No.

24       Q    All right.  You can set Exhibit 3 aside.

25            Earlier, you mentioned a meeting that

Exhibit A

Page 162

1    took place on May 28th; do you recall that?  We

2    may need to get Exhibit 3 back if you don't

3    recall.  I'm going to ask you to review Exhibit

4    3, pages 1540 to 1541, and let me know if that

5    refreshes your memory as to a meeting on

6    May 28th?

7        A    Yes.  Thank you.

8        Q    Okay.

9    (Plaintiff's Exhibit No. 13 was marked for the

10            purpose of identification.)

11   BY MR. CAREY:

12       Q    I'm going to mark as Plaintiff's Exhibit

13   13, a document that's Bates numbered OSU-1120.

14   This is what appears to be a calendar

15   appointment.

16          This is a calendar appointment for a

17   meeting regarding Mr. Christensen that was

18   scheduled for 8:00 p.m. on May 28th; is that

19   correct?

20       A    I don't recall a meeting at 8:00 p.m.

21       Q    Do you recall a meeting occurring on the

22   28th regarding Mr. Christensen?

23       A    I -- I can't recall.  The email that I

24   sent, that was the update was for 8:02 p.m.

25   This must be the meeting in the afternoon that

```
                                          Page 163

 1     referred to the 8:02 email.  1540.

 2       Q    So --

 3       A    So there were --

 4       Q    Sorry.  Did a meeting occur on May 28th

 5     that included some or all of the people listed

 6     in Exhibit 13?

 7       A    Some of the people, yes.

 8       Q    Do you recall who?

 9       A    Oh, I can't recall everyone that was

10     there.  Some people thought they could attend

11     and then there was some -- Amy was there.

12       Q    You're referring to Amy Golian; is that

13     how you pronounce it?

14       A    Yes.

15       Q    Okay.  Do you recall whether Monica Moll

16     was there?

17       A    I cannot recall.  I think so, but I

18     can't recall her.

19       Q    Do you recall whether Kelly Smith was

20     there?

21       A    Yes.

22       Q    She was?

23       A    Yes.

24       Q    Do you recall whether Brian Thompson was

25     there?
```

Page 164

1      A    I can't recall if Brian was there or
2    not.  I think so.
3      Q    Do you recall whether Chris Kabourek,
4    Ryan Level or Keisha Mitchell was there?
5      A    Ryan Level was there.  I can't remember
6    about Chris or Keisha.
7      Q    Do you recall whether JR Blackburn was
8    there?
9      A    JR was not in attendance I don't think.
10     Q    Who is Nadia Haque?
11     A    Nadia works in Keisha Mitchell's office,
12   CRCO office.  I don't know -- I don't recall if
13   she was there.
14     Q    You can set it aside.  You testified
15   earlier that Mr. Christensen's suspension
16   barred him from campus and that he was notified
17   that he was subject to arrest if he returned.
18   Is it fair to say that disenrolling him comes
19   with the same restrictions on campus access as
20   suspension?
21     A    I can't recall the specifics in terms of
22   disenrollment.  Certainly, because you're not
23   allowed on campus, so certainly similar.
24     Q    Are there any greater safety procedures
25   in place associated with disenrollment that are

Page 165

1    not in place for interim suspension?

2        A    Safety procedures or safety concerns?

3        Q    Procedures.  Are there any safeguards

4    that are invoked?  Start from the beginning.

5    Are there any safeguards or safety mechanisms

6    that are invoked by disenrollment that are not

7    invoked for suspension?

8        A    I don't think so.

9        Q    If you had not invoked Section 21 of the

10   Code of Conduct, Mr. Christensen would likely

11   have remained suspended until the conclusion of

12   his student conduct process; is that correct?

13       A    Yes.  Unless he had requested special

14   permission to be on campus, but the interim

15   suspension would have held.

16       Q    Did anything occur after his suspension

17   that caused you to believe that a suspension

18   was inadequate to ensure campus safety?

19       A    The additional involvement of law

20   enforcement, the Torres concern and engagement

21   with the police.  Certainly, the additional

22   communication and concerns from our community

23   increased in between the time of the interim

24   suspension and the disenrollment.

25       Q    What additional engagement of law

Page 166

1      enforcement did you understand to have occurred

2      after his suspension?

3          A     The Torres piece.   That's -- I became

4      aware of that situation.   The additional

5      engagement and from -- that Perry -- Cranberry

6      Township, that I think happened to Brian, so

7      all of those pieces together in addition to

8      what had been shared before.

9          Q     Is it your understanding that you were

10     required to disenroll Mr. Christensen?

11         A     Required?  As an obligation to ensuring

12     the safety of the University, it felt prudent.

13         Q     Was it your understanding that you were

14     under any legal obligation to disenroll

15     Mr. Christensen?

16         A     In terms of honoring our administrative

17     code and specifically 3335-23-21, that as a way

18     to firmly address our concerns based on the

19     information that gathered, I felt it was a

20     requirement to do so.

21         Q     Let's turn back to Exhibit 1 which is

22     the Code of Student Conduct.  Can you point me

23     to any provision in Section 21 that you

24     understand to create an obligation for you to

25     disenroll Mr. Christensen?

Page 167

1      A    One of the largest responsibilities that

2    I have as the senior vice president for student

3    life is to try and ensure the health, safety

4    and well-being of our community.  And that does

5    certainly include our campus community.

6           This particular provision, based on the

7    information that had been presented, both prior

8    to the interim suspension as well as the

9    additional data that we received between the

10   interim suspension and the date of this

11   disenrollment, this provision allows for me to

12   be able to do that based on the information

13   that I have at the time.

14          So I felt, as part of my responsibility,

15   is to try to do everything I can to ensure the

16   health, safety and well-being of our community.

17     Q    I understand your testimony to be in

18   part that Section 21 allows you to disenroll a

19   student under those circumstances.  Does

20   Section 21, in your understanding of it,

21   require you to disenroll a student?

22     A    I think after review of the entire

23   situation, and the issues that were brought

24   forward, it certainly suggests that it's here

25   to leverage as needed, and in this particular

Page 168

1      situation, it was important that there is some

2      separation between the University and the

3      student.

4          Q     Why?

5          A     From a health and safety perspective.

6               MR. CAREY:  Could you read back the

7      prior answer?

8           (Thereupon, the record was read back.)

9      BY MR. CAREY:

10         Q    What separation was created by invoking

11     Section 21 that was not already invoked by his

12     interim suspension?

13         A    The disenrollment, again, was more of an

14     administrative safety measure based on the

15     safety concerns.  Because disenrollment would

16     certainly provide an opportunity for the

17     student to be able to share additional

18     information petition that could outline what

19     things have changed that will allow for you to

20     return to be a student at Ohio State.

21              Unfortunately, that petition response

22     did not -- was not in response to or did not

23     align with what the expectations are or the

24     criteria might be.

25         Q    Let's turn back to Exhibit 3.  I'll

Exhibit A

Page 169

1          direct you to page OSU-1538.  At the bottom of

2          that page is an email from you, correct?

3              A    Yes.

4              Q    And you write, in part, quote, Given the

5          ongoing safety concerns and the impact on

6          members of our campus community, we can convene

7          to discuss the potential application of Section

8          3335-23-21 of the Code of Student Conduct.

9                   This section authorizations the senior

10         vice president for student life, or their

11         designee, to administratively disenroll a

12         student when there's clear and convincing

13         evidence that the student's continued presence

14         poses a significant risk of substantial harm to

15         the health or safety to themselves or others

16         and property.

17             A    Correct.

18             Q    Is the meeting you are describing there,

19         the same one as Exhibit 13?

20             A    On 5/28, yes.

21             Q    5/38-- sorry.

22             A    Oh --

23             Q    My apologies.  I thought you were

24         referring to the page number.  You are saying

25         on May 28th?

Page 170

1      A     Yes.  Yes.

2      Q     Okay.  By the end of that meeting, on

3   May 28th, you had decided to invoke Section 21;

4   is that correct?

5      A     Yes.  Based on the additional

6   information, the social -- the additional

7   social media post, yes.

8      Q     The additional post you are referring to

9   is the Torres video?

10     A     Yes.  Sorry.  I'm tracking.

11     Q     At any time, during this process, did

12  anyone recommend or argue to you that

13  Mr. Christensen should not be disenrolled under

14  Section 21?

15         MR. RUSTICO:  I'm going to object.  That

16  could implicate attorney-client privilege.

17         THE WITNESS:  Correct.

18  BY MR. CAREY:

19     Q     At any time, during this process --

20         MR. CAREY:  Strike that.

21  BY MR. CAREY:

22     Q     At any time during or after the meeting,

23  on the evening of May 28th, did you personally

24  consider any reasons not to exercise Section

25  21?

Page 171

1     A     Not based on the data that we have.

2     Q     Would it be fair to say that you made up

3     your mind during that meeting on the 28th?

4     A     During and after.

5     Q     How -- excuse me.  How long after?

6     A     It was well after, when I drafted the

7     email to provide an update that was after 8:00.

8     And I think the meeting was at 4:00 or 5:00, so

9     continuing to think, understanding the

10    potential implications of this big decision,

11    again, having never disenrolled a student, I

12    took this very, very seriously.

13          So it was not made haphazardly or

14    without a lot of consideration based on the

15    information that we had.

16    Q     Sure I'm just trying to pinpoint the

17    point in time where your mind was made up.

18    Would it be fair to say that was on the 28th?

19    A     Certainly I had thoughts that it would

20    make sense for us to, after that meeting, to

21    consider moving forward.  Yet, I still also

22    wanted to get feedback from others to make sure

23    that we were continuing to be aligned.

24    Q     Who else did you need feedback from at

25    this point?

Page 172

1      A    Just, as always, with legal, wanting to
2    make sure that they hear and interpret what
3    I've learned the same way that I do.
4      Q    There was legal representation in the
5    meeting on the 28th, correct?
6      A    Sure.
7      Q    So at what point did you make up your
8    mind?
9      A    That I wanted to advance it was the
10   evening of the 28th.
11     Q    Did you have any discussions with
12   President Carter about Mr. Christensen prior to
13   Mr. Christensen's disenrollment?
14     A    No.
15     Q    Did you meet with President Carter at
16   any time during this process?
17     A    Well, he is my boss.  So between March
18   and the day after this, we certainly had
19   one-to-one meetings, but those meetings did not
20   pertain to Guy Christensen.  Those were regular
21   one-to-one meetings.
22     Q    Not what I'm asking -- my apologies.  I
23   was not clear.  Did you meet with President
24   Carter at any time between when you first
25   became aware of the Rodriguez video and

Page 173

1    Mr. Christensen's disenrollment?

2       A    No.  The communications that you have

3    here, where you see the president and the

4    provost copied, they are learning what I know

5    during these emails.

6            There were no conversations that

7    happened before or during or, quite frankly,

8    even prior to or after those meetings.  They

9    were intentionally only provided the updates.

10      Q    To your knowledge, did anyone from OSU

11   speak with Congressman Torres about

12   Mr. Christensen prior to Mr. Christensen's

13   disenrollment?

14      A    Oh, I don't know that.

15      Q    To your knowledge, did anyone from OSU

16   speak with Leo Turrell about Mr. Christensen?

17      A    I'm not familiar with that name.

18      Q    To your knowledge, did anyone from OSU

19   speak with U.S. Attorney General Pam Bondi

20   about Mr. Christensen at any time?

21      A    I'm not aware of that.

22      Q    To your knowledge, did anyone from OSU

23   speak with any Department of United States

24   Justice excluding the FBI about Mr. Christensen

25   at any time?

Page 174

1        A     Not that I'm aware of.

2        Q     To your knowledge, did anyone from OSU

3     speak with any other federal government

4     officials at any time --

5        A     I have --

6        Q     -- about Mr. Christensen?  My apologies.

7        A     No.  Not that I'm aware of.

8        Q     Let's try that again.  To your

9     knowledge, did anyone from OSU speak with any

10    other federal government officials about

11    Mr. Christensen at any time?

12       A     Not that I'm aware of.

13       Q     Do you know if staff asked to be kept

14    posted on the situation with Mr. Christensen?

15       A     I don't recall that.

16       Q     Did you have any discussions with

17    Senator Serrano or staff about Mr. Christensen?

18       A     No.

19       Q     What is the Fisher Family Foundation?

20       A     I'm imagining that it's connected to the

21    Fisher College of Business.

22       Q     To your knowledge, is the Fisher Family

23    Foundation a major donor of Ohio State?

24       A     I have no idea.

25       Q     Aside from what we have already

Exhibit A

                                    Page 175

1        discussed, were there any additional facts that

2        contributed to your decision to disenroll

3        Mr. Christensen?

4            A    No others than the ones outlined in the

5        letter.

6            Q    Not to be a stickler.  Let's see if I

7        can get a answer to the specific question I'm

8        asking.

9                 Aside from what we have discussed here

10       today, are there any additional facts that

11       contributed to your decision to disenroll

12       Mr. Christensen?

13                MR. RUSTICO:  Objection.  How is she

14       supposed to remember everything that we have

15       discussed here today?  I don't remember

16       everything that we discussed here today.

17                MR. CAREY:  Fair enough.  Fair enough.

18       All right.  I'll move on.

19       BY MR. CAREY:

20           Q    No one else who was involved in the

21       decision to disenroll Mr. Christensen discussed

22       either the Rodriguez video or the Torres video

23       with Mr. Christensen prior to his

24       disenrollment; is that correct?  To your

25       knowledge?

1          MR. RUSTICO:  Okay.

2          MR. CAREY:  I'll try it again.

3     BY MR. CAREY:

4      Q    You did not discuss either the Rodriguez

5     video or the Christensen video -- try yet

6     again.  You did not discuss either the

7     Rodriguez video or the Torres video with

8     Mr. Christensen prior to disenrolling him; is

9     that correct?

10     A    Correct.

11     Q    To the best of your knowledge, did

12    anyone else, from OSU administration who was

13    involved in the decision to disenroll

14    Mr. Christensen discuss either of those videos

15    with him?

16     A    I don't know.

17     Q    Do you have any knowledge that they did?

18     A    I do not have any knowledge that they

19    did or didn't.

20     Q    Other than the suspension letter from

21    Mr. Level, and the disenrollment letter from

22    you, are you aware of any other communication

23    from OSU to Mr. Christensen giving him notice

24    of the allegations or evidence against him?

25     A    I am not aware of anything beyond the

Exhibit A

Page 177

1  letters that Mr. Christensen would have

2  received.

3     Q    Did Mr. Christensen have any opportunity

4  prior to his disenrollment to contest the

5  determination that his presence constituted a

6  safety risk?

7     A    I did not have a conversation with Mr.

8  Christensen.

9     Q    Are you aware of him being given such an

10 opportunity?

11    A    I did not provide him the opportunities.

12         MR. CAREY:  I would like to take ten

13 minutes.  Call it 3:15.

14         MR. RUSTICO:  Sure.

15         MR. CAREY:  Thanks.

16    (Thereupon, a brief break was taken.)

17 BY MR. CAREY:

18    Q    Back on.  You testified that you did not

19 afford Mr. Christensen any opportunity prior to

20 his disenrollment to contest the determination

21 that his presence constituted a safety risk.

22 Did anyone else, to your knowledge?

23    A    Not that I'm aware of.

24    Q    Is it possible that that could have

25 happened and you would not be aware of it?

Page 178

1      A      Probably not.

2      (Plaintiff's Exhibit No. 14 was marked for the

3                purpose of identification.)

4      BY MR. CAREY:

5      Q      I'm going to mark as Exhibit 14,

6      document Bates numbered OSU-1770.  What is

7      Exhibit 14?

8      A      I don't know.

9      Q      I'm going to represent to you that this

10     document came from you.  Do you have any reason

11     to think that's not the case?

12     A      I have no idea what this is.

13     Q      Do you ever use ChatGPT?

14     A      Sure.  To help in managing emails and

15     address tone and things like that.

16     Q      Do you have an account for Chat GPT?

17     A      Yes.

18     Q      Do you maintain the chat logs with Chat

19     GPT?

20     A      No.

21     Q      You delete them?

22     A      Yeah.  I don't keep them.

23     Q      Are the conversations still on your Chat

24     GPT account?

25     A      No.

Page 179

1     Q     Why not?

2     A     I just don't necessarily keep them.

3     Q     Well, they are automatically saved, are

4     they not?

5     A     I don't know enough about that.

6     Q     Have you intentionally deleted any

7     documents having to do with this case?

8     A     No.

9     Q     You can set that aside.  Have you made

10    any uses of Chat GPT or any other AI software

11    in any way related to this case?

12    A     Certainly through Copilot, where we are

13    looking to address tone, which is a tool that

14    Ohio State encourages us to utilize.

15    Q     Have you asked Chat GPT any legal

16    questions connected to this case?

17    A     Understanding a deposition.

18    Q     Have you asked Chat GPT anything

19    regarding Mr. Christensen?

20    A     No.

21    Q     Anything regarding the Rodriguez video?

22    A     No.

23          MR. CAREY:  So I'm just going to state

24    for the record, Greg, we have outstanding

25    document requests.  To the extent that there

1    are any AI chat logs that may be responsive,

2    those will need to be produced.  Can we agree

3    to that?

4         MR. RUSTICO:  I can agree to look into

5    it.  I'm not aware of any.

6         MR. CAREY:  Okay.  Thank you.

7    (Plaintiff's Exhibit No. 15 was marked for the

8            purpose of identification.)

9    BY MR. CAREY:

10    Q    Going to mark as Exhibit 15, a document

11    that is Bates numbered OSU-1486 through 1487.

12    It is a letter on Ohio State letterhead to Zoha

13    Kalili.  Exhibit 15 is a letter from you to

14    Mr. Christensen's attorney, Zoha Kalili; is

15    that correct?

16    A    Correct.

17    Q    And it's undated but I'll represent to

18    you that it was sent in July of 2025; does that

19    sound correct to you?

20    A    That sounds accurate.

21    Q    This letter is your response to

22    Mr. Christensen's petition for re-enrollment,

23    is that correct?

24    A    Yes.

25    Q    Does Exhibit 15 contain a complete and

Exhibit A

Page 181

1      truthful statement of why Mr. Christensen's
2      petition for re-enrollment was rejected?
3          A     May I take a minute to read the entire
4      letter?
5          Q     Sure.
6          A     I have reviewed it.
7          Q     Does Exhibit 15 contain a complete and
8      truthful statement of why Mr. Christensen's
9      petition for re-enrollment was rejected?
10         A     Yes.
11         Q     Thank you.  You can set 15 aside.
12               Are you aware that Section 21 of the
13     Code of Student Conduct was rescinded effective
14     November 2020?
15               MR. RUSTICO:  Objection.  That calls for
16     a legal conclusion.
17               MR. CAREY:  No it doesn't.  Can you
18     answer the question?
19               THE WITNESS:  I am not aware.
20     (Plaintiff's Exhibit No. 16 was marked for the
21               purpose of identification.)
22     BY MR. CAREY:
23         Q     I'll mark a document as Exhibit 16.
24     Document states at the top, 3335-23-21, and
25     it's marked to be rescinded.  Have you seen

Page 182

1    Exhibit 16 before?

2      A    I do not recall having seen this

3    document.

4      Q    I'll represent to you that this is a

5    document on file with the Registrar of Ohio,

6    which is a publication that gives official

7    notice of change to administrative rules and

8    that it indicates that Section 21 was filed for

9    rescission in 2020.  Do you have any reason to

10   disagree with that?

11     A    I would not.  I just arrived here in

12   2020, so I don't -- no.

13   (Plaintiff's Exhibit No. 17 was marked for the

14            purpose of identification.)

15   BY MR. CAREY:

16     Q    Going to mark Exhibit 17.  A document

17   that states at the top, Filings for rule number

18   3335-23-21.  Exhibit 17 states at the top,

19   Filings for rule number 3335-23-21.  Have you

20   seen Exhibit 17 before?

21     A    I have not.

22     Q    I'll represent to you that Exhibit 17 is

23   the entry in the Registrar of Ohio, listing

24   filings relating to rule 3335-23-21, indicating

25   that a rescission was filed with an effective

1      date of November 11th, 2020.  Do you have any

2      reason to disagree with that?

3          A    I don't know.

4          Q    Do you have any reason to believe,

5      despite what I have shown you here, that

6      Section 21 was still in affect in May of 2025?

7          A    Based on the information that I was

8      given, and its inclusion on our Code of Student

9      Conduct and our board of trustee's page, I

10     would not have any reason to believe that it no

11     longer existed.

12         Q    So you're relying on the fact that it's

13     published on OSU's website and the Board of

14     Trustee's page, you said?

15         A    Yes.  It's -- as a part of our Code of

16     Student Conduct as well as on the Board of

17     Trustee's page.

18         Q    Are you aware that it does not appear in

19     the Ohio Administrative Code?

20         A    I would not be aware of that.

21         Q    Okay.

22              MR. CAREY:  Five minutes.

23            (Thereupon, a brief break was taken.)

24     BY MR. CAREY:

25         Q    All right.  Dr. Shivers, earlier, you

Exhibit A

Page 184

1      testified that either a then current or a --
2            MR. CAREY:  Strike that again.
3      BY MR. CAREY:
4        Q    Earlier, you testified that either a
5      then current student or a recent graduate had
6      contacted you with concerns about
7      Mr. Christensen; do you recall that?
8        A    Yes.
9      (Plaintiff's Exhibit No. 18 was marked for the
10              purpose of identification.)
11     BY MR. CAREY:
12       Q    I'm going to mark Exhibit 18,
13     OSU-1700-1702.  Did you already get a copy?
14           MS. GOLIAN:  I didn't.  I was waiting
15     for the official.
16     BY MR. CAREY:
17       Q    If you could take a moment and review
18     Exhibit 18, and let me know when you are ready
19     to proceed.
20       A    Ready.
21       Q    Is this the complaint that you were
22     referring to?
23       A    Yes, that's it.  Could not remember her
24     name for anything.
25       Q    To the best of your recollection, did

Page 185

1     you receive any other complaints or reports
2     from then current OSU students about
3     Mr. Christensen or the Rodriguez video?
4        A     This is the only one that I can recall.
5        Q     Okay.  All right.  I think that's all my
6     questions.  Read and sign?
7           MR. RUSTICO:  I'm going to ask a few
8     rebuttal questions or clarification questions.
9     Can we just take like a five-minute break?
10          MR. CAREY:  Sure.
11          MR. RUSTICO:  So I can get my ducks in a
12    row.
13       (Thereupon, a brief break was taken.)
14                    EXAMINATION
15    BY MR. RUSTICO:
16       Q     Just a few clarifying questions so
17    Dr. Shivers what was President Carter's role in
18    the decision -- the decision to disenroll
19    Mr. Christensen?
20       A     President Carter did not have a role in
21    the decision-making.
22       Q     Who made the decision to disenroll
23    Mr. Christensen?
24          MR. CAREY:  Objection.  Asked and
25    answered.

Page 186

1          MR. RUSTICO:  You can answer anyway.

2          THE WITNESS:  I made a decision in

3      consultation with the Office of Legal Affairs.

4      BY MR. RUSTICO:

5      Q    Did you have any phone calls with

6      President Carter about Mr. Christensen?

7      A    No.

8      Q    Did you send him any text messages?

9      A    No.

10     Q    Did he respond to your emails with more

11     than just one or two sentences or words?

12     A    No.

13     Q    Did you feel that you had the authority

14     to make this decision irrespective of him?

15     A    Yes.  That's why in the emails when I

16     included the piece from the code, I wanted it

17     to clearly demonstrate that I had the authority

18     to be able to do that.

19     Q    So those emails were intended to inform

20     him of the decision you had made?

21     A    Correct.

22         MR. CAREY:  Objection to form.  Leading.

23         THE WITNESS:  They are all update emails

24     to President Carter and to those on there.  It

25     was not asking for permission.  More so here's

Page 187

1     where, we stand.

2          MR. RUSTICO:  Those are all the

3     questions I have.

4          MR. CAREY:  Read and sign?

5          MR. RUSTICO:  Yes.

6          The only other issue is we have to talk

7     about Exhibit 2.  So we want to claw back part

8     of that email.

9          MR. CAREY:  All right.  You want to take

10    this off the record, or you want this on the

11    record?

12         MR. RUSTICO:  On the record's fine, I

13    guess.

14                    - - -

15              C O N F I D E N T I A L

16                 S T A R T S

17

18

19

20

21

22

23

24

25

Page 188

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Exhibit A

Page 189



```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17          C O N F I D E N T I A L
18              E N D S
19                 -  -  -
20      (DEPOSITION CONCLUDED AT 4:06 P.M.)
21
22
23
24
25
```

Page 190

1                              )
       STATE OF OHIO            )
2                              )

3

4        I, Jennifer E. Davis, Notary Public for the
       State of Ohio, do hereby certify :

5

6        That the witness named in the deposition,
       prior to be examined, was by me, first duly
       sworn;

7

8        That said deposition was taken before me at
       the time and place therein set forth and was
       taken down by me in shorthand and thereafter
9      transcribed into typewriting under my direction
       and supervision;

10

11       That said deposition is a true record of the
       testimony given by the witness and of all
       objections made at the time of the examination.

12

13       I further certify that I am neither counsel
       for nor related to any party to said action,
       nor in any way interested in the outcome
14     thereof.

15       IN WITNESS WHEREOF I have subscribed my name
       and affixed my seal this 17TH day of November,
16     2025.

17

18                          Jennifer E. Davis
                            Jennifer E. Davis

19

20                          Notary Public
                            Notary ID 2022-RE-851847
21                          MY COMMISSION EXPIRES: 07/24/27

22

23

24

25

Exhibit A

```
                                                    Page 191
 1                      Veritext Legal Solutions
                           1100 Superior Ave
 2                            Suite 1820
                         Cleveland, Ohio 44114
 3                      Phone: 216-523-1313
 4
       December 5, 2025
 5
       To: Greg A. Rustico, Esq.
 6
       Case Name: Christensen, Guy  v. Carter, Jr., Walter, et al.
 7
       Veritext Reference Number: 7671936
 8
       Witness:  Melissa Shivers       Deposition Date:  11/17/2025
 9
10     Dear Sir/Madam:
11
       Enclosed please find a deposition transcript.  Please have the witness
12
       review the transcript and note any changes or corrections on the
13
       included errata sheet, indicating the page, line number, change, and
14
       the reason for the change.  Have the witness' signature notarized and
15
       forward the completed page(s) back to us at the Production address
16     shown
17     above, or email to production-midwest@veritext.com.
18
       If the errata is not returned within thirty days of your receipt of
19
       this letter, the reading and signing will be deemed waived.
20
21     Sincerely,
22     Production Department
23
24
25     NO NOTARY REQUIRED IN CA
```

Exhibit A

```
                                                  Page 192
1                      DEPOSITION REVIEW
                     CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 7671936
3        CASE NAME: Christensen, Guy  v. Carter, Jr., Walter, et al.
         DATE OF DEPOSITION: 11/17/2025
4        WITNESS' NAME: Melissa Shivers
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have made no changes to the testimony
    as transcribed by the court reporter.
8
    _____        _____
9   Date                    Melissa Shivers
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
              Statement; and
14       Their execution of this Statement is of
              their free act and deed.
15
         I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17
                       _____
18                     Notary Public
19                     _____
                       Commission Expiration Date
20
21
22
23
24
25
```

Exhibit A

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
         ASSIGNMENT REFERENCE NO: 7671936
 3       CASE NAME: Christensen, Guy  v. Carter, Jr., Walter, et al.
         DATE OF DEPOSITION: 11/17/2025
 4       WITNESS' NAME: Melissa Shivers
 5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7       I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9       I request that these changes be entered
    as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____        _____
    Date                    Melissa Shivers
14
         Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18            in the appended Errata Sheet;
         They signed the foregoing Sworn
19            Statement; and
         Their execution of this Statement is of
20            their free act and deed.
21       I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23            _____
              Notary Public
24
              _____
25            Commission Expiration Date
```

Exhibit A

Page 194

```
1                        ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                   ASSIGNMENT NO: 7671936
3      PAGE/LINE(S) /        CHANGE        /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19

       _____      _____
20     Date                  Melissa Shivers
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23                   _____
                     Notary Public
24
                     _____
25                   Commission Expiration Date
```

[& - 2025]

| | | | |
|---|---|---|---|
| **&** | 158:18 | **162**   4:15 | **184**   4:20 |
| **&**   157:3 | **13**   4:15 162:9 | **1633**   4:8 | **185**   3:6 |
| **0** |    162:13 163:6 |    112:24 | **187**   3:9 |
| **01062**   1:8 |    169:19 | **1634**   4:8 | **189**   3:9 |
| **07/24/27** | **139**   4:9 |    112:25 113:7 | **19**   3:9 |
|    190:21 | **14**   3:9 4:16 | **17**   1:14 4:19 | **1:00**   112:15 |
| **1** |    178:2,5,7 |    182:13,16,18 | **1:05**   112:16 |
| **1**   4:3 27:5,11 | **140**   4:10 |    182:20,22 | **1:25**   188:7 |
|    28:11 87:8 | **142**   4:11 | **1700**   4:20 | **1:47**   137:20 |
|    98:19 114:21 | **1486**   4:17 | **1700-1702** | **2** |
|    166:21 |    180:11 |    184:13 | **2**   4:4 46:1,5 |
| **10**   4:12 19:16 | **1487**   4:17 | **1702**   4:20 |    49:7 85:6 87:8 |
|    19:20,21 149:9 |    180:11 | **1751**   4:9 |    187:7,19 |
|    149:12 154:9 | **149**   4:12 |    139:16 | **20**   28:22 29:19 |
| **102**   4:6 | **15**   4:17 180:7 | **1752**   140:6 |    29:23 98:21,24 |
| **105**   4:7 |    180:10,13,25 | **1753**   4:9 |    99:3 100:5,14 |
| **10:40**   61:25 |    181:7,11 |    139:16 |    192:16 193:22 |
| **10:45**   62:1 | **1512**   47:5 | **1770**   178:6 |    194:22 |
| **11**   4:13 157:3,7 |    188:20 | **178**   4:16 | **2020**   181:14 |
|    157:14,19,23 | **1513**   49:6 | **17th**   190:15 |    182:9,12 183:1 |
| **11/17/2025** | **1534**   4:5 60:6 | **18**   4:20 103:22 | **2022**   190:20 |
|    191:8 192:3 | **1538**   169:1 |    184:9,12,18 | **2024**   37:1 38:2 |
|    193:3 | **1540**   60:12,13 | **180**   4:17 |    38:10 39:2 |
| **1100**   191:1 |    68:3 147:1,2 | **181**   4:18 |    44:14 51:7,18 |
| **1108**   2:4 |    159:18,22 | **1812**   4:6 103:1 |    51:23 52:1,25 |
| **112**   4:8 |    162:4 163:1 |    103:14 104:4 |    53:5,9,14 54:6 |
| **1120**   4:15 | **1541**   162:4 | **1814**   103:15 |    55:5 |
|    162:13 | **1548**   4:12 |    104:4 | **2025**   1:14 |
| **1170**   4:16 |    149:13 | **1815**   103:16 |    36:10,12 37:3 |
| **11th**   183:1 | **157**   4:13,14 |    104:21 |    37:10,17 38:1 |
| **12**   4:14 157:3 | **1590**   1:15 | **1816**   103:16 |    38:3 40:22 |
|    157:10,22,24 | **16**   4:18 181:20 | **182**   4:19 |    46:6 53:17,20 |
| |    181:23 182:1 | **1820**   4:6 103:2 |    54:10,25 55:10 |
| | | |    191:2 | |

Exhibit A

**[2025 - 851847]**                                                    Page 2

73:24 74:4
88:15 104:25
105:16 109:3
156:7 157:20
180:18 183:6
190:16 191:4
**203**   2:4
**21**   33:18,22,25
35:6,16,20
114:22 115:1
115:11,17
165:9 166:23
167:18,20
168:11 170:3
170:14,25
181:12 182:8
183:6
**216-523-1313**
191:3
**21st**   46:5 55:20
125:8
**22nd**   55:10,20
74:11,21
116:13,19
125:8
**23rd**   75:19
117:7
**24**   36:16
**24th**   55:25
157:20
**25**   59:3
**25th**   55:25
104:25 105:13
105:16 110:20

116:1 160:4,7
**26th**   157:9,17
158:19
**27**   4:3
**27th**   117:22
139:18 188:7
**28**   148:6
**28th**   142:16
148:16,25
159:19 160:4
162:1,6,18,22
163:4 169:25
170:3,23 171:3
171:18 172:5
172:10
**2:00**   137:21
**2:25**   1:8

### 3

**3**   4:5 60:2,6
68:2 87:8
146:24,25
149:8 159:18
161:24 162:2,4
168:25
**3.4**   77:8 90:10
93:4 97:22
98:5,14 124:18
137:14
**30**   7:21 11:14
12:17
**30th**   116:3
149:15

**31st**   60:8
**33002**   190:18
**3335-23-1**   4:19
**3335-23-20**
28:21 29:16
**3335-23-21**
4:18 21:10,15
26:6 33:13
166:17 169:8
181:24 182:18
182:19,24
**3355-23-21**
144:13
**346**   4:10
140:25
**35**   10:5
**3:15**   177:13

### 4

**4**   4:6 102:21,24
102:25 103:20
105:5
**43201**   1:15
**43206**   2:5
**44114**   191:2
**46**   4:4
**479**   4:13 157:7
157:23
**481**   4:14
157:12
**489**   4:14
157:12
**4:00**   171:8

**4:06**   189:20

### 5

**5**   3:4 4:7 105:7
105:11 107:4
191:4
**5/21/2025**   4:4
**5/28**   169:20
**5/38**   169:21
**500**   1:15
**5:00**   171:8

### 6

**6**   4:8 112:20,23
113:9,14 114:1
114:4,7,11,15
115:7 128:9
129:18 144:11
**60**   4:5
**614-586-1972**
2:5
**67,000**   76:13,19

### 7

**7**   4:9 139:12,15
139:21 140:15
**7671936**   191:7
192:2 193:2
194:2

### 8

**8**   4:10 140:20
140:24,25
142:6,8
**851847**   190:20

**[8:00 - affixed]**                                    Page 3

| | | | |
|---|---|---|---|
| **8:00** 162:18,20 171:7 | **abundance** 60:17 107:13 | 190:13 | 138:7 142:4 157:16 158:7 |
| **8:02** 162:24 163:1 | **access** 164:19 | **actionable** 65:24 | 159:11 176:12 |
| **9** | **accidentally** 103:2 | **actions** 73:24 74:4 110:7 | **administratio...** 69:2 |
| **9** 4:11 142:9,12 143:19 | **accordance** 192:5 193:5 | 124:25 145:6 | **administrative** 33:14 129:4,5 |
| **929** 4:7 105:11 | **account** 141:22 143:15 178:16 178:24 | **activity** 49:12 67:24 68:10 | 166:16 168:14 182:7 183:19 |
| **931** 4:7 105:11 | | **actually** 10:21 97:16 123:21 153:5 | **administrativ...** 33:21 35:25 169:11 |
| **986** 4:11 142:13 | **accountability** 91:15 95:25 | **addition** 130:10 166:7 | **administrator** 16:12 130:19 |
| **988** 142:22 | **accurate** 14:12 59:25 63:14 111:2 113:14 114:2 180:20 | **additional** 15:21 20:6 21:4 30:8 66:9 101:21 148:3 165:19,21,25 166:4 167:9 168:17 170:5,6 170:8 175:1,10 | **advance** 31:16 172:9 |
| **989** 4:11 142:14 | | | **advice** 48:18,24 82:22 85:20 158:16 188:10 188:11 189:2 |
| **9:00** 1:14 | | | |
| **9:13** 188:8 | **accused** 31:7 31:17 42:4 43:16 | | |
| **a** | **accuser** 42:2 43:13 | **additionally** 68:6 | **advises** 140:3 |
| **a.m.** 1:14 | **acknowledge** 192:11 193:16 | **address** 21:16 35:1 166:18 178:15 179:13 191:15 | **advocate** 96:3 |
| **ability** 7:3 77:12 | **aclu** 2:3 5:8 | | **affairs** 1:15 18:19 21:24 36:4 82:16 88:24 89:19 100:13 186:3 188:14 |
| **able** 30:7 35:11 54:24 129:9 132:14 134:10 150:22 152:15 153:6 154:20 167:12 168:17 186:18 | **acluohio.org** 2:6 | **adjustment** 34:24 | |
| | **act** 138:22 192:14 193:20 | **administration** 51:21 72:11 105:25 131:16 131:23 132:14 133:3 136:21 | **affect** 7:3 183:6 |
| **above** 191:17 | **action** 50:19 60:21 65:19 66:4 77:24 78:4 80:22 129:10 139:8 145:11 161:5 | | **affected** 97:12 |
| **absolutely** 113:17 117:2 125:1 133:10 139:10,10 | | | **affiliation** 78:12,17,19 |
| | | | **affixed** 190:15 192:15 193:21 |

**afford** 177:19
**afternoon**
162:25
**agencies** 43:23
63:8 117:1
130:9
**agency** 44:15
144:9,10
**agent** 60:18
**agents** 17:8
63:20
**aggressive**
140:11
**ago** 9:23 53:19
**agree** 19:24
20:24 28:11
29:20 31:5,11
31:15,20 32:8
32:20 33:18
48:13 55:13
71:9 75:14
85:16 98:24
101:7 112:7
133:19 134:4
136:13 144:19
144:22 180:2,4
**agreed** 63:12
67:18 100:11
131:18
**ahead** 32:4
85:5,10 112:23
135:24 189:5
**ai** 9:2 179:10
180:1

**al** 1:9 2:7 191:6
192:3 193:3
**alert** 66:19
**align** 168:23
**aligned** 171:23
**alignment**
81:18
**allegation** 18:6
133:20
**allegations**
31:10 122:2,4
176:24
**alleging** 104:24
**allow** 30:11,13
32:14 168:19
**allowed** 164:23
**allows** 30:6
134:21 167:11
167:18
**amy** 2:3,13
5:12 163:11,12
**analysis** 147:13
147:18
**analyst** 68:8,14
68:22 69:6
**analysts** 68:10
159:24
**angry** 118:23
**ann** 157:24
158:2
**answer** 5:24
6:6,15,21 7:4
33:4,5 47:24
49:20 50:3

79:9 83:12
93:19 96:9
108:9 119:16
128:6 132:14
132:16 135:24
160:16 168:7
175:7 181:18
186:1
**answered**
44:25 94:22
130:14 135:2
185:25
**answering**
119:11
**answers** 5:25
6:1,2 47:1 84:7
116:9
**anti** 82:2
141:13,14,20
141:25
**anticipate**
111:9,21
137:11,15
**anytime** 123:21
**anyway** 33:2
186:1
**apologies** 38:14
99:12 169:23
172:22 174:6
**apologize** 11:19
79:24 130:15
**appeal** 8:10,15
8:17 41:18

**appear** 47:11
183:18 192:11
193:15
**appearances**
2:1
**appears** 157:8
157:23 162:14
**appellate** 41:17
41:20
**appended**
193:11,18
**application**
169:7
**appointment**
162:15,16
**appreciate** 87:2
123:8
**approach**
20:19 121:5,6
**appropriate**
22:8,10,15
100:12
**approved**
129:12,13
**approximately**
9:22 19:16,20
37:2
**arguably**
188:24
**argue** 43:25
52:10 170:12
**arrange** 58:12
**arranged** 112:5

Exhibit A

**[arrest - aware]** Page 5

| | | | |
|---|---|---|---|
| **arrest** 73:4,12 | **asking** 5:23 | **assistant** 2:14 | 188:18,23 |
| 110:17 164:17 | 7:23 19:18,19 | **associate** 2:14 | **attorneys** 3:8 |
| **arrested** 58:12 | 21:17,20 22:2 | 10:16 30:23 | 47:21 |
| **arrived** 182:11 | 22:3,4,4 25:10 | 56:19,21 | **authentic** |
| **article** 120:16 | 29:3 36:23,24 | 106:23 158:6 | 125:23 126:3,5 |
| **ascertain** 64:1 | 39:14 46:18,19 | **associated** 50:2 | **authority** 14:9 |
| 64:7 65:14 | 50:4,5,6,11 | 57:9 59:4 | 14:14,18,22,25 |
| **aside** 8:22 | 52:9 56:24 | 112:9 164:25 | 15:5 21:7,9,12 |
| 12:18 13:6 | 64:14 66:2,2 | **assume** 6:16 | 22:5,6 98:25 |
| 14:1 15:7 | 76:22,24 82:20 | **assure** 25:11 | 115:16 186:13 |
| 21:20 26:13,18 | 83:13 93:9,11 | **attached** 86:19 | 186:17 |
| 39:17,23 51:2 | 96:16 108:5 | 86:19 187:24 | **authorizations** |
| 57:8 62:6 | 113:22 125:25 | 193:7 | 115:1 169:9 |
| 69:15 91:19 | 131:2 132:2,5 | **attaching** | **authorize** |
| 92:2 105:5 | 135:21,23 | 157:21 | 193:11 |
| 114:20 127:10 | 148:2 156:20 | **attachment** | **authorized** |
| 127:15 130:21 | 156:21 158:15 | 157:22 | 22:17 23:4 |
| 140:19 141:23 | 160:13 172:22 | **attempt** 72:16 | 104:6 |
| 142:8 143:19 | 175:8 186:25 | 72:20 73:11,15 | **authorizes** 99:3 |
| 149:8 158:24 | **assertion** 48:14 | 155:11 | **authorizing** |
| 161:24 164:14 | 49:24 | **attend** 120:1,5 | 115:11 |
| 174:25 175:9 | **assess** 107:15 | 163:10 | **automatically** |
| 179:9 181:11 | 136:1 138:9 | **attendance** | 179:3 |
| **asked** 6:12,20 | **assessed** 136:24 | 120:12 164:9 | **available** 30:16 |
| 47:1 49:2 | **assessing** 101:1 | **attention** 60:15 | 30:21 134:16 |
| 59:12,15 67:11 | **assessment** | 68:18 118:17 | 135:14,14 |
| 67:15,19,20 | 32:17 78:1 | **attorney** 2:9 | 136:18 160:25 |
| 75:23 83:1 | 116:24 146:19 | 5:7 7:18,24 | **ave** 191:1 |
| 85:22 89:7 | 146:21 147:4,4 | 8:18 47:20 | **avenue** 2:4 |
| 96:7,13 109:11 | 147:8 148:1,9 | 50:21,25 61:14 | **average** 12:24 |
| 111:22 148:14 | 148:20 150:24 | 83:5,6 85:8 | **avoid** 6:3,7,8 |
| 150:14 159:12 | **assignment** | 86:22 158:2 | **aware** 13:19,23 |
| 174:13 179:15 | 192:2 193:2 | 170:16 173:19 | 14:6 16:16,18 |
| 179:18 185:24 | 194:2 | 180:14 188:15 | 16:23 17:10,12 |

**[aware - behaviors]**  Page 6

17:15,22 18:7
18:13,16 19:4
23:20,25 24:8
25:4,17,20
33:11 36:1,8
37:12,15 38:1
38:8,25 39:25
40:6,21,24
44:14,19,21,23
45:5 52:2,3
53:6,7,11,15
54:12,20 57:19
63:18 64:17,20
65:13,17 72:15
72:23 73:6,10
73:13,17,20
74:5,24 76:12
78:15 79:1,14
79:20 80:1,8
80:12,14 82:8
89:25 94:12
97:7 101:6
102:11 110:6,8
112:4 114:19
115:14 116:4
118:9 119:24
121:17,20
122:20,23
125:6 126:24
130:17 131:19
131:20 138:19
138:25 141:18
141:24 142:7
142:25 143:7,8

143:13 146:12
153:5 154:11
159:2,7 161:10
166:4 172:25
173:21 174:1,7
174:12 176:22
176:25 177:9
177:23,25
180:5 181:12
181:19 183:18
183:20
**awareness** 14:5
24:5,19 25:3
31:18 36:4,20
37:4 42:20
55:16,24 77:5
77:12 90:11
102:14 156:13
156:13,15
158:23

**b**

**back** 29:10
36:16 40:1,4
41:9,9 44:1,2
47:19 50:25
51:11,13 52:22
52:23 53:10
55:4 62:2 63:4
63:6 65:9,10
66:7 67:4 68:2
76:5,11,16,19
82:12,14 84:6
84:8 85:7,14

86:5,24 87:3
93:13,14
112:16 114:21
126:9,10 128:5
128:7,9 129:17
131:25 132:1,3
132:6 134:1
135:3,4 144:4
144:11 146:23
147:23 149:21
150:20 152:3
153:21,23
159:17 162:2
166:21 168:6,8
168:25 177:18
187:7,25
191:15
**ballpark** 19:19
**barred** 110:14
164:16
**based** 18:6
28:14 30:2
50:8,17 52:25
57:21 60:22
65:19 83:19
89:7 94:6
115:2 128:16
129:21 130:6
130:20 134:21
139:8 151:16
152:19 153:9
153:11 160:24
166:18 167:6
167:12 168:14

170:5 171:1,14
183:7
**basing** 100:6
**basis** 23:21
25:2,15 31:25
32:12 50:15
71:17 114:5,17
127:23 128:18
130:2 138:12
144:24 155:23
156:16
**bates** 47:4 60:6
103:1 105:11
112:24 139:16
140:24 142:13
149:13 157:7
157:11 162:13
178:6 180:11
**bearing** 120:17
**bechtold**
106:18
**becoming** 82:7
127:25
**beginning**
103:1 104:22
165:4
**begins** 144:13
**behalf** 141:13
**behavior** 35:12
107:13 151:8,9
**behaviors**
37:13,15
118:18,21

Exhibit A

[belief - campus]

**belief** 93:15
94:4
**believe** 21:6,12
26:14,18 62:25
66:13 70:5,24
76:8,25 78:2,9
80:7,13 85:18
87:18 92:4,16
92:25 93:6,21
96:7 97:11,19
97:25 98:3,7
98:10 101:4
108:20 109:7
109:13 110:20
122:3 123:22
124:23 125:2
126:5 127:6
136:1 139:1
152:23 159:4
161:3,7 165:17
183:4,10
**believed** 58:5
65:24 71:22
72:5 124:25
139:6
**bellamkonda**
105:19,20
**best** 6:14 17:13
60:25 61:1
68:20 74:9,19
75:16 78:13,14
88:14 108:9
109:22 111:13
113:13,25

134:4 161:18
176:11 184:25
**better** 99:24
**beyond** 24:20
63:7 69:12
77:6 89:15
130:25 150:12
161:21 176:25
**big** 171:10
**bigger** 90:12
**bit** 16:22 151:1
**blackburn**
106:2,3 164:7
**blair** 2:8
**blogging** 10:8
**board** 14:20
45:10,12,18
49:16 132:17
156:6 183:9,13
183:16
**bodies** 136:24
**bolded** 147:2
**bomb** 17:15
**bondi** 173:19
**boss** 172:17
**bottom** 60:15
68:3 113:6
169:1
**bound** 23:11
134:12 136:2
**breadth** 99:25
**break** 6:18,21
41:1,7 44:12
46:23 47:13,16

48:4 61:20,21
62:4 84:14
85:4 87:5
88:21 102:20
112:13,19
137:16,18,25
148:7 177:16
183:23 185:9
185:13
**breaks** 85:1
**brevity** 29:19
33:18
**brian** 149:16
150:5 153:7,19
154:18 163:24
164:1 166:6
**brief** 41:7
47:16 62:4
85:4 87:5
102:20 112:19
137:25 177:16
183:23 185:13
**briefly** 10:1
13:17 138:2
**bring** 148:14
**broad** 156:23
**broadly** 80:24
**brought** 36:20
37:4 53:3 54:4
142:20,21
143:5,6 167:23
**buchanan**
52:14,16 84:21

**build** 70:19
**bullet** 49:8
**business**
174:21

**c**

**c** 187:15 189:17
**ca** 191:25
**calendar**
162:14,16
**call** 29:18 33:1
33:17 58:3,10
77:24 80:21
83:21 84:13
93:2 116:18,22
118:1 124:13
177:13
**called** 78:3
96:21 130:12
143:15
**calling** 24:24
77:22 91:5
122:18
**calls** 32:22
91:13 181:15
186:5
**campaign**
142:1 143:9,14
**campus** 16:13
16:17,19,24
17:16 18:8
42:18 58:6
59:18 63:17,20
72:17,21,24

Exhibit A

**[campus - certainly]** Page 8

76:9,17 77:2
78:5 110:14,17
110:22 130:5
133:21 136:22
137:7 141:13
158:20 161:8
161:13 164:16
164:19,23
165:14,18
167:5 169:6
**capitol** 126:20
127:3,7,13,18
127:22 128:2
**card** 105:14
**care** 20:5
**career** 16:2
**carefully** 113:9
**carey** 2:2 3:4
5:4,7 15:11,12
27:7,18,22
28:1,3 29:1,9
32:3,7 33:4,7
34:5,6 41:3,6,8
43:25 44:4
45:2,4 46:3,10
46:14,17,24
47:2,13 48:1,7
48:9,13,22
49:2,5,22 50:4
50:10,15,19
51:2,4,11,15
52:9,14,18,22
53:1 60:4 61:6
61:11,21,23,25

62:5 63:4,10
64:23 65:2,7
65:11 66:22,23
67:4,5,13,14
68:1 82:12,19
83:2,9,14,16
84:6,9,16,22
85:5,10,15
86:4,6,12,15,24
87:2,6,10,11
93:11,17,19,20
98:8,9 102:18
102:23 103:7
105:9 108:8
109:6 112:12
112:15,18,22
117:16,17
119:13,20
122:21,22
123:8,11,12
126:2,4,9,14
128:5,8,23,24
131:25 132:4,9
134:3 135:3,7
135:23 136:12
137:20,23
138:1 139:14
140:22 141:4,5
142:11 143:11
143:12 149:11
153:21 154:2,3
157:5 160:16
160:18,21,23
162:11 168:6,9

170:18,20,21
175:17,19
176:2,3 177:12
177:15,17
178:4 179:23
180:6,9 181:17
181:22 182:15
183:22,24
184:2,3,11,16
185:10,24
186:22 187:4,9
187:17 188:1
189:3,6,15
**carter** 1:9 2:7
12:5,7,20 13:2
13:8 14:13,13
23:14 24:12
25:13,22 90:1
90:13 172:12
172:15,24
185:20 186:6
186:24 191:6
192:3 193:3
**carter's** 106:3
185:17
**case** 1:8 5:9,17
43:19 89:24
90:7,14,17
99:8 100:9,19
109:9,17 115:9
136:11 161:3
178:11 179:7
179:11,16
191:6 192:3

193:3
**cases** 23:23
24:11
**cassi** 108:24
**cassie** 150:4,6
**cause** 99:5
100:16
**caused** 124:14
161:6 165:17
**caution** 60:17
107:14
**center** 70:11,15
**ceo** 139:24
**certain** 36:6
43:17 45:23
81:14 94:1
102:15 108:2
150:2 155:16
161:9
**certainly** 8:9
14:16,21 15:4
17:12,17 21:2
21:25 22:11
24:14 25:4
31:18 36:3,19
37:12 54:22
57:21 59:6,21
77:10,25 78:7
82:15 89:12,23
91:5 94:2
95:22 102:16
108:11 116:4
116:25 124:14
136:18,25

Exhibit A

**[certainly - christensen]** Page 9

| | | | |
|---|---|---|---|
| 145:23 153:7 | **charges** 53:3 | 164:3,6 | 123:14 124:3,6 |
| 156:11,18 | 54:4 | **christensen** 1:6 | 126:21 127:8 |
| 164:22,23 | **chat** 178:16,18 | 2:2 5:9 36:10 | 127:11,16 |
| 165:21 167:5 | 178:18,23 | 36:13 37:10 | 130:7,13 |
| 167:24 168:16 | 179:10,15,18 | 38:9 39:1,10 | 131:12 137:5 |
| 171:19 172:18 | 180:1 | 40:22 44:16 | 137:13 138:23 |
| 179:12 | **chatgpt** 178:13 | 50:2 51:6,17 | 139:3 140:17 |
| **certificate** | **check** 11:4 12:7 | 51:22,25 53:4 | 141:12 143:14 |
| 193:11 | 12:18 19:12,25 | 53:10 54:9,13 | 143:20 145:19 |
| **certification** | 20:9,12,24 | 54:21 56:7 | 146:9,20 147:3 |
| 192:1 193:1 | 21:3 38:12 | 58:12 59:5,17 | 147:9 149:21 |
| **certify** 190:4,12 | 39:20 56:8,16 | 62:10,15,18 | 150:23 151:14 |
| **chabad** 70:10 | 57:12,15,22 | 63:1,9 64:3,9 | 152:1,10,13,18 |
| 70:11,13,14,17 | 58:23 59:16 | 65:16 66:25 | 152:24 153:11 |
| 70:20,23 | 96:6,6,13,17,22 | 72:18,22 73:8 | 154:7,21 |
| **chain** 46:6 | 107:14 118:25 | 73:12,16,18,21 | 155:22 156:3,6 |
| 47:10 60:10 | 144:2 145:25 | 74:1 76:2,15 | 156:10,14 |
| 105:12,15 | 146:2 149:2 | 78:11,16,21 | 158:22,25 |
| 139:17 142:15 | 150:15,21 | 79:15 83:22 | 160:6 161:5 |
| 149:16 | 151:6,15,18,25 | 87:15,20 88:19 | 162:17,22 |
| **change** 182:7 | 152:19 153:12 | 88:23 89:1 | 165:10 166:10 |
| 191:13,14 | 153:20 154:12 | 90:23 91:2 | 166:15,25 |
| 193:8 194:3 | 154:16,24 | 92:12 94:14 | 170:13 172:12 |
| **changed** 154:1 | **checked** 20:1 | 97:7 99:1 | 172:20 173:12 |
| 168:19 | **checking** 46:13 | 107:8,22 | 173:16,20,24 |
| **changes** 104:17 | **checks** 145:23 | 110:11,13,21 | 174:6,11,14,17 |
| 191:12 192:7 | 154:19 | 111:10,22 | 175:3,12,21,23 |
| 193:7,9 | **chief** 106:3 | 112:1,5 113:5 | 176:5,8,14,23 |
| **channels** 18:25 | 107:1 | 114:16 115:16 | 177:1,3,8,19 |
| 22:8,10 | **choose** 23:8 | 115:21 116:5 | 179:19 184:7 |
| **characterizing** | 24:11 | 117:7,22 | 185:3,19,23 |
| 123:3 | **chris** 105:23 | 118:12,18 | 186:6 191:6 |
| **charge** 106:23 | 157:24 158:5 | 119:7 121:5,25 | 192:3 193:3 |
| 124:21 | 158:19,20,23 | 122:3,24 | |

Exhibit A

**christensen's**
8:17 53:23
55:9 67:8,17
69:1 73:4 74:6
74:20 75:17
77:18 78:25
79:9,13,25
82:9 89:21
90:20 105:2
110:24 114:5,8
114:12 115:25
116:11,16
119:21 121:16
122:8 124:1
130:21 138:14
144:17 145:10
148:10,24
150:21 153:2
155:11,19
160:11 161:2
164:15 172:13
173:1,12
180:14,22
181:1,8
**circumstance**
45:17
**circumstances**
15:13,17
167:19
**city** 2:4
**civil** 73:19
146:16 192:5
193:5

**claim** 86:1
187:18 189:7
189:11
**claimed** 136:21
**claiming** 188:2
189:9
**clarification**
129:16 146:14
185:8
**clarify** 45:22
80:7 97:4
135:18
**clarifying**
109:4 126:7
185:16
**clarity** 64:19
76:14 113:25
**class** 140:8
**classes** 139:2
**claw** 47:19
50:25 85:7,13
86:5 187:7,25
**clear** 37:25
64:15 66:1
79:8 130:15
146:4 169:12
172:23
**clearly** 47:18
47:22 61:9
152:22 186:17
**cleveland** 191:2
**client** 47:20
50:21,25 61:14
83:6 85:8

86:22 93:10
170:16 188:18
**clock** 84:23
**close** 119:4
**coaching** 15:11
64:23,25
160:19
**code** 4:3 15:15
15:19 21:19
22:18 23:4,8
23:12 27:12
28:7,9,12,21
29:8,11 31:6
31:12 33:13
34:20 35:10
42:22 77:5
98:20 99:14
114:21 115:14
129:6 134:24
165:10 166:17
166:22 169:8
181:13 183:8
183:15,19
186:16
**collaborate**
42:7,12
**collaboration**
21:24 42:19
**collaborative**
42:17 130:8
**collaboratively**
17:24
**colleague** 5:12

**college** 141:19
141:25 174:21
**columbus** 1:15
2:5 60:19
76:20 77:13,16
**combative**
140:10
**come** 32:14
76:11,16,19
103:23 141:22
147:23
**comes** 32:16
164:18
**coming** 102:12
123:19
**commenced**
40:18,25
**commencem...**
88:10
**comment** 94:7
**commentary**
79:18,20
**commenting**
79:2,15 121:18
**comments** 90:2
90:5
**commission**
190:21 192:19
193:25 194:25
**commit** 98:3
124:24 125:3
138:22
**commitment**
73:19

Exhibit A

**committed** 67:7
68:7
**committing**
124:11
**comms** 106:13
158:11
**communicate**
13:8 30:5
35:24 142:4
153:17
**communicated**
57:11 131:22
154:5 159:11
161:1
**communication**
38:3 45:22
48:18 53:16
66:7 67:10
83:21 85:19
88:5 103:16
133:20 152:6,7
153:19 157:1
165:22 176:22
**communicati...**
50:11 54:7
101:2 128:14
128:17 129:19
130:1 131:11
143:1 156:24
173:2
**communities**
96:3
**community**
53:23 69:21,23

70:19 77:2
78:5 80:2,15
80:23,23 81:13
94:3,5,9
122:14,15
124:8 128:15
129:20 130:5
130:10,13,25
156:22 157:2
158:21 165:22
167:4,5,16
169:6
**compelled**
77:17
**complain** 133:3
138:7
**complainant's**
133:24
**complained**
87:20
**complaint** 9:5
81:14,21 87:14
88:18 184:21
**complaints**
80:1,14,19,25
81:8 138:9
185:1
**complete** 105:1
180:25 181:7
**completed**
191:15
**complex** 32:2
**compliance**
146:16

**complicated**
50:17
**computer**
124:19
**concealed** 27:3
**concede** 86:7
**conceding**
189:11
**concern** 34:25
56:6 81:14
112:8 124:15
124:16 134:12
165:20
**concerned**
20:17 84:3
97:18 121:25
187:22
**concerning**
67:24 68:10
107:12 127:25
151:1,8,9
**concerns** 17:11
20:4 21:16
24:19 25:5
30:2,6 38:22
53:21,24 54:1
54:4 57:25
58:10 60:20
80:20,21 81:3
83:22 107:6
109:23 117:2
122:14 124:5
126:13 133:7,9
133:9,17 135:9

135:11 141:8,9
154:12,15,22
156:22 165:2
165:22 166:18
168:15 169:5
184:6
**conclude** 90:23
91:2 92:12
95:11 97:15
122:10 123:25
125:22 147:21
153:14
**concluded**
40:15 51:6
189:20
**conclusion** 91:6
91:11,21 95:2
126:1,15
153:17 161:12
165:11 181:16
**conclusions**
64:2,8 65:15
94:20 133:23
**condemnation**
55:11
**condemned**
74:11
**conditions** 34:4
34:10
**condoning**
116:14
**conduct** 4:3
11:15,22 15:15
15:19 19:12

[conduct - contrary]

21:19 22:18
23:4,8,12,17,23
24:3 27:13
28:7,9,12,21
29:12 30:1,13
30:24 31:7,13
33:13 36:5
42:22 43:3,11
59:16 77:5,6
89:4 98:20
99:15,15
104:23 111:13
114:22 115:15
129:3,6,6
134:25 135:12
146:19 153:8
165:10,12
166:22 169:8
181:13 183:9
183:16
**conducted**  36:9
120:3 146:2
147:5,20
**conducting**
141:25
**conducts**  42:24
**conference**
119:25 120:4,9
**confidential**
3:8 47:19,22
50:18 61:10,13
61:14
**confirm**  153:10
156:4

**confirmed**
60:23
**confused**
151:12
**congressman**
74:22 116:19
121:23 122:4
125:24 126:17
126:21 127:8
127:12,17
173:11
**connected**
69:19,23 77:16
93:23 143:9,15
174:20 179:16
**connection**
14:2 40:15,25
52:1 53:4,14
73:8,23 74:3
146:20 150:15
152:1 153:15
154:6 156:3
**consider**  16:11
21:23 170:24
171:21
**considerate**
52:20
**consideration**
171:14
**considerations**
90:19 114:17
**considered**
96:21

**consistent**
103:18
**constitute**
156:16
**constituted**
44:17 51:7
125:23 177:5
177:21
**constitutes**
24:1
**consultation**
18:19 100:12
136:25 186:3
**consulted**  24:8
82:18 188:15
188:23
**consuming**
134:17 135:6
135:15
**contact**  17:17
56:10,12 57:8
58:15,18,19
62:9 66:19,20
66:24 70:4,23
71:20 72:4,11
152:15 153:6
154:20 155:19
**contacted**  39:1
59:23 60:1,18
62:14 63:11
66:17 133:2
136:21 138:6
159:22 184:6

**contacting**
62:19
**contacts**  133:11
**contain**  180:25
181:7 188:9
**contained**
45:13 124:2
126:16
**containing**
133:20
**content**  83:1
113:12,15,18
113:23 117:23
118:19 119:6
121:24 188:11
189:1
**contest**  35:8
177:4,20
**context**  34:7
36:15,24,25
38:2 41:13
42:10,12,21
77:21
**continue**  60:23
96:2 97:4
99:12 139:2
**continued**  53:8
144:8 169:13
**continuing**
103:1 171:9,23
**contradict**
49:24
**contrary**  51:9

Exhibit A

**[contributed - crosstalk]** Page 13

**contributed**
54:8 175:2,11
**contributing**
108:18 109:21
**convene** 169:6
**conversation**
6:4 15:24 69:3
69:5,7 83:7,10
89:8 160:10,14
177:7
**conversations**
82:21 83:17
102:16 145:18
146:8 155:1
173:6 178:23
188:10
**convincing**
169:12
**coordinate**
20:23
**copied** 130:23
131:4,7,8
143:4 173:4
**copilot** 179:12
**copy** 48:9
132:19 184:13
**copying** 45:12
**correct** 9:25
10:15,25 11:1
11:17,18,19,23
11:24 12:1,3
14:10,11 22:24
23:13 37:17
45:7,20 47:11

47:12 56:18
57:16 58:24,25
60:10 63:13
67:21 69:14
70:12 75:2,11
75:24,25 78:12
79:5 80:10,17
87:16 94:14,15
94:17,18,25
95:20 96:11,12
96:14 99:18
100:20,21
103:21 104:8,9
104:12,15
105:17,21
106:1,4,5,8,19
106:24 107:2,3
107:19,20
108:22 109:5,5
110:14,18
111:1 115:10
116:20 119:8
121:13 129:7
129:12,14,15
131:14,15
138:13 139:22
139:23,25
140:2 142:19
142:23 144:17
144:18 145:13
145:15,15
146:17 149:18
149:19,23
150:16 154:4,8

156:18 157:17
157:18 158:3,4
159:8,13 160:4
161:22 162:19
165:12 169:2
169:17 170:4
170:17 172:5
175:24 176:9
176:10 180:15
180:16,19,23
186:21
**corrected** 45:15
49:18
**corrections**
191:12 193:17
**correctly** 45:9
53:21 68:12
78:24 100:18
107:17 140:13
**counsel** 2:14
4:22 7:9,12,13
61:18 158:4
190:12
**counseling** 10:9
**county** 192:10
193:15
**course** 13:7
16:2 31:4
53:19 76:22
82:16 90:19
**court** 1:1 86:17
189:10 192:7
**courtesy**
189:10

**coverage** 120:5
120:20
**covered** 188:25
**cranberry**
143:25 144:1
146:3 152:14
154:11 156:1
166:5
**crc** 147:15
**crco** 82:15
83:12,15,18
88:24 89:3,19
146:15 147:5,8
147:10,17
148:8 164:12
**create** 40:7,8
70:19 166:24
**created** 80:22
130:12,13
168:10
**credible** 44:17
49:13 50:1
51:7 66:14
127:7 149:22
153:15 154:6
**criteria** 168:24
**cross** 26:12
84:4
**crossed** 84:11
**crosses** 102:2
**crossover**
89:15
**crosstalk** 38:15
79:12 119:9

Exhibit A

**[crosstalk - describing]** Page 14

132:24
**curious** 145:25
**current** 9:12,14
9:23 10:2
28:17,19 81:1
81:8,25 87:14
87:18 88:7,18
89:5 130:17
184:1,5 185:2
187:24
**currently** 57:2
**cut** 187:22
**cv** 1:8

**d**

**d** 187:15
189:17,18
**d.c.** 54:15 55:11
**danger** 70:25
71:22 72:6
**dash** 28:22
**dashes** 29:7
**data** 100:6
139:8 153:9
167:9 171:1
**date** 1:14 119:6
148:5,6 161:16
167:10 183:1
191:8 192:3,9
192:19 193:3
193:13,25
194:20,25
**dated** 4:4 46:5
60:8 105:13,16

142:16 149:14
157:17 159:18
**dates** 36:18,21
36:23
**david** 2:2 5:7
27:16
**davis** 190:4,18
**day** 56:10
57:10,12,14
58:15,18
172:18 190:15
192:16 193:22
194:22
**days** 98:17
191:18
**dcarey** 2:6
**dealer** 105:14
**dear** 188:21
191:10
**december**
191:4
**decide** 21:21
**decided** 170:3
**decision** 14:18
15:8 16:4
24:25 25:2,14
25:16,23 30:17
30:22 99:21
100:10 110:11
120:17 121:12
134:21 140:16
151:3 155:23
156:10 171:10
175:2,11,21

176:13 185:18
185:18,21,22
186:2,14,20
**decisions** 14:14
15:1
**decompound**
154:2
**deed** 192:14
193:20
**deem** 18:6
**deemed** 191:19
**defend** 31:8
**defendants**
1:10 2:7
**degree** 141:10
**delete** 178:21
**deleted** 179:6
**demand** 133:4
138:8
**demeanor** 96:4
**demonstrate**
34:3,10 186:17
**demonstrates**
31:21
**demonstrating**
32:9
**demonstrations**
42:16 137:7,12
**denied** 97:8
122:25
**dennis** 107:1
**denying** 123:15
**department**
10:15,21 11:15

42:8 51:22
53:8,13 57:6
59:12 67:12
107:2 149:17
150:12 151:24
155:18 156:2
173:23 191:22
**departments**
10:5,12,18,22
10:24 43:24
106:13
**depend** 139:5
139:11
**depending**
12:11 43:3
**depends** 10:6
83:13 84:25
134:7,9
**deposed** 5:13
**deposition** 1:12
7:7 8:25 9:3
85:18 86:20
179:17 189:20
190:5,7,10
191:8,11 192:1
192:3 193:1,3
**depth** 99:25
**describe** 24:10
158:9
**described**
84:11
**describing**
169:18

Exhibit A

**designee** 30:25
99:5,9,17
100:4,15 115:3
169:11
**designees** 41:19
**desire** 96:5
**despite** 183:5
**detail** 66:9
128:3 188:4
**details** 46:19
54:2 120:2
**detective**
149:16,20
150:14,20
151:23 152:3,9
153:13 154:5
155:7,10
**determination**
22:12,13 108:5
177:5,20
**determine**
21:15 30:7
65:23 76:2
83:5 101:19
111:14 112:3
**determined**
24:7 49:12
**development**
10:17
**difference**
20:15 128:25
145:3
**different** 20:9
20:13 23:24

24:1 32:16
51:3 106:14
133:17
**differently** 26:7
32:6 93:5
**dining** 10:8
**direct** 28:24
48:20 60:14
169:1
**direction** 10:5
18:18 190:9
**directly** 11:2
12:20 60:20
153:11
**director** 11:22
56:17 66:18
67:2,6,16,23
68:7 69:4 89:3
106:18 155:3
159:23
**directory** 71:15
**disagree** 26:1
71:17 86:9
101:13,14
182:10 183:2
**disagreed**
25:22
**disappointed**
118:23
**discernable**
124:22
**disciplinary**
36:8 40:18,21
40:24 41:13

43:19 53:2
54:3 110:6
**discipline**
13:18 14:3,8
14:10,15,19
15:15,19 16:5
23:15 25:24
26:25 27:2
41:12 42:10
**disciplined**
26:3,4,8,10,15
26:20,23 31:24
32:12,21 33:2
33:10 109:9
**disclose** 114:15
**disclosed** 50:19
50:24 61:18
**disclosure** 85:8
**discuss** 7:23
13:2 27:20
82:10,25 87:4
89:20,23 169:7
176:4,6,14
**discussed** 7:24
82:23 85:18
88:22,25 99:10
99:20,22 100:2
102:6,13 110:9
145:16 146:10
148:18 156:5
175:1,9,15,16
175:21
**discussing**
41:10 44:13

54:14 74:22
88:21 116:19
154:18
**discussion**
13:16 57:13
69:10 188:10
**discussions**
13:6 111:3,6
172:11 174:16
**disenroll** 24:25
25:14 115:8,16
116:9 120:17
121:12 130:2
133:1 136:19
138:4,5,11
140:16 151:4
155:23 156:10
156:17 166:10
166:14,25
167:18,21
169:11 175:2
175:11,21
176:13 185:18
185:22
**disenrolled**
22:16 25:8
33:22 34:22
35:6,15,19,25
127:12,17
133:4,13 137:6
138:8 170:13
171:11
**disenrolling**
25:6 134:6,19

Exhibit A

**[disenrolling - email]** Page 16

135:17 136:15
143:20,23
151:13 164:18
176:8
**disenrollment**
8:18 33:14
34:11 41:14
113:5,12,16,19
114:5,8,12,18
115:1,7,11
116:2,12,17,21
118:8 119:22
121:17 122:9
122:24 123:14
124:1 125:11
125:17 127:20
127:21 128:10
129:1,3,8
133:16 134:23
138:14 144:17
144:24 145:10
148:10 151:22
159:16 161:17
164:22,25
165:6,24
167:11 168:13
168:15 172:13
173:1,13
175:24 176:21
177:4,20
**dispatch** 17:8
**dispatched**
63:20

**district** 1:1,2
**division** 1:3
**divulge** 82:20
**docket** 86:22
**doctrine** 50:21
**document** 8:12
27:12,14,25
28:6 29:3 34:9
46:4,18 47:7,9
47:10,23 48:23
50:7,9,24 51:3
60:6,9 61:4
85:16,23,24
86:3,8 102:25
103:11 112:24
113:3,11
139:16,21
140:24 141:22
141:24 142:13
149:13 157:7
157:11,12,21
162:13 178:6
178:10 179:25
180:10 181:23
181:24 182:3,5
182:16
**documentation**
8:7 34:2,9,16
40:9,12
**documents**
7:25 8:2,3,5,8
8:23 9:8
105:11 179:7

**doing** 6:3,8
20:21 31:17
58:16 68:11
97:18 104:19
151:11 160:20
160:21 161:10
**donor** 174:23
**double** 46:15
103:3
**dps** 67:2 68:6
69:4 159:23
**dr** 27:18 29:10
41:9 62:6,8
183:25 185:17
**drafted** 171:6
**draw** 126:15
133:22
**drawn** 64:2,7
65:15 95:3
**draws** 55:10
**drew** 94:20
**ducks** 185:11
**due** 62:2 135:1
**duly** 5:2 190:6

**e**

**e** 187:15 189:17
189:18 190:4
190:18
**earlier** 9:11
19:9 40:20
78:6 82:1
87:13 96:7
108:20 109:7

115:20 130:15
134:11 145:16
146:10,15
156:5 161:25
164:15 183:25
184:4 188:14
**early** 84:17
88:10
**ease** 55:8
**easily** 124:22
**eastern** 1:3
**edits** 104:17
**education**
69:22
**effective**
181:13 182:25
**either** 43:1
56:24 100:4
175:22 176:4,6
176:14 184:1,4
**elected** 79:2,15
79:21 121:18
**electronically**
8:24
**elevated** 56:6
**elizabeth** 106:6
142:4
**email** 4:4 13:3
13:7 45:11
46:5,6 47:10
47:21 60:7,7
60:10,16 69:13
88:4,9,11
105:12,13,14

105:16 130:23
130:24 131:4,7
131:9,10
132:18 139:17
139:17,21
140:6 142:15
142:16,17
149:14,14,16
152:5 153:3
154:10 155:7
157:8,14,17
158:17 159:18
162:23 163:1
169:2 171:7
187:8 191:17
**emails** 132:12
132:21 133:16
141:6 157:19
173:5 178:14
186:10,15,19
186:23 188:5,6
**embassy** 54:14
**emerge** 32:25
**emerged** 31:21
32:9,19
**emergency**
155:4
**employer** 9:12
**enact** 107:7
**enclosed**
191:11
**encompassed**
145:1

**encouraged**
90:24 91:3
122:11
**encourages**
179:14
**encouraging**
78:8 91:22
92:4
**endanger**
136:14
**enforcement**
16:20,25 17:2
17:4,7,10 42:8
44:15 51:6
56:10 57:9
58:15,18,20
59:8,14,20
73:22 74:2
117:1 120:13
126:12 127:25
130:9 143:21
144:10,25
145:1,5,12
152:13,17,24
159:12 160:10
161:1 165:20
166:1
**engage** 124:3
144:1
**engaged** 17:1
31:19 120:11
**engagement**
10:7 30:9
37:16 42:18

59:14,20 63:9
126:12 127:24
143:21 144:25
145:2,5,7,12
165:20,25
166:5
**engagements**
59:7
**enrolled** 54:25
**enrollment**
8:20 33:25
34:8,18 180:22
181:2,9
**ensure** 16:13
19:25 35:12
95:24 108:11
110:22 165:18
167:3,15
**ensuring**
166:11
**entail** 111:4,7
**entered** 193:9
**entire** 61:13
167:22 181:3
192:5 193:5
**entirely** 6:12
**entitled** 33:14
**entry** 182:23
**errata** 191:13
191:18 193:7
193:10,18
194:1
**escalated** 91:25

**escalating**
95:15
**escalation** 58:3
58:10 77:22
84:13 91:5,13
91:18,20,24
92:3,6,10,20
94:6,24 95:9
107:10 118:17
118:22 119:1
122:19 124:13
**especially**
134:17 135:5
135:15
**esq** 2:2,3,8,8,9
2:13 191:5
**essentially** 14:4
14:7 82:1
188:6
**estimate** 16:3
85:2
**et** 1:9 2:7 191:6
192:3 193:3
**evacuate** 72:21
**evacuated**
72:25
**evacuation**
72:17
**evaluate** 189:7
**eveland** 45:8,11
45:18 49:8,15
60:8 157:19
**evening** 60:20
160:1,3,7

Exhibit A

170:23 172:10
**event** 129:8
**events** 39:7
**eventually**
  25:11 98:13
**everybody**
  131:9 132:19
**evidence** 86:16
  169:13 176:24
**exact** 17:25
  19:15,17,18
  36:21,23 71:12
  106:20 150:8
  150:11
**exactly** 36:6
  37:5 56:15
  64:13 67:19
  68:15 77:9
  101:23 106:12
  108:21 110:4
  120:10 121:1
  121:24 147:19
  148:21 149:6
  154:25
**examination**
  3:1,4 5:3
  185:14 190:11
**examined**
  190:6
**example** 24:2
  35:2
**exception**
  109:10,18

**exchange** 13:12
  13:13 60:7
  139:22 149:14
  157:14
**exclude** 83:2
**excluding**
  82:22 113:20
  173:24
**excuse** 40:8
  171:5
**executed**
  193:10
**executing**
  21:14
**execution**
  192:14 193:19
**executive**
  105:20
**exercise** 170:24
**exhibit** 27:5,11
  27:19 28:11
  46:1,5 48:10
  49:7 60:2,5
  62:7 68:2
  86:11,12,16
  98:19 102:18
  102:21,24,25
  103:20 105:5,7
  105:10 107:4
  112:20,23
  113:9,14 114:1
  114:4,7,11,15
  114:21,24
  115:7 128:9

129:17 139:12
  139:15,21
  140:15,20,24
  140:25 142:6,8
  142:9,12
  143:19 144:11
  146:24 149:8,9
  149:12 154:9
  157:3,6,10,14
  157:19,22,23
  157:24 158:18
  159:18 161:24
  162:2,3,9,12
  163:6 166:21
  168:25 169:19
  178:2,5,7
  180:7,10,13,25
  181:7,20,23
  182:1,13,16,18
  182:20,22
  184:9,12,18
  187:7,19
**exhibits** 4:1,22
  27:9 48:5
  86:19 87:6
**exist** 34:12
**existed** 34:4,11
  74:24 183:11
**existence**
  188:11
**exonerated**
  32:19
**exonerating**
  32:25

**expectation**
  31:2
**expectations**
  168:23
**expel** 21:7,13
  21:22 22:6
  23:3,9 128:19
**expelling** 22:14
**experience** 25:9
  111:16
**expiration**
  192:19 193:25
  194:25
**expires** 190:21
**explain** 20:15
  121:4,6 128:17
  129:25 145:3
**explicitly** 90:24
  91:3,22 92:4
**express** 57:25
**expressed** 96:4
  130:18
**expressing**
  128:15,18
  129:20 130:1
**expressly** 22:17
  71:10
**expulsion**
  128:22 129:1,2
**extended**
  117:12
**extending**
  86:14

Exhibit A

**extent** 42:19
  59:19 179:25
**external** 142:17
**extract** 24:17
**eyes** 3:8

**f**

**f** 187:15 189:17
**facilities**
  158:11
**fact** 55:2
  108:15 114:9
  114:13 126:11
  145:4,11
  151:18 154:23
  183:12
**factor** 108:1
  109:21
**facts** 50:10
  113:12 175:1
  175:10
**faculty** 138:15
  140:9
**fail** 114:15
**fair** 6:9,16
  23:11 30:15
  40:23 44:19
  45:14 49:17,23
  55:8 62:24
  64:19 65:13
  67:11,15 68:25
  120:16 121:8
  134:18 135:16
  152:16 153:13

156:15 160:9
164:18 171:2
171:18 175:17
175:17
**fall** 76:10
**falls** 99:14
**false** 26:22
  45:14,19
  104:11 122:2,4
**falsely** 114:7,11
**familiar** 28:9
  28:20 29:4,11
  29:14 33:12
  69:16 70:10
  71:5 173:17
**family** 174:19
  174:22
**fashion** 136:6
**fault** 125:16
**fbi** 49:10,25
  59:24 60:1,18
  60:21 62:9,14
  62:17,19,25
  63:2,11,11,16
  64:1,6,11,12
  65:14,18,20
  66:3,11,14
  145:17,18
  146:5,9 159:23
  173:24
**fear** 80:22
  128:15,18
  129:20 130:1
  130:12,19

**fearful** 82:2
  130:11
**federal** 174:3
  174:10
**feedback**
  171:22,24
**feel** 77:17,24
  105:14 186:13
  188:18
**feeling** 80:21
**feelings** 96:5
**felt** 61:16
  120:10 166:12
  166:19 167:14
**fifth** 132:25
**file** 182:5
  189:10
**filed** 9:6 182:8
  182:25
**filings** 4:19
  182:17,19,24
**final** 14:9,22
  16:4 25:16
  100:9 159:21
**find** 102:18
  104:10 115:8
  191:11
**finding** 35:8
  44:15,16 99:3
  99:8 100:4,19
  100:24 101:7,9
  115:2,10
**findings** 53:13
  64:3,8 65:16

148:9
**fine** 49:1 52:15
  84:18 86:9
  150:19 187:12
**finish** 6:7
**finished** 119:18
  144:14
**firmly** 166:18
**first** 17:12 25:7
  34:12 49:8
  54:12 55:19
  115:9 125:6
  133:15 141:21
  172:24 190:6
**fisher** 174:19
  174:21,22
**fit** 48:20
**five** 9:19,24
  19:22,23 41:3
  61:23 98:17
  112:13 183:22
  185:9
**focus** 10:6
  154:25
**follow** 64:1,6
  64:10,17,21
  65:14 87:12
  124:7 131:16
**followed** 64:12
**followers** 77:8
  90:10 97:22
  98:5,15 137:14
  139:6

[following - golian]                                    Page 20

| following 59:11 | found 34:4,10 | gathered | 93:9 103:3 |
| 107:6 110:25 | 50:1 66:14 | 111:10 166:19 | 112:15,23 |
| 111:17 145:23 | 89:17 127:7 | gauging 98:17 | 117:11 128:9 |
| follows 5:2 | 149:22 154:6 | gaza 121:7 | 130:25 135:24 |
| force 49:10,25 | foundation 2:3 | general 2:9,14 | 189:4 |
| 60:19 | 174:19,23 | 21:21 24:16 | going 5:23 6:5 |
| foregoing | four 77:7 | 36:24 41:11 | 25:10,19 27:8 |
| 192:13 193:18 | frame 135:9,11 | 122:15 123:19 | 29:18 33:17 |
| forever 136:7 | frankly 173:7 | 137:3 150:17 | 43:25 47:19,24 |
| form 32:1 | free 84:4,12 | 158:4 173:19 | 48:3,15,17,19 |
| 128:18 130:2 | 89:14,15 | general's | 52:10 60:5,14 |
| 142:23,24 | 147:24 192:14 | 188:15,24 | 61:6 66:8 68:4 |
| 153:25 155:22 | 193:20 | generally 13:18 | 83:11,12 85:13 |
| 186:22 187:24 | freedom 147:11 | 23:15 24:10 | 93:8 102:24 |
| 189:11 | front 187:20 | 28:8,20 29:4 | 104:21 105:10 |
| formal 100:3 | fruit 50:20 | 29:11 33:12 | 107:4 108:4 |
| 134:24 | frustrated | 41:15 43:12 | 109:1 119:15 |
| formed 37:9,22 | 118:23 | 46:19 158:9 | 119:17 124:12 |
| 38:5,6 114:17 | full 114:4 | getting 37:20 | 129:17 135:19 |
| former 81:16 | function 31:6 | gilbert 2:3 5:12 | 138:2 139:15 |
| 81:20,25 87:15 | 31:12 139:7 | gillen 2:8 | 140:5,23 |
| 87:19 88:7 | further 48:2 | give 6:1 26:22 | 142:12 153:24 |
| 155:12 | 86:22 107:16 | 35:2 46:20 | 157:6,10 |
| forth 76:11,20 | 129:10 135:12 | 89:9 114:15 | 160:12,18 |
| 100:16 190:8 | 190:12 | 115:15 | 162:3,12 |
| forward 13:25 | | given 24:19 | 170:15 178:5,9 |
| 32:14 115:23 | **g** | 169:4 177:9 | 179:23 180:10 |
| 134:22 158:18 | garbled 16:22 | 183:8 190:11 | 182:16 184:12 |
| 167:24 171:21 | garcia 157:25 | gives 182:6 | 185:7 188:2 |
| 191:15 | 158:2 | giving 176:23 | golian 2:13 |
| forwarded | gather 111:25 | go 32:3 41:9 | 27:16 29:5 |
| 157:24 | 134:4,10,13 | 48:2 61:4 | 46:8 47:15 |
| forwarding | 136:8 | 62:10 85:3,5 | 48:6,8,23 |
| 142:17 | | 85:10 87:3 | 52:20 61:3,8 |

Exhibit A

61:12 62:2
64:22,25 65:4
84:19 103:6
163:12 184:14
**golian.7** 2:15
**good** 5:5,6 14:6
137:23 189:16
**gotcha** 46:16
**gotten** 29:8
**governing**
29:15
**government**
174:3,10
**gpt** 178:16,19
178:24 179:10
179:15,18
**graduate** 88:15
184:5
**graduated**
88:12,13
**graduation**
81:18,19 88:9
**great** 5:21 6:11
6:24 7:2 41:5
75:16 80:18
87:10 123:11
128:3 137:17
**greater** 107:10
164:24
**greek** 24:3,13
**greg** 2:9 44:1
52:10 160:22
179:24 191:5

**gregory.rustico**
2:11
**group** 18:9,10
18:15,16,22
157:20
**growing** 27:10
**guess** 61:15
96:18 110:1
155:15 187:13
**guidance** 15:22
18:18
**guilty** 26:12
119:10
**guy** 1:6 2:2 5:9
8:17 36:9,13
37:9 38:9
53:23 55:9
83:22 107:7
116:5 123:11
144:4 147:2
148:1 150:17
153:8 155:14
155:16 158:22
172:20 191:6
192:3 193:3

**h**

**habit** 27:9
**half** 7:22 84:22
**handwritten**
157:13
**hannah** 106:18
**haphazardly**
171:13

**happen** 23:23
35:14 93:3
98:13
**happened** 33:8
37:1,2,2 38:9
39:19 53:18
108:21 148:4
160:15 166:6
173:7 177:25
**happening**
23:21 68:18
**happens** 21:5
129:2,4
**haque** 164:10
**harm** 31:23
32:11 35:9
169:14
**harm's** 122:2
**harmful** 124:7
**hatred** 143:16
143:17
**head** 36:19
**health** 10:7
20:5,18 31:23
58:2 95:6
130:4 167:3,16
168:5 169:15
**hear** 30:11,14
83:23 98:15
172:2
**heard** 36:12,15
36:25 65:7
140:7 146:1

**hearing** 31:6,12
31:16,21 32:9
32:19,25 33:9
**heightened**
117:2
**held** 9:16,18
165:15
**help** 123:8
178:14
**helpful** 111:15
**high** 1:15
**hillel** 69:16,18
69:25 70:4
139:24
**hired** 9:19,22
**history** 140:9
**holistic** 10:11
10:17,20 11:16
**home** 153:2
**honoring**
166:16
**hope** 116:9
**host** 10:18
81:12 133:8
134:20
**hosted** 118:12
**hosting** 120:24
**hour** 7:22,22
**hours** 84:24
85:2
**house** 70:10,15
70:16,17,20,23
**housing** 10:8

Exhibit A

**huh** 42:23
100:17 129:22
129:24
**human** 121:15
**hundred** 38:23
43:17

**i**

**idea** 122:6
123:24 174:24
178:12
**identification**
27:6 46:2 47:3
60:3 102:22
105:8 112:21
139:13 140:21
142:10 149:10
157:4 162:10
178:3 180:8
181:21 182:14
184:10
**identified**
94:10 142:5
**identifies** 71:16
144:16
**identify** 114:7
114:11 148:19
148:23
**identifying**
131:12 154:22
**ignore** 23:8
**imagine** 23:22
97:24 132:19
147:15 150:10

**imagined** 64:10
143:3
**imagining**
132:11 174:20
**immediate** 12:4
12:21 16:16,18
16:20,23,24
17:3,6 18:7,13
19:6 56:4
161:7
**immediately**
17:8 55:23
63:20 91:8
**imminent** 58:5
63:16,21 70:5
70:24 71:23
72:6,13 97:16
98:12 136:5
**impact** 116:23
139:7 140:16
150:24 169:5
**implicate**
170:16
**implications**
171:10
**import** 42:20
**important** 24:5
25:6 31:5,12
90:11 109:8,13
168:1
**impression**
37:9,11,13,21
38:4,6 54:9

**inadequate**
165:18
**inadvertent**
85:8
**incident** 35:13
40:9,15 44:13
51:23 52:1
53:5,9 54:6
107:11,21,25
108:15,22
109:20 144:20
144:23 150:18
**incidents** 38:8
53:14
**incite** 92:13,17
95:12 97:16
117:24 125:1
**incited** 98:11
123:22
**incitement**
122:17
**inciting** 17:23
**include** 41:19
77:15 99:15
107:9 145:7
161:19 167:5
**included** 60:11
85:12,25 86:3
86:10 101:1
130:24 163:5
186:16 191:13
**includes** 105:19
105:23

**including** 44:16
60:10 86:15
120:14 142:18
155:18 156:23
**inclusion** 183:8
**incorporated**
193:12
**incorrect** 45:22
45:23
**increased**
165:23
**incumbent**
133:22
**independently**
85:22
**indicated**
140:10
**indicates** 182:8
**indicating**
35:17,21
182:24 191:13
**indication**
48:16 76:18
**individuals**
53:22 97:22
132:11 157:15
**inform** 17:11
21:5 30:8
107:5 151:21
186:19
**information**
8:24 21:4
22:11 30:8,16
30:20 31:1,20

**[information - involving]** Page 23

32:8,14,15,18
32:24 33:9
34:21 45:13
49:16,24 50:5
50:18 51:8
54:17,22 61:16
94:19 95:1,10
95:13,16,22
97:23 100:22
101:5,14,15,16
101:19,21,25
102:9 104:23
108:12 110:10
111:9,14,24
114:16 120:14
122:10 130:6
134:5,16,18,20
135:13,17
136:14 140:15
148:3,15,19,21
148:24 149:4
152:4 156:11
157:1 159:5
160:25 161:15
161:19 166:19
167:7,12
168:18 170:6
171:15 183:7
**informative**
112:3
**informed** 23:18
24:12,23 25:1
26:15,20 90:14
90:17 95:14

107:24 110:16
**initially** 82:7
**initiate** 62:9
72:16
**inquire** 128:3
**ins** 11:4 12:7
154:12,16
**insanely** 50:17
**insight** 148:3
**inspiring** 78:8
**instance** 15:14
15:18 62:14
188:12
**intend** 92:22
**intended** 77:10
92:13,17 93:1
93:7,22 94:4
95:11 186:19
**intent** 48:10
94:20 95:3
97:8,13 122:25
123:16
**intention** 110:1
**intentionally**
173:9 179:6
**intentions**
93:16
**interaction**
43:9 155:21
**interactions**
144:3
**interested**
190:13

**interesting**
77:3
**interim** 13:20
13:22,23 14:1
16:1 29:15,22
30:10 31:19
75:1,5,7,9,13
79:18 96:15,20
97:1,3,5 98:21
99:22 100:7,11
101:9,10,17
103:12 105:3
107:7 110:25
111:17 116:7
148:5,13 159:1
161:16 165:1
165:14,23
167:8,10
168:12
**interpret** 98:15
172:2
**interpreted**
93:5
**interview** 41:25
42:2,4 120:3
120:19,22,23
121:3,8
**interviewed**
94:16
**interviewer**
121:1
**interviewing**
43:12,15

**interviews**
42:24
**investigate**
17:20 18:1,5
22:3 43:7
133:22
**investigation**
20:10,12 21:1
41:23 43:6
53:8 127:4,22
128:2 134:24
135:12
**investigations**
20:23 23:19
**invoke** 170:3
**invoked** 98:25
165:4,6,7,9
168:11
**invoking**
168:10
**involve** 68:21
**involved** 15:14
15:18,23,23
41:22 43:4,18
43:22 44:9
55:6 117:1
150:4,5 159:25
175:20 176:13
**involvement**
41:21 111:19
165:19
**involving**
126:21 146:11

Exhibit A

| | | | |
|---|---|---|---|
| **iowa** 5:19 | 93:24 94:3,5,8 | **keeping** 27:2 | 57:20 58:21 |
| **irrespective** | 140:7 | **keisha** 83:23 | 59:22 61:8,18 |
| 186:14 | **job** 9:14 14:6 | 89:2,9 102:13 | 62:21 63:7 |
| **israel** 71:6,21 | 16:11 | 164:4,6,11 | 64:12 66:16 |
| **israeli** 54:14 | **jobs** 138:15,16 | **keisha's** 147:19 | 67:25 68:15,23 |
| **issue** 12:22 | **joint** 60:19 | **kelly** 11:22 | 69:8 70:2,9,22 |
| 15:24 18:4 | **jointly** 99:21 | 89:3 101:15 | 71:4,12 72:3 |
| 23:17 24:3,20 | **jr** 1:9 2:7 106:2 | 102:11 103:17 | 72:25 74:13 |
| 34:22 99:25 | 164:7,9 191:6 | 103:25 110:25 | 76:6,12,13,23 |
| 100:7 136:3 | 192:3 193:3 | 111:12 112:2 | 77:9 83:4,7 |
| 187:6 | **judge** 1:8 | 126:19 142:20 | 85:13,20 87:25 |
| **issued** 73:3,8 | **july** 180:18 | 163:19 | 88:3 92:23 |
| 133:15 | **jump** 6:6 | **kept** 174:13 | 93:2 94:1 |
| **issues** 17:11 | **jurisdiction** | **kind** 5:17 34:2 | 97:14 98:5,22 |
| 42:15,20 83:25 | 40:5 | 34:8,16 40:7,8 | 100:25,25 |
| 167:23 | **jurisdictions** | 53:3 73:22 | 101:3,18,23 |
| **issuing** 13:22 | 143:22,23 | 74:2 113:21 | 102:5 103:8 |
| 101:16 | 145:6 | 153:25 | 106:12,20 |
| **item** 148:7 | **justice** 173:24 | **kinds** 24:10 | 109:8,14 110:3 |
| **j** | **k** | 158:11,12 | 111:11 112:25 |
| | | **knew** 45:13,19 | 114:24 117:20 |
| **j** 2:2,8 | **kabourek** | 49:17 55:4 | 119:10 121:24 |
| **jeff** 46:6 | 105:23,24 | 76:5,24 83:19 | 127:9 128:10 |
| **jeffrey** 107:1 | 157:24 158:5 | **know** 6:13 15:3 | 132:7,10,16 |
| **jennifer** 190:4 | 158:19 164:3 | 19:15,17 26:3 | 133:10 137:14 |
| 190:18 | **kalili** 180:13,14 | 26:9 27:14 | 137:15 139:18 |
| **jeopardize** | **kaplan** 46:7 | 31:16 33:6 | 144:14 145:24 |
| 75:21 117:10 | **keep** 23:18 | 36:2 37:11 | 147:15,19,25 |
| 118:3 | 24:11,22 25:1 | 38:11,13 39:12 | 150:3,7,11 |
| **jessica** 45:8 | 27:8 37:19 | 39:16 40:10,19 | 151:11 152:11 |
| 60:8 157:19 | 48:11 90:13,16 | 43:14 45:16,23 | 152:14,15,21 |
| **jew** 143:16,17 | 144:7 178:22 | 46:25 49:4 | 152:25 153:1 |
| **jewish** 69:21,22 | 179:2 | 51:24 52:6 | 154:20 155:6,8 |
| 70:18 92:19 | | 54:18 56:23 | 155:16,20 |

Exhibit A

160:15,17
161:4 162:4
164:12 173:4
173:14 174:13
176:16 178:8
179:5 183:3
184:18 187:21
**knowing**
124:18
**knowledge**
33:8 51:20
53:2 54:3 57:1
58:17 63:15,19
63:25 64:5
67:22 69:25
70:8,20 71:2
72:1,10,20
73:3,7,11,14,18
73:21 74:1
101:13 102:12
105:1,4 113:13
114:1 117:14
117:18 118:6
131:6 142:3
145:17 146:8
147:22 152:9
152:12,16
155:10,17
156:1 173:10
173:15,18,22
174:2,9,22
175:25 176:11
176:17,18
177:22

**knows** 117:23

**l**

**l** 187:15 189:17
**lacks** 14:25
**lamb** 139:22,24
**landed** 108:13
**language** 58:7
58:9 188:5
**large** 137:11
138:6
**largest** 167:1
**law** 16:20,25
17:1,4,7,10
42:8 44:15
51:5 56:10
57:9 58:15,18
58:20 59:8,13
59:19 73:22
74:2 117:1
120:13 126:12
130:9 143:21
144:10,25
145:1,5,12
152:12,17,24
159:12 160:10
161:1 165:19
165:25
**lawsuit** 9:6,9
**lead** 41:14
119:17 135:12
**leader** 20:17
**leadership**
106:14

**leading** 34:11
186:22
**leads** 101:24
**learn** 17:20
29:25 30:1
55:1 133:7
140:12 144:8
155:14,15
**learned** 172:3
**learning** 70:3
173:4
**leave** 48:4
112:2
**led** 33:10 91:11
91:21 92:3
94:19 95:1,11
96:5 116:8,8
122:10 126:12
161:12
**legal** 1:15
17:13,25 18:19
21:24 36:3
48:18,24 82:16
82:22 83:11
85:20 88:24
89:19 100:13
108:5 126:1
135:21,23
137:1 147:13
147:16 158:16
166:14 172:1,4
179:15 181:16
186:3 188:10
188:11,14

189:1 191:1
194:1
**legally** 108:6
**legs** 27:10
**lens** 77:25
147:16
**leo** 173:16
**letter** 104:3,7
104:10,22
107:24 115:7
116:2 128:10
142:1,23,24
143:9,13,20
161:17 175:5
176:20,21
180:12,13,21
181:4 191:19
**letterhead**
180:12
**letters** 103:20
103:23,24
131:17,21
177:1
**letting** 87:7
151:11
**level** 10:25 11:2
11:5,21,25
12:2 13:21,24
14:5 15:21
23:24 24:1,18
30:23,25 32:16
41:20,21 77:11
99:11,13,18
100:20,23

Exhibit A

**[level - mark]** Page 26

104:4,7,11
122:17 127:24
130:12 164:4,5
176:21
**leverage** 18:17
21:9 167:25
**leveraging**
21:14 22:11
**life** 9:15,17,20
10:4 99:4
100:15 115:3
155:5 167:3
169:10
**light** 59:8
**likely** 44:8
97:16 165:10
**limitation** 66:6
**limited** 60:21
65:18,21 66:4
66:8,11
**line** 3:9,9 84:4
84:4,5,12
102:2 105:19
106:2,7 115:3
115:23 191:13
193:7 194:3
**lines** 77:7
**listed** 163:5
193:7,17
**listen** 118:16
**listening** 77:23
**listing** 182:23
193:7

**litigation** 8:13
**little** 84:24
151:1
**live** 77:13,15
123:10
**local** 154:10
**located** 76:3
**location** 1:15
**logs** 178:18
180:1
**long** 6:5,19
7:20 9:16
11:13 12:16
27:25 53:19
76:6 78:24
119:15 171:5
**longer** 34:12,23
34:25 84:19,21
106:10,11
129:14 183:11
**look** 20:20
27:13 35:3
46:21 59:13
180:4 188:3
**looked** 156:12
**looking** 8:9
85:7,13 147:10
179:13
**loop** 119:4
**lost** 29:8
**lot** 42:14
118:16 133:16
133:17,17
171:14

**lunch** 84:17
87:5

**m**

**ma'am** 52:19
**madam** 191:10
**made** 13:19,23
14:19 15:9
16:4 17:12
23:20 24:8
25:17,20 53:13
54:13 64:2,8
65:15 73:11,23
74:3 89:23
95:23 99:4,8
100:9,19 101:8
102:3 104:24
109:21 115:12
119:24 123:15
144:6 148:9
153:4 154:11
160:25 171:2
171:13,17
179:9 185:22
186:2,20
190:11 192:7
**maintain**
178:18
**maintains**
28:13
**major** 174:23
**make** 6:2 14:15
17:18 18:15
19:3 20:2,3

22:12,13 23:24
24:25 45:14
59:6 75:21
79:11 87:8
100:4 108:5
109:10,25
117:9,25 118:1
118:2 134:21
151:19 152:15
153:6 154:20
155:18 171:20
171:22 172:2,7
186:14
**making** 14:6
20:4 30:17,21
76:12 89:24
90:1,4 122:4
124:9,17
137:23 158:16
185:21 187:17
**mall** 57:8
**management**
155:4
**managing**
178:14
**manner** 23:3
**march** 36:21
37:3,20 38:3
53:17,20 54:7
156:7 157:20
172:17
**mark** 27:20
60:5 102:24
105:10 112:23

Exhibit A

**[mark - middle]** Page 27

139:15 140:23
142:12 146:23
157:6,10
162:12 178:5
180:10 181:23
182:16 184:12
**marked** 27:5
46:1 47:21
60:2 61:9
102:21 105:7
112:20 139:12
140:20 142:9
149:9 157:3
162:9 178:2
180:7 181:20
181:25 182:13
184:9
**marketing**
106:13
**marking** 27:11
46:4 149:12
**markup** 27:19
**material** 49:20
85:2,9
**materials** 8:9
8:14
**matter** 25:23
48:3 82:10
88:22 89:20
**mean** 8:15
14:24 17:5
22:9 29:7
37:17 43:22,22
77:20 79:4

84:16,25 86:16
92:20 119:13
122:14 188:12
**meaning** 24:6
44:5 67:3
121:5
**means** 11:10
12:14 13:7
15:23 24:22
35:23 119:11
**meant** 110:13
136:9
**measure**
107:15 168:14
**measures** 65:22
**mechanisms**
165:5
**media** 37:16
38:23 49:12
53:24 63:12
67:8,17 68:9
68:19 69:1
78:20 99:16
117:12 119:22
120:23 130:7
130:21 138:17
143:15 159:13
170:7
**medications**
7:2
**meet** 7:15,17
11:9,11,12
12:8,10,13
107:9 112:5

172:15,23
**meeting** 7:8,11
103:17 110:24
111:4,7 112:8
112:9 148:6,16
148:18,25
149:7 161:25
162:5,17,20,21
162:25 163:4
169:18 170:2
170:22 171:3,8
171:20 172:5
**meetings** 7:20
11:5,13 12:6
12:16,19
111:17 172:19
172:19,21
173:8
**melissa** 1:12
3:2 5:1,11 60:9
105:13 139:18
142:16 149:15
157:9 191:8
192:4,9 193:4
193:13 194:20
**member** 43:1,2
69:7 77:1 78:4
140:9 151:24
158:20
**members** 36:3
38:11 42:17
70:6 71:24
72:7,14 77:2
78:5 80:22

81:13 94:8
128:14 129:19
130:10,25
137:2 157:2
169:6
**memory** 162:5
**mention** 78:11
92:2 95:8
128:13 129:18
**mentioned** 8:14
8:23 39:18
53:16 87:13
88:24 95:8,9
106:22 120:20
130:22 144:20
146:15 161:25
**mentions** 78:16
78:18 91:19
143:20 188:23
**message** 77:10
88:2 93:25
124:5 142:17
142:23 156:5,9
161:21
**messages**
141:12,19
186:8
**messaging**
38:22 77:14
153:18
**met** 7:13 120:9
**middle** 147:1
188:22

Exhibit A

**midstream**
154:1
**midwest**
191:17 194:1
**million** 77:8
90:10 93:4
97:22 98:5,14
124:18 137:14
**mind** 15:16
16:21 20:8
30:19 34:17
96:20 171:3,17
172:8
**mine** 46:12
**minimum**
188:4,17,25
**minute** 48:1
112:13 181:3
185:9
**minutes** 7:21
11:14 12:17
41:3,4 61:23
137:19 177:13
183:22
**misleading**
104:11
**misstating**
49:16 87:16
**mitchell** 83:23
89:2 164:4
**mitchell's**
164:11
**moll** 56:14,17
56:25 57:14

58:4,11,23
59:23 60:17
63:15,19,23,25
64:5 66:17
106:22 145:20
146:11 158:13
159:22 163:15
**moll's** 145:16
160:9
**moment** 27:13
27:24 144:12
184:17
**monica** 56:14
56:17,25 57:8
57:14,19 60:17
66:17 68:6
69:4,5,6
106:22 142:21
143:5 144:5
145:16 158:13
159:22 163:15
**monitor** 60:23
63:12 67:16
68:9 159:12
**monitoring**
62:18 63:1,8
67:7 69:1
**month** 12:8,8,9
12:25
**morale** 108:6
**morning** 5:5,6
74:10 116:13
**mothers** 141:13
141:19,24

**move** 115:22
134:22 175:18
**moving** 15:25
25:18 115:8
171:21
**muddled**
119:17
**murdered**
92:19
**mutually** 99:20
100:19
**myriad** 128:14
129:19

**n**

**n** 187:15,15
189:17,17,18
**nadia** 164:10
164:11
**name** 5:7,10
82:5,6 87:22
144:6,9 155:8
155:9 173:17
184:24 190:15
191:6 192:3,4
192:15 193:3,4
193:21
**named** 190:5
**names** 81:4
**naomi** 139:22
**narrative** 71:13
77:19 93:24
95:4,10

**nash** 2:13
**nature** 54:1
66:5 69:10
90:9 91:25
111:17 123:19
128:1 130:8
134:12
**necessarily**
20:9,25 36:23
83:5 118:15
125:4 127:1
136:6 179:2
**necessary**
136:15
**need** 18:6 31:15
52:16,18 61:4
85:25 86:10
91:13 108:12
136:5,10,24
162:2 171:24
180:2 189:8
**needed** 167:25
**needing** 15:21
101:14
**neither** 190:12
**never** 75:21
94:13,16 117:9
137:14 154:5
171:11
**new** 106:15
148:15,23
149:4
**newer** 158:20

**news** 78:20
 119:23
**nonviolent**
 118:3
**normally** 6:4
**north** 1:15
**nos** 105:11
 157:3
**notarized**
 191:14
**notary** 190:4
 190:20,20
 191:25 192:10
 192:18 193:15
 193:23 194:23
**notation** 35:16
 35:20
**note** 25:7
 157:13 191:12
**notice** 114:16
 176:23 182:7
**noticed** 46:12
**notification**
 103:12,15
 113:4
**notified** 164:16
**notify** 18:10
**notion** 78:7
**notorious** 87:7
**november** 1:14
 36:16 38:2,9
 39:1,19 40:25
 44:14 49:9,25
 51:7,18,23

52:1,25 53:5,9
53:10,14 54:6
55:5 107:11,21
107:25 108:15
108:22 109:20
144:4,20,23
145:8 149:21
150:3 181:14
183:1 190:15
**number** 19:15
 19:17,18 103:1
 130:9 131:11
 138:6 142:25
 157:15 169:24
 182:17,19
 191:7,13
**numbered** 60:6
 140:25 142:13
 149:13 157:11
 162:13 178:6
 180:11
**numbers** 29:6
 193:7

**o**

**o** 187:15
 189:17
**oath** 5:24
**object** 47:17
 48:20 49:1
 93:8 108:4
 109:1 128:21
 135:20 153:24
 160:12 170:15

**objection** 32:1
 33:3 43:21
 44:25 49:19
 50:3,14 52:7
 82:24 123:2
 125:25 175:13
 181:15 185:24
 186:22
**objections**
 160:22 190:11
**obligation**
 61:17 135:22
 166:11,14,24
**obtain** 73:14,15
**obtaining**
 82:22 85:20
**obvious** 119:16
 188:13
**occasionally**
 11:12
**occur** 58:6
 63:17 92:22
 93:1 97:20
 98:1 123:21
 133:13 163:4
 165:16
**occurred** 35:13
 51:17 101:20
 127:21 160:10
 166:1
**occurrence**
 38:2 44:13
**occurring**
 162:21

**offer** 34:3,9
**offered** 86:16
**office** 1:15 2:9
 30:1,13 36:3,7
 43:2 62:23
 82:16 106:19
 106:21 133:12
 146:16 155:4
 164:11,12
 186:3 188:15
 188:24
**officer** 49:10,25
 56:22,25 57:3
 150:9,11,13
**officers** 17:8
**offices** 82:17
**official** 18:25
 48:7,8,9 182:6
 184:15 192:15
 193:21
**officials** 79:1,2
 79:14,15,21
 121:18,18
 174:4,10
**oftentimes**
 11:11 32:15
**oh** 37:23 39:5,8
 46:9 48:8
 58:21 66:16
 70:2 91:9
 101:18 103:5
 119:13 163:9
 169:22 173:14
 187:20

Exhibit A

**ohio** 1:2,15 2:3
2:5,9,13 5:8
9:13 23:23
64:11 68:7
69:19,23 71:6
71:21 77:7,17
105:21 106:7
106:16 144:7
159:24 168:20
174:23 179:14
180:12 182:5
182:23 183:19
190:1,4 191:2
**ohioago.gov**
2:10,10,11
**okay** 8:5,11,22
10:20 14:23
20:21 25:12
29:18 38:25
45:24 50:13
52:13 61:2,8
64:16 66:1
71:14 74:14
78:15 83:14
85:10 86:4
87:1 93:18
96:25 99:17
100:1 104:1,20
113:25 115:14
115:24 121:14
126:3,7 142:8
146:13 151:19
158:24 162:8
163:15 170:2

176:1 180:6
183:21 185:5
187:17 188:12
189:15
**once** 5:16 12:8
12:8,25 33:23
34:1 35:15,19
**ones** 9:10 175:4
**ongoing** 95:4,9
130:8 147:3
169:5
**online** 54:13
78:15
**opinions** 58:1
**opportunities**
177:11
**opportunity**
15:2 25:14
29:25 30:4,7
31:1,8,9
104:14 168:16
177:3,10,19
**opposed** 98:12
**opposing** 61:17
**order** 73:15,16
73:19 79:23
81:11 99:23
159:14 189:7
**ordered** 29:2
**organization**
24:4 70:1,21
71:5,10,16
143:10

**organizations**
5:20 10:9
71:15 72:5,12
**organized** 27:9
**ori** 140:10,12
**osu** 1:15 4:5,6,6
4:7,7,8,8,9,9,10
4:11,11,12,13
4:14,14,15,16
4:17,17,20,20
12:4 16:2
28:13 35:23
39:18,24 42:7
47:5 51:20,21
53:7,13 54:21
56:18 57:5
58:14,18 59:12
60:6 62:9,14
62:18 63:7,11
64:6 65:14
67:11,15,20
69:16,18,25
70:4,8,11,23
71:2,11,15
72:1,10,11
77:2 78:5,11
78:17,18 80:2
80:15 81:1,8
98:25 103:1,2
105:11 107:2
112:24 117:19
118:7 120:14
130:17,19
131:11,13,16

131:22 132:14
133:2,19,22
136:21 138:6
139:2,16,24
140:25 141:12
141:18 142:3
142:13,18,25
145:19 146:9
146:17 149:13
149:17 151:24
155:17,18
157:7,12,16
159:10 161:1
162:13 169:1
173:10,15,18
173:22 174:2,9
176:12,23
178:6 180:11
184:13 185:2
**osu's** 58:6 63:1
63:17 69:2
72:17,21 76:16
156:6 183:13
**osu.edu** 2:15
**osupd** 17:17,25
18:17,25 19:6
19:9,11 38:11
38:18 39:1,3
39:17,21,23
40:1,14 44:16
49:10,25 56:14
58:19,22 59:15
59:19 68:21,25
108:23 109:24

Exhibit A

109:25 136:25
144:3 145:7
147:5 148:2,23
150:7
**osupd's**  68:10
68:14 69:6
159:24
**outcome**  24:7,8
24:9 32:22
190:13
**outline**  168:18
**outlined**  34:19
34:20 161:17
175:4
**outlines**  145:4
**outreach**  36:16
39:17 63:2
143:25 144:1,5
145:17 153:8
**outstanding**
179:24
**overall**  161:14
**override**  14:14
14:18 15:8
**oversee**  10:13
**oversight**  10:5
**overstep**
147:12
**own**  8:7 20:5
95:24 107:10
126:15 133:23

**p**

**p.m.**  148:6
162:18,20,24
188:8 189:20
**page**  3:2,9,9 4:2
46:13 49:6,7
60:12,15 68:3
104:20 113:7
114:23 140:6
142:22 147:1,2
157:23 159:18
159:22 169:1,2
169:24 183:9
183:14,17
191:13,15
193:7 194:3
**pages**  103:14
103:16 104:4
117:12 162:4
**pam**  173:19
**paperwork**
48:11
**paragraph**
128:13 129:18
144:13,16
159:21 188:22
**paraphrase**
135:10
**parents**  81:12
131:13,17,18
131:21 132:3
136:20

**park**  2:4
**parkinson**
106:6
**part**  16:11
25:25 27:1
30:10 57:7
78:1 107:4
114:17 116:8
148:20 151:13
155:23 160:14
167:14,18
169:4 183:15
187:7 188:20
193:9
**participation**
111:20 120:12
**particular**  12:9
16:6,9 17:18
18:2,21 21:10
21:18,20 24:20
25:3 30:2
42:15 57:25
76:16 77:4
83:20 85:17
94:8,11 111:12
111:21 122:16
122:18 132:13
132:20,21
134:14 138:21
167:6,25
**particularly**
15:25 118:14
133:8 134:10

**partnering**
42:14
**partnership**
42:17
**parts**  189:8
**party**  190:13
**path**  99:23
**pathway**  25:18
**pattern**  107:13
**pause**  30:9
99:24 124:15
**pay**  68:18
118:16
**pd**  154:10,11
**pending**  6:19
46:21,24 65:3
**pennsylvania**
59:17 76:6
**people**  77:15
92:19 93:4,24
118:1 124:18
131:12 132:17
157:20 163:5,7
163:10
**perceived**  78:9
122:17 136:4
**percent**  38:23
43:17
**period**  117:12
**permission**
165:14 186:25
**perry**  153:4
166:5

Exhibit A

**person** 10:22
10:23,25 11:9
11:11 12:13,15
13:6,21,24
20:1,3 34:20
41:16 43:8,9
49:11 62:22
68:15 115:9
130:22 132:13
133:12 142:5
149:20
**personal**
111:16 130:20
**personally**
15:14,18 16:4
37:14 124:3,10
125:3 170:23
192:11 193:15
**personnel**
142:18
**perspective**
14:8 15:3,22
89:10,11 95:14
96:2 118:20
148:12 158:23
168:5
**pertain** 172:20
**pertained**
137:8
**pertaining**
143:14
**petition** 8:18
8:19 33:25
34:8,18 35:7

129:11,13
168:18,21
180:22 181:2,9
**phone** 13:10
186:5 191:3
**phrase** 152:22
**physically**
59:18 76:3
**piece** 156:25
166:3 186:16
**pieces** 107:23
166:7
**pinpoint**
171:16
**place** 34:12
35:12 44:14
70:18 85:21
162:1 164:25
165:1 190:8
**placed** 35:16,20
**plaintiff** 1:7 2:2
5:8
**plaintiff's** 4:2
27:5,11 46:1,4
60:2,5 102:21
102:25 105:7
105:10 112:20
112:23 139:12
139:15 140:20
140:23 142:9
149:9,12 157:3
157:6 162:9,12
178:2 180:7
181:20 182:13

184:9
**planning**
105:25 120:1,5
158:8
**plans** 76:16
87:4
**platform** 118:3
**play** 23:15
34:23 96:19
121:9 151:3
156:9
**played** 23:17
110:10
**playing** 50:20
**plead** 132:25
**please** 5:9 6:13
23:1 26:16
27:24 33:5
34:13 35:18
60:12 63:3
64:23 65:2
82:11 87:16
99:12 104:20
114:10 127:14
129:25 144:11
153:22 191:11
191:11
**podcast** 120:25
**point** 25:5 49:8
57:3 71:12
81:16 110:5,23
111:24 166:22
171:17,25
172:7 189:12

**points** 153:9
**poisonous**
50:21
**police** 42:7 43:7
51:21 53:7,13
56:22,25 57:2
57:5 59:12
72:11 107:2
120:11 126:12
126:20 127:3,7
127:13,18,22
127:24 128:2
149:17 151:24
155:18 156:2
165:21
**pop** 118:14
**portion** 48:14
48:17 99:14
145:9
**portions** 188:1
**pose** 31:22
**posed** 35:8
136:22 161:7
**poses** 133:21
169:14
**position** 9:16
9:18,24 19:5,8
75:22 87:2
117:10
**positioning**
122:1
**possible** 6:13
72:24 134:5
177:24

Exhibit A

**[possibly - process]** Page 33

| | | | |
|---|---|---|---|
| **possibly** 87:14 | **presented** | **principal** 24:16 | **privileged** |
| **post** 78:15 | 167:7 | **prior** 36:10,12 | 47:18 49:20 |
| 107:8 109:23 | **preside** 57:5 | 37:10,22,25 | 50:5,10,18 |
| 110:3 116:7,7 | **president** 2:14 | 40:22 43:10,18 | 61:3,9,10,13,14 |
| 170:7,8 | 9:15,17,19,20 | 54:10 59:3 | 61:16 83:11 |
| **posted** 55:21 | 10:4,17 12:5,7 | 62:18 63:1,9 | 85:16 86:7 |
| 55:23,25 74:21 | 12:20 13:2,8 | 74:12,19,25 | 188:9 |
| 75:19 116:13 | 13:15 14:13,13 | 75:17 78:22,25 | **privy** 100:22 |
| 117:7,22 124:5 | 14:21,23,24 | 79:9,13,21,25 | **pro** 70:1,21 |
| 174:14 | 15:2 23:14 | 81:9,19 88:23 | 71:10,17 |
| **posting** 108:25 | 24:11 25:13,22 | 89:21 90:20 | **proactively** |
| **posts** 53:24 | 30:24 56:19,21 | 96:8 101:16 | 68:8 |
| 54:13 55:1 | 89:25 90:1,13 | 102:13 107:11 | **probably** 5:21 |
| 60:22 63:12 | 99:4 100:15 | 115:21 116:11 | 11:8 15:4 |
| 65:19 95:23 | 105:20,24 | 116:16,21 | 19:21 24:18 |
| 128:16 129:21 | 106:3,7,19,21 | 118:7 119:21 | 36:4 178:1 |
| 130:21 138:17 | 106:23 115:2 | 121:16 122:9 | **procedure** |
| 138:24 | 158:6,7 167:2 | 122:23 123:13 | 192:5 193:5 |
| **potential** 24:20 | 169:10 172:12 | 123:25 138:14 | **procedures** |
| 95:14 99:25 | 172:15,23 | 148:10 159:10 | 164:24 165:2,3 |
| 104:24 169:7 | 173:3 185:17 | 159:15 160:11 | **proceed** 19:4 |
| 171:10 | 185:20 186:6 | 161:2 167:7 | 27:15,23 103:9 |
| **precautionary** | 186:24 | 168:7 172:12 | 113:1 139:19 |
| 107:15 | **presides** 57:3 | 173:8,12 | 184:19 |
| **precise** 128:22 | **presumably** | 175:23 176:8 | **proceedings** |
| **prep** 8:4 | 28:1 69:12 | 177:4,19 190:6 | 36:9 40:18,21 |
| **prepare** 7:6 | 104:10 | **privilege** 47:20 | 40:24 41:14 |
| 8:24 9:3 | **primarily** | 48:14 50:22 | 43:19 |
| **presence** | 42:24 127:23 | 51:1 83:3,6 | **process** 22:2 |
| 169:13 177:5 | 153:20 155:14 | 86:2,23 170:16 | 23:6 26:5 |
| 177:21 | 155:15 | 187:18 188:2 | 32:13,22 33:1 |
| **present** 78:10 | **primary** 83:25 | 188:18 189:7,9 | 100:3 111:13 |
| 109:9 136:17 | 96:23 130:3 | 189:12 | 129:3,4,5,6 |
| 189:11 | 153:18 | | 136:7 165:12 |

[process - quote]                                                              Page 34

170:11,19
172:16
**produced**
180:2
**production**
191:15,17,22
**proficient**
136:24
**program** 9:2
**prohibited** 77:6
99:14,15
**prominently**
47:22
**promise** 124:10
**promoted** 9:21
**promoting** 82:2
**prompted**
118:24
**pronounce**
163:13
**pronouncing**
45:9
**property**
169:16
**proposed** 13:20
**protect** 86:1
130:4
**protected** 84:5
89:16
**protection**
73:15
**protest** 42:15
**protests** 137:7
137:12

**provide** 10:4
18:17 26:14,19
31:7 69:20,22
168:16 171:7
177:11
**provided** 34:21
61:15 98:25
148:11 173:9
**provides** 30:4
**provision** 21:19
21:21 85:17
115:4,15,18
166:23 167:6
167:11
**provost** 89:25
90:4,16 105:21
173:4
**prudent** 166:12
**public** 56:17,19
56:21 57:4,7
62:23 66:18
67:7,12,16,23
79:1,14,21
80:2,15 86:21
90:9 106:24
121:17 137:3
158:10 190:4
190:20 192:10
192:18 193:15
193:23 194:23
**publically** 97:8
122:25
**publication**
182:6

**published** 76:4
183:13
**purpose** 19:24
20:8,10 27:6
29:22 30:10
46:2 60:3
102:22 105:8
112:21 139:13
140:21 142:10
149:10 157:4
162:10 178:3
180:8 181:21
182:14 184:10
**purposes** 47:3
48:18 55:12
82:21 85:19
**pursuant** 33:22
**pursued** 24:6
**put** 35:12 104:6
**putting** 122:1

**q**

**question** 6:12
6:15,19,20,21
15:16 16:21
18:12 22:25
23:5 26:16
32:2,6 37:21
38:4,7 39:7
44:2 45:1
46:22,24 47:6
47:8 48:19
49:2,15,21
50:8,16 51:10

51:12 52:10,11
52:12 56:9
60:24 63:3,5
65:3,8 82:13
83:12 93:12,19
108:9 109:11
116:10 119:12
119:19 129:17
132:15,17
135:2,13,21,24
153:22,25
158:17 175:7
181:18
**questioned**
94:17
**questioning**
85:22
**questions** 5:24
5:25 6:6,24 7:4
44:1 47:24
48:25 94:21
111:22 119:16
179:16 185:6,8
185:8,16 187:3
187:22
**quickly** 136:6
136:10
**quit** 138:15,16
**quite** 173:7
**quote** 30:8,9
75:19,20
104:23,25
107:5,16 117:8
117:8,23 118:4

Exhibit A

**[quote - recall]**

123:5 128:14
129:19,23
140:6,12
154:10 169:4

**r**

**r** 187:16
**raised** 30:3,6
53:22,22
109:24 156:15
**raising** 156:13
**rand** 142:5
**rarely** 13:13
**rather** 113:7
133:23
**rationale**
127:19 151:16
156:19,21,21
**ravi** 105:19
**reach** 17:12
19:10 91:6
109:25 150:22
**reached** 38:11
38:18 39:20
85:21 89:3
99:21 108:23
140:11 151:19
**reaches** 77:6
**reaching** 13:15
100:23
**reaction** 56:4
**read** 9:5,8 44:1
44:2 51:11,13
52:22,23 63:4

63:6 65:10
68:4,11 78:20
82:12,14 84:6
84:8 93:12,14
104:21 107:4
107:16 119:22
126:10 128:5,7
131:25 132:1,6
134:1 135:3,4
140:5,13
144:12 153:21
153:23 168:6,8
181:3 185:6
187:4 192:5,6
192:12 193:5,6
193:17
**readily** 30:16
30:21 134:16
135:14 136:17
**reading** 49:9
191:19
**ready** 27:15,23
28:4 98:22,23
103:8,10
112:25 113:2
139:19,20
144:15 184:18
184:20
**real** 78:9
**realizing**
116:25
**really** 10:6
42:19 95:24
149:1

**reason** 21:8,13
21:22 22:7
23:9 26:23
28:16 37:19
62:25 66:13
73:5,9 76:8,15
76:25 78:2
84:10 88:8
101:4 105:2
108:15,18
109:10,14,17
114:8,9,12,13
127:6 137:10
139:1 143:4
152:23 159:3
161:3 178:10
182:9 183:2,4
183:10 191:14
193:8 194:3
**reasonable**
99:5 100:16
**reasonably**
134:5
**reasoning**
25:20 27:1
113:16,19
145:9 151:13
**reasons** 26:9
27:2 107:22
143:22 144:16
170:24
**rebuttal** 185:8
**recall** 16:6,9
36:11,21 40:11

40:16 44:3,5,6
44:7,11,18,20
44:22,23 45:3
45:5 52:24
53:20,21 54:5
54:16 56:3,13
58:7,16 59:9
59:23 62:12,13
62:16,20 64:18
66:17,20,24
67:1,2,6,9 74:8
74:17 78:24
79:17,23 80:18
80:25 81:2,4
81:21,23,24
82:4,6 83:17
87:22 88:1,3,6
88:8,11,17,20
90:1,4,22 92:1
96:9 103:22
104:2,3,19
108:21 109:11
116:15 117:4
117:13 118:11
119:5 120:4,7
120:19 121:2
123:18 125:9
126:18,19
127:2,20 131:9
132:20 137:9
143:17 144:6
148:17,21
149:6,24 150:5
155:9 156:7

159:14 160:6
162:1,3,20,21
162:23 163:8,9
163:15,17,18
163:19,24
164:1,3,7,12,21
174:15 182:2
184:7 185:4
**receipt** 191:18
**receive** 21:4
73:22 74:2
103:24 122:9
138:10 185:1
**received** 20:4
54:23 80:1,14
81:1 88:1
104:23 131:11
132:18,21
141:18 142:25
161:15,19
167:9 177:2
**receives** 133:19
**receiving** 49:11
88:2,18 97:23
139:9
**recent** 60:7
87:19 105:12
105:15 107:6,8
139:17 142:15
148:4 149:14
157:8,16 184:5
**recipients**
132:12

**recognizing**
20:6
**recollection**
53:25 60:25
61:1 68:20
74:9,19 75:17
78:13,14 88:14
109:22 161:18
184:25
**recommend**
170:12
**recommendat...**
25:19 101:10
188:16,17
189:1
**recommendat...**
144:5
**record** 5:10
37:25 47:4
51:13 52:23
61:5,7 63:6
65:10 79:12
82:14 84:8
85:3 87:4
93:14 102:19
126:8,10 128:7
132:1 134:1
135:4 153:23
168:8 179:24
187:10,11
190:10 193:9
**record's** 187:12
**recorded** 5:25
76:4

**redacted**
187:21 189:14
**redactions**
61:11
**redundant**
130:16
**reenrollment**
35:7
**refer** 55:9
**reference** 55:8
191:7 192:2
193:2
**referenced**
192:11 193:15
**referred** 9:10
163:1
**referring** 8:19
39:21 68:2
75:13 90:8
95:17 99:11
118:21 119:2
143:24 154:15
163:12 169:24
170:8 184:22
**refers** 155:7
160:3
**refrain** 64:23
65:2
**refresher** 5:22
**refreshes** 162:5
**regarding**
14:19 53:23
59:19 87:13,15
87:20 88:19

103:17 116:5
122:16 150:20
154:12,16
162:17,22
179:19,21
**registrar** 182:5
182:23
**registrar's** 36:7
**regular** 11:4
12:6,18 23:21
172:20
**regularly** 42:9
**rejected** 181:2
181:9
**related** 5:19
26:6 179:11
190:13
**relating** 9:9
24:13 38:8
182:24
**relative** 8:10,15
53:24 94:22
148:13,16
158:22
**relevant** 30:15
30:20 136:14
148:23 154:17
**relying** 183:12
**remained**
165:11
**remember** 37:5
39:5 44:10
54:2,19 56:14
57:11 81:11,17

Exhibit A

**[remember - returned]** Page 37

| | | | |
|---|---|---|---|
| 81:18 88:2 | **reporter** 192:7 | **requests** 155:1 | 134:14 139:5 |
| 91:14,15 96:11 | **reporting** | 179:25 | 139:11 145:6 |
| 109:2,3 110:4 | 120:8 127:2 | **require** 23:24 | 145:24 151:20 |
| 120:1,10,25 | **reports** 11:21 | 167:21 | 168:21,22 |
| 144:9 148:17 | 11:25 12:2 | **required** 108:7 | 180:21 |
| 164:5 175:14 | 30:24 78:20,23 | 166:10,11 | **responses** |
| 175:15 184:23 | 102:11 119:22 | 191:25 | 149:3 |
| **remote** 112:8 | 158:10,13 | **requirement** | **responsibilities** |
| **remotely** 112:5 | 161:20 185:1 | 35:10 166:20 | 10:2 167:1 |
| **renker** 155:2 | **represent** 5:8 | **requires** 32:16 | **responsibility** |
| **repeat** 16:8 | 71:14 157:21 | **rescinded** 4:18 | 18:21 19:2 |
| 18:12 22:25 | 160:24 178:9 | 181:13,25 | 130:3 167:14 |
| 26:16 32:5 | 180:17 182:4 | **rescission** | **responsible** |
| 34:13 47:8 | 182:22 | 182:9,25 | 13:22 |
| 51:10 63:3 | **representation** | **resistance** | **responsive** 18:5 |
| 64:4 65:8,9 | 172:4 | 91:17,18,19,24 | 31:10 77:14,18 |
| 73:25 82:11 | **representing** | 92:3,6,10 94:6 | 77:20 151:2,5 |
| 91:1 114:10 | 2:2,7 | 94:24 95:8 | 151:10 180:1 |
| 126:9 127:14 | **request** 16:19 | 107:10 122:19 | **responsiveness** |
| 133:25 | 16:24 17:3,7 | 124:14 | 136:9 |
| **repeating** | 17:18,21 18:21 | **respect** 135:1 | **restating** 38:7 |
| 15:16 16:21 | 19:2,6,9 57:12 | 147:8 | **restraining** |
| 30:19 | 59:19 63:19 | **respond** 19:6,9 | 73:16 |
| **rephrase** 6:14 | 69:2,7 127:22 | 39:18 63:21 | **restrictions** |
| 47:9 | 158:15 193:9 | 136:5,10 153:8 | 33:15 164:19 |
| **report** 10:19 | 193:11 | 186:10 | **result** 54:4 |
| 11:2 40:1,4,9 | **requested** | **responded** | 72:18,21 139:3 |
| 40:12 49:11 | 19:11 41:18 | 131:22 146:2 | **resulted** 43:20 |
| 67:23 68:9 | 56:7,15 57:15 | 151:14,17 | **retained** 4:22 |
| 83:21 150:20 | 57:21 58:22 | **response** 16:20 | **return** 98:19 |
| 152:3 | 59:10 68:24 | 16:24 17:3,6 | 114:21 129:9 |
| **reported** | 107:14 144:7 | 18:3 21:18 | 168:20 |
| 127:13,18 | 153:12 165:13 | 22:15 39:23 | **returned** |
| | | 109:12 118:17 | 164:17 191:18 |

**[review - s]** Page 38

| | | | |
|---|---|---|---|
| **review** 8:8,23 | 188:6 | **role** 10:2 13:17 | 82:24 83:4,10 |
| 25:14 30:15,20 | **rights** 146:16 | 14:2,7 23:14 | 84:15,18 85:6 |
| 31:1 47:23 | **riot** 17:23 | 23:17 41:11,15 | 85:11,24 86:5 |
| 83:24 104:14 | **rises** 14:5 15:20 | 68:17 69:20 | 86:9,13,18 |
| 107:6 113:9 | **risk** 21:10,16 | 106:9 110:10 | 87:1,3 93:8,15 |
| 135:15,16 | 26:6 31:22 | 121:10 130:3 | 93:18 108:4 |
| 136:13 147:3 | 32:10 34:25 | 150:12 151:3 | 109:1 112:14 |
| 162:3 167:22 | 35:8 95:6 | 156:9 158:9 | 112:17 119:11 |
| 184:17 191:12 | 124:7 133:21 | 185:17,20 | 123:2,5,10 |
| 192:1 193:1 | 134:15 136:22 | **room** 48:4 | 125:25 126:3,7 |
| **reviewed** 33:24 | 155:3 169:14 | **roommate** | 128:21 135:19 |
| 103:20,22,23 | 177:6,21 | 155:6,12,19,22 | 137:16,18,22 |
| 113:11 134:19 | **ritchie** 74:22 | **roommate's** | 153:24 160:12 |
| 147:16 181:6 | 116:4,6,20 | 155:8 | 160:20 170:15 |
| **reviewing** | **rodriguez** | **row** 185:12 | 175:13 176:1 |
| 40:11 77:3 | 55:12,15 56:5 | **rude** 119:14 | 177:14 180:4 |
| 83:20 89:8 | 66:15 70:3 | **rule** 4:19 24:16 | 181:15 185:7 |
| 104:3 | 72:8 76:4 77:1 | 115:15 182:17 | 185:11,15 |
| **revisit** 138:2 | 78:3,12 79:5 | 182:19,24 | 186:1,4 187:2 |
| **rhetoric** 122:16 | 79:16,17 80:3 | **rules** 26:13,18 | 187:5,12,19 |
| **right** 5:21 | 80:4,5,12,15 | 182:7 192:5 | 188:3 189:4,13 |
| 11:20 13:1 | 81:9 82:8 89:1 | 193:5 | 189:16 191:5 |
| 26:3,9 29:3 | 90:25 91:4 | **runs** 111:12 | **ryan** 10:25 |
| 41:6 48:22 | 92:13 94:17 | **rustico** 2:9 3:6 | 11:21 13:21,24 |
| 49:6 51:2 62:7 | 95:19 96:10 | 27:25 28:24 | 30:23,25 41:20 |
| 80:11 85:15,24 | 97:15 98:11 | 32:1 33:3 41:2 | 99:10,11,13,17 |
| 86:6,18 96:7 | 102:4,6 118:10 | 43:21 44:25 | 100:20 101:1 |
| 98:17 105:5 | 122:11 123:23 | 46:9,11,16,20 | 103:24 164:4,5 |
| 112:17 131:2 | 124:2 130:11 | 46:25 47:14,17 | |
| 132:20 146:5 | 137:8 150:16 | 48:12,21,25 | **s** |
| 147:2 159:17 | 153:16 159:7 | 49:4,19 50:3,8 | **s** 187:16,16 |
| 160:24 161:24 | 172:25 175:22 | 50:13,16,23 | 189:18 191:15 |
| 175:18 183:25 | 176:4,7 179:21 | 52:7,13,15 | 193:8,8 194:3 |
| 185:5 187:9 | 185:3 | 61:20,22,24 | |

Exhibit A

**safe** 125:10
**safeguards**
165:3,5
**safety** 10:7
16:14 20:5,18
21:11,16 31:23
53:24 56:18,20
56:22 57:4,7
58:2 62:23
66:18 67:7,12
67:16,23 80:20
95:6 106:24
110:22 112:9
130:4,20
133:21 136:22
147:3 158:10
161:8,13
164:24 165:2,2
165:5,18
166:12 167:3
167:16 168:5
168:14,15
169:5,15 177:6
177:21
**sake** 29:19
33:18
**sanction** 73:22
74:2
**sargus** 1:8
**satisfy** 34:17
**saved** 179:3
**saw** 57:21 72:7
121:9

**saying** 50:23
85:25 108:25
121:2 124:20
136:7 161:11
169:24
**says** 60:16,16
99:6 100:14
147:4 154:9,15
159:25 188:21
**scale** 137:11
**scan** 117:11
**schaffer** 150:4
150:6
**schedule** 12:12
**scheduled**
11:14 12:17
110:24 162:18
**scheduling**
103:17
**screen** 124:19
**seal** 190:15
192:15 193:21
**sealed** 3:8
**search** 73:7
**second** 46:20
49:7 114:23
128:13 129:18
188:7
**secretary** 45:10
**section** 28:20
29:14,18,19,23
33:12,17,17,22
33:25 35:6,16
35:20 68:3,5

98:21,21,24
99:3 100:5,14
104:21 114:22
115:1,11,17
140:5 144:13
165:9 166:23
167:18,20
168:11 169:7,9
170:3,14,24
181:12 182:8
183:6
**see** 6:5 18:20
19:1 48:20
49:7 99:5
115:4 120:22
131:18 147:4
154:9 157:25
159:19 160:1
173:3 175:6
189:8
**seeing** 67:9
**seemingly**
118:22
**seems** 103:19
**seen** 28:1 94:16
102:4 120:20
140:25 141:3,6
141:11,21
181:25 182:2
182:20
**sees** 117:23
**semester** 76:10
**semitism** 82:2
141:14,20,25

**senator** 174:17
**send** 186:8
**sending** 94:1
**senior** 2:14,14
9:15,17,18,20
10:3 16:12
20:17 105:24
106:7,18 158:7
167:2 169:9
**sense** 89:9
97:21 98:2
134:11 171:20
**sent** 45:11
88:11 103:21
104:7,15
113:10 116:2
141:12,12
156:6 162:24
180:18
**sentences**
186:11
**separate** 20:22
**separation**
168:2,10
**sequentially**
29:2
**series** 5:23 29:6
**seriously**
171:12
**serrano** 174:17
**serve** 10:3 14:2
123:10
**served** 9:23

[services - sorry] Page 40

services 10:9
session 43:8
set 51:2 62:6
    69:15 105:5
    114:20 140:19
    142:8 143:19
    149:8 158:24
    161:24 164:14
    179:9 181:11
    190:8
sets 13:24
setting 12:18
    14:1 15:7
    21:20 26:13,18
    127:10,15
    141:23
several 28:14
    140:7 143:21
    145:5
shaffer 108:24
share 15:3
    60:20 168:17
shared 54:16
    81:3,15 82:1
    95:13,17,22
    98:16 130:7
    133:9 148:22
    149:6 156:22
    156:24 157:1
    166:8
sharing 188:21
sheet 191:13
    193:7,10,18
    194:1

shivers 1:12 3:2
    5:1,11 27:18
    29:10 41:9
    60:9 62:6,8
    105:13 139:18
    142:16 149:15
    157:9 183:25
    185:17 191:8
    192:4,9 193:4
    193:13 194:20
shooting 54:14
    55:11 74:11
    116:14
shorthand
    190:8
shortly 56:8
shown 7:25 8:4
    8:5 183:5
    191:16
side 41:17,20
    124:19
sided 46:15
    103:3
sign 185:6
    187:4
signature 113:6
    190:18 191:14
signed 192:13
    193:18
significant
    31:22 32:10
    137:6 169:14
signing 191:19

similar 133:9
    141:7,8 143:2
    164:23
simplify 34:15
    115:6
simply 21:21
sincerely
    191:21
singularly
    136:23
sinister 48:10
sir 191:10
sit 44:21 45:6
    62:13 64:20
    65:12 119:5
site 188:20
sites 130:8
situated 111:14
situation 12:22
    16:7,10 22:1
    23:25 25:4
    30:2 32:24
    43:3 52:25
    78:1 89:5
    90:10 99:21
    102:14,17
    107:16 116:24
    121:7 126:20
    134:7 144:2
    150:25 166:4
    167:23 168:1
    174:14
six 9:22 133:14

size 24:3
slightly 84:22
slipped 47:23
smith 11:23,25
    89:3,20 101:15
    103:17 110:25
    111:4 112:4
    126:19 163:19
smith's 112:9
social 37:16
    38:23 49:12
    53:23 63:12
    67:8,17 68:9
    68:19 69:1
    99:16 117:11
    130:7,21
    138:16 143:15
    159:13 170:6,7
software
    179:10
sole 156:18,20
solely 133:2
    136:20 138:5
    138:11
solutions 191:1
    194:1
soon 47:1
sorry 6:3 7:10
    8:3 16:8 20:11
    26:12 34:5
    36:18,22 37:23
    38:15,16 42:11
    46:9,25 61:4
    65:7 79:8,17

[sorry - strike]                                                    Page 41

| | | | |
|---|---|---|---|
| 80:4,6 92:9 | **specifically** | 126:19 132:6 | 193:15 |
| 115:5 116:7 | 8:16 19:2 | 149:21 152:24 | **stated** 65:18 |
| 117:16 119:13 | 59:10,15 66:21 | 153:10 | 66:3 75:19 |
| 121:14 125:15 | 78:4 81:24 | **spoken** 51:16 | 78:6 117:8,23 |
| 128:21 146:6 | 83:23 92:2,25 | 94:13 | **statement** |
| 150:9,19 163:4 | 93:3,6,21 | **spring** 54:25 | 60:25 91:10,12 |
| 169:21 170:10 | 95:19 96:24 | 55:5 | 102:3 105:2 |
| 188:20 | 124:16 147:10 | **stacey** 155:2 | 107:9 123:15 |
| **sort** 34:23 | 148:1 154:19 | **staff** 43:1,2,11 | 124:17 181:1,8 |
| 41:11 43:9 | 166:17 | 68:8 106:4 | 192:13,14 |
| 124:17 147:25 | **specifics** | 109:24 138:15 | 193:19,19 |
| **sound** 180:19 | 164:21 | 174:13,17 | **statements** |
| **sounds** 180:20 | **speculate** 39:13 | **staffers** 54:15 | 72:18,22 73:23 |
| 189:16 | 64:14 65:22,25 | **stand** 187:1 | 74:3 91:10 |
| **southern** 1:2 | 66:2 76:23 | **staple** 46:12 | **states** 1:1 49:9 |
| **spaces** 68:19 | 93:10 155:13 | **start** 34:7 | 159:22 173:23 |
| **speak** 12:20 | 160:13 | 83:14 119:14 | 181:24 182:17 |
| 51:22 152:10 | **speculation** | 165:4 | 182:18 |
| 152:13,17 | 33:3 | **started** 150:18 | **stating** 157:13 |
| 173:11,16,19 | **speculative** | **starting** 104:22 | **stature** 24:4 |
| 173:23 174:3,9 | 32:2,3 45:16 | 122:13 148:8 | **stems** 107:8 |
| **speaking** 6:7,8 | **speech** 84:4,5 | **state** 2:13 5:10 | **steps** 17:14 |
| 24:14 53:9 | 84:12 89:14,16 | 9:13 23:23 | 18:18 |
| 65:2,4 160:21 | 89:16 147:11 | 27:1 47:4 | **stickers** 102:19 |
| **special** 60:18 | 147:24 | 64:11 66:18 | **stickler** 175:6 |
| 165:13 | **speed** 158:21 | 67:3,6,16,22 | **stop** 160:19 |
| **specific** 18:9 | **spend** 42:14 | 68:7,8 69:20 | **stored** 8:24 |
| 26:9 91:12 | **spending** | 69:24 71:6,21 | **stories** 78:21 |
| 107:9 119:5 | 110:13 | 77:7,17 105:21 | 119:23,24 |
| 137:10 141:11 | **spillage** 86:14 | 106:8,16 114:4 | **street** 1:15 |
| 141:23 152:23 | 86:22 | 159:23 168:20 | **strike** 34:5 |
| 158:18 159:3 | **split** 106:12 | 174:23 179:14 | 67:13 98:8 |
| 175:7 | **spoke** 49:10 | 179:23 180:12 | 117:16 122:21 |
| | 68:6,21 89:2 | 190:1,4 192:10 | 141:4 143:11 |

Exhibit A

**[strike - sure]** Page 42

| | | | |
|---|---|---|---|
| 170:20 184:2 | 72:12 77:5 | 131:21 132:5 | **suicidal** 75:20 |
| **student** 4:3 | 81:15,16,20,25 | 133:2 136:20 | 117:8 |
| 9:15,17,20 | 82:5,6 87:15 | 138:6 140:4,7 | **suite** 1:15 2:4 |
| 10:4,6,7,9,11 | 87:19,19,23 | 185:2 | 191:2 |
| 10:17 11:15,16 | 88:7,7 99:4 | **stuff** 158:12 | **summarize** |
| 11:22 13:18 | 100:15 104:23 | **subject** 73:19 | 10:1 13:17 |
| 14:3,8,15,19 | 109:8,14 | 110:17 164:17 | 41:15 |
| 15:14,18 16:5 | 111:13 115:3 | **submit** 129:11 | **sunday** 60:20 |
| 17:22 18:9,10 | 118:25 128:19 | **submitted** 8:13 | 159:25 160:3,3 |
| 18:14,16,22,22 | 129:8 130:2,24 | **subscribed** | 160:7 |
| 20:18,21 21:7 | 133:1,3,11,21 | 190:15 192:10 | **superior** 12:4 |
| 21:13,22 22:6 | 134:6,19 | 193:14 194:21 | 191:1 |
| 22:14,16,18 | 135:17 136:16 | **subsequent** | **supersede** |
| 23:3,4,8,9,12 | 136:19,22 | 97:9 | 14:25 |
| 23:15,17,22 | 138:4,5,7 | **subset** 94:11 | **supervises** |
| 25:1,6,8,15,23 | 140:2,3,4,8 | **subsidiary** | 10:22,23 |
| 26:2,8,14,19,22 | 155:4 165:12 | 11:16 | **supervision** |
| 26:25 27:13 | 166:22 167:2 | **substantial** | 190:9 |
| 28:7,9,12,21 | 167:19,21 | 31:23 32:11 | **supervisory** |
| 29:11 30:5,9 | 168:3,17,20 | 35:9 169:14 | 60:18 |
| 30:12,14,18,22 | 169:8,10,12 | **substantially** | **support** 10:11 |
| 30:24 31:6,7 | 171:11 181:13 | 141:7 143:1 | 10:20 11:16 |
| 31:13,22,24 | 183:8,16 184:5 | **sufficient** | 15:21 69:20 |
| 32:10,11,19,20 | **student's** 68:9 | 110:21 | 92:18 188:16 |
| 32:25 33:10,13 | 169:13 | **suggest** 34:24 | 188:17,25 |
| 33:22 34:3,9 | **students** 5:19 | 90:21 92:19 | **supporting** |
| 35:5,15,19,24 | 14:10 18:9,11 | 104:17 159:6 | 71:6,20 |
| 36:5 41:11,13 | 18:15,16 31:15 | **suggested** | **supposed** |
| 42:5,10,22 | 69:21 70:18 | 54:23 | 175:14 |
| 43:3,10,11,16 | 71:6,20 72:12 | **suggests** 34:21 | **sure** 6:2 7:14 |
| 43:19 44:9 | 76:11 81:1,3,5 | 35:11 107:12 | 8:12 14:20 |
| 49:11 54:21,24 | 81:8 88:19 | 133:12 153:3 | 15:10 17:5 |
| 55:2,4,6 71:10 | 108:12 130:18 | 167:24 | 19:3 20:2,3,4 |
| 71:15 72:4,4 | 131:1,3,13,17 | | 31:4 38:24 |

Exhibit A

**[sure - tell]** Page 43

39:8 41:2,3
45:15 48:12,21
59:6,11 61:24
67:19 76:14
77:4 79:8,11
84:15,16 87:8
102:1 108:19
112:11,14
120:18 125:12
128:23 132:8
135:1 137:4,20
145:22 146:15
146:23 150:1
150:10 151:19
171:16,22
172:2,6 177:14
178:14 181:5
185:10
**surprised**
61:19
**suspected**
39:10
**suspend** 30:17
30:22 110:11
**suspended**
51:25 52:4,6
52:25 56:2
66:25 74:7
75:7,9 90:21
97:6 99:1
107:22 108:16
109:15 116:1
160:7 165:11

**suspending**
44:9 74:12
107:25 110:21
**suspension**
13:20,22,23,25
14:1 16:1
29:15,23 30:11
31:19 43:20
74:20,25 75:2
75:3,4,5,12,13
75:18 78:22,25
79:10,13,19,22
79:25 80:9,16
81:10 82:9
88:23 89:22
90:20 96:9,14
96:15,20 97:1
97:2,3 98:21
99:22 100:8,12
101:9,10,17
103:13,15
105:3 107:7
108:1 109:22
111:1,18
115:22 116:8
122:8 125:11
125:14,16
129:2 145:21
148:5,14,25
159:1,8,10,15
160:11 161:2,6
161:11,16
164:15,20
165:1,7,15,16

165:17,24
166:2 167:8,10
168:12 176:20
**suspensions**
42:21
**sworn** 5:2
190:6 192:10
192:13 193:14
193:18 194:21

**t**

**t** 187:15,16,16
189:17
**take** 6:18,21
11:13 12:16
27:13 30:9
37:24 41:1
46:23 47:13
48:1,5 60:22
61:20,21 65:19
66:4 67:4
83:24 84:14,16
85:1 112:12
133:7 136:7
137:16,18,21
144:12 161:5
177:12 181:3
184:17 185:9
187:9 188:3
189:6
**taken** 20:5 41:7
47:16 62:4
85:4 87:5
102:20 107:12

107:23 108:17
110:7 112:19
137:25 177:16
183:23 185:13
190:7,8
**talk** 13:10 22:4
26:12 57:13
65:6 80:11
149:1 187:6
**talked** 115:20
**talking** 68:4
93:4 94:25
146:4
**tantamount**
123:15
**target** 18:23
93:22 94:5
**targeted** 18:8
18:14 77:1
**targets** 93:7
**task** 49:10,25
60:19
**tasked** 43:12,15
**taught** 140:9
**team** 14:6
15:21 42:18,18
68:23 69:6
112:2 147:20
**tell** 35:11 57:18
63:15 70:4,24
71:21 72:5,12
89:6 115:5
117:24 118:19

**ten** 41:3,5,6
137:19 177:12
**tend** 132:19
**tenor** 56:6
119:3 122:16
**term** 10:15
70:12 80:23
91:14,16
**terminology**
11:20 55:13
**terms** 7:8,11
8:13 13:4
42:16 90:9
91:23 92:8
111:19 113:15
136:8,9 141:8
151:10 152:19
156:13 158:25
164:21 166:16
**terrorism**
60:19
**testified** 5:2
23:2 37:25
40:20 43:22
80:8,13 82:4
108:20 109:7
116:17 135:10
138:3 164:14
177:18 184:1,4
**testify** 126:6
**testifying** 52:8
**testimony** 23:7
52:5 55:22
59:12 87:17

108:14 167:17
190:11 192:6,7
193:6,9,12
**text** 147:2
186:8
**texts** 13:12,13
**thank** 7:1 34:13
38:7 46:8
51:16 68:13
69:15 75:12
103:6 112:18
119:3 123:9
132:7 146:14
160:22 162:7
180:6 181:11
**thanks** 129:16
177:15
**theory** 15:8
**thereof** 190:14
**thing** 20:25
38:15 46:11
119:14 120:7
**things** 20:13
35:1 79:23
81:12 118:24
133:18 148:4
156:12 168:19
178:15
**think** 14:20,21
14:22 15:5
21:2,9,14
24:18 25:6
28:16,18,18
32:13 36:20

37:16 38:22
44:8 47:24
48:16 56:23
57:2 59:25
62:22 63:14,22
67:9 70:16
72:24 75:7
76:15 81:19,23
84:13 85:21
92:18 101:24
106:11,17
110:2 111:2
112:6 119:25
120:2,24 121:4
121:25 124:12
125:4 130:14
130:14 134:7,9
136:17 137:23
139:5,10
141:21 142:20
148:13 149:24
154:17,17
155:13 163:17
164:2,9 165:8
166:6 167:22
171:8,9 178:11
185:5 189:8
**thinking** 37:19
94:2 115:10
**third** 115:3
**thirty** 7:21,21
191:18
**thomas** 2:8

**thomas.gillen**
2:10
**thompson**
149:17,20,25
150:2,14,20
151:23 152:3
152:10,20
153:14 154:5
155:7,11
163:24
**thompson's**
154:10
**thought** 65:7
89:14 93:10
111:11 163:10
169:23 187:20
**thoughts**
171:19
**threat** 16:17,18
16:23 17:15
18:8,14,23
19:7 20:6,21
44:17 50:1
51:8 66:14
70:5 72:13
75:21 80:20
117:9 124:10
125:23 126:3,5
126:16 127:7
134:15 149:22
153:15 154:6
161:7,12
**threaten** 97:8
122:25 123:16

Exhibit A

**[threaten - truthfully]** Page 45

138:16,21
**threats** 49:13
104:24 117:25
118:1,2 124:2
141:9
**three** 19:23
85:2
**threshold**
34:17
**tiktok** 118:14
**time** 1:14 5:18
5:22 6:18 8:6
12:9 21:7,13
21:22 22:6
25:7 39:6,11
40:2 42:14
44:17 49:14
53:19 55:3,7
59:1,4,4 62:3
72:17 73:4,9
73:12 74:15
76:3,9 78:24
82:7 90:2,5
96:16,20,21
97:6 100:7
102:10 104:18
106:9 110:7
115:22 117:5
117:12 124:23
125:2,10
133:15 134:12
134:17 135:6,9
135:11,15
136:2 137:5,11

137:24 141:21
145:20 148:7
149:22 157:11
159:1 161:10
161:15 165:23
167:13 170:11
170:19,22
171:17 172:16
172:24 173:20
173:25 174:4
174:11 190:8
190:11
**timed** 92:23
**timeline** 136:15
**timeliness**
135:25 136:3
**timely** 12:21
134:14 136:6,8
136:9
**times** 5:15 7:17
16:3 19:14
33:21,24
**timing** 88:9
**title** 9:14 29:6
106:15,20
150:8
**titling** 150:12
**today** 24:15
156:24 175:10
175:15,16
188:14
**together** 100:2
107:12,23
108:17 166:7

**ton** 23:22
**tone** 56:6 96:3
118:22 119:3
122:15 178:15
179:13
**took** 44:12,13
73:24 74:4
145:11 162:1
171:12
**tool** 9:2 179:13
**top** 27:12 37:24
46:6 157:13
181:24 182:17
182:18
**torres** 74:22
79:18 80:5,8
116:5,6,18,20
116:23 118:11
121:21,23
122:5 125:7,20
125:22,24
126:16,17,22
127:8,10,12,15
127:17 144:2
165:20 166:3
170:9 173:11
175:22 176:7
**totality** 21:25
125:5 156:12
**touch** 144:8
**toward** 15:25
25:18 94:2
**towards** 18:14
122:4

**township**
143:25 144:1
146:3 152:14
153:4 154:11
166:6
**track** 48:11
**tracking** 80:5
170:10
**transcribed**
190:9 192:7
**transcript**
35:17,21 85:12
86:20 119:18
120:21 121:9
187:23,25
191:11,12
192:5,12 193:5
193:11,17
**tree** 50:21
**troubling** 89:12
89:17
**true** 113:14
114:2 137:2
190:10
**trustee's** 183:9
183:14,17
**trustees** 45:10
45:12 49:17
188:21
**truthful** 60:24
105:1 181:1,8
**truthfully** 7:4
114:4

Exhibit A

Page 46

**try** 6:7,8 26:17
  27:8,20 32:18
  34:15 65:12
  138:4 146:7
  152:22 154:1
  167:3,15 174:8
  176:2,5
**trying** 36:18
  83:2 96:18
  116:7 121:4,5
  155:11 171:16
**turn** 60:12
  98:20 104:20
  114:22 142:22
  144:11 146:23
  147:1 159:17
  166:21 168:25
**turned** 33:9
**turrell** 173:16
**twice** 7:19
**two** 11:8 20:13
  54:14 82:17
  84:7,24 85:2
  91:23 92:8,18
  93:24 99:20
  107:23 119:24
  153:9 186:11
  188:6
**tyler** 2:8
**tyler.blair** 2:10
**type** 24:19
**typewriting**
  190:9

**typically** 13:14
  13:19 17:9
  19:10 25:13
  41:16,21,22
  103:23

**u**

**u.s.** 173:19
**uh** 42:23
  100:17 129:22
  129:24
**unable** 139:2
**undated** 180:17
**under** 5:24
  15:13,15,17,19
  22:5 29:23
  31:6,12 33:25
  35:6,15,19
  40:4 42:21
  43:24 49:8
  99:14 100:5
  115:11 135:20
  144:13 145:11
  147:2 166:14
  167:19 170:13
  190:9
**understand**
  6:11 7:3 15:24
  17:5,13 20:20
  21:17,25 29:23
  52:12 65:20
  84:10 96:18
  101:19,22
  102:9 103:14

108:13,24
  110:1 124:9
  126:4 154:14
  166:1,24
  167:17
**understanding**
  20:16 26:2,8
  35:5 38:14,18
  38:21 39:9,15
  40:14,17 50:6
  50:12 53:12,18
  59:16 62:8,17
  66:3,5,10
  68:16 69:9
  75:8,10 81:7
  89:4 92:21
  93:12 97:12
  99:24 100:18
  103:18 121:22
  123:13 124:20
  127:11,16
  128:1 129:7
  145:14 147:7
  147:14 148:8
  166:9,13
  167:20 171:9
  179:17
**understandings**
  95:2
**understood**
  6:16 59:7
  83:25 87:17
**undertook**
  147:8

**unfold** 23:19
**unfortunately**
  121:15 168:21
**unit** 69:19
**united** 1:1
  173:23
**university** 2:13
  5:19 9:13
  16:12 36:20
  37:4 71:7,21
  105:21 106:16
  128:15 129:9
  129:10,14,20
  139:8 151:18
  166:12 168:2
**unlawful** 58:5
  90:24 91:3,22
  92:5 95:12
  122:11 124:4
  138:22
**unofficial**
  46:14
**unquote** 154:12
**untaken** 147:17
**update** 162:24
  171:7 186:23
  188:21
**updates** 173:9
**updating** 28:15
**use** 21:15 23:6
  35:6 47:17
  50:18 58:9
  65:23 91:23
  178:13

Exhibit A

| | | | |
|---|---|---|---|
| **used** 9:2 26:5 58:8 100:23 | **version** 28:12 28:17,19 187:21 189:14 | 116:5,12,18,19 116:22,23 | **viewpoints** 122:7 |
| **uses** 179:10 | **versions** 28:14 | 117:6,13,15,19 | **violate** 158:25 |
| **using** 47:25 80:23 95:23 115:9 | 46:14 | 117:21 118:5,7 118:10,11,16 | **violation** 89:14 147:24 |
| **usually** 23:18 24:22 | **versus** 129:5 **vice** 2:14 9:15 | 120:22 122:11 122:17 123:23 | **violations** 147:11 |
| **utilize** 179:14 | 9:17,18,20 10:3,16 30:23 | 124:2 125:7,20 125:22 126:16 | **violence** 16:17 16:19,23 18:8 |
| **utilized** 115:19 | 56:19,21 64:11 99:4 100:15 | 127:10,15 130:11,12 | 18:14 19:7 58:5 63:16,21 |
| **v** | 105:20,24 106:7,23 115:2 | 137:8 150:16 153:16 159:7 | 70:6,25 71:23 72:6,13 82:3 |
| **v** 191:6 192:3 193:3 | 158:6,7 167:2 169:10 | 161:21 170:9 172:25 175:22 | 90:24 91:3,22 92:5,14,16,22 |
| **validity** 17:21 | **video** 55:10,12 | 175:22 176:5,5 | 93:1,7,22 |
| **vandalism** 138:22 | 55:15 56:5 57:20,20 58:1 | 176:7,7 179:21 185:3 | 95:12,15,15 97:17,19,25 |
| **varies** 12:11 | 66:15 70:3 | **videos** 57:19 | 98:4,10 117:24 |
| **various** 10:23 96:3 102:11 | 72:8 74:10,13 74:14,21,24 | 74:6 78:21 79:3 91:11 | 122:12,18 123:21 124:4 |
| **vehicle** 35:7 | 75:18,23 76:4 77:1,4,15 78:3 | 96:8,19 115:20 115:25 118:12 | 124:11,24 125:1,3,23 |
| **verbal** 6:1 | 78:7,12,16 | 118:13,19 | 126:17 128:16 |
| **verbalize** 6:2 | 79:5,16 80:3,4 80:9,12,16,24 | 119:6,23 121:19 123:6 | 128:18 129:21 130:1,19 |
| **verbatim** 118:20 | 81:9 82:8,18 89:1 90:25 | 137:13 176:14 | 138:23 141:9,9 |
| **verified** 55:6 | 91:4,7,8,21,25 | **view** 71:12 | **voice** 118:22 |
| **verify** 54:24 142:24 | 92:13 93:23 94:17,25 95:18 | **viewed** 84:1 116:6 | **vs** 1:8 |
| **veritext** 191:1,7 194:1 | 95:19 96:10,23 97:9,16 98:11 | **viewing** 82:18 **viewpoint** | **w** |
| **veritext.com.** 191:17 | 102:4,6,15 | 77:25 95:5 | **w** 2:8 **wait** 119:18 |
| **versa** 64:11 | | 96:1,1 121:6 | |

Exhibit A

**[waiting - wrote]** Page 48

| | | | |
|---|---|---|---|
| **waiting** 184:14 | 172:1 | **wednesday** | 135:5,25 |
| **waived** 191:19 | **warned** 18:22 | 148:6 159:19 | 137:17 160:17 |
| **walk** 87:7 | **warrant** 73:3,7 | 160:4 | 160:19 170:17 |
| **walking** 27:10 | **warranted** | **weeks** 11:8 | 181:19 186:2 |
| **walls** 77:7 | 41:18 109:24 | **weigh** 14:16,22 | 186:23 190:5 |
| **walter** 1:9 2:7 | **warrants** 13:16 | 14:24 | 190:11,15 |
| 191:6 192:3 | **washington** | **weighed** 89:13 | 191:8,11 192:1 |
| 193:3 | 54:15 | **welcome** | 192:4,11 193:1 |
| **want** 18:24 | **watch** 26:12 | 129:14 | 193:4,15 |
| 19:3 39:12 | 55:19 56:1 | **welfare** 59:16 | **witnesses** 41:25 |
| 41:9 47:13 | 74:7,10,14,20 | 96:6,13 | 42:25 |
| 48:11 50:25 | 75:18 116:1,12 | **wellness** 38:12 | **witness'** 191:14 |
| 59:22 61:21 | 117:6,14,19,21 | 144:2 | **word** 133:24 |
| 65:22,25 79:11 | 118:5,7 119:9 | **went** 56:15 | **words** 95:24 |
| 80:11 82:25 | 125:13,19,19 | 118:15 153:1 | 125:1 186:11 |
| 83:7,20 84:17 | **watched** 55:15 | **whereof** 190:15 | **work** 6:22 |
| 85:12 86:1,2 | 55:17,22 57:20 | **widespread** | 17:24 |
| 86:10 87:8 | 75:23 96:8,10 | 77:11 | **works** 5:22 |
| 97:4 107:5 | 102:15 115:21 | **willing** 188:19 | 17:9 36:6 |
| 108:11 111:25 | 116:17 119:7 | **winded** 6:5 | 150:7 164:11 |
| 117:25 128:21 | **watching** 78:7 | 119:15 | **world** 97:24 |
| 130:15 133:10 | 91:7,8 118:11 | **withdraw** | **write** 115:7 |
| 134:12,13 | **way** 17:9 21:16 | 66:22 | 169:4 |
| 137:16,21 | 22:17 44:5,7 | **witness** 3:2 | **writes** 140:6 |
| 187:7,9,10,23 | 51:3 58:22 | 15:11 32:5 | **writing** 81:22 |
| 187:25 | 62:11 65:20 | 33:6 41:5 44:3 | 142:1 143:9,14 |
| **wanted** 59:6 | 77:9 84:23 | 45:3 48:20 | **written** 40:7,8 |
| 83:22 101:15 | 95:7 98:16 | 51:14 52:24 | 40:11 131:21 |
| 101:22,24 | 103:19 115:17 | 63:7 64:24 | **wrong** 31:17 |
| 147:25 154:23 | 120:9 122:2 | 65:1,3,5,6 | 150:3 |
| 171:22 172:9 | 166:17 172:3 | 82:15 87:9 | **wrongdoing** |
| 186:16 | 179:11 190:13 | 109:5 123:4 | 39:10 |
| **wanting** 21:25 | **website** 28:13 | 126:11 132:2,7 | **wrote** 69:12 |
| 95:24 154:19 | 183:13 | 133:25 134:2 | 107:5,19 |

**[wrote - zoom]**                    Page 49

131:17 132:3

**y**

**yeah**  24:21
26:17 34:15
39:8 46:10,22
48:13 50:14
64:14 79:7
85:11 91:9
93:17 120:24
137:22 178:22
187:20
**year**  28:15,15
**years**  9:19,22
9:24 133:14
**yehudai**  140:10
**yell**  52:17,18
**yep**  47:14,15
61:22

**z**

**zeiger**  157:14
**zionism**  140:9
**zionist**  70:1,21
71:10,17
**zionists**  94:10
94:11
**zoha**  180:12,14
**zoom**  11:12

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Exhibit A

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

Exhibit A

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Exhibit A



PLAINTIFF'S EXHIBIT

1

11/17/2025

PENGAD 800-631-6989

**Code of Student Conduct**

Updated November 16, 2023

### CHAPTER 3335-23 CODE OF STUDENT CONDUCT
### As of November 16, 2023

#### 3335-23-01 Introduction and purpose.

(A) The code of student conduct, a part of the Ohio Administrative Code, is established to foster and protect the core mission of the university; to foster the scholarly and civic development of the university's students in a safe and secure learning environment; and to protect the people, properties and processes that support the university and its mission. The core mission of the Ohio state university is to be the model public university dedicated to research, teaching and learning, and service. The university's shared values define our ethical culture – for all students, faculty, and staff – in support of that mission. These values are:

(1) Excellence and impact: demonstrating leadership in pursuit of our vision and mission

(2) Diversity and innovation: welcoming differences and making connections among people and ideas

(3) Inclusion and equity: upholding equal rights and advancing institutional fairness

(4) Care and compassion: attending to the well-being of individuals and communities

(5) Integrity and respect: acting responsibly and being accountable

Our shared values support principles of open-minded exploration and freedom of expression, respectful and inclusive community, and caring relationships built on trust through honesty, transparency, and authentic engagement. Additional information can be found at www.osu.edu/shared-values.

(B) As members of the Ohio state university community, we strive to embody these shared values through our actions and conduct. The Ohio state university/buckeye honor pledge's purpose is to motivate reflection on our shared values and emphasize the importance of one's personal commitment to ethics in education and learning. Instructors have the discretion to ask students to include a signed version of the pledge with examinations, papers, or other academic assignments/requirements. Additional information - can be found at https://ugeducation.osu.edu/buckeye-honor-pledge.

The Buckeye Honor Pledge
As a buckeye I pledge to act with responsibility and care. I will build trust through honesty, transparency, and authentic engagement. I will demonstrate integrity through my original contributions and respectful collaboration with others. I will act in accordance with the code of student conduct. Time and change will surely show, I will uphold these values wherever I go.

(C) The ADA coordinator's office can provide accommodations based on the impact of a disability to students during the student conduct process. Students are responsible for requesting these accommodations when they feel they are needed. Visit the university's ADA office at https://ada.osu.edu/.

(Board approval dates: 4/6/2012, 2/22/2019, 11/16/2023)

#### 3335-23-02 Jurisdiction.

(A) The code of student conduct applies to the on-campus conduct of all students and registered student organizations, including conduct using university computing or network resources. The code of student conduct also applies to the off-campus conduct of students and registered student organizations directly connected to:

(1) Academic course requirements or any credit-bearing experiences, such as internships, field trips, study abroad or student teaching;

**Code of Student Conduct**

(2) Any activity supporting pursuit of a degree, such as research at another institution or a professional practice assignment;

(3) Any activity sponsored, conducted, or authorized by the university or by registered student organizations;

(4) Any activity that causes substantial destruction of property belonging to the university or members of the university community, or causes or threatens serious harm to the safety or security of members of the university community; or

(5) Any activity which could constitute a criminal offense as defined by local, state or federal law, regardless of the existence or outcome of any criminal proceeding.

(B) The code may be applied to behavior conducted online, via e-mail, text, or other electronic medium. Students should also be aware that online postings such as web postings and posts on social networking sites and applications are in the public sphere and are not private. These postings can subject a student to allegations of conduct violations if evidence of policy violations is posted online. The university does not routinely search for code of student conduct violations, but may take action if and when such information comes to the attention of university officials.

Students and/or registered student organizations may also be held accountable for the behavior of their guests or members when the student or members of the registered student organization has knowledge of, facilitates or contributes to the guest's or member's misconduct.

The code of student conduct governs all campuses of the university. Students attending regional campuses, centers, or institutes are advised to consult their local resources for additional information or rules pertaining to those locations.

The university reserves the right to administer the code of student conduct and proceed with the hearing process even if the student withdraws from the university, is no longer enrolled in classes, or subsequently fails to meet the definition of a student while a disciplinary matter is pending. The university may, within its discretion, place a hold or other notation on the student's transcript while the matter is pending.

Students continue to be subject to federal, state, and local laws while at the university, and violations of those laws may also constitute code of student conduct violations. In such instances, the university may proceed with university disciplinary action under the code of student conduct independently of any criminal proceeding involving the same conduct and may impose sanctions for the code of student conduct violation even if such criminal proceeding is not yet resolved or is resolved in the student's favor.

(C) Discrimination and harassment, including, but not limited to sexual misconduct, based on a protected class in any form, is never acceptable. Students are responsible to know and adhere to the university's non-discrimination, harassment, and sexual misconduct policy found at https://policies.osu.edu. This policy, and not this code of student conduct, govern the investigation, adjudication, and resolution of protected class discrimination and harassment complaints.

(Board approval dates: 3/2/2001, 12/7/2007, 4/6/2012, 4/8/2016, 9/2/2016, 2/22/2019, 5/31/2019, 11/16/2023)

**3335-23-03 Definitions.**

As used in the code of student conduct:

**Code of Student Conduct**

Updated November 16, 2023

(A) "University premises" includes all lands, buildings, facilities, and resources owned, leased, managed, or operated by the university.

(B) "Student" includes an individual to whom an offer of admission has been extended, paid an acceptance fee, registered for classes, or otherwise entered into another agreement with the university to take instruction.

    (1) Student status lasts until an individual graduates, is permanently dismissed, or is not in attendance for two complete, consecutive terms. Student status also lasts while they have a continuing educational relationship with the university.

    (2) "Student" also includes registered student organizations. A student organization remains a "student" for purposes of this code of student conduct for one calendar year following the expiration of the organization's most recent registration.

    (3) This code of student conduct also applies within the discretion of an appropriate university official to former students for violations committed while a student.

(C) "Members of the university community" includes, but are not limited to, students, faculty, staff, and visitors to the campus.

(D) "Complaint" includes information alleging a code of student conduct violation or other published rule, policy, standard, or guideline applicable to students, provided to the university, per paragraph (A) of rule 3335-23-05 of the Administrative Code.

(E) "Academic activities" includes any assignment, quiz, examination, candidacy examinations, laboratory, paper, report, field or placement work, submission, reading, seminar, presentation, or other educational activity that is required for a course or degree program.

(F) "Calendar days" refers to all seven days of the week without regard to whether classes are in session or university offices are open or closed.

(G) "Business days" include any day other than Saturday, Sunday, or days when university offices are closed as scheduled according to the university's academic calendar found at https://registrar.osu.edu/academic-calendar/.

(Board approval dates: 3/2/2001, 12/7/2007, 4/6/2012, 4/8/2016, 9/2/2016, 2/22/2019, 5/31/2019, 11/16/2023)

### 3335-23-04 Prohibited conduct.

Any student found to have engaged, or attempted to engage, in any of the following conduct while within the university's jurisdiction, as set forth in rule 3335-23-02 of the Administrative Code, will be subject to disciplinary action by the university. For the purposes of this section, attempt shall be defined as conduct that, if successful, would constitute or result in the prohibited conduct.

(A) Academic misconduct

    Any activity that tends to compromise the academic integrity of the university or subvert the educational process. Examples of academic misconduct include, but are not limited to:

    (1) Violation of course rules and/or assignment guidelines as contained in the course syllabus or other information provided to the student;

**Code of Student Conduct**

(2) Knowingly requesting, providing, and/or receiving unauthorized information, materials, and/or assistance during academic activities;

(3) Possession and/or use of unauthorized information, materials, and/or assistance during academic activities;

(4) Submitting plagiarized work for an academic requirement. Plagiarism is the representation, including but not limited to copying, of another's work or ideas as one's own; it includes the unacknowledged word-for-word use and/or paraphrasing of another person's work, and/or the inappropriate unacknowledged use of another person's ideas;

(5) Unauthorized use of generative artificial intelligence systems or similar technologies to complete academic activities;

(6) Submitting substantially the same work to satisfy requirements for one course or academic requirement that has been submitted in satisfaction of requirements for another course or academic requirement, without permission of the instructor of the course for which the work is being submitted or supervising authority for the academic requirement. This includes submitting the same work for courses that the student is retaking pursuant to the university's grade forgiveness rule;

(7) Falsification, fabrication, or dishonesty in creating or reporting laboratory results, research results, and/or academic activities;

(8) Serving as, or enlisting the assistance of a substitute for a student in academic activities;

(9) Alteration of grades or marks by the student in an effort to change the earned grade or credit;

(10) Alteration of academically-related university forms or records, or unauthorized use of those forms or records;

(11) Engaging in activities that unfairly place other students at a disadvantage, including but not limited to taking, hiding, or altering resource material, or manipulating a grading system;

(12) Violation of program regulations and/or policies as established by departmental committees and made available to students; and

(13) Providing falsified materials, documents, or records to a university official to meet academic qualifications, criteria, or requirements, including but not limited to submitting falsified doctor's notes and/or falsified transcripts.

(B) Endangering health or safety.

(1) Endangering behavior: Taking or threatening action that endangers the safety, physical or mental health, or life of any person, or creates a reasonable fear of such action.

(2) Stalking: Engaging in a pattern of unwanted conduct directed at another person that threatens or endangers the safety, physical or mental health, or life or property of that person, or creates a reasonable fear of such a threat or action. When stalking is sex- or gender-based, it falls under the university's non-discrimination, harassment, and sexual misconduct policy.

(3) Operating a vehicle while impaired by alcohol or drugs in a manner that endangers the safety of the university community.

**Code of Student Conduct**

(C)   Destruction of property.

Actual or threatened damage to or destruction of university property or property of others, whether done intentionally or with reckless disregard.

(D)   Dangerous weapons or devices.

Storage, or possession of dangerous weapons, devices, or substances including, but not limited to, firearms, ammunition, or fireworks, unless authorized by an appropriate university official or permitted by a university policy, even if otherwise permitted by law. Use or misuse of weapons, devices, or substances in a manner that causes or threatens serious harm to the safety or security of others. As required by Ohio Revised Code Section 2923.1210, this section does not prohibit a student who has been issued a valid concealed handgun license from transporting or storing a firearm or ammunition when both of the following conditions are met:

(1)   Each firearm and all of the ammunition remains inside the person's privately-owned motor vehicle while the person is physically present inside the motor vehicle, or each firearm and all of the ammunition is locked within the trunk, glove box, or other enclosed compartment or container within or on the person's privately owned motor vehicle;

(2)   The vehicle is in a location where it is otherwise permitted to be.

(E)   Dishonest conduct.

Dishonest conduct, including, but not limited to, knowingly reporting a false emergency; knowingly making false accusation of misconduct; misuse or falsification of university or related documents by actions such as forgery, alteration, or improper transfer; possession, use or manufacturing of a false identification document; submission of information known by the submitter to be false to a university official.

(F)   Theft or unauthorized use of property.

Theft or the unauthorized use or possession of university property, services, resources, or the property of others.

(G)   Failure to comply with university or civil authority.

Failure to comply with legitimate directives of authorized university officials, law enforcement or emergency personnel, identified as such, in the performance of their duties, including failure to identify oneself when so requested; or violation of the terms of a disciplinary sanction.

(H)   Drugs.

Use, being under the influence of, production, distribution, sale, or possession of drugs, and/or drug paraphernalia in a manner prohibited under law or applicable university policy or university facility policy, such as within the Ohio stadium and the Schottenstein center. This includes, but is not limited to, the misuse of prescription drugs.

(I)   Alcohol.

Use, underage intoxication, production, distribution, sale, or possession of alcohol in a manner prohibited under law or applicable university policy or university facility policy, such as within the Ohio stadium and the Schottenstein center.

(J)   Unauthorized presence.

**Code of Student Conduct**

Updated November 16, 2023

Unauthorized entrance to or presence in or on university premises.

(K)   Disorderly or disruptive conduct.

Disorderly or disruptive conduct that unreasonably interferes with university activities or with the legitimate activities of any member of the university community.

(L)   Hazing

Doing, requiring, or encouraging any act, whether or not the act is voluntarily agreed upon, tied to initiation, continued membership, or participation in any group, that causes or creates a substantial risk of causing mental or physical harm or humiliation. Such acts may include, but are not limited to, using alcohol, creating excessive fatigue, and paddling, punching or kicking in any form. Failure to intervene, prevent, or report acts of hazing may constitute a violation of this section.

(M)   Student conduct system abuse.

Abuse of any university student conduct system, including but not limited to:

(1)   Failure to obey the summons or directives of a hearing body, as defined in rule 3335-23-10 of the Administrative Code or university official;

(2)   Falsification, distortion, or misrepresentation of information before a hearing body, as defined in rule 3335-23-10 of the Administration Code, or university official;

(3)   Disruption or interference with the orderly conduct of a student conduct proceeding;

(4)   Knowingly instituting a student conduct proceeding without cause;

(5)   Discouraging an individual's proper participation in, or use of, a university student conduct system;

(6)   Influencing the impartiality of a member of a hearing body, as defined in rule 3335-23-10 of the Administrative Code, prior to, and/or during the course of a student conduct proceeding;

(7)   Harassment and/or intimidation of a member of a hearing body, as defined in rule 3335-23-10 of the Administrative Code, or university official, prior to, during, and/or after a student conduct proceeding;

(8)   Failure to comply with one or more sanctions imposed under the code of student conduct; and

(9)   Influencing another person to commit an abuse of a university student conduct system.

(N)   Violation of university rules or federal, state, and local laws.

Violation of other published university rules, policies, standards, and/or guidelines, including but not limited to, those which prohibit the misuse of computing resources, rules for student groups or organizations, and residence hall rules and regulations. Students may be held accountable under the procedures described in other published rules, policies, standards and guidelines and under the provisions of this code of student conduct regardless of whether action in undertaken under this code of student conduct. Students are responsible for reviewing and understanding the rules, standards and guidelines provided to them by their academic programs and colleges. Applicable policies are found at https://policies.osu.edu.

**Code of Student Conduct**

Conviction or acceptance of responsibility – including a judicial finding of guilt, pleas of no contest or "no-lo contendere" – for state, local or federal crimes when the underlying behavior has a substantial connection or relationship to the university's property, programs or could reasonably impact the health, safety, or security of members of the university community.

(O)   Riotous behavior.

    (1)   Participation in a disturbance with the purpose to commit or incite any action that presents a clear and present danger to others, causes physical harm to others, or damages property.

    (2)   Proscribed behavior in the context of a riot includes, but is not limited to:

        (a)   Knowingly engaging in conduct designed to incite another to engage in riotous behavior; and

        (b)   Actual or threatened damage to or destruction of university property or property of others, whether done intentionally or with reckless disregard; and

        (c)   Failing to comply with a directive to disperse by university officials, law enforcement or emergency personnel; and

        (d)   Making explicit or implied threats in a manner that causes a reasonable fear of harm in another; and

        (e)   Impeding, hindering, or obstructing a university official, law enforcement, or emergency personnel in the performance of their duties.

    (3)   This rule shall not be interpreted as proscribing peaceful demonstrations, peaceful picketing, a call for a peaceful boycott, or other forms of peaceful dissent.

(P)   Recording or distribution without knowledge

Using electronic or other means to make or distribute a video, audio, or photographic record of any person in a location where there is a reasonable expectation of privacy without the person's prior knowledge, when such a recording is likely to cause injury, distress, or damage to reputation. This includes, but is not limited to, taking video, audio, or photographic records in shower/locker rooms, residence hall rooms, and restrooms. The storing, sharing, and/or distributing of such unauthorized records by any means is also prohibited.

(Q)   Public urination or defecation.

Urination or defecation in a place such as a sidewalk, street, park, alley or yard, residence hall space, or on any other place or physical property that is not intended for use as a restroom.

(R)   Retaliation.

Any intentional adverse action against any individual who makes an allegation, files a report, serves as a witness, assists a complainant or respondent, or participates in any university investigation or proceeding.

(S)   Harm to animals.

Intentional physical harm or threats of harm to animals, including but not limited to companion animals, service animals, or emotional support animals.

**Code of Student Conduct**

Lawful hunting and fishing is not prohibited by this code of student conduct. The care and use of animals involved in research activities is governed by the office of responsible research practices institutional animal care and use committee and not this code.

(Board approval dates: 3/2/2001, 7/11/2003, 7/7/2006, 12/7/2007, 4/6/2012, 4/8/2016, 9/2/2016, 2/22/2019, 5/31/2019, 11/16/2023)

## Student Conduct Procedures

### 3335-23-05 Initiation, inquiry and investigation of code violations.

(A)   Initiation.

Person(s) who witness, experience or become aware of what they believe to be a possible code of student conduct violation should provide information to the following officials or offices

(1)   Complaints about possible code of student conduct violations occurring in residence halls should be reported to the residence hall director;

(2)   Complaints about possible non-residence hall related code of student conduct violations should be reported to the office of student conduct, or chief student conduct officer for the regional campuses;

(3)   Complaints about possible sexual misconduct should be reported pursuant to the non-discrimination, harassment, and sexual misconduct policy;

(4)   Complaints about possible protected class discrimination or harassment should be reported pursuant to non-discrimination, harassment, and sexual misconduct policy;

(5)   Complaints regarding academic misconduct should be reported to the committee on academic misconduct; and

(6)   In cases when the alleged activity may involve a violation of criminal law in addition to a code of student conduct violation, complaints should be reported to the university police division or other appropriate law enforcement agency.

(B)   Preliminary inquiry.

The university conducts a preliminary inquiry into the nature of the incident, complaint or notice, jurisdiction, available information, and involved parties. Within the university's discretion, the preliminary inquiry may lead to:

(1) A determination that there is insufficient information to pursue the investigation, or the behavior alleged, even if proven, would not violate the code;

(2) An informal resolution such as an educational discussion or mediation. An educational discussion is a discussion about the student's behavior and its impact. Informal resolution is not available in cases of academic misconduct.

(3) An investigation and/or initiation charges.

**Code of Student Conduct**

Typically, an informal resolution will end the conduct process, but if more information is shared during an educational discussion or informal resolution that warrants additional inquiry, an investigation may be initiated.

(C)    Investigation.

    (1)    Role of the university.

        (a)    The director of student conduct, the chief conduct officer for the regional campuses, residence hall directors, assistant hall directors and other designated university personnel are authorized to investigate alleged violations other than those involving paragraphs (C)(1)(b) and (C)(1)(c) of this rule;

        (b)    The coordinator of the committee on academic misconduct and other designated university personnel are authorized to investigate allegations involving academic misconduct;

        (c)    Only those personnel designated by the non-discrimination, harassment, and sexual misconduct policy shall investigate charges involving sexual misconduct.

        (d)    Only those personnel designated by the non-discrimination, harassment, and sexual misconduct policy shall investigate charges involving protected class discrimination or harassment.

        (e)    The Ohio state university police or other appropriate law enforcement agency shall have primary responsibility for the criminal investigation of acts that involve suspected criminal violation of federal, state or local laws. Such investigation does not replace any other university investigation.

        (f)    The university may conduct concurrent investigations regarding potential violations of institutional policy or federal, state and local law.

    (2)    Role of participants.

        (a)    During the investigation, the student allegedly involved in misconduct may be:

            i.    Notified of the alleged violation;

            ii.    Requested to make an appointment to discuss the matter; and

            iii.    Provided a date by which the appointment must be made.

        (b)    Any person believed to have information relevant to an investigation may also be contacted and requested to make an appointment to discuss the matter.

    (3)    Failure to comply with a request to make and/or keep an appointment relevant to an investigation may result in a disciplinary hold being placed on a respondent's registration and records and/or the initiation of charges for student conduct system abuse.

    (4)    Upon completion of an investigation, the investigator will decide upon an appropriate course of action, which may include, but is not limited to:

        (a)    Taking no further action and closing the case;

        (b)    Deferring initiation of charges with or without conditions;

**Code of Student Conduct**

(c) Seeking informal resolution; or

(d) Initiating charges by the appropriate university official when a finding of jurisdiction has been made and there is reasonable cause to believe that a violation of the code of student conduct may have occurred. Reasonable cause is defined as some credible information to support each element of the violation, even if that information is merely a credible witness or a victim's statement. Charges will not be issued where a complaint is unsupported by any credible information or does not meet the elements of a code of student conduct violation.

(Board approval dates: 12/7/2007, 3/2/2011, 4/6/2012, 4/8/2016, 9/2/2016, 5/31/2019, 11/16/2023)

### 3335-23-06 Amnesty.

At the university's discretion, amnesty may be extended to students who may be hesitant to report a code of student conduct violation to university officials because they fear that they themselves may be accused of minor policy violations, including but not limited to underage drinking, at the time of the incident. If a student is granted amnesty, an educational discussion or other informal resolution may be considered, but no university conduct proceedings under this code will result.

At the university's discretion, amnesty may also be extended on a case-by-case basis for minor policy violations when students request assistance for others in need, including the person receiving assistance. If a student is granted amnesty, an educational discussion or other informal resolution may be considered, but no university conduct proceedings under the code of student conduct will result. In cases of academic misconduct, need does not include a student's inability to complete an assignment without assistance.

(Board approval dates: 5/31/2019, 11/16/2023)

### 3335-23-07 Filing of complaint and initiation of charges.

A complaint alleging a code of student conduct violation should be made to the university as soon as practicable in accordance with paragraph (A) of Rule 3335-23-05 of the Administrative Code. Absent extraordinary circumstances, the university will not take action on complaints filed more than six months from the discovery of non-academic misconduct (paragraphs (B) to (S) of rule 3335-23-04 of the Administrative Code) or thirty business days for academic misconduct (paragraph (A) of rule 3335-23-04 (A) of the Administrative Code). These time limitations do not apply to complaints of sexual misconduct or other protected class discrimination and harassment.

Absent extraordinary circumstances, the university must initiate charges, if any, within one year of the filing of the complaint. This time limitation does not apply to complaints of sexual misconduct or other protected class discrimination and harassment. In all cases, a student charged with one or more code of student conduct violations has the right to be heard, subject to the student conduct procedures.

(Board approval dates: 3/2/2001, 12/7/2007, 4/6/2012, 4/8/2016, 5/31/2019, 11/16/2023)

### 3335-23-08 Notice of charges and options for resolution.

(A) Notification.

Students shall be notified of university charges in writing. Written charges may be presented in person, by placement in the respondent's residence hall mailbox, by email to the respondent's official university email address (which may direct the student to view the notice on a secure

**Code of Student Conduct**

Updated November 16, 2023

website), by text message, by other form of electronic communication specific to the student on file with the university registrar, or by mail to the respondent's local or permanent address on file in the office of the university registrar.

(B)  Current address.

All students are required to maintain an accurate and current permanent address and phone number with the university registrar.

(C)  Meeting with university official.

Following notification of charges, respondents are strongly encouraged to and shall be given the opportunity to meet with a university official for the purpose of explaining the university student conduct process and discussion of the charges.

(D)  Options for resolution.

Charges may be resolved by administrative decision pursuant to rule 3335-23-09 of the Administrative Code or a hearing pursuant to rule 3335-23-10 of the Administrative Code.

(E)  Failure to respond.

Failure of the respondent to respond to the initiation of charges or schedule a preliminary meeting within the deadlines provided by the university shall in no way prevent the university from scheduling and conducting a hearing in the absence of the respondent.

(Board approval dates: 3/2/2001, 12/7/2007, 4/6/2012, 4/8/2016, 5/31/2019, 11/16/2023)


**3335-23-09  Administrative decision.**

In a case where a respondent admits to a violation(s) in writing, the student may request in writing to have a decision as to appropriate sanction made administratively by a hearing officer rather than have the charges referred to a hearing body. In such situations, the student waives the right to a hearing and the related procedural guarantees provided by a hearing body. Administrative decisions in academic misconduct cases involving graduate students may be made in consultation with the graduate school. Following an administrative decision, the student retains the right to request an appeal (see Administrative Code Section 3335-23-18) of the original decision. Appeals following an administrative decision may only be requested, on the ground that the sanction is grossly disproportionate to the violation committed.

When a respondent fails to respond to the initiation of charges and information exists to support finding a violation, the hearing officer may issue an administrative decision so long as sanctions do not include suspension or dismissal. In this circumstance, the respondent retains the right to request an appeal of the decision under all grounds found in Administrative Code Section 3335-23-18. If the respondent is suspended or dismissed in a subsequent case, the respondent may appeal both the outcome in the subsequent case and an administrative decision issued due to a failure to respond.

(Board approval dates: 3/2/2001, 7/7/2006, 12/7/2007, 4/6/2012, 4/8/2016, 5/31/2019, 11/16/2023)


**3335-23-10  Hearing bodies.**

(A)  The respondent has the right to accept responsibility for the charges, which will result in an administrative decision, or choose to have a hearing.

**Code of Student Conduct**

(B)  In addition to the committee on academic misconduct and the university conduct board, the following university employees/officials are considered official university hearing bodies and may conduct administrative hearings of alleged code of student conduct violations affording the respondent the same procedural guarantees as provided in the hearings conducted by a committee or board:

   (1)  The director of student conduct, or designee;

   (2)  The coordinator of the committee on academic misconduct, or designee;

   (3)  University housing professional staff; and

   (4)  The chief conduct officer for the regional campuses.

(C)  Students will be afforded the right to request a separate hearing and choose an administrative or board hearing, except under special circumstances when, in order to ensure a fair and just process, the hearing officer may determine the appropriate hearing body. Special circumstances include but are not limited to situations when multiple respondents are charged arising from the same factual circumstances or in multiple incidents involving the same respondent. The university reserves the right to combine hearings for respondents.

(Board approval dates: 3/2/2001, 12/7/2007, 4/6/2012, 4/8/2016, 9/2/2016, 5/31/2019, 11/16/2023)

**3335-23-11  Notice of hearing and request for postponement.**

(A) Notice.

   If a hearing is to be held, written notification will be provided to the respondent. The notice may be delivered, placed into a student's residence hall mailbox, sent by email to the student's official university email address or sent by text message, which may direct the student to view the notice on a secure website, or mailed to the last known address of the student, by first-class mail, no fewer than ten calendar days prior to the hearing. Unless already provided to the student, the notification will include the charge(s), date, time, and location of the hearing, the designated hearing body, a statement of the student's rights, and information on the hearing procedures.

(B) Postponement.

   The respondent may request a postponement for reasonable cause, which may be granted at the university's discretion. A request for a postponement for reasonable cause must be made in writing, include supporting rationale and be received by the person sending the hearing notification at least two business days before the scheduled hearing. The university reserves the right to reschedule a hearing for the first appropriate available date.

(Board approval dates: 3/2/2001, 12/7/2007, 4/6/2012, 4/8/2016, 5/31/2019, 11/16/2023)

**3335-23-12  Hearing procedures.**

Although the procedural requirements are not as formal as those existing in criminal or civil courts of law, to ensure fairness, the following procedures will apply and, unless already provided to the student, be included within the hearing notice:

(A)  Attendance.

**Code of Student Conduct**

Attendance at hearings is limited to those directly involved or those requested by the hearing body to attend. The hearing body will take reasonable measures to assure an orderly hearing, including removal of persons who impede or disrupt proceedings.

(B)    Timelines.

Except as expressly provided by this code of student conduct, the university may set deadlines related to the investigation and hearing process. Absent extraordinary circumstances, respondents must submit all witness names and evidence for submission at least two business days prior to a scheduled hearing.

(C)    Advisor.

The respondent may choose to bring an advisor for support throughout the disciplinary process. The advisor (i.e., support person) may be any person other than a witness. The advisor may only counsel the student and may not actively participate in the disciplinary process, unless the hearing body determines that clarification is needed.

(D)    Witnesses.

    (1)    The respondent may invite relevant factual witnesses to attend, ask questions of witnesses called by others, and will be notified of potential witnesses to be called.

    (2)    The university may present witnesses, question those presented by the respondent and will notify the respondent of invited witnesses.

    (3)    Respondents may also invite up to three character witnesses to submit written statements for the hearing body's review. A character witness is a person who attests to another's moral conduct and reputation. Character witness statements will only be considered during sanctioning process if a violation is found.

    (4)    Expert witnesses are not permitted. In cases requiring special expertise, the hearing body may appoint individuals with appropriate expertise to serve as consultants to the hearing body. The consultant may be present and provide information as called upon during the hearing but will not vote.

(E)    Standard of evidence.

A student will only be found in violation if a preponderance of evidence supports the charges.

(F)    Majority vote required.

A student will not be found in violation unless a majority of the hearing body finds the student in violation. In the event of a tie, the hearing body will continue to deliberate. If after the hearing body determines that exhaustive deliberations have occurred and a majority decision is not reached, the student will be found not in violation.

(G)    In cases where prompt review is essential (e.g., when graduation or the end of the academic year is imminent) the respondent may be offered the option of an administrative review consisting of an administrative decision or administrative hearing. The respondent may decline such expedited review without the expectation that the process can be completed on an expedited timeline.

(Board approval dates: 3/2/2001, 7/11/2003, 12/7/2007, 4/6/2012, 4/8/2016, 9/2/2016, 5/31/2019, 11/16/2023)

Exhibit A
Shivers Dep. Ex. 1 - Page 13 of 21

**Code of Student Conduct**

**3335-23-13 Attendance.**

Because the most accurate and fair review of the facts can best be accomplished when all parties are present, the respondent and invited witnesses are strongly encouraged to attend and participate. If an individual does not choose to attend a hearing, the charges will be reviewed as scheduled based on the available information, and a decision will be made. Although no inference may be drawn against a student for failing to attend a hearing or remaining silent, the hearing will proceed and the conclusion will be based on the evidence presented. No decision shall be based solely on the respondent's failure to attend the hearing or answer the charges. In special circumstances, written statements may be considered by the hearing body when a respondent or witness does not attend or fully participate in a hearing.

(Board approval dates: 3/2/2001, 4/8/2016, 5/31/2019, 11/16/2023)

**3335-23-14 Record of proceedings.**

A single record consisting of written notes, audio recording, or other method selected by the hearing body, will be made of all hearings. Such record will remain university property but will be made available to the respondent for review during the appeal period. A written notice of the decision will be provided to the respondent. If the respondent is found in violation, information regarding appeal procedures will be provided to the respondent.

(Board approval dates:, 3/2/2001, 4/6/2012, 4/8/2016, 5/31/2019, 11/16/2023)

**3335-23-15 Committee on academic misconduct.**

(A)    On behalf of the committee, the coordinator may investigate and resolve all reported cases of student academic misconduct that fall under the committee's jurisdiction. The coordinator and chair shall establish procedure for the investigation and resolution of cases. The committee does not hear cases involving academic misconduct in professional colleges having a published honor code. These colleges shall follow their own codes and procedures which can be obtained in their respective central offices. Some allegations against graduate students that fall under the committee's jurisdiction may also implicate the university policy and procedures concerning research misconduct and/or graduate school policy on the investigation of allegations of research misconduct by a graduate student. Upon receipt of such an allegation, the coordinator shall meet with the dean of the graduate school or designee, and/or the senior vice president for research or designee, and these parties shall mutually agree on the appropriate procedure for adjudicating the case. Notice of this decision and a description of the procedure to be used shall promptly be given to the student who has been charged. The coordinator or chair may refer complaints to the student conduct system if it is determined that the academic misconduct allegation is incidental to some other misconduct.

(B)    The committee on academic misconduct is constituted according to rule 3335-5-48.7 of the Administrative Code.

(C)    All complaints of academic misconduct shall be reported to the coordinator of the committee.

(D)    Students have an obligation to report suspected misconduct.

**Code of Student Conduct**

(E) A quorum for a hearing shall be no fewer than three voting members of the committee which shall include no fewer than one student member and two faculty members.

For cases involving graduate students, reasonable efforts will be made to have graduate students serve as the student members of the hearing committee.

(F) Eligibility.

   (1) To be eligible for appointment, an undergraduate student must possess a minimum 2.5 cumulative grade point average, and all students must maintain a 2.5 cumulative grade point average to continue serving. To be appointed or serve, a student should not be under current disciplinary sanction or probation or suspension. A student found in violation of the code of student conduct who receives a formal reprimand may continue service upon review and determination by the coordinator of the committee.

   (2) Removal

   The coordinator of the committee may remove committee members under certain circumstances, including but not limited to, not attending training, falling below the minimum grade point average, repeated absences, violating the code of student conduct or other applicable laws or rules, policies, standards, or guidelines, or not responding to repeated attempts at communication. Whenever possible, notification shall be made in writing to the committee member prior to removal.

(Board approval dates: 3/2/2001, 7/7/2006, 4/6/2012, 4/8/2016, 11/16/2023)

### 3335-23-16 University conduct board.

(A) Membership.

The respondent may elect for the university conduct board to adjudicate charges involving prohibited behaviors listed in rule 3335-23-04 of the Administrative Code, except paragraph (A) (academic misconduct). The director of student conduct will recommend members for approval as follows:

   (1) Fifteen faculty and/or staff members appointed by the vice president of student life for three-year terms;

   (2) Fifteen undergraduate student members, appointed by undergraduate student government for two-year terms;

   (3) Six graduate student members, appointed by the council of graduate students for two-year terms;

   (4) Four professional student members, appointed by the inter-professional council, for two-year terms; and

   (5) The director of student conduct or designee shall serve as board coordinator ex-officio without vote.

(B) Quorum.

A quorum for a hearing shall be no fewer than four voting members of the board which shall include no fewer than two student members, unless the respondent elects not to include student members. A hearing board shall consist of no more than eight voting members.

Exhibit A

Shivers Dep. Ex. 1 - Page 15 of 21

**Code of Student Conduct**

Updated November 16, 2023

(C)  Eligibility and alternates.

   (1)  To be eligible for appointment or service, an undergraduate student must possess a minimum 2.5 cumulative grade point average, and all students must maintain a 2.5 cumulative grade point average to continue serving. To be appointed or serve, a student should not be under current disciplinary sanction of probation or suspension. A student found in violation of the code of student conduct who receives a formal reprimand may continue service upon review and determination by the director of student council.

   (2)  Additional alternate members may be appointed as needed.

   (3)  Removal.

       The director of student conduct may remove university conduct board members under certain circumstances, including but not limited to, not attending training, falling below the minimum grade point average, repeated absences, violating the code of student conduct or other applicable laws or rules, policies, standards, or guidelines, or not responding to repeated attempts at communication. Whenever possible, notification shall be made in writing to the university conduct board member prior to removal.

(Board approval dates: 3/2/2001, 12/7/2007, 4/6/2012, 4/8/2016, 9/2/2016, 5/31/2019, 11/16/2023)

**University Sanctions**

### 3335-23-17  General guidelines for sanctions.

If a student is found to be in violation of the code, sanctions should be commensurate with the violations found to have occurred. In determining the sanction(s) to be imposed, the hearing body should take into account any mitigating circumstances and any aggravating factors including, but not limited to, any provocation by the subject of the conduct that constituted the violation, any past misconduct by the student, any failure of the student to comply fully with previous sanctions, the actual and potential harm caused by the violation, the degree of intent and motivation of the student in committing the violation, and the severity and pervasiveness of the conduct that constituted the violation. Misconduct motivated by bias for classes protected by university policy, other than constitutionally protected expression, may be considered an aggravating factor for sanctioning. Impairment resulting from voluntary use of alcohol or drugs (i.e., other than medically necessary) will also be considered an aggravating, and not a mitigating, factor. One or more of the following courses of action may be taken when a student has been found to have violated the code of student conduct.

(A)  Disciplinary sanctions.

   (1)  Formal reprimand.

       A written letter of reprimand resulting from a student's misconduct.

   (2)  Disciplinary probation.

       This probationary condition is in effect for a specified time period and may involve the loss of specified privileges. Further violation of university rules, policies, standards, or guidelines during the probationary period will additionally be viewed as a violation of the probation, which shall result in further action up to and including suspension or dismissal.

   (3)  Suspension.

**Code of Student Conduct**

Suspension is a sanction that terminates the student's enrollment at the university for a specified time period. Satisfactory completion of specified stipulations may be required for reenrollment at the end of the suspension period. Under special circumstances, the hearing body may hold the imposition of suspension in abeyance, which would allow for the student's continued enrollment so long as the student adheres to all stipulations, restrictions, or conditions imposed by the hearing body.

(4)   Dismissal.

Dismissal is a sanction which permanently separates a student from the university without opportunity to re-enroll in the future.

(B)   Conditions of suspension and dismissal.

Unless a student is otherwise notified in writing, a suspension or dismissal will not take effect until after the appeal period. A student who has been dismissed or suspended from the university shall be denied all privileges afforded a student (including, but not limited to, participation in university sponsored or sanctioned events and activities) and shall be required to vacate campus as determined by the hearing body. In addition, after vacating campus property, a suspended or dismissed student may not enter upon campus and/or other university property at any time, for any purpose, in the absence of expressed written permission from the vice president for student life or designee. To seek such permission, a suspended or dismissed student must file a written petition to the vice president for student life for entrance to the campus for a limited, specified purpose or to have the terms of this condition modified or reduced.

(C)   Failing or lowered grades.

In cases of academic misconduct, a hearing body may authorize the instructor to award a failing or lowered grade in the course and a loss of credit on the graded coursework.

(D)   Other sanctions.

Other appropriate sanctions may be imposed by a hearing body singularly or in combination with any of the above-listed sanctions. Examples include, but are not limited to, making restitution for property damage or misappropriation of university property or services, or the property of any person, residence hall contract termination or reassignment to another room, restriction of access to specified campus facilities and/or property, research assignments, community service projects, special workshop participation, referral to medical resources or counseling personnel, and/or educational sanctions.

(Board approval dates: 3/2/2001, 7/7/2006, 12/7/2007, 5/14/2010, 4/6/2012, 4/8/2016, 5/31/2019, 11/15/2023)

**Appeal Process**

### 3335-23-18  Appellate process.

(A)   Right to appeal.

(1)   A student found to have violated the code of student conduct has the right to appeal the original decision. The appeal is not intended to re-hear or re-argue the same case and is limited to the specific grounds outlined in this rule. The appeal must state the specific grounds for the appeal and should include all supporting documentation. The appeal must be postmarked, delivered, or sent via email or online form, to the appropriate appeal officer, listed below, within five business days after the date on which notice of the decision is sent

**Code of Student Conduct**

Updated November 16, 2023

to the student. Each student shall be limited to one appeal of a decision of a hearing body. The decision of the appeal officer is final.

(2) Any extensions to the appeal date may be made at the discretion of the director of student conduct, residence life, or the office of academic affairs or their designee.

(3) A student who has accepted responsibility for violating the code of student conduct waives the right to appeal, except on the basis that the disciplinary sanction is grossly disproportionate to the violation(s) committed.

(4) When found in violation of the code of student conduct, a respondent shall be limited to one appeal. The decision of the appeal officer is final.

(B) Grounds for appeal.

(1) An appeal may be based only upon one or more of the following grounds:

(a) Procedural error that resulted in material harm or prejudice to the student (i.e., by preventing a fair, impartial, or proper hearing). Deviations from the designated procedures will not be a basis for sustaining an appeal unless material harm or prejudice results; or

(b) Discovery of substantial new evidence that was unavailable at the time of the hearing and which reasonably could have affected the decision of the hearing body;

(c) Disciplinary sanction imposed is grossly disproportionate to the violation(s) committed, considering the relevant aggravating and/or mitigating factors.

(2) Non-attendance by the respondent or the complainant may not be the sole grounds for an appeal.

(C) Appropriate appeal officers.

(1) Appeals from residence hall hearings:

(a) All appeals from residence hall hearings other than contract terminations, shall be submitted to the director of housing and residence education or designee;

(b) All appeals, when the sanction imposed by the residence hall hearing is contract termination, shall be submitted to the director of student conduct or designee.

(2) Appeals of a decision of a hearing body other than those described in the previous section will be submitted for decision to the vice president for student life or designee.

(3) Appeals of decisions of the committee on academic misconduct or its coordinator will be submitted for decision to the executive vice president and provost or designee.

(D) Appeal proceedings.

(1) The appeal officer will dismiss the appeal if the appeal is not based upon one or more of the grounds set forth in paragraph (B) of this rule.

(2) The appeal officer will decide the appeal based upon a review of the record and supporting documents (e.g. prior disciplinary history).

**Code of Student Conduct**

(E)  Possible dispositions by the appeal officer.

The appeal officer may, after a review of the record:

    (1)  Uphold the original decision and/or sanction(s);

    (2)  Dismiss the case or individual charge(s) against the student and vacate any portion or all of the sanction(s);

    (3)  Modify or reduce the sanction(s); or

    (4)  Remand the case to the original hearing body to consider a specific issue as directed by the appeal officer or refer the case to a new hearing body to be reheard. If possible, a new hearing body should be different from the one that originally decided the case. If a case is reheard by a hearing body, the sanction imposed can be greater than that imposed at the original hearing.

(Board approval dates: 3/2/2001, 12/7/2007, 5/14/2010, 4/6/2012, 4/8/2016, 9/2/2016, 5/31/2019, 11/16/2023)

### 3335-23-19  Deviations and other procedures.

A student and hearing officer may agree in advance to deviations from procedure. Such deviations are not then subject to appeal. Other deviations are acceptable as long as such deviations are not found upon appeal to be materially harmful to the respondent. The office of student life, student conduct and the committee on academic misconduct may create additional procedures, such as record retention and reporting, in alignment with the code of student conduct. Student conduct will publish standards used to review, investigate, and adjudicate allegations involving registered student organizations. These procedures must be publicly available on the appropriate Ohio state university's website.

(Board approval dates: 3/2/2001, 4/6/2012, 4/8/2016, 5/31/2019, 11/16/2023)

### 3335-23-20  Interim suspension.

(A)  When the vice president for student life or designee has reasonable cause to believe that the student's presence on university premises or at a university-related or registered student organization activity poses a significant risk of substantial harm to the safety or security of themselves, others, or to property, the student may be immediately suspended from all or any portion of university premises, university-related activities or registered student organization activities. The interim suspension will be confirmed by a written statement.

(B)  The interim suspension shall remain in effect until:

    (1)  The conclusion of the student conduct process, including any appeal;

    (2)  The vice president for student life or designee terminates the interim suspension in writing; or

    (3)  The vice president for student life or designee terminates the interim suspension upon written request by the student where a determination is made that reasonable cause for the interim suspension no longer exists.

        (a)  The request from the student must be in writing and must include supporting documentation or evidence that the student does not pose, or no longer poses, a

Exhibit A
Shivers Dep. Ex. 1 - Page 19 of 21

**Code of Student Conduct**

significant risk of substantial harm to the safety or security of themselves, others or to property.

(b) A decision on such a request will be made without undue delay by the vice president for student life or designee.

(Board approval dates: 3/2/2001, 7/11/2003, 5/14/2010, 4/6/2012, 9/2/2016, 5/31/2019, 11/16/2023)

### 3335-23-21 Administrative disenrollment and other restrictions.

A student may be: disenrolled from the university; prohibited from all or any portion of university premises, university-related activities or registered student organization activities; and/or permitted to remain only under specified conditions when the vice president for student life or designee finds that there is clear and convincing evidence that the student's continued presence poses a significant risk of substantial harm to the health or safety of themselves, others, or to property.

(A) In those cases under paragraph (A) of this rule in which it appears that the risk posed by the student is a result of a health condition or a disability as defined by the Americans with Disabilities Act, the vice president for student life or designee shall also determine whether the risk or disruption can be eliminated or sufficiently reduced through reasonable accommodation and, if so, shall take appropriate steps to ensure that accommodation is made. The vice president for student life or designee may request the student to undergo an appropriate examination, as specified by the vice president for student life or designee, to determine whether any such condition exists and whether any such accommodation is possible. If the student fails to undergo such an examination, and if the other available evidence supports a finding under paragraph (A) of this rule, the vice president for student life or designee shall, to the extent reasonably possible, take the least restrictive measure or combination of measures necessary to resolve the risk or disruption

(B) A student who has been disenrolled; prohibited from university premises, university-related activities or registered student organization activities; or permitted to remain only under specified conditions may petition the vice president for student life for revision of that status. The petition must include supporting documentation or evidence that:

 (1) The conditions found to have existed under paragraph (A) of this rule no longer exist and will not recur, and

 (2) The student meets all normal and appropriate standards for admission and enrollment in any academic unit in which the student seeks to re-enroll. Upon receipt of such a petition, the vice president for student life or designee shall evaluate the evidence and may consult with the student, any appropriate university personnel, and any other persons whom the vice president for student life or designee deems appropriate. The vice president for student life or designee may deny the petition, grant the petition in whole or in part under specified conditions, or grant the petition in whole or in part without condition.

(Board approval dates: 3/2/2001, 12/6/2001, 5/14/2010, 4/6/2012)

### 3335-23-22 Authority.

The bylaws of the university board of trustees and rules of the university faculty provide that the university president shall have the final responsibility and authority for the discipline of all students of the university (see paragraph (A) of rule 3335-11-01 of the Administrative Code). This responsibility and authority has been delegated by the president to the vice president for student life, whose office is also charged with responsibility for promulgation of rules governing student conduct (see paragraph (H) of rule 3335-1-03 of the Administrative Code).

**Code of Student Conduct**

Updated November 16, 2023

The deans of colleges and of the graduate school, the directors of schools, and the chairpersons of departments, respectively, are responsible to the president through regular disciplinary channels for the discipline of all students in the activities of their respective colleges, schools, and departments (see paragraph (B) of rule 3335-11-01 of the Administrative Code). Likewise, the deans and directors of the regional campuses are responsible to the president through the executive vice president and provost for the discipline of all students in the activities of their respective campuses.

The Ohio state university code of student conduct is an official publication of the university board of trustees. All petitions for revision and amendment of this code of student conduct should be submitted through the office of the vice president for student life. The code of student conduct shall remain consistent with the university's non-discrimination, harassment, and sexual misconduct policy; any code of student conduct changes related to these policies shall be done in consultation with the appropriate official designated under the non-discrimination, harassment, and misconduct policy. Proposed revisions to the code of student conduct shall be reviewed, in draft form, by the office of the president, the office of academic affairs, and the steering committee of the university senate before being presented for approval to the university senate by the council on student affairs. No revision shall become effective unless approved by the university board of trustees and until printed notice of such revisions is made available to students.

This Code shall take effect upon approval by the board of trustees. It shall govern all procedures in matters brought after it first takes effect and also all further procedures in matters then pending, except to the extent that in the discretion of the university the application in a particular action pending would not be feasible, in which event the former version of this Code shall be used. The definitions of prohibited conduct used in a particular matter will be the definitions found in the version of section 3335-23-04 in effect at the time the alleged conduct occurred.

(Board approval dates: 3/2/2001, 5/14/2010, 4/6/2012, 4/8/2016, 9/2/2016, 5/31/2019, 11/16/2023)

Exhibit A

Shivers Dep. Ex. 1 - Page 21 of 21