# Exhibit B

Deposition of Guy Christensen

```
                                         Page 1
  1          UNITED STATES DISTRICT COURT
  2       FOR THE SOUTHERN DISTRICT OF OHIO
  3                EASTERN DIVISION
  4          ~~~~~~~~~~~~~~~~~~~~~
  5
  6  GUY CHRISTENSEN,
  7
  8                Plaintiff,
  9
 10      vs.           Case No.  25-CV-01062
 11
 12  WALTER CARTER "TED", et al.,
 13
 14                Defendant.
 15
 16          ~~~~~~~~~~~~~~~~~~~~~
 17              DEPOSITION OF
 18             GUY CHRISTENSEN
 19
                November 24, 2025
 20                9:33 a.m.
 21               Taken at:
                VIRTUAL Zoom
 22         VERITEXT LEGAL SOLUTIONS
                CLEVELAND, OH
 23
 24      Kurt Spencer, Notary Public
 25
```

Exhibit B

Page 14

1    being publicly known that I was expelled from a

2    university; unfairly, unlawfully. There's

3    personal, you know, reasons, but I think those

4    are the main ones for me.

5            Q.    So you used the word expelled. So

6    it's your belief that you were expelled from

7    Ohio State University?

8            A.    Essentially. I know it's

9    technically administrative disenrollment, but.

10           Q.    And you describe the notation on

11   your transcript as a mark. What exactly is on

12   your transcript?

13           A.    There's a notation referring to

14   OSU's student code of conduct -- I believe it's

15   a student code of conduct that, you know,

16   refers to the clause that the administration

17   used to get rid of me.

18           Q.    Did you reach out to Ohio State,

19   before filing this complaint?

20                 MR. CAREY:  Objection. Vague.

21           A.    I'm not sure I understand the

22   question.

23           Q.    So before filing this lawsuit, did

24   you reach out to Ohio State to try to resolve

25   this issue --

```
                                            Page 15

 1          A.    Yeah.

 2          Q.    How did you go about doing that?

 3          A.    I replied to their initial e-mail

 4   notifying me of my suspension, and tried to

 5   follow their process as best as I could and as

 6   well as I understood it.

 7          Q.    So that was your involvement,

 8   before you were administratively disenrolled.

 9   But after you were administratively disenrolled

10   and before you filed this lawsuit, did you try

11   to resolve this notation issue?

12               MR. CAREY:  Objection.

13   Mischaracterizes testimony.  Go ahead.

14          A.    No, I don't believe we were ever

15   offered the chance to do something like that.

16          Q.    Was there something that was

17   restricting you from reaching out, before

18   filing a lawsuit?

19          A.    Could you be more specific -- do

20   you mean like physically restraining, doing

21   something like that?

22          Q.    So you mentioned you didn't believe

23   you were offered the opportunity to do so; and,

24   so, I was trying to figure out what you meant

25   by you weren't offered the opportunity.
```

Page 16

```
 1        A.    I was referring to the fact that
 2   Ohio State did not offer me a fair avenue of
 3   recourse when I said that.
 4        Q.    Did you review the letter from
 5   Dr. Shivers, when she denied your petition for
 6   reenrollment --
 7        A.    Yeah.
 8        Q.    Do you recall that, at the end of
 9   that letter, she invited you to file an
10   additional petition, if you wanted to seek
11   reenrollment?
12        A.    Would you remind me of the exact
13   words that she used.
14        Q.    Sure.  Just a minute.
15             MR. CAREY:  If you would like me to
16   show him an exhibit, just let me know.
17             MR. RUSTICO:  Yep.  I'm just
18   getting it straight.  I believe it should be
19   Exhibit 15 -- there it is -- thank you.
20        Q.    If you could look to the second
21   page of Exhibit 15, the paragraph that begins,
22   Mr. Christensen remains --
23             MR. CAREY:  Sorry, Greg.  Are we
24   talking about the exhibit that's at Bates
25   number 1486 --
```

Exhibit B

Page 17

```
 1              MR. RUSTICO:  Yes.
 2              MR. CAREY:  Okay.  I'm handing that
 3    to the witness right now.
 4         A.    Did you say second page?
 5         Q.    Mr. Christensen, if you could take
 6    a look, you can review this document.  Just
 7    take a minute and just let me know when you're
 8    ready.  You can take your time, but let me know
 9    when you're ready.
10         A.    Okay.
11         Q.    So, do you see on the top of the
12    second page there, the paragraph that begins,
13    Mr. Christensen -- can you read that, please.
14         A.    Yes.
15              MR. CAREY:  Objection.  Are you
16    asking him to read it to himself or read it out
17    loud onto the record?
18              MR. RUSTICO:  Both -- or, out loud
19    onto the record.
20              MR. CAREY:  The document did not
21    come from him, so I'm going to object to
22    that -- these are not his words.
23              MR. RUSTICO:  All right.
24              THE WITNESS:  Should I answer him?
25              MR. CAREY:  I think you should read
```

Page 18

1   it to yourself -- Greg, can we agree on that?

2          MR. RUSTICO:  Fine.  All right.

3      Q.    Would you agree that this paragraph

4   states, Mr. Christensen remains welcome to

5   further reflect and submit a petition that

6   includes documentation or evidence that he no

7   longer poses a significant risk of substantial

8   harm to himself or others for consideration.

9   Did I read that correctly?

10     A.    You did read that correctly.

11     Q.    All right.  You can put that aside.

12  Mr. Christensen, have you spoken publicly about

13  this case?

14     A.    Yes.

15     Q.    In what ways have you spoken about

16  this case?

17     A.    I've spoken about it online.

18     Q.    Through what Platforms?

19     A.    Rumble, Next and Substack --

20     Q.    Okay.

21     A.    Although, I'm not certain those are

22  the only platforms.

23     Q.    Have you given any interviews?

24     A.    Would you be more specific.

25     Q.    Have you been interviewed about

Page 33

1  that information on their heads.  Many people

2  that I meet for the first time have -- you

3  know, I'd rather just avoid that conversation

4  and have them get to know me as like a fellow

5  regular dude.  I feel like starting off a

6  friendship or a meeting with that information

7  kind of changes the way they see me, and I

8  don't necessarily like that in my personal

9  connections --

10        Q.    Do you ever have situations, where

11  people --

12        A.    And, sometimes --

13        Q.    Sorry -- you can go ahead.

14        A.    Sometimes, it's just like

15  irrelevant.  For example, I go to a classroom

16  for school and I'm not going to talk about it

17  there.  It's like, I don't want to seem --

18  frankly, I don't care about people knowing or

19  not, like, generally, I don't need the

20  attention and I'm not going to like bring it up

21  in that sort of circumstance either.

22        Q.    Do people ever notice you in

23  public?

24        A.    Yeah.

25        Q.    Is that something that happens

Exhibit B

Page 34

1   frequently?  Infrequently?

2          A.      Frequently.

3          Q.      Roughly, how many times in a month

4   does someone recognize you on the street or at

5   a coffee shop or out in public?

6          A.      I don't know -- I don't count.

7          Q.      Would you say that happens more or

8   less than once a month --

9          A.      More.

10         Q.      More or less than once a week?

11         A.      See, I don't know, like, it

12  depends.

13         Q.      Do you consider yourself famous?

14         A.      I guess -- I hate being, like,

15  coming off as egotistical and -- yeah, I

16  suppose I am considered famous.

17         Q.      Is that something that you wanted,

18  being --

19         A.      I think there's two.  I think there

20  are two differing reasons that go towards that;

21  I think when I was younger, I wanted to be

22  famous, because, I mean, what kid doesn't want

23  to be like a famous YouTuber, right -- but,

24  now, I think that that's changed and I -- I

25  wouldn't even necessarily characterize it as

Exhibit B

Page 35

```
 1   wanting to be famous -- I want to have
 2   influence so I can do good.
 3         Q.    What kind of influence?
 4         A.    Over thoughts, I guess.
 5         Q.    Sorry, I missed that last answer.
 6         A.    I said, over thoughts -- the way
 7   people think about, you know, things in the
 8   world.
 9         Q.    So you want to be able to persuade
10   people; is that fair?
11               MR. CAREY:  Objection.
12   Mischaracterization.
13         A.    I think I do want to persuade
14   people.  I like teaching them things.
15         Q.    You want to educate them --
16         A.    Yeah.
17         Q.    Do you want to mobilize them?
18         A.    I do want to mobilize them with my
19   platforms to take, you know, non-violent
20   action.
21         Q.    So you mentioned that originally
22   your posts were comedic in nature; at what
23   point did they shift away from comedy and
24   towards politics?
25         A.    Started a new series on my channels
```

Page 49

1   sources do you use?

2          A.    I'd like to clarify that -- my

3   political videos, what I deem like, as, like,

4   purely political, didn't really start until

5   midway through 2023 -- and, prior to that, with

6   my skits and my series Monkey Explanation, I

7   sparsely used sources.

8          Q.    So you said earlier these Monkey

9   Explanation videos were meant to be

10  educational --

11         A.    Yeah.

12         Q.    And so you were creating these

13  educational videos without sourcing them in any

14  way.

15         A.    Right.

16         Q.    And you had -- sorry -- it looked

17  like you were going to continue.

18         A.    If you've ever seen one of them,

19  you would know that they're not really the type

20  to include sources for the short, and they're

21  really merely making one simple kind of moral

22  point, usually.

23         Q.    So to clarify, I wasn't asking if

24  you cited your sources.  I was asking what

25  sources you were using to gain the information

Page 65

```
 1         Q.    Okay.  And do you have -- is TikTok
 2    your primary platform; is that fair to say --
 3         A.    Yeah.
 4         Q.    Is that the one where you have the
 5    most followers?
 6         A.    Yeah.
 7         Q.    Have you ever had content pulled
 8    down from any other platforms?
 9         A.    Yeah.
10         Q.    Have you had things taken down from
11    Instagram?
12         A.    (Inaudible) -- did you hear that?
13         Q.    No.  I'm sorry.
14         A.    I said yes.
15         Q.    And do you recall what content
16    Instagram pulled down?
17         A.    I know one specific video.
18         Q.    Do you remember roughly when that
19    was?
20         A.    It was around May.
21         Q.    May of 2025?
22         A.    Yeah.
23         Q.    Was it the Rodriguez video?
24         A.    It was.
25         Q.    Have you had any other posts taken
```

Exhibit B

Page 66

1    down from Instagram before or since?

2         A.    Yeah.  I had sparsely some story

3    takedowns on Instagram during the prior

4    year-and-a-half to May, right, in 2025.  Those

5    were, I believe taken down because I was

6    reposting someone else's like Instagram

7    publication onto my story and somehow it

8    violated their guidelines.  And post the

9    Rodriguez video getting taken down on

10   Instagram, I had many, many videos succinctly

11   taken down all of a sudden.  I didn't notice

12   any patterns -- it was just whatever videos I

13   had up, they all got taken down in a row, until

14   my account was permanently banned on Instagram.

15        Q.    So are you still banned from

16   Instagram?

17        A.    That account is still banned.

18        Q.    And roughly when did you say that

19   ban was instituted?

20        A.    End of May to sometime in June.  I

21   don't recall the exact day or like week.  Those

22   posts, it was following all the video takedowns

23   that started to happen on that Instagram

24   account.

25        Q.    So before May 2025, had you had

Page 67

1    content removed from Instagram before?

2         A.    Like I said, all I can remember is

3    a few story posts of people and there was

4    pro-Palestine related content that was being

5    taken down.

6         Q.    In those instances, did Instagram

7    notify you in some way, do they let you know

8    when a particular post has been taken down?

9         A.    Yeah.

10        Q.    Do they normally give you a reason

11   why?

12        A.    Yeah.

13        Q.    Is it like a vague reason that just

14   says you violated our policies, or is it more

15   specific like you violated this section of our

16   policy?

17        A.    Well, it depends -- for the story

18   posts, I don't recall what reason, sometimes,

19   Instagram will give a blanket reason that says,

20   for example, when they took down my Instagram

21   account, they just said my account violated

22   their community standards, so I wasn't allowed

23   on Instagram anymore -- or, they might say

24   something was bullying and that's why it

25   violated their guidelines and was taken down.

Page 93

1   aid so we could support the people of Gaza,

2   while they were being subject to total

3   starvation by the occupation.  We raised around

4   half a million, at this point, for that this

5   year.  That's an example.  I made a lot of

6   videos about it.

7        Q.    So you were able to mobilize your

8   followers to donate a pretty significant amount

9   of money?

10       A.    Yeah.

11       Q.    Have you been able to mobilize them

12  in other ways; you mentioned, I think maybe

13  protests or demonstrations --

14       A.    Yeah.

15       Q.    What, tell me a little bit more

16  about that.

17       A.    Most recent example I can recall is

18  the first No Kings protest.  I encouraged my

19  followers to get out and go show up there.

20       Q.    So we've kind of jumped ahead to

21  your current type of content.  When did you get

22  interested in -- and I want to take a step back

23  and kind of figure out how we got there.  So

24  when did you become interested in the

25  Israeli/Palestinian conflict?

Page 94

1    A.    October 7, 2023.

2    Q.    Okay.  What kind of content were
3    you posting before then -- had you gotten more
4    into politics at that point, or you were still
5    doing your educational --

6    A.    Yeah, I'd gotten more into politics
7    that year.

8    Q.    Okay.  What kind of positions did
9    you fight for, before we got to the October 7th
10   moment?

11   A.    I started that year -- this was a
12   shift in kind of my ideology.  I started
13   fighting for more like progressive left-leaning
14   positions.

15   Q.    Do you recall any of those?

16   A.    Yeah.  The woman's right to choose
17   her, have a choice over her body.

18   Q.    So the abortion issue then, was
19   that included in that?

20   A.    That is the issue.

21   Q.    Okay.  And roughly how many
22   followers would you say you had, at this time,
23   again, on October 7, 2023, I know you wouldn't
24   know exactly how many, but, roughly, how many
25   followers did you at that point?

Exhibit B

Page 125

1  right --
2        A.    That's right.
3        Q.    So once you came to Ohio State,
4  would you, did you already consider yourself
5  part of the movement -- I'm using, trying to
6  use your terminology -- you call it the
7  movement, right?
8        A.    To make sure there's a distinction
9  here, there's the Palestinian resistance made
10 up of Palestinians in Palestine and then
11 there's the international movement in
12 solidarity with their fight for liberation -- I
13 would consider myself part of the latter.
14       Q.    And did you consider yourself part
15 of that group by the time you arrived on Ohio
16 State's campus?
17       A.    Yeah.
18       Q.    Did you do any activism, while you
19 were on campus?
20       A.    Could you be more specific.
21       Q.    So did you participate in any
22 rallies --
23       A.    I did.
24       Q.    Do you recall some of those --
25       A.    I do.

Exhibit B

1     Q.    What kind of rallies were you a

2  part of?

3     A.    There were a few marches I went to

4  around campus and I specifically remember

5  protesting the education reform bill in Ohio.

6     Q.    Did you participate in any protests

7  on campus?

8     A.    Yeah, that -- yeah.

9     Q.    Did you take a leadership role in

10  any of these on-campus activities?

11     A.    No.

12     Q.    Did the people at these events, the

13  people that you were protesting with, I guess I

14  would say, did they know who you were --

15     A.    Some of them.

16     Q.    So some of the people at Ohio State

17  knew about your online activities?

18          MR. CAREY:  Objection.  Vague.

19     A.    Yeah.  You're gonna have to be more

20  specific.  That's a really broad question.

21     Q.    Were you aware of people at Ohio

22  State, your fellow classmates, that knew about

23  your online activism?

24     A.    Certain classmates knew.

25     Q.    Are you aware of any class --

Exhibit B

Page 127

1          A.     And --

2          Q.     Sorry.  Go ahead.

3          A.     Certain classmates knew and I knew

4    that they knew, but -- yeah.

5          Q.     Were you aware of --

6          A.     It wasn't --

7          Q.     Were you aware of Ohio State

8    classmates who followed you on TikTok?

9                 MR. CAREY:  Sorry.  I think he was

10   completing his answer, before you asked that

11   last question.

12         A.     Could you repeat the question.

13         Q.     Were you aware of fellow classmates

14   who followed you on TikTok?

15         A.     Yeah, fellow students.

16         Q.     Did you ever get recognized on

17   campus --

18         A.     Yeah.

19         Q.     For your online content --

20         A.     Yeah.

21         Q.     How frequently would you say that

22   happened that someone would recognize you in

23   person based on your online experience, talking

24   specifically about at Ohio State?

25         A.     Three times a week, maybe.

Exhibit B

Page 128

1          Q.    Were these generally positive
2     interactions or did you have people, I don't
3     know, complaining to you or something?
4          A.    100% of interactions are positive.
5          Q.    Just to be clear, you said 100%?
6          A.    Yeah.  100% of the people who
7     recognized me, IRL, was positive.
8          Q.    Were you a member of any student
9     groups related to the Palestinian movement --
10          A.    Yeah.
11          Q.    What groups?
12          A.    SJP and a chalking group.
13          Q.    What's SJP?
14          A.    Are you asking me what SJP is?
15          Q.    Yes.
16          A.    Students for Justice in Palestine,
17     a student led group.  They have chapters across
18     the nation.
19          Q.    Why'd you join that group?
20          A.    Because I belong with them.
21          Q.    Why do you believe you belong with
22     them?
23          A.    I look up to the student protest
24     movements on campus.  And in spring of 2024, I
25     watched as the encampment protest happened and

Page 129

1    I was inspired by their bravery.

2         Q.    That was before you came to campus,

3    right?

4         A.    Yeah, that's right.

5         Q.    What role did you play at SJP?

6         A.    A minor role.

7         Q.    What made it minor?

8         A.    There's nothing that made it major.

9         Q.    What kind of activities did you do

10   with SJP?

11        A.    A few marches.

12        Q.    Did OSU ever try to stop those

13   marches that you're aware of?

14        A.    No, I'm not aware of that happening

15   when I attended.

16        Q.    You mentioned another student

17   group.  You said something about chalking; is

18   that right --

19        A.    Yeah.

20        Q.    What was that group?

21        A.    It was a small group of us

22   students -- I don't know if everyone was a

23   student.

24        Q.    What did you all do?

25        A.    We chalked near and on campus.

Page 130

1    Q.    What did you chalk?

2    A.    Messages on the sidewalks.

3    Q.    What kinds of messages?

4    A.    Messages in solidarity with the

5    Palestinian people.

6    Q.    Could you give me an example of

7    something that you would chalk?

8    A.    I recall one message where I wrote,

9    google Nakba on the sidewalk -- did you get

10   that?

11   Q.    Yep.  Yes.  Why would you chalk

12   that?

13   A.    To educate people, peak their

14   interest.

15   Q.    Did any of your chalkings ever talk

16   about Zionism?

17   A.    I'm sure some of them referenced

18   Zionism.

19   Q.    They ever reference Zionists?

20   A.    I'm not sure.  It's a lot of

21   speculation.  I don't have a memory of that

22   specifically.

23   Q.    Is this chalking allowed?

24   A.    To the best of my knowledge, we had

25   permission from the administration that what we

Exhibit B

Page 131

1    were doing was permissible.

2         Q.    Did you ever face any pushback

3    about your chalking?

4         A.    Could you be more or explain --

5         Q.    Sure.  Did anyone ever complain to

6    you or did you ever hear from the university;

7    just anything, did you ever hear anything back,

8    any feedback, I guess, is what I should say --

9    did you ever get any feedback about your

10   chalking?

11        A.    Like a message.

12        Q.    Like, did anyone ever ask you to

13   stop?

14        A.    Not that I can recall.

15        Q.    Okay.  Do you recall an incident in

16   November of 2024 that involved the FBI?

17        A.    I do recall that.

18        Q.    During that process or during that

19   incident, were you contacted by OSU PD?

20        A.    I was.

21        Q.    What did they want from you?

22        A.    They wanted to meet with me.

23        Q.    Did you meet with them --

24        A.    I did.

25        Q.    What did they ask you?

Page 158

1          A.     I'm sorry.  Is that a quote?
2          Q.     Yes.  So in the video, you say that
3     you urge -- it says, I urge you to support
4     Elias' actions just before you read the
5     manifesto in the video.  I'm just trying to
6     figure out what you meant by that -- what did
7     you mean by urging your supporters to support
8     his actions?
9          A.     That we shouldn't shy away from,
10    again, going back to the point of the video, a
11    reaction to genocide; we should understand it,
12    as what it is and what needs to happen to
13    prevent other acts like these.  And also in the
14    underlying crimes that drove these actions.
15         Q.     What did you mean when you said
16    that he's not a terrorist, he's a resistance
17    fighter?
18         A.     I meant that the narrative, which
19    has dominated about Elias Rodriguez is that he
20    is an anti-Semitic terrorist, and I meant that
21    he's not an anti-Semitic terrorist after
22    reading his manifesto.
23         Q.     And so you knew within 24 hours of
24    the shooting that he was not a terrorist.
25         A.     That's my knowledge.  That's

Exhibit B

1  correct.

2      Q.    Then you encourage your followers

3  to meet it with their own greater resistance

4  into escalation.  Right?

5            MR. CAREY:  Objection.

6  Mischaracterizes the video.

7      A.    Could you ask me a more specific

8  question.

9      Q.    You recall saying that your

10 followers should meet it with our own greater

11 resistance and escalation.

12            MR. CAREY:  Objection.

13 Mischaracterizes the video.

14     A.    Yeah, I just -- I think that's a

15 little bit out of context.  If you ask me what

16 I meant by that, I can answer -- but I think

17 it's kind of difficult for me to answer that,

18 when it's just broad like that.

19     Q.    So in your complaint, you quote

20 this portion of your video, and in it you say,

21 we will meet it with our own greater resistance

22 and escalation.  Did you mean that when you

23 said it?

24            MR. CAREY:  Objection.  Vague.

25     A.    Yeah.  I meant -- the it in that

Exhibit B

Page 163

1    he's a product of Empire.

2         Q.    Would you say he's a hero?

3         A.    I would say there's a lot more

4    sophistication and, in the way that I used it

5    in the video, I used that analogy because of

6    the connection between the Galactic Empire and

7    imperialism that I view the world through a

8    lens of today.

9         Q.    Was this video ever removed from

10   any platforms?

11        A.    Could you be more specific.

12        Q.    Was this video, to your knowledge,

13   ever removed from any social media platforms?

14        A.    Can you identify which video.

15        Q.    Oh, sorry -- the Rodriguez video --

16   the one we've been talking about.

17        A.    Okay.  The second Rodriguez video,

18   the follow-up, the retraction of the

19   condemnation was removed.

20        Q.    Where was it removed from?

21        A.    TikTok and Instagram.

22        Q.    So TikTok pulled this down --

23        A.    They did --

24        Q.    Did they contact you in some way --

25        A.    And then --

Exhibit B

Page 185

1    pretty concerned when you received this letter?

2         A.    Yeah.   I was worried about how this

3    would affect my future.

4         Q.    Do you recall receiving a

5    well-being check from law enforcement around

6    this time?

7         A.    I'm sorry, what?

8         Q.    I'll rephrase.   Do you recall being

9    contacted by law enforcement around this time?

10        A.    Typically, what law enforcement?

11        Q.    That wasn't my question.   I can

12   get.   We can get more specific later.   I'm just

13   asking, do you recall being contacted by law

14   enforcement around this time?

15        A.    The only law enforcement who

16   contacted me was Bryan Thompson from OSU PD,

17   the detective.

18        Q.    Okay.   And do you recall what that

19   conversation was about?

20        A.    I didn't have a conversation with

21   him.

22             MR. RUSTICO:   Kurt, could you read

23   the previous answer.

24             (Whereupon, the court reporter read

25             back the last answer.)

```
                                              Page 186

 1              MR. RUSTICO:  Okay.  Thank you,

 2   Kurt.

 3        Q.    So he contacted you, but you didn't

 4   have a conversation -- please help me

 5   understand this --

 6        A.    You have it exactly right.

 7        Q.    Okay.  So how did he contact you?

 8        A.    Via his phone.

 9        Q.    Okay.  Did he leave you a

10   voicemail?

11        A.    Yeah, he left me a voicemail.

12        Q.    Okay -- because you didn't answer

13   the call --

14        A.    I didn't answer the call.

15        Q.    Did you respond to the voicemail?

16        A.    No.

17        Q.    Do you recall what he said in the

18   voicemail?

19        A.    Nothing -- I really don't know

20   exactly what he said.

21        Q.    Do you remember generally what he

22   said?

23        A.    Something about like checking in on

24   me.

25        Q.    Is there a particular reason why
```

Exhibit B

Page 187

1   you didn't respond to him?

2        A.    I didn't see any reason I should.

3        Q.    In his message, did he ask you to

4   respond?

5        A.    I don't know.  I can't remember.

6        Q.    So you recall that he left you a

7   voicemail and that he was, appeared to be

8   checking on you in some way; is that correct --

9        A.    Something like that.

10        Q.    But you don't recall if he asked

11   you to call him back?

12        A.    You know, it's quite possible he

13   did.  I can't remember exactly what he said.

14   So I'm not going to say he did.

15        Q.    In your experience, when you check

16   on someone, do you normally want to hear back

17   from them?

18        A.    Yeah, if it's like a personal

19   thing.

20        Q.    Have you ever been subject to a

21   student conduct investigation before --

22        A.    No.

23        Q.    Before this incident -- sorry -- to

24   be clear.

25        A.    No, I wasn't involved in any

Exhibit B

Page 231

1          A.    I'm not familiar with a

2    disenrollment process from a claimed higher

3    education institution.

4          Q.    But did you understand that a

5    subsequent petition was possible, was

6    permitted?

7               MR. CAREY:  Objection.  Asked and

8    answered.

9          A.    Look, I didn't really feel like it

10   was possible to successfully petition once

11   again.

12         Q.    I didn't ask you if it would be

13   possible to do it successfully.  I asked, was

14   it your understanding that you could file

15   another petition for reenrollment?

16         A.    I could technically have sent

17   another letter, but there was -- I don't

18   know --  and my feelings at the time was that

19   this is not possible to accomplish -- there is

20   no way to prove that something that never

21   happened isn't happening anymore.

22         Q.    But you weren't foreclosed from

23   sending another letter.

24         A.    No.  No one was physically stopping

25   me from sending another letter.

Page 234

1    what schools you considered, at that point?

2         A.    Yeah.  I considered a few different

3    schools, chiefly, the community college near

4    where I live, ████████  █  ██████████████ , ████████████

5    ████  █  ██████████ .  I think I looked at the ████ .

6    I think -- there were some other local ones

7    that I perused -- my hopes were not high in the

8    success of being accepted.

9         Q.    Did you apply to some of these

10   schools --

11        A.    I did.

12        Q.    How many of these schools did you

13   apply to, at that time?

14        A.    I believe two.  I can't remember.

15   There may be more.  I don't remember right now.

16        Q.    What was the process like to apply;

17   obviously, you know, you're outside the normal

18   timeline.  How did you go about applying to

19   these schools?

20        A.    Online portal.

21        Q.    Each school had an online portal,

22   where you could apply, even though it was the

23   middle of the summer?

24        A.    Yeah.  I think even though it was

25   the middle of the summer, these schools still

Page 236

1          MR. RUSTICO:  Sure.

2      Q.    Was it your understanding that the

3  local community college accepts most everyone

4  who applies --

5      A.    It was my hope.

6      Q.    Did they accept you?

7      A.    They did.

8      Q.    (Confidential) what about

9  ██████████ ██ ███████████, what was your

10  understanding as you were applying to them?

11      A.    I knew I had been accepted the year

12  prior, obviously, I did not choose to go there.

13  But I did not have enough (inaudible) for the

14  ████████ ██ ██████████ to accept me.  And I

15  didn't know what to think.  I was like

16  (inaudible) at least I'll (inaudible) and the

17  reason, I only applied to the local college

18  (inaudible).

19          COURT REPORTER:  That answer was

20  really breaking up.

21          MR. RUSTICO:  It was breaking up

22  for us as well.

23      Q.    So you were accepted to both the

24  schools that you applied to --

25      A.    I was.

Page 237

```
 1         Q.    As part of both these applications,
 2    did you have to produce your OSU transcript --
 3         A.    I did have to.
 4         Q.    And that's the transcript that
 5    included the notation about your administrative
 6    disenrollment --
 7         A.    Yes.
 8         Q.    Did either of the schools ask you
 9    any follow-up questions about that notation?
10         A.    No.
11         Q.    Did either of the schools you
12    applied to ask you any questions about this
13    incident?
14         A.    No.
15         Q.    Do you have any reason to believe
16    that either of these schools reached out to
17    Ohio State about this incident?
18         A.    I have no idea.
19         Q.    So you enrolled at -- I'll just say
20    "the university" this fall -- did you start
21    with the normal fall semester --
22         A.    Yes.
23         Q.    But you're looking to either
24    transfer or apply somewhere else.  Can you tell
25    me about that.
```

Page 240

1      Q.    What makes you believe that it's a

2   hindrance?

3      A.    I don't believe it's positive.  I

4   believe it's a negative that it's included.

5      Q.    And why is that?

6      A.    I think it's like, generally,

7   looked down upon to be considered a -- what was

8   it, "a threat to campus," or however it's

9   worded -- obviously false, but the way it's

10  worded, it's very bad.  It looks like I'm an

11  evil person, which I'm not.

12     Q.    Has any admissions counselor

13  explained that to you, that they view it as a

14  hindrance?

15     A.    They didn't use that word.

16     Q.    If I recall your testimony, you

17  said that your current university or the other

18  one you applied to, they didn't ask about this,

19  correct?

20     A.    Yeah, that's correct.

21     Q.    And you are accepted to both the

22  universities you've applied to.

23     A.    Yes, that's correct.

24     Q.    Have you ever spoken to any college

25  admissions expert, who told you about what this

Exhibit B

Page 241

1    notation would do?

2         A.    I've spoken to an advisor about it.

3         Q.    Who is that?

4         A.    I don't recall their name.

5         Q.    Are they an advisor at your current

6    university or somewhere else?

7         A.    They were at my current university,

8    and they said that I should get that removed as

9    soon as possible.  We discussed whether or not

10   the university is aware that it even says that.

11        Q.    And so is this particular person's

12   opinion that another university would care

13   about this?

14        A.    Yeah, it was --

15              MR. CAREY:  Objection.

16        A.    It was the academic advisor's

17   opinion that this mattered for my academic

18   career.

19        Q.    Do you feel that your Ohio State

20   transcript otherwise reflects well on you?

21        A.    I think what I've done reflects

22   well; my grades and my credits that I took into

23   college, they reflect well on me.

24        Q.    You were pleased with your grades

25   that you got at Ohio State?

```
                                      Page 242
 1          A.     Yeah, except one.
 2          Q.     Which one was that?
 3          A.     I don't know what the class is
 4    called, but when I got graded, I was upset of
 5    myself for getting --
 6          Q.     You don't remember which class it
 7    was?
 8          A.     I don't remember the name of the
 9    class.
10          Q.     Do you remember the topic?
11          A.     I think it was some poli-sci class.
12          Q.     Do you have any recollection of
13    what that class was about?
14          A.     I'm unsure if poli-sci was even the
15    topic.  I just remember they had an online test
16    one day and I slept in for it, because it was
17    like, you know, off schedule for what normally
18    goes on in a week.  And that's why I had the
19    poor grade.  I was really mad at myself for it.
20          Q.     Was this the Zionism class?
21          A.     No.  No, it wasn't.
22          Q.     Okay.
23                 MR. RUSTICO:  How about we take a
24    ten-minute break.
25                 MR. CAREY:  Sure.
```

Page 243

```
 1            MR. RUSTICO:  I'm likely almost
 2    done, but we'll let you know.
 3            (Whereupon, a recess was taken.)
 4            MR. RUSTICO:  All right.
 5        Q.    You mentioned a conversation that
 6    you had with a counselor at your current
 7    university.  How did that conversation come
 8    about?
 9        A.    I met with an academic advisor,
10    when first registering for classes, prior to
11    the beginning of the fall semester;
12    subsequently, after the meeting, we had like a
13    Zoom meeting, I reached back out to him and we
14    ended up meeting again later that day.
15        Q.    Was the context of the meeting your
16    interest in transferring?
17        A.    (Confidential) I had already been
18    accepted to ████ , at that point --
19            THE WITNESS:  Can we mark that as
20    confidential?
21            MR. CAREY:  Yeah.  Can we flag
22    that, just that one mention as confidential?
23            MR. RUSTICO:  That's all right.
24        Q.    So the meeting with the university
25    counselor, though, was it about your ability to
```

Page 244

1    transfer somewhere else?

2        A.    No.   I think you're

3    misunderstanding.   I had a regularly like

4    normally scheduled meeting with an academic

5    advisor to register for fall classes at this

6    university.

7        Q.    Okay.  And that's when the notation

8    was discussed?

9        A.    The notation was discussed in the

10   following meeting later that day.

11       Q.    Okay.  Did you bring it up to the

12   advisor or did the advisor bring it up to you?

13       A.    I don't exactly remember how it got

14   brought up, but it got brought up after the

15   normal meeting was over.

16       Q.    Okay.  So this meeting wasn't in

17   the context of your now pending transfer

18   application.   It was back in the beginning of

19   the semester.

20       A.    I'm sorry.  Could you say that one

21   more time.

22       Q.    I was just trying to clarify.  So

23   this meeting occurred early in the semester,

24   before you had decided to transfer.

25       A.    This meeting occurred, before I

1  attended my first class at this university.

2        Q.    Okay.  So the context of that

3  meeting was not a potential transfer, because

4  you hadn't even started yet, right?

5        A.    That was not the context of the

6  meeting.  It was a normally scheduled academic

7  advisement appointment.

8        Q.    Okay.  And the advisor told you

9  that they thought this would hinder you in some

10 way?

11       A.    He didn't use the exact word

12 hinder, but they highlighted its importance in

13 getting it removed, as neither one of us knew

14 whether this new university had seen it, let

15 alone what they would do if they did see it and

16 decide to take action.

17       Q.    So this new university, which had

18 received your transcript, you didn't believe

19 that they had noticed it?

20       A.    That's what we discussed.  Yes.

21       Q.    Okay.  But you had sent them your

22 transcript, correct, as part of your

23 application --

24       A.    Yeah, that's right.

25       Q.    And no one flagged it for you in

Exhibit B

1  the application process.

2          A.     Uh-huh.  No.

3          Q.     So you mentioned, I think this is

4  hours ago now, but you think of your social

5  media career as a career, I think, like your

6  social media work as a career?

7          A.     Yeah, I think there's a career in

8  there.  I'm not sure if it's what I ultimately

9  want to do.  But, yeah.  I agree with that.

10         Q.     Has it been a meaningful source of

11  income for you?

12         A.     It's been enough to get by.

13         Q.     And you've been creating content on

14  social media for a little over five years; is

15  that right --

16         A.     Yeah.

17         Q.     And during that time, you've

18  generated income at different levels at

19  different times, right?

20         A.     Yeah.

21         Q.     If you were to put all of that

22  income together, whether it be through payment

23  for views, ads, subscriptions, direct payments,

24  what would you estimate, how much money do you

25  think you have made by making content on social

**"First Video"**
**https://x.com/guychristcnsen/status/19255057277344236l7**
**Posted on Substack on May 22, 2025, 6:55 AM**
**04:08**

Just a few hours ago to Zionist workers at the Israeli embassy at the Capitol here in the United States were murdered, shot by what seems to be a member of the movement. They've already got a suspect in custody. I want to condemn this attack for some obvious reasons and for some reasons that are not so obvious. But it's important because I want to talk also about what may happen to the movement in this country now that this has happened.

First off, I don't support the slaughter of civilians. That's not the way to go about it and bring justice. These people deserve to be tried and punished and sentenced to jail for their facilitation of this genocide and Israel's many, many, many crimes. Albeit, these two did work in the Israeli embassy, which is an arm of the propaganda machine. Israel has set up to disseminate propaganda internationally, but that's beside the point.

I'm also very afraid that the Trump regime is about to turn around tomorrow and use this attack as a pretext to violently crack down on the movement within this country. The Trump regime has already been deporting every student they can manage to justify deportation so far who support Palestine and criticize Israel, and Trump has publicly said that he wants to go after civilians next and he's trying to figure out a way to do it. Our Department of Justice has announced that they want to file hate crime indictments and terrorism charges against critics of Israel, especially student protesters and leaders here on college campuses in the United States to jail them, to jail them.

The FBI is already monitoring every American and immigrant, and wannabe immigrant, who is criticizing Israel or supporting Palestine on their social media, which they've labeled as counter terrorism efforts in the name of our national security. Us Americans all know what that means. National security counterterrorism is just another excuse to invade our privacy and suppress us.

The Trump regime also has a playbook that they're going by called Project Esther, developed by the Heritage Foundation, the same people behind Project 2025, whose whole purpose is to suppress and eliminate the pro-Palestinian movement here in the United States and especially on college campuses.

But this has been reminding me a lot of is the assassination of German diplomat Ernst Von Rath by a Jewish activist, which served as the Nazi's pretext to launch the Kristallnacht, a pogrom against Jewish people. That was the transition between discriminatory policy in Nazi Germany to violence and destruction against Jews.

The stage here in America has been set in a similar manner with discriminatory policies surrounding free speech, freedom of protest, freedom of press, against everyone across the board

Exhibit B

Ex. A - Page 1 of 2

who supports Palestinian human rights or criticizes Israel, which really amount to the same thing. And I'm afraid this may serve as a pretext for a massive and violent crackdown against us here in this country.

Like I said at the beginning of this video, these Zionist embassy workers deserved a trial, not being murdered in the streets. We can guess what motivated this attack and it probably has nothing to do with antisemitism. This probably was not motivated by antisemitism, but the fact that Israel has live-streamed a genocide to the world for two years and counting, and all the world has done is sit and watch as it's happened. Obviously, and with how dire the situation is right now, people will be driven to the point where they take it into their own hands to do something, anything to try to stop this.

It is interesting this comes as Israel seems to be entirely losing the narrative. European news outlets are fast abandoning their manufactured consent they've given Israel for the past two years to quickly try to wash their hands of the blood. Piers Morgan even called it a genocide yesterday, which obviously doesn't absolve him of everything he's done. But just to my point, those in America are even labeling Israel's operation Gideon's Chariots as a final solution for Gaza. So it's quite convenient.

Anyways, I encourage you guys to contribute to the fundraiser where we're trying to feed Palestinians in Gaza. We've already raised over $180,000; it's in my bio. Thank you and free Palestine.

**"Rodriguez Video"**
**https://substack.com/@yourfavoriteguy/note/p-164212516**
**Posted on Substack on May 22, 2025, 11:22 PM**
**08:55**

I take it back. I do not condemn the elimination of those two Zionist officials who worked at the Israeli embassy last night. And here's why: Israel has live streamed a genocide to the entire world for the last two years. And I could talk to you for days, for days about all the crimes, all the atrocities I reported on. And when I'm finished, you would still not know 1% of the Palestinians suffering. And you cannot expect to do such a thing in this world without the people standing up to fight to stop you in any way they can to resist against you. And that is exactly what happened.

Do not let yourself be fooled by the media, by the Zionists in this country, who are telling you that this was an antisemitic terrorist attack. It was not.

First of all, the man who was assassinated was a Christian Zionist, proclaiming it so on his social media. He spent his days working at the Israeli embassy fighting to maintain Israel's genocide and support for that genocide in this country. He is a war criminal and the same was true for the woman. This was not because they were Jewish; it was because there were Zionist.

And a manifesto from the suspect in custody, Elias Rodriguez, who apparently, if we are to believe this is true, he is part of the movement and he has consistently posted about Palestine. He targeted these two because of their connection to the state of Israel because they are Zionists, not because they are Jews.

I'm about to read you his manifesto, which he published with a signature and time stamp hours before the attack and his name was released by the police, but I want to urge you first to support Elias's actions. He is not a terrorist; he's a resistance fighter.

And the fact is that the fight against Israel's war machine, against their genocide machine, against their criminality includes their foreign diplomats in this country and internationally. And I want to remind you that while this attack took the lives of two human beings, Israel has murdered thousands of Palestinian civilians in cold blood, without any shame, with pride, rejoicing in the streets of Israel over this. And they get no attention to this country while this attack is being used to weaponize violence against the movement. But we will meet it with our own greater resistance and escalation.

And if this manifesto is genuine, if Elias is who the police is saying he is, I wholeheartedly agree. Let's read this manifesto:

> Halilintar is a word that means something like thunder or lightning. In the wake of
> an act, people look for a text to fix its meaning. So, here's an attempt. The atrocities

committed by Israelis against Palestine defy description and defy quantification. Instead of reading descriptions mostly, we watch them unfold in a video, sometimes live.

After a few months of rapidly mounting death tolls, Israel had obliterated the capacity to even continue counting the dead, which has served its genocide well. At the time of writing, the Gaza Health Ministry records 53,000 killed by traumatic force. At least 10,000 lie under rubble. And who knows how many thousands more dead of preventable disease or hunger. Tens of thousands now at risk of imminent famine due to Israeli blockade. All enabled by Western and Arab government complicity. The Gaza Information Office includes 10,000 under the rubble with a dead in their own count.

In news reports, there've been those 10,000 under the rubble for months now, despite the continual making of more rubble and repeated bombing of rubble again and again in the bombing of tents amid the rubble. Like the Yemen death toll, which had been frozen at some few thousand for years under the Saudi UK-US bombardment before being belatedly revealed to stand at 500,000 dead.

All of these figures are almost surely a criminal undercount. I have no trouble believing the estimates that put the toll at 100,000 or more. More had been murdered since March of this year than in protective edge and cast lead put together. What more at this point can one say about the proportion of mangled and burned and exploded human beings whom were children. who let this happen? We'll never deserve the Palestinians' forgiveness; they've let us know as much.

An armed action is not necessarily a military action; it usually is not. Usually, it is theater and spectacle, a quality it shares with many unarmed actions. Nonviolent protests in the opening weeks of the genocide seemed to signal some sort of turning point. Never before had so many tens of thousands joined the Palestinians in the streets across the West. Never before had so many American politicians been forced to concede that, rhetorically at least, the Palestinians were human beings, too.

But thus far, the rhetoric has not amounted to much. The Israelis themselves boast about their own shock at the free hand the Americans have given them to exterminate the Palestinians. Public opinion has shifted against the genocidal apartheid state, and the American government has simply shrugged. They'll do it without public opinion then, criminalize it where they can, suffocate it with bland reassurances that they're doing all they can to restrain Israel where cannot criminalized protest outright.

Aaron Bushnell and others sacrifice themselves in the hopes of stopping the massacre and the state works to make us feel their sacrifice was made in vain, that there's no hope in escalating for Gaza and no point in bringing the war home. We can't let them succeed; their sacrifices were not made in vain. The impunity that representatives of our government feel at abetting this slaughter should be revealed as an illusion then.

The impunity we see is the worst for those of us in immediate proximity to the genocidaires. A surgeon who treated victims of the Mayan genocide by the Guatemalan state recounts an instance in which she was operating on a patient who'd been critically injured during the massacre when suddenly armed gunmen entered the room and shot the patient to death on his operating table, laughing as they killed him. The physicians at the worst part was seeing the killers, well known to him, openly swagger down local streets and the years after.

Elsewhere, a man of conscience once attempted to throw Robert McNamara off of a Martha's Vineyard-bound ferry into the sea, incensed at the same impunity and arrogance he saw in that Butcher of Vietnam, as he sat in the ferry's lounge laughing with friends. The man took issue with McNamara's very posture, telling you "my history is fine, and I can be slumped over a bar like this with my good friend Ralph here, and you'll have to lump it." The man did not succeed at heaving McNamara off a catwalk into the water. The former Secretary of State managed to cling to the railing and clamber back to his feet. But the assailant explicated the value of the attempt by saying, "well, I got him outside, just the two of us, and suddenly his history wasn't so fine, was it?"

A word about the morality of arm demonstration. Those of us against the genocide take satisfaction in arguing that the perpetrators abettors have forfeited their humanity. I sympathize with this viewpoint and understand its value in soothing the psych, which cannot bear to accept the atrocities it witnesses even mediated through the screen. But inhumanity has long since shown itself to be shockingly common, mundane, prosaically human. A perpetrator may then be a loving parent, a filial child, a generous and charitable friend, an amiable stranger capable of moral strength at times when it suits him and sometimes even when it does not and yet be a monster all the same. Humanity doesn't exempt one from accountability.

The action would've been morally justified taken 11 years ago during protective edge around the time I personally became acutely aware of our brutal conduct in Palestine. But I think to most Americans such an action would've been illegible; it would seem insane. I'm glad that today at least there are many Americans for which the action will be highly legible and in some funny way, the only same thing to do.

I love you, mom, dad, baby sis, the rest of my familia, including you. Free Palestine.
Signed, Elias Rodriguez.

I ask you, what is the difference between Elias Rodriguez and Aaron Bushnell to you? Perhaps the only difference I can see is that Aaron Bushnell's sacrifice inflames, protesting his government's role in a genocide he could no longer bear to be a part of. It's more palatable to this world because he did not throw the final stone in his last moments at the mob of criminals whose suffering they've brought to this world is more than this world can bear any longer.

You might've seen my update early this morning where I condemn this attack. And I reaffirm that I had a change of perspective after hearing critiques from people in the movement. It is like, as they said, I am condemning Luke Skywalker for attacking the Death Star because the Empire might crack down on the resistance. And while my point was that this attack will be used for a crackdown on the movement in the coming days, they're right. We must meet with escalation and stronger resistance. I hope my retracted condemnation does not allow our government to condemn me to a cell, but I don't know.

Follow my page for more. Thank you and free Palestine.

**"First Follow-Up Video"**
**https://www.tiktok.com/@yourfavoriteguy/video/750771446305 59409 10**
**Posted on TikTok on May 23, 2025**
**00:28**

Since Zionists on Twitter are going rabid over what I just posted, I just want to disclaim that I'm not suicidal. I would never make a threat that would jeopardize my position to influence and educate people about the atrocity and evils that Zionism is currently bringing down upon the Palestinian people, especially in Gaza. I hate Nazis and I hate Zionists. So, you know, I don't have a problem with you much if you're not one of those things.

**"Torres Follow-Up Video"**
**https://x.com/guychristensen_/status/1925655240214196420**
**Posted on TikTok on May 27, 2025, 4:49 PM**
**07:07**

Right now, a member of Congress who's an AIPAC millionaire is trying to sic the Capitol police to go after me after I made a video on him exposing his genocidal rhetoric and friendships with Israeli war criminals, hoping that one day he would be held accountable for his crimes in a similar manner that the perpetrators of the holocaust were held accountable in the Nuremberg Trials after World War II.

This is Ritchie Torres. He represents the Bronx District in the House, and he's taken well over a million dollars from AIPAC, one of the largest spenders in the pro-Israel lobby, who has captured most of our Congress. In 2024 AIPAC spent money on most of the congressional races and won 386 seats. That's a majority of our entire Congress, dominated by a pro-Israel lobby.

AIPAC's number one job here in the United States is to make sure that our government keeps sending Israel bombs. That's it. Taking money from them is so criminal, so morally bankrupt. I really can't put it in more words without wasting more time in this video. It's blood money and Ritchie Torres has enjoyed his trips to Israel. He's enjoyed meeting the war criminals who have carried out this genocide, who have spouted genocidal and dehumanizing rhetoric against the Palestinians, which Richie does as well.

So, when I made a video about Ritchie and how he's taken bloodstained money and raised awareness about the criminals who are in our government, he took notice and he spent the last week slandering me as an antisemite, which is a claim that has no backing. There's no truth behind it whatsoever. Anybody who knows who I am, who's heard what I have to say online, knows that I don't have any problem with Jewish people at all. Nothing. Nothing.

Now, in complete honesty, I thought it was funny watching Ritchie freak out over what I had posted about him. His libel against me didn't bother me. But just an hour ago, he went to the New York "shit" Post and gave them a scoop on how he's siccing the Capitol police after me to investigate me for supposed threats of violence, another claim, which has no truth to it.

In my video—and this is what he twists up—I say "now Ritchie, screenshots last forever, what you have done will haunt your family for eternity, and if you're still alive, you will end up in a Nuremberg trial." The meaning behind that is pretty obvious. I'm saying that when justice comes for Palestine, if Ritchie's still alive, meaning not old and dead and deceased or whatever, he will end up in the court alongside the rest of the people there. But there's some people, especially in our government, who are way too old that I don't expect to see in a Nuremberg trial. Like Joe Biden has cancer who unfortunately, won't be alive by the time justice reaches the Palestinian people and he won't have his day in court. That's an example of somebody who won't be alive to

end up in a Nuremberg trial. And that's all I meant by that. But, of course, as this whole week has been a massive character assassination on me attempting to discredit me, labeling me as gay or … it's so wild. New York Post called me baby face in every article they publish about me. Their gutter journalism is exactly why nobody takes the New York Post seriously anymore.

This is utterly ridiculous. Anybody in their right mind knows when they see my content that I'm not an antisemite. I hate Nazis just as equally as I do Zionists. Anyone who sees my content knows that I do not incite violence. I do not tell anyone to make threats. I do not want anyone to make threats. Why would I call for people to make threats? All that would do is jeopardize my platform. I'm nonviolent.

Now in the grand scheme of things, Ritchie Torres is just another useless low-level politician in Congress compared to the rest. His career has only been elevated because he promised to staunchly defend Zionists' crimes. And if we want to talk about incitement to violence, Ritchie Torres' support for Israel's crimes and defense of them here in the states emboldens Israel to go even further with their crimes.

Right now, Israel is putting Palestinians in cages, and they are whisking in the Palestinians they deem a threat, or they want to remove, like journalists or critics of the state of Israel, are being disappeared through this aid-distribution plan, which has already gone horribly wrong. It's horrific the videos that we're seeing today. And I wanted to talk about this first, but this was more important to address, obviously. But there's a video later coming out about that. People like Richard Torres, you won't hear a word of his mouth about that. You won't hear him talk about how Israel fired at dozens of diplomats from all over the world as they tried to talk to Palestinians in the West Bank last week. You won't hear him condemn Israel for assassinating diplomats and other neighboring countries. You won't hear him talk about how Israel has starved-out Gaza for 80-plus days and is now putting them into concentration camps. He won't say anything about that. If he does his career is over, he's not going to be propped up by AIPAC anymore. His lips are sealed. Maybe deep down, he has some morals, way, deep down inside him that might make him want to say something about it, but he never will. He never will.

And that's the biggest issue is that when you have these—not even just the pro-Israel lobby—but lobbying in general in the United States, and what we've seen for over a decade now is that these interests take over human interests, the interest of the people, humanity. They suck the humanity, our politicians who now are beholden to interests that are funding them way more than honestly, the people of this country are. It's blood money. It really is. And that's why I said that I hope that Ritchie Torres' pajamas get stained with blood when he goes to sleep on that pile of money he took from AIPAC, because it's blood money.

Yeah, I don't think people like Ritchie Torres should have a career meeting with, like, the worst war criminals that we might ever be alive to witness. There's no excuse for it, honestly, and anything in defense of Israel that he's saying every single day on his social media or in his speeches

or whatever, you can't defend what he's saying. He's advocating that there's no genocide. He's saying that. It's so wrong, guys, it's so bad. And if you speak out about it, he'll go to the New York "shit" Post and get them to slander you for days on end.

That's just the thing: we are really close to completely breaking the Zionist narrative in America. And that's why they're fighting so hard to get rid of anyone who's shattering that narrative. So, I encourage you guys, please support me right now. I am in need of it. All my socials are in my bio. There's ways to support me directly in my bio. Make sure you got me on a few different platforms in case I get removed.

Thank you and free Palestine.