# Exhibit C

Deposition of Kelly Smith

1

```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
                    EASTERN DIVISION

                        - - - - -


Guy Christensen,            :

        Plaintiff,          :

        vs.                 : Case No. 2:25-cv-01062
                              Judge Sargus
Walter Carter Jr.,          : Magistrate Judge Vascura
et al.,
                            :
        Defendants.
                            :


                        - - - - -

              DEPOSITION OF KELLY SMITH

                        - - - - -


       Taken at The Ohio State University
            Office of Legal Affairs
        1590 North High Street, Ste. 500
              Columbus, OH 43201
         November 19, 2025, 10:00 a.m.




                        - - - - -


             Spectrum Reporting LLC
        400 South Fifth Street, Ste. 201
              Columbus, Ohio 43215
          614-444-1000 or 800-635-9071
            www.spectrumreporting.com

                        - - - - -
```

30

1   A.          Yeah.  Sure.  I mean, usually we
2   already know that.
3   Q.          Okay.  How would you already know that?
4   A.          University records.
5   Q.          What happens after notice is issued?
6   A.          After notice is issued to the student,
7   we issue the student the notice via Maxient or,
8   again, if they're a non-campus student, they're
9   getting that delivered to them in person by
10  police.  We have recordkeeping that we do.  We
11  update our case management system.  We're also
12  giving notice to key university partners.  So we
13  would be noticing, for example, BuckID, the
14  university registrar, their academic advisor, our
15  student advocacy center so that they're aware of
16  it and can provide support to the student if they
17  need support.  And then we would be proceeding
18  with whatever investigation follows.
19  Q.          To what extent is investigation
20  conducted before an interim suspension?
21  A.          Not much, because typically an interim
22  suspension is happening at the start of something
23  with, you know, an initial report with some sort
24  of alarming information that we're concerned

                                                                    31

1    about.  And we're making the decision to issue,
2    you know, the interim decision -- suspension has
3    been approved.  We want to get that out and then
4    start the investigation, so we often have a very
5    initial report at the start of it.
6    Q.         If you receive an initial report that
7    you regard alarming, would you agree that it's
8    important to review other readily available
9    information before issuing a suspension?
10   A.         I'm not following your --
11   Q.         Suppose you receive an initial report
12   that you consider alarming.  Would you make any
13   effort to review readily available information on
14   top of that, prior to making a recommendation of
15   whether to suspend the student, or simply suspend
16   the student?
17   A.         You're asking me to speculate on
18   something.  I don't know what that other
19   information is.
20   Q.         So in your mind, it's not necessarily
21   important to gather readily available information
22   before recommending a suspension?
23   A.         I'm not going to speculate on what you
24   think readily available information is.

43

1 report is received?
2 A. I mean, typically, it's pretty -- it's
3 pretty quick. I mean, it's -- we're dealing with
4 urgent circumstances, so we are working rather
5 quickly when it's an interim suspension, so...
6 Q. Is it common to see that happen within
7 a day?
8 A. Yes.
9 Q. And to be clear, I'm talking about the
10 suspension itself, not just your recommendation.
11 Would you agree that it's still common
12 to see that happen within a day?
13 A. Okay, now I'm not sure what you're
14 asking.
15 Q. Sure. Let me back up.
16 Would you say that it's common to see
17 an interim suspension issued within a day of your
18 office receiving an initial report that you found
19 alarming?
20 A. I mean, I -- what I would say is it
21 would be my -- if I would -- when I receive a
22 report that causes me to recommend an interim
23 suspension, it would be my hope to be able to
24 process that as quickly as possible.

44

1   Q.          When you make a recommendation about an
2   interim suspension, are you then aware of it
3   immediately when an interim suspension is issued?
4   A.          So when I make a recommendation for an
5   interim suspension, the approval of it is a reply
6   to me and then I am working to have it processed,
7   so yes.
8   Q.          Okay.  So would you say that that whole
9   process from the receipt of an initial report
10  through the issuance of an interim suspension
11  typically occurs within a day?
12  A.          Yes.
13  Q.          Can there sometimes be delays in that
14  process as a result of a weekend?
15  A.          I mean, I -- you're asking me again to
16  sort of speculate.
17  Q.          Can you recall ever seeing the process
18  take a little bit longer because a report came in
19  over a weekend?
20  A.          I've given people my cellphone number,
21  so it shouldn't happen.  If there are things
22  happening that need to be addressed, people should
23  know how to reach me.
24  Q.          Earlier you mentioned collaborating

Exhibit C

                                                                87

1    answered.  She said she doesn't recall.
2    Q.         You can answer.
3    A.         I don't recall the specifics of the
4    conversation.
5    Q.         Did you -- did you recommend any course
6    of action at that time?
7               MR. BLAIR:  Objection.  Asked and
8    answered.  She said she doesn't recall.
9    A.         I don't recall at that time any
10   recommendations.
11   Q.         Did you discuss the Rodriguez video
12   with anyone else, other than Ryan Lovell and
13   Melissa Shivers, on May 25th?
14   A.         No, not that I recall.
15   Q.         Are you aware of any video posted by
16   Guy Christensen in which he stated, quote, I'm not
17   suicidal, and, quote, I would never make a threat
18   that would jeopardize my position?
19              MR. BLAIR:  Objection.  Asked and
20   answered.  She already said she doesn't recall any
21   other videos.
22              MR. CAREY:  That's not what she said.
23              MR. BLAIR:  You can answer.
24   A.         I don't recall watching other videos.

```
                                                              90

 1   were you present for any other discussions about

 2   Guy Christensen on May 25th?

 3   A.        Not that I can recall.

 4   Q.        Do you have any reason to believe that

 5   anything in the Rodriguez video was specifically

 6   targeted at any member or members of the OSU

 7   campus community?

 8   A.        No.

 9   Q.        Are you -- strike that.

10             Are you aware of any video by Guy

11   Christensen in which he discloses an affiliation

12   with OSU?

13   A.        I'm not aware of that.

14   Q.        Did you read any media reports or news

15   stories about either Mr. Christensen or any of his

16   videos prior to his suspension?

17   A.        I don't recall.

18   Q.        Were you aware of any public officials

19   or elected officials commenting on either

20   Mr. Christensen or his videos prior to his

21   suspension?

22   A.        I don't recall.

23   Q.        Were you aware of any complaints or

24   reports received from the public or from the OSU
```

130

1 any classes?
2 A. I mean, if he was registered for
3 classes. But I know that we had to make a request
4 to remove the pending investigation.
5 Q. Aside from any code or notation on
6 Mr. Christensen's transcript, what other means are
7 you aware of by which OSU might inform someone
8 that Mr. Christensen had been disenrolled?
9 A. I'm not aware of any.
10 Q. To the best of your knowledge, is there
11 anyone else who might be aware of some means?
12 A. Well, I mean, I suppose the other
13 recordkeepers at the institution may have records.
14 We are -- Student Conduct is also tasked with
15 keeping records, but our -- we keep conduct
16 history reports, but we only keep and report
17 records of violations. Mr. Christensen doesn't
18 have a record of a conduct violation.
19 Q. Why is that?
20 A. Because he was not investigated,
21 charged or adjudicated of any violations of the
22 Code of Student Conduct.
23 Q. Is an administrative disenrollment
24 different from an adjudication in your mind?

131

1     A.     It's not my mind, it's the code.

2     Q.     Is it?

3     A.     Well, in the code it is.

4     Q.     So under the code, an administrative
5 disenrollment is not considered an adjudication?

6     A.     Under the code, it is a separate
7 section. So when we -- when we talk about what
8 the Code of Student Conduct provides to students
9 to resolve -- to be found in violation of one of
10 the prohibited behaviors that are listed in
11 section four, there are hearing procedures.
12 Administrative disenrollment is not an
13 adjudication process for any of those prohibited
14 behaviors, so it is not a conduct violation for
15 resolution.

16     Q.     It's sort of its own entity?

17     A.     It's its own thing.

18     Q.     Earlier we discussed a student who you
19 referred to as student B who successfully
20 petitioned for re-enrollment.
21             Do I have that right?

22     A.     Yes.

23     Q.     Were you involved in any discussions
24 about student B's petition for re-enrollment?

Exhibit C