# Exhibit D

Deposition of Ryan Lovell

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Guy Christensen,          :

    Plaintiff,       :

    vs.              : Case No. 2:25-cv-01062
                     Judge Sargus
Walter Carter Jr.,        : Magistrate Judge Vascura
et al.,
                 :

    Defendants.      :

- - - - -

DEPOSITION OF RYAN LOVELL

- - - - -

Taken at The Ohio State University
Office of Legal Affairs
1590 North High Street, Ste. 500
Columbus, OH 43201
November 21, 2025, 10:10 a.m.

- - - - -

Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

```
                                                              44
 1    Exhibit 4.
 2    A.          Oh, sorry, didn't even see that.
 3    Sorry.
 4    Q.          It's almost like you're not a lawyer.
 5    A.          I was going to say, what is going on
 6    with that?  Okay.
 7    Q.          If we could return to Exhibit 4.
 8    A.          Sure.
 9    Q.          Would I be correct in understanding
10    that you made the determination that there was
11    reasonable cause to believe that Guy Christensen's
12    presence on university premises posed a
13    significant risk of substantial harm?
14                MS. BUCHANAN:  Objection.  Asked and
15    answered.
16                You can answer.
17    A.          I mean, I think as I said before, like,
18    the senior vice president is the decision-maker.
19    My responsibility then is to send the letter out.
20    I'm doing that in agreement with her in order to
21    do that.  And then I'm responsible for any sort of
22    modifications for the interim suspension.
23    Q.          Dr. Shivers testified that you and she
24    jointly made the decision to issue an interim
```

45

1  suspension to Guy Christensen.
2  Does that match your recollection?
3  A.     Yes.  As I said, I'm doing that in
4  agreement with the decision.
5  Q.     Do you remember what the reasons were
6  for that suspension?
7  A.     I mean, the code has the language about
8  the substantial harm piece that's listed in here.
9  That significant risk of substantial harm to the
10 safety and security of the -- I mean, to yourself,
11 others, property.  It's really the university
12 community piece.
13     And based upon the language that was
14 used, I think in a social media post, I don't
15 remember if it was TikTok, but in a social media
16 post that had some threatening language in it,
17 concerns raised by the university community
18 regarding their safety, then we believed that
19 there was reasonable cause to move forward with an
20 interim suspension while we determine next steps.
21 Q.     Were there any other reasons for the
22 interim suspension?
23 A.     I mean, I don't remember all the pieces
24 and conversation at that time.  I mean, they were

59

1  released in May of 2025?
2  A.         I don't know that.
3  Q.         To your knowledge, did anyone obtain or
4  attempt to obtain a protection order, restraining
5  order, or civil commitment order against
6  Mr. Christensen?
7  A.         I don't know that.
8             MR. CAREY:  All right.  I've been
9  talking for a bit and I think we're making good
10 time.  I would like to take ten minutes.
11            MS. BUCHANAN:  Sure.
12            (A recess is taken.)
13 Q.         To the best of your knowledge,
14 Mr. Lovell, why was Mr. Christensen suspended on
15 May 25th rather than administratively disenrolled?
16 A.         Are you talking internally suspended?
17 Q.         Let me back up.
18            Is there a difference between
19 suspension and interim suspension?
20 A.         There is, yes.
21 Q.         Okay.  What is the difference?
22 A.         I mean, the interim part.  So, I mean,
23 an interim suspension is a temporary time frame
24 where we can make some additional assessments

60

1 about next steps.  A suspension would be a removal
2 from the institution for some sort of period of
3 time.
4 Q.         So an interim suspension might not have
5 a determinate period of time attached to it?
6 A.         Correct.
7 Q.         But a suspension has a set period of
8 time attached to it?
9 A.         Yes.  It generally occurs after --
10 after a conduct process.
11 Q.         Okay.  Well, thank you for the
12 clarification.  I'll ask it again.
13            To the best of your knowledge, why was
14 Mr. Christensen given an interim suspension on
15 May 25th rather than being administratively
16 disenrolled?
17 A.         Sure.  I mean, that's a first step in
18 our conduct process when we believe that there's
19 risk for substantial harm, that threatening
20 language, the aggressiveness of the post, some of
21 the things that were said led us to a time frame
22 of wanting to create an interim suspension so that
23 we could assess the situation for potential next
24 steps.

61

1  Q.      Why did you feel it was necessary to
2  assess the situation any further?
3  A.      Oh, I think an interim suspension
4  allows us to gather some additional information.
5  Q.      I understand that.  I'm asking why was
6  it necessary in this case to assess anything any
7  further?
8  A.      I don't know that I understand your
9  question.
10 Q.      I understand the difference between an
11 interim suspension and an administrative
12 disenrollment.  I'm asking:  Why did you choose
13 the interim suspension rather than simply engaging
14 in a disenrollment?
15 A.      Well, I mean, part of it's -- well, an
16 interim suspension allows us to conduct a process.
17 So we want to make sure that we've got all of
18 the -- to gather as much information as we can
19 before making a final decision of a conduct
20 process or an administrative disenrollment.
21 Q.      At that point in time when you issued
22 an interim suspension, was there any particular
23 information that you wanted to gather?
24 A.      Yes.

69

1  media reports or news stories about him at any
2  time?
3  A.        I don't.
4  Q.        Are you aware of any public officials
5  or elected officials commenting on Mr. Christensen
6  or his videos at any time?
7  A.        I don't recall that.
8  Q.        You're not aware of any comments by
9  Congressman Ritchie Torres?
10 A.        Not at the time, no.
11 Q.        Are you aware of any as you sit here?
12 A.        No.  I should have just said it that
13 way.  No.
14 Q.        It becomes a reflex at some point.
15 A.        You're fine.
16 Q.        So fair to say you're not aware of any
17 comments by Attorney General Pam Bondi?
18 A.        No.
19 Q.        Do you know who Leo Terrell is?
20 A.        No.
21 Q.        Were you aware of any complaints or
22 reports about Mr. Christensen received from the
23 public or the OSU community prior to his
24 suspension?

74

1  A.         I mean, to -- I mean, my role -- my
2  role at that point is around the interim
3  suspension and the substantial risk of harm to the
4  university community.  We concluded that the video
5  and the things that were said in the video did --
6  did potentially exist as a substantial risk of
7  harm to the university community.
8  Q.         Did you form any other opinions aside
9  from that?
10 A.         No.
11 Q.         What was the basis for your conclusion
12 that it formed a risk of substantial harm to the
13 university community?
14 A.         I mean, the things that were said
15 within the video.  I mean, the aggressive nature
16 of the way those things were said within the
17 video.  I mean, it was -- the video -- I mean, I
18 don't recall all of the details of it, but, I
19 mean, it was about the murder of the two Israeli
20 diplomats, about being very supportive of --
21 Mr. Rodriguez I think is the individual who had --
22 I don't know if that case has been tried --
23 allegedly shot those individuals, that -- you
24 know, that there was potential need to escalate

75

1    these sorts of behaviors.
2            So those pieces gave us concern that
3    those might be issues that would then potentially
4    come up on our campus based upon what was said and
5    the number of social media followers that
6    Mr. Christensen had.
7    Q.         Did you conclude or form the opinion
8    that Mr. Christensen intended for the Rodriguez
9    video to incite violence?
10   A.         Did I -- say that one more time.
11   Q.         Did you conclude or form the opinion
12   that Mr. Christensen intended for the Rodriguez
13   video to incite violence?
14   A.         We thought it could.
15   Q.         Right now I'm asking about you
16   personally.
17   A.         I thought it could.
18   Q.         So you thought that the Rodriguez video
19   could incite violence?
20   A.         It could, yes.
21   Q.         Do you believe that was
22   Mr. Christensen's intent, to incite violence?
23   A.         I don't know that it's my place to
24   judge his intent.

76

1  Q.    So you formed no opinion on that?
2  A.    It's not my place to judge his intent.
3  Q.    I'm asking if you formed any opinion on
4  it.
5  A.    The opinion that I formed was that the
6  video could have resulted in violence on campus.
7  I don't know what his intention was behind the
8  video.
9  Q.    What violence do you believe would
10 occur as a result of the Rodriguez video?
11 A.    I thought folks could have come to
12 campus to identify a student and target them with
13 harm.
14 Q.    Do you have any reason to believe that
15 anything in the Rodriguez video was specifically
16 targeted at any member or members of the OSU
17 campus community?
18 A.    I don't know that.
19 Q.    Do you have any reason to believe that
20 anything in the Rodriguez video was targeted to
21 OSU generally?
22 A.    I don't know that.  I mean, you're
23 going back to his intention of the video, and I
24 don't know what his intention of the video was.

77

1  Q.         Was there anything in the video that
2  led you to believe it was targeted to OSU?
3  A.         I don't know that.
4  Q.         When did you believe violence could
5  occur as a result of the Rodriguez video?
6  A.         I mean, we thought it could happen
7  immediately upon the release of the video.  That's
8  why the interim suspension was issued relatively
9  quickly.
10 Q.         Well, the interim suspension was issued
11 five days later; is that right?
12 A.         No.  The interim suspension was issued
13 on the 25th.
14 Q.         Sorry.  Not -- not the interim
15 suspension.  Strike that.
16            The administrative disenrollment was
17 issued five days after the interim suspension,
18 correct?
19 A.         Correct.
20 Q.         So you're saying that the interim
21 suspension was issued quickly?
22 A.         Yes.
23 Q.         Where specifically did you believe that
24 violence might occur as a result of the Rodriguez

78

1 video?
2 A.     I mean, the -- because of the
3 definition of an interim suspension, it's that
4 risk of substantial harm to members of the
5 university community, to property, so I don't know
6 that we could make a determination of an exact
7 location that that could occur.  But, I mean, the
8 Ohio State campus is quite large, so, I mean, we
9 were concerned that it could have happened
10 anywhere on campus.
11 Q.     So your jurisdiction is the Ohio State
12 campus, correct?
13 A.     Correct.
14 Q.     Did you have any reason to believe that
15 violence was more likely at Ohio State than
16 elsewhere?
17 A.     I mean, I don't know that.  I mean,
18 that's not my place to determine that.
19 Q.     Did you form any opinion on that?
20 A.     I did not.
21 Q.     So is it fair to say that you formed
22 the opinion that violence could occur, and the
23 area within your control to do something about
24 that was Ohio State?

79

1    A.     Yes.

2    Q.     Who specifically do you believe that --

3 let me rephrase that.

4         Who do you specifically believe could

5 have been incited to violence by the Rodriguez

6 video?

7         MS. BUCHANAN: Objection to the

8 compound question.

9    Q.     Yeah. Let me try that again.

10         You testified that you believe the

11 Rodriguez video could lead to violence?

12    A.     (Indicates affirmatively.)

13    Q.     By whom?

14    A.     It's difficult for me to say. I don't

15 know who all of his followers are on social media,

16 who would have seen that post. I mean, we live in

17 an era where political violence is becoming more

18 common, unfortunately. So my concern was about

19 that.

20         I don't know who the followers are. I

21 don't know who sees that video. I don't know how

22 they interpret it. But based upon the language,

23 the rhetoric, the things that were said, the

24 support of someone who allegedly had murdered

80

1    diplomats, there was a concern and fear amongst
2    our campus community about what that may mean.
3    Q.       Who specifically did you believe could
4    be the targets of the violence?
5    A.       I mean, it's difficult to say based
6    upon who the followers are.  I mean, I think we
7    had obviously concern for our students who
8    identify as being Jewish, because the two
9    diplomats who had been murdered were Jewish.
10   Q.       Did anything in the Rodriguez video
11   lead you to believe that Mr. Christensen intended
12   to target Jewish people?
13   A.       Again, I don't -- I can't comment to
14   his intention.
15   Q.       Okay.  You've never spoken with
16   Mr. Christensen; is that correct?
17   A.       That is correct.
18   Q.       You've never seen him interviewed or
19   questioned about the Rodriguez video or anything
20   else?
21   A.       I have not.
22   Q.       Were you aware at the time that you
23   issued the interim suspension that Mr. Christensen
24   had publicly denied any intent to threaten anyone

Exhibit D