# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

GUY CHRISTENSEN,

   Plaintiff,

    v.

WALTER ("TED") CARTER, JR.,
in his official capacity, *et al.*,

   Defendants.

          Case Number 2:25-cv-1062
          JUDGE EDMUND A. SARGUS, JR.
          Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

This matter is before the Court on Plaintiff Guy Christensen's Motion for Preliminary Injunction. (ECF No. 8.) Defendants, university officials, responded in opposition (ECF No. 28), Plaintiff replied in support (ECF No. 32), and Defendants filed a surreply in further opposition (ECF Nos. 33-1, 33-2). For the reasons set forth below, the Court **GRANTS** Plaintiff's Motion for Preliminary Injunction. (ECF No. 8.)

## BACKGROUND

This case arises out of the action taken by the Ohio State University ("OSU") to disenroll Plaintiff Guy Christensen after he posted charged video content on social media during the summer of 2025 related to the Israel-Palestine conflict. Mr. Christensen identifies himself as a fervent supporter of the Palestinian liberation movement and critic of Israel's conduct in the war in Gaza. During the relevant time, Mr. Christensen had over three million followers on social media.

The subject matter of and content discussed in Mr. Christensen's videos are polarizing. Yet, the Court emphasizes at the outset that the First Amendment to the United States Constitution "applies to loathsome and unpopular speech with the same force as it does to speech

that is celebrated and widely accepted." *Bible Believers v. Wayne County, Michigan*, 805 F.3d 228, 243 (6th Cir. 2015) (en banc). Speech on a matter of public concern "cannot be restricted simply because it is upsetting or arouses contempt." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011). Therefore, "other than in a few limited areas, almost all speech is protected from governmental interference." *McElhaney v. Williams*, 81 F.4th 550, 557 (6th Cir. 2023) (quoting *Novak v. City of Parma*, 932 F.3d 421, 427 (6th Cir. 2019)). The exceptions are quite limited, including "speech expressed as part of a crime, obscene expression, incitement, and fraud." *Id.* (quoting *Novak*, 932 F.3d at 427).

Despite the divisive issue about which Mr. Christensen spoke, the Court's charge is simple—it must determine the constitutionality of Mr. Christensen's speech and subsequent disenrollment from OSU.

## I. Factual Background

### A. Mr. Christensen's Enrollment at OSU and Social Media Presence

Mr. Christensen enrolled at OSU as an undergraduate student in the fall of 2024. (ECF No. 8-1, ¶ 2.) At that time, he had established an online presence as a political activist and social media influencer. (*Id.* ¶ 3.) Mr. Christensen has more than three million followers on the social media platform known as TikTok. (*Id.* ¶ 7.) Mr. Christensen identifies himself as a strong supporter of the movement for Palestinian liberation and routinely posts videos of himself commenting on Palestinian rights and the Israel-Palestine conflict across a range of social media platforms, including TikTok, X (formerly Twitter), Instagram, and Substack. (*Id.* ¶¶ 3–5.) At the close of the spring semester of his freshman year (around the end of April 2025), Mr. Christensen left OSU's campus and the state of Ohio, and did not plan to return until the fall 2025 semester. (*Id.* ¶ 16.)

2

**B.      Mr. Christensen's Social Media Posts at Issue in this Case**

This lawsuit centers around two videos that Mr. Christensen posted on TikTok on May 22, 2025, after leaving OSU's campus for the summer. (ECF No. 1; ECF No. 8-1, ¶¶ 18–20, 26–27.) In those videos, Mr. Christensen expressed his pro-Palestine views in a passionate and controversial manner. (ECF No. 8-2, PageID 121, 123.)

**1.      The Rodriguez Video**

The first video relates to the deaths of two employees of the Israeli embassy in Washington, D.C. (ECF No. 1, ¶ 20; ECF No. 8-2, PageID 121.) The employees were shot and killed by Elias Rodriguez on May 21, 2025, as they exited an event hosted by the American Jewish Committee at the Capital Jewish Museum in Washington, D.C. (ECF No. 1, ¶ 20.)

Initially, Mr. Christensen condemned the shooting in a video that he posted on TikTok on May 22, 2025. (ECF No. 8-1, ¶ 18; ECF No. 8-2, PageID 119; Initial Condemnation Video Transcript, ECF No. 32-6.) Later that day, Mr. Christensen posted another video to TikTok withdrawing his condemnation (the "Rodriguez Video"), which is one of the two videos at issue in this case. (ECF No. 8-1, ¶¶ 18–19; ECF No. 8-2, PageID 121; Rodriguez Video Transcript, ECF No. 32-7.) In the Rodriguez Video, Mr. Christensen begins by stating: "I take it back. I do not condemn the elimination of those two Zionist officials, who worked at the Israeli embassy last night." (Rodriguez Video Transcript, ECF No. 32-7, PageID 1233.) Relevant to this lawsuit, Mr. Christensen used the terms "resistance" and "escalation" in the Rodriguez Video, which come from the following statements:

> And I want to remind you that, while this attack took the lives of two human beings, Israel has murdered thousands of Palestinian civilians in cold blood without any shame, with pride, rejoicing in the streets of Israel over this, and they get no attention in this country, while this attack is being used to weaponize violence against the movement. But we will meet it with our own greater resistance and escalation.

3

. . .

You might have seen my update early this morning where I condemned this attack and I reaffirm that I had a change of perspective after hearing critiques from people in the movement. It is like as they said, I am condemning Luke Skywalker for attacking the Death Star because the Empire might crack down on the resistance. And while my point was that this attack will be used for a crackdown on the movement in the coming days, they're right. We must meet with escalation and stronger resistance.

(*Id.* PageID 1234–35, 1241.) Mr. Christensen also read Elias Rodriguez's manifesto, which had been posted on social media, aloud. (ECF No. 1, ¶¶ 20, 24; Rodriguez Video Transcript, ECF No. 32-7, PageID 1235–40.)

## 2. The Torres Video

The second video relates to Mr. Christensen's criticism of Congressman Ritchie Torres, who serves as a member of the United States House of Representatives on behalf of New York. (ECF No. 8-1, ¶ 26; ECF No. 8-2, PageID 123.) Also on May 22, 2025, Mr. Christensen posted a video on TikTok denouncing Congressman Torres's position that the conflict in Gaza did not constitute genocide and Congressman Torres's affiliations with the American Israel Public Affairs Committee (AIPAC), Israeli public figures, and the Zionist movement (the "Torres Video"). (ECF No. 8-1, ¶ 26; ECF No. 8-2, PageID 123.) In part, Mr. Christensen stated:

Today an AIPAC millionaire and elected official, Ritchie Torres, announced: "There's no genocide in South Africa. There is no genocide in Gaza. Stop debasing the term 'genocide' by using it as ideological warfare." Now Ritchie, screenshots are forever and what you've said and done will haunt your family for eternity as you will eventually, if you're still alive, end up in a Nuremburg trials for all the elected officials in America who facilitated and protected this genocide. How many children have to die before the AIPAC money is outweighed by the crimes?

. . .

So shame on Ritchie. He is a Zionist scumbag. And I hope that the money he sleeps on at night stains his pajamas blood red. Thank you and free Palestine.

4

(ECF No. 8-2, PageID 123.)

### 3. Additional Videos

The day after posting the Rodriguez and Torres Videos, Mr. Christensen released a video responding to criticism he had received. (ECF No. 8-1, ¶¶ 31–32; ECF No. 8-2, PageID 125; Clarification 1 Transcript, ECF No. 32-8.) He emphasized that he "would never make a threat that would jeopardize [his] position to influence and educate people about the atrocity and evils that Zionism is currently bringing down upon the Palestinian people, especially in Gaza." (Clarification 1 Transcript, ECF No. 32-8.)

On May 27, 2025, Mr. Christensen posted another video responding to backlash, in which he denied that he is antisemitic and stated that he does not incite violence. (ECF No. 8-1, ¶¶ 31, 33; ECF No. 8-2, PageID 127; Clarification 2 Transcript, ECF No. 32-9.) Specifically, he said:

> Anybody in their right mind knows when they see my content that I'm not in an antisemite. I hate Nazis just as equally as I do Zionists. Anyone who sees my content knows that I do not incite violence. I do not tell anyone to make threats. I do not want anyone to make threats. Why would I call for people to make threats? All that would do is jeopardize my platform. I'm non-violent.

(Clarification 2 Transcript, ECF No. 32-9, PageID 1252.)

Mr. Christensen posted the first of his follow-up videos before receiving letters from OSU suspending and disenrolling him from the university, which are discussed in more detail below. (*Compare* ECF No. 8-1, ¶ 32 (first follow-up video posted on May 23, 2025), *with* ECF No. 8-2, PageID 129–31 (suspension letter dated May 25, 2025), *and* ECF No. 8-2, PageID 139–40 (disenrollment letter dated May 30, 2025).) Mr. Christensen posted the second of his follow-up videos after receiving the suspension letter, but before receiving the disenrollment letter. (*Compare* ECF No. 8-1, ¶ 33 (second follow-up video posted on May 27, 2025), *with* ECF No. 8-2, PageID 129–31

(suspension letter dated May 25, 2025), *and* ECF No. 8-2, PageID 139–40 (disenrollment letter dated May 30, 2025).)

### C. Mr. Christensen's Disenrollment from OSU

On May 25, 2025, Mr. Christensen received two letters from OSU. (ECF No. 8-1, ¶¶ 37–39.) The first letter, signed by Ryan Lovell, an Associate Vice President at OSU, suspended Mr. Christensen, "temporarily and immediately, from university premises and property as well as participation in all university activities, whether on or off campus property," pursuant to Section 3335-23-20 of OSU's Code of Student Conduct (the "Code") and based on Mr. Lovell's finding that "there is reasonable cause to believe your presence on university premises or at a university-related or registered student organization activity poses a significant risk of substantial harm to the safety or security of yourself, others, or to property."[1] (ECF No. 8-1, ¶ 38; ECF No. 8-2, PageID 129–31.) If Mr. Christensen were to enter university premises while suspended without requesting and being granted temporary access privileges, his conduct would "be considered a violation of university rules as well as criminal trespass in accordance with Ohio Revised Code Section 2911.21, which may result in immediate arrest and/or further disciplinary action by the university." (ECF No. 8-2, PageID 130.)

The second letter, signed by Kelly Smith, the Director of Student Conduct at OSU, instructed Mr. Christensen to set up a meeting with her regarding the interim suspension. (ECF No. 8-1, ¶ 39; ECF No. 8-2, PageID 133–34.) Mr. Christensen scheduled this meeting, which was to be held by videoconference on June 5, 2025. (ECF No. 8-1, ¶¶ 40–41.)

---

[1] The Court noticed that some materials in the record state Mr. Christensen was suspended under Section 3335-23-20, while others refer to Section 3355-23-01. Similarly, some materials in the record state that Mr. Christensen was disenrolled under Section 3355-23-21, while others refer to Section 3335-23-21. These discrepancies are not material to the Court's analysis.

On May 30, 2025, Mr. Christensen received a letter signed by Defendant Shivers, the Senior Vice President for Student Life at OSU, stating that Mr. Christensen was disenrolled from OSU pursuant to Section 3355-23-21(A) of the Code. (ECF No. 8-1, ¶ 43; ECF No. 8-2, PageID 139–40.) This letter explained that a student may be disenrolled from OSU under Section 3355-23-21(A) "when the vice president for student life or designee finds that there is clear and convincing evidence that the student's continued presence poses a significant risk of substantial harm to the health or safety of themselves, others, or to property." (ECF No. 8-2, PageID 139.) In the letter, Defendant Shivers stated:

> Taken together, I find that your May 22, 2025 social media post inciting violence, for which you received an interim suspension on May 25, 2025; your May 22, 2025 social media post about Congressman Torres that he interpreted as a threat of violence and requested U.S. Capitol Police assistance; the myriad communications from members of the university community expressing fear of violence based on your posts; and the engagement of several law enforcement jurisdictions in response to your actions to be clear and convincing evidence that your continued presence at the university poses a significant risk of substantial harm to the safety of the university community warranting your disenrollment.

(*Id.*)

Defendant Shivers explained that "a student who has been disenrolled from the university may petition the vice president for student life for revision of that status" and that "[t]he petition must include supporting documentation or evidence that the conditions found to have existed that resulted in the disenrollment no longer exist and will not recur." (*Id.* PageID 140.) She specified that she "will give full consideration to a request from [Mr. Christensen] to re-enroll in the university; however, [Mr. Christensen] must provide documentation or evidence that [he] no longer pose[s] a significant risk of substantial harm to the safety of the university community." (*Id.*) Absent an approved petition, a disenrolled student may not return to OSU. (Shivers Dep., ECF No. 28-1, PageID 475.)

On June 3, 2025, Ms. Smith informed Mr. Christensen that their meeting would no longer be taking place because the meeting related to Mr. Christensen's interim suspension under Section 3355-23-01 of the Code, and Mr. Christensen was ultimately disenrolled under Section 3355-23-21 of the Code, which involves a different process. (ECF No. 8-1, ¶ 44; ECF No. 8-2, PageID 147–48.)

On June 23, 2025, Mr. Christensen, through counsel, submitted a petition for re-enrollment at OSU. (ECF No. 8-1, ¶ 46; ECF No. 8-2, PageID 152–61.) In the petition, Mr. Christensen argued that his presence at OSU did not pose a threat to the safety of others and that his disenrollment violated his First and Fourteenth Amendment rights. (ECF No. 8-2, PageID 159.) Defendant Shivers rejected this petition, positing that Mr. Christensen did not submit evidence or documentation showing that he no longer posed a significant risk of substantial harm to the safety of the university community; rather, Defendant Shivers characterized the petition as improperly disputing "what 'clear and convincing evidence' of conduct that constitutes a significant risk of substantial harm to health or safety is." (ECF No. 8-1, ¶ 47; ECF No. 8-2, PageID 166–67.)

OSU placed a notation on Mr. Christensen's transcript indicating that he was "administratively disenrolled pursuant to 3335-23-21." (ECF No. 8-1, ¶ 54; ECF No. 28-6.) Section 3335-23-21 of the Code is available on OSU's website and states that a student may be disenrolled "when the vice president for student life or designee finds that there is clear and convincing evidence that the student's continued presence poses a significant risk of substantial harm to the health or safety of themselves, others, or to property." (Shivers Dep., ECF No. 28-1, PageID 374); 3335-23-21 Administrative disenrollment and other restrictions, The Ohio State Univ. Bd. of Trs., https://trustees.osu.edu/code-student-conduct/3335-23-21

[https://perma.cc/VN5G-RQW3] (last visited Jan. 13, 2026). Mr. Christensen currently attends another university. (ECF No. 8-1, ¶ 53.) He plans to apply to a different university abroad by February 2026 and will need to provide his OSU transcript as part of that application process. (*Id.* ¶ 54.)

## II.     Procedural Background

In September 2025, Mr. Christensen initiated this action against Defendants Walter "Ted" Carter, Jr., in his official capacity as President of OSU, Melissa Shivers, in her official capacity as Senior Vice President for Student Life at OSU, and Ryan Hunt, in his official capacity as Registrar at OSU. (ECF No. 1.) Mr. Christensen alleges that Defendants violated his First Amendment right to free speech by expelling him for engaging in protected political speech and his Fourteenth Amendment right to due process by expelling him summarily, without an opportunity to be heard. (*Id.*)

Shortly after filing suit, Mr. Christensen moved for a preliminary injunction that would require Defendants to "expunge any mention of involuntary disenrollment from his academic transcript at the Ohio State University" and enjoin them "from making any equivalent representation through academic records or other means." (ECF No. 8.) The Parties agreed to an expedited discovery schedule (ECF Nos. 19, 20) and, after conducting said discovery, Defendants responded in opposition to Mr. Christensen's Motion for Preliminary Injunction (ECF No. 28) and Mr. Christensen replied in support (ECF No. 32). Defendants also moved for leave to file a surreply in further opposition to Plaintiff's Motion for Preliminary Injunction (ECF No. 33), which the Court granted (ECF No. 34).

The Court held a hearing on Mr. Christensen's Motion for Preliminary Injunction on January 12, 2026. (ECF No. 35.) At the hearing, the Parties presented oral arguments and answered questions from the Court.[2] (*Id.*)

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctions. When determining whether to grant a request for a preliminary injunction, courts consider four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc). In First Amendment cases, "the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits" because the remaining factors "largely depend on the constitutionality of the [state action]." *See Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012) (quoting *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007)).

## ANALYSIS

The Court examines each of the preliminary injunction factors in turn.

---

[2] The Parties informed the Court that they agree on the material facts and that an evidentiary hearing was unnecessary for Plaintiff's Motion for Preliminary Injunction. (ECF Nos. 29, 30.) Thus, the Court evaluates the Parties' arguments presented in their papers and at oral argument, as well as the Parties' evidentiary submissions accompanying their papers, when deciding Plaintiff's Motion for Preliminary Injunction.

I.      **Likelihood of Success on the Merits**

First, the Court considers whether Mr. Christensen has shown a strong likelihood of success on the merits of his First Amendment retaliation claim and Fourteenth Amendment procedural due process claim.

A.      **First Amendment Retaliation Claim**

The First Amendment to the United States Constitution provides, in relevant part: "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The Fourteenth Amendment, Section 1, prohibits persons acting under state authority from abridging any constitutional right of a United States citizen. U.S. Const. amend. XIV, § 1.

"'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). To prove a First Amendment retaliation claim, Mr. Christensen must show that (1) he engaged in protected speech, (2) Defendants took an adverse action against him, and (3) there is a causal connection between the protected speech and the adverse action. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

1.      **Protected Speech**

First, Mr. Christensen must show that he engaged in protected speech. As noted above, "other than in a few limited areas, almost all speech is protected from governmental interference." *McElhaney*, 81 F.4th at 557 (quoting *Novak*, 932 F.3d at 427) (citation modified). Political speech, specifically, is at the core of First Amendment protection. *See Thaddeus-X*, 175 F.3d at 388. Speech does not lose its protected status simply because it is "provocative and

challenging" or has "profound unsettling effects." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949).

Mr. Christensen argues that the Rodriguez and Torres Videos are political speech protected by the First Amendment. (ECF No. 8, PageID 86–99; ECF No. 32, PageID 733–51.) Defendants do not assert that Mr. Christensen's speech was not political in nature—Mr. Christensen's statements are undoubtedly political, albeit controversial. Instead, Defendants respond that Mr. Christensen's speech is not protected by the First Amendment because it constitutes incitement under *Brandenburg v. Ohio*, 395 U.S. 444 (1969) and posed a risk of substantial disruption to OSU's campus. (ECF No. 28, PageID 318–33.) The Court considers both arguments.

### i. Speech that Constitutes Incitement Under *Brandenburg v. Ohio*, 395 U.S. 444 (1969)

The First Amendment does not protect a right to incite violence. *Bible Believers*, 805 F.3d at 244. To determine whether speech incites violence, courts examine whether "(1) the speech explicitly or implicitly encouraged the use of violence or lawless action, (2) the speaker intends that his speech will result in the use of violence or lawless action, and (3) the imminent use of violence or lawless action is the likely result of his speech." *Id.* at 246 (citing *Brandenburg*, 395 U.S. at 477).

Defendants argue that at the time they learned of the Rodriguez Video, Mr. Christensen was engaged in speech to incite violence. (ECF No. 28, PageID 318–26.) The record shows that Defendants viewed Mr. Christensen's use of the words "resistance" and "escalation" in the Rodriguez Video, along with his demeanor, as the components of the Rodriguez Video likely to

12

incite violence.[3] (Shivers Dep., ECF No. 28-1, PageID 437–38.) The terms "resistance" and

"escalation" come from the following statements in the Rodriguez Video:

> And I want to remind you that, while this attack took the lives of two human beings, Israel has murdered thousands of Palestinian civilians in cold blood without any shame, with pride, rejoicing in the streets of Israel over this, and they get no attention in this country, while this attack is being used to weaponize violence against the movement. But we will meet it with our own greater resistance and escalation.
>
> . . .
>
> You might have seen my update early this morning where I condemned this attack and I reaffirm that I had a change of perspective after hearing critiques from people in the movement. It is like as they said, I am condemning Luke Skywalker for attacking the Death Star because the Empire might crack down on the resistance. And while my point was that this attack will be used for a crackdown on the movement in the coming days, they're right. We must meet with escalation and stronger resistance.

(Rodriguez Video Transcript, ECF No. 32-7, PageID 1234–35, 1241.)

First, the Court examines whether these statements "explicitly or implicitly encouraged

the use of violence or lawless action." *Bible Believers*, 805 F.3d at 246. Mr. Christensen's

statements did not explicitly encourage violence or lawlessness and are unlikely to be an implicit

endorsement of such action. For several reasons, the Court views these statements as

encouraging resistance and escalation in the form of lawful action. In the past, Mr. Christensen

has used his social media platform to advocate for nonviolent action, such as participating in

---

[3] In their response in opposition, Defendants include additional arguments regarding why the Rodriguez Video incites violence, including Mr. Christensen's decision to read Elias Rodriguez's manifesto aloud. (ECF No. 28, PageID 320–21.) But "[g]overnment 'justification[s]' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented *post hoc* in response to litigation.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). Yet, even considering these additional points, the Court reaches the same conclusion—Mr. Christensen has shown a strong likelihood of succeeding on his arguments that the Rodriguez Video does not constitute incitement under *Brandenburg*.

13

peaceful protests, signing petitions, and contacting representatives for the Uniting for Peace Resolution in the UN General Assembly. (Christensen Dep., ECF No. 32-1, PageID 788–89.) He also conducted a "six-day hunger strike . . . to inspire and kick off a campaign partnered with an organization on the ground in Gaza to raise money" and mobilized followers to attend "No Kings" protests. (*Id.*)

In addition, the day after posting the Rodriguez Video, Mr. Christensen uploaded another video explaining that he "would never make a threat that would jeopardize [his] position to influence and educate people" about Palestinian rights and the conflict in Gaza. (ECF No. 8-1, ¶¶ 31–32; ECF No. 8-2, PageID 125; Clarification 1 Transcript, ECF No. 32-8.) Similarly, on May 27, 2025, less than a week after the Rodriguez Video, Mr. Christensen posted a video stating that he is "non-violent" and that "[a]nyone who sees [his] content knows that [he does] not incite violence." (ECF No. 8-1, ¶¶ 31, 33; ECF No. 8-2, PageID 127; Clarification 2 Transcript, ECF No. 32-9, PageID 1252.) Finally, when asked about his use of the words "resistance" and "escalation" at his deposition, Mr. Christensen remained adamant that he meant "to encourage [his] audience to take part in nonviolent actions, as [he has] always advocated for them to do." (Christensen Dep., ECF No. 32-1, PageID 813–15.) None of the facts here indicate an endorsement of violence or lawlessness. The record contains no other evidence to the contrary.

Even if Mr. Christensen's use of the terms "resistance" and "escalation" referred to the use of illegal violence, "the First Amendment protects endorsements of lawlessness that do not contain a specific call to action." *Higgins v. Ky. Sports Radio, LLC*, 951 F.3d 728, 737 (6th Cir. 2020); *see also James v. Meow Media, Inc.*, 300 F.3d 683, 698 (6th Cir. 2002) (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002)) ("The mere tendency of speech to encourage

unlawful acts is not a sufficient reason for banning it absent some showing of a direct connection between the speech and imminent illegal conduct."). For example, in *Hess v. Indiana*, a protester in an angry mob yelled "[w]e'll take the f[------] street later" or "[w]e'll take the f[------] street again." 414 U.S. 105, 107 (1973). The Supreme Court found that, "at worst," this statement "amounted to nothing more than advocacy of illegal action at some indefinite future time," which lacked the particularity necessary to prevail under the *Brandenburg* standard. *Id.* at 108. Similarly, in *Nwanguma v. Trump*, the Sixth Circuit held that President Trump's calls in front of a crowd at a campaign rally to "[g]et 'em out of here," referring to protestors, was protected by the First Amendment because it did not "specifically advocate imminent lawless action," even when members of the audience responded by assaulting, pushing, and shoving the protestors. 903 F.3d 604, 606–07, 610–12 (6th Cir. 2018).

Like the statements at issue in *Hess v. Indiana* and *Nwanguma v. Trump*, the Rodriguez Video did not call for imminent unlawful action. Mr. Christensen did not identify a time, place, or manner for the "resistance" or "escalation" to occur. In addition, there is no evidence that violence or lawlessness occurred as a result of Mr. Christensen's speech. With respect to Defendants' position that Mr. Christensen's demeanor led them to conclude his speech was inciting violence, "[a]n advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 928 (1982). Stated differently, Mr. Christensen's demeanor in the video changes nothing.

Next, the Court considers whether Mr. Christensen intended for his statements to result in the use of violence or lawless action. *Bible Believers*, 805 F.3d at 246. The record supports Mr. Christensen's position on this point—he did not possess the requisite intent. As discussed above,

15

Mr. Christensen posted two videos shortly after the Rodriguez Video stating that he "would never make a threat" and "do[es] not incite violence." (Clarification 1 Transcript, ECF No. 32-8; Clarification 2 Transcript, ECF No. 32-9.) Likewise, at his deposition, Mr. Christensen testified that the Rodriguez Video was meant "to encourage [his] audience to take part in nonviolent actions, as [he has] always advocated for them to do." (Christensen Dep., ECF No. 32-1, PageID 813–15.) Mr. Christensen's prior track record supports this—he historically used his platforms to encourage nonviolent action by his supporters. Other than Defendants' interpretation of Mr. Christensen's meaning of his own words, there is no evidence that Mr. Christensen intended for his statements to result in the use of violence or lawless action.

Finally, the Court evaluates whether the imminent use of violence or lawless action was the likely result of Mr. Christensen's speech. *Bible Believers*, 805 F.3d at 246. The statements at issue in this case were shared through a TikTok video to a general audience with no specific call to action—no time, place, or planned follow-up—and, as such, were unlikely to result in the imminent use of violence or lawless action. As stated above, there is no evidence violence or lawlessness has occurred.

While Mr. Christensen's statements may be deemed harsh, because there is "no evidence or rational inference from the import of the language, that his words were intended to produce, and likely to produce, imminent disorder, those words could not be punished by the State on the ground that they had a tendency to lead to violence." *Hess*, 414 U.S. at 109.

### ii.    Speech that Causes a Substantial Disruption Under *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969)

This case involves a public university's response to the speech of one of its students. "[W]here state-operated educational institutions are involved, [the Supreme Court] has long recognized 'the need for affirming the comprehensive authority of the States and of school

officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.'" *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Tinker*, 393 U.S. at 507). At the same time, however, Supreme Court precedent "leave[s] no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." *Id.* Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506.

In *Tinker*, the Supreme Court held that public high and middle schools may prohibit student speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." 393 U.S. at 513. To do so, the school "must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509. More recently, in *Mahanoy Area School District v. B. L. by and through Levy*, the Supreme Court clarified that a public school's interest in regulating student speech is "diminished" when that speech occurs off campus. 594 U.S. 180, 190 (2021). "[C]ourts must be more skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all." *Id.* at 189–90.

*Tinker* and *Mahanoy* involved high schools and middle schools. Universities are different from those types of schools due to the "age, independence, and living arrangements" of the students who attend them. *See Mahanoy*, 594 U.S. at 194 n.2 (Alito, J., concurring). Universities may be able to restrict speech that causes "substantial disruption of or material interference with school activities." *Ward v. Polite*, 667 F.3d 727, 734 (6th Cir. 2012) (quoting *Tinker*, 393 U.S. at 514, in a case involving a graduate-level counseling program). Still, there is "no doubt" that the

First Amendment right of speech "extend[s] to the campuses of state universities." *Widmar v.*
*Vincent*, 454 U.S. 263, 268–69 (1981). Indeed, "[t]he college campus is peculiarly suited to serve
as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid*
*Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979) (Duncan, J.).

The law is not entirely clear as to what extent *Tinker* applies to cases involving
universities, as opposed to cases involving public high or middle schools, but the Court need not
define the contours of such application here. Even assuming *Tinker* applies to the instant case,
the Court concludes that Mr. Christensen has demonstrated a strong likelihood of succeeding on
his position that his statements do not meet the "demanding standard" set forth in *Tinker* and
remain protected under the First Amendment. *Mahanoy*, 594 U.S. at 193.

Defendants argue that OSU "had multiple grounds to support its belief that Plaintiff
would cause substantial disruption on campus." (ECF No. 28, PageID 330.) Those "grounds"
are: (1) OSU received communications from members of the university community expressing
fear of violence based on Plaintiff's posts, (2) law enforcement was engaged to respond to
Plaintiff's actions, (3) administrators believed that Plaintiff intended to incite violence based on
the Rodriguez Video, (4) Congressman Torres interpreted the Torres Video as a threat of
violence against him, (5) Plaintiff did not respond to law enforcement's attempts to contact him,
and (6) administrators believed there was a strong likelihood Plaintiff's speech would
substantially disrupt campus due to Plaintiff's extensive online presence. (*Id.*)

There is no evidence to suggest that Mr. Christensen's conduct disrupted any class or
classwork at OSU. *Cf. Mahanoy*, 594 U.S. at 192–94 (holding that the school could not carry its
burden under *Tinker* even when there was evidence that the plaintiff's social media posts
disrupted a math class on multiple occasions and upset community members). Importantly, when

Mr. Christensen recorded and published the Rodriguez and Torres Videos, the spring semester had ended, he was not on campus or in the state of Ohio, and he did not plan to return to campus until the fall semester. (ECF No. 8-1, ¶¶ 16, 20, 27.) Mr. Christensen did not identify himself as an OSU student, mention OSU or anyone in its community, or otherwise target or direct his speech towards OSU in the Rodriguez and Torres Videos. (*Id.*; ECF No. 8-2, PageID 121, 123); *see Mahanoy*, 594 U.S. at 204–05 (Alito, J., concurring) (collecting cases) (noting that off-campus speech that "addresses matters of public concern" and is "not expressly and specifically directed at the school" is "almost always beyond the regulatory authority of a public school").

No student reported to OSU concerns about Mr. Christensen's statements before OSU disenrolled Mr. Christensen. Activist organizations, the general public, and some parents expressed objections to Mr. Christensen's opinions, but "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker*, 393 U.S. at 508; *see also Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 749 (6th Cir. 2025) (en banc) (explaining that it is "unclear when (if ever) schools may silence nondisruptive speakers because of the way that listeners will react to their message"); *Bible Believers*, 805 F.3d at 248 ("A review of Supreme Court precedent firmly establishes that the First Amendment does not countenance a heckler's veto.").

Similarly, Defendants argue that the engagement of law enforcement demonstrates that believing Plaintiff would cause a substantial disruption on campus was reasonable. Nothing in the record, however, suggests that any law enforcement agency opened an actual investigation into Mr. Christensen beyond a single interview in November 2024, which resulted in a determination that there were no credible threats at that time. (ECF No. 25.)

While the record contains evidence that Mr. Christensen's social media posts were offensive to many people, the record contains no evidence that his speech caused, or would cause, a disruption so significant as to meet *Tinker*'s high standard. Thus, the facts of this case do not support the conclusion that Defendants' forecast of substantial disruption was reasonable.

### 2. Adverse Action

Next, Mr. Christensen must show that he suffered an adverse action because of his protected speech. An adverse action is one that "would chill or silence 'a person of ordinary firmness' from future First Amendment activities." *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007) (quoting *Thaddeus-X*, 175 F.3d at 397). Defendants do not meaningfully dispute this element of Mr. Christensen's First Amendment retaliation claim. (*See* ECF No. 28, PageID 310 (disputing that Plaintiff established the first and third elements of his First Amendment retaliation claim).) The Court concludes Mr. Christensen's disenrollment from OSU constitutes an adverse action that would deter a person of ordinary firmness from engaging in protected speech. *See Diei v. Boyd*, 116 F.4th 637, 647–48 (6th Cir. 2024).

### 3. Causal Connection

Finally, Mr. Christensen must show a causal connection between the adverse action taken against him and his protected speech. To demonstrate causation, a plaintiff is required to show that his protected activity was a motivating factor in the adverse decision. *Thaddeus–X*, 175 F.3d at 399; *see also Thompson v. Ohio State Univ.*, 639 F. App'x 333, 344 (6th Cir. 2016) (quoting *Arnett v. Myers*, 281 F.3d 552, 560 (6th Cir. 2002)). Then, the burden shifts to the defendant to show that it would have taken the same action in the absence of the protected activity. *Thaddeus–X*, 175 F.3d at 399.

20

Defendant Shivers's May 30 letter to Mr. Christensen listed the following reasons for his disenrollment from OSU:

> your May 22, 2025 social media post inciting violence, for which you received an interim suspension on May 25, 2025; your May 22, 2025 social media post about Congressman Torres that he interpreted as a threat of violence and requested U.S. Capitol Police assistance; the myriad communications from members of the university community expressing fear of violence based on your posts; and the engagement of several law enforcement jurisdictions in response to your actions.

(ECF No. 8-2, PageID 139.) Mr. Christensen argues that all four of those reasons relate to and arise out of his protected speech, so his speech was the root cause that motivated his disenrollment. (ECF No. 32, PageID 754.) Indeed, Defendant Shivers refers to the Rodriguez Video, the Torres Video, and reactions by the community and law enforcement to the Rodriguez and Torres Videos.

Defendants do not argue that they would have disenrolled Mr. Christensen even if he had not posted the Rodriguez and Torres Videos (i.e., engaged in the protected conduct). Defendants assert that "the decision to administratively disenroll Plaintiff was not 'motivated in substantial part by a desire to punish' Plaintiff for the content of his speech," instead, it "was motivated by a desire to protect the safety of the campus community." (ECF No. 28, PageID 313.) This is a difference without a distinction. *Wells v. Rice*, 692 F. Supp. 3d 735, 748 (E.D. Ky. 2023) (rejecting defendant's argument that the adverse action "based on his fear for his family's safety and not to retaliate against Plaintiffs for their protected speech" and noting that "[t]he root behavior that [Defendant] seeks to exact retribution for is [Plaintiffs'] Facebook post," which is "the constitutionally-protected conduct that allegedly causes him to fear for his family's safety").

Defendants' motivation for disenrolling Mr. Christensen stems from the Rodriguez and Torres Videos, and Mr. Christensen has shown a strong likelihood of establishing that those videos are forms of protected speech. Defendants' argument that they disenrolled Mr.

21

Christensen to promote campus security, rather than to punish him, does not change the fact that they disenrolled Mr. Christensen because of his speech. And, as explained above, there was not violence or lawlessness incited by the videos to protect the community from. At base, Defendants took an adverse action against Mr. Christensen because of his statements, and Defendants' position that they did so to ensure the safety of the students does not make their conduct constitutional.

For these reasons, Mr. Christensen has demonstrated a strong likelihood of success of showing that he engaged in protected speech, Defendants took an adverse action against him, and a causal connection exists between the protected speech and the adverse action.

### B. Fourteenth Amendment Due Process Claim

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To establish a procedural due process claim, a plaintiff must show "(i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023).

Defendants concede the first element of Plaintiff's procedural due process claim. (ECF No. 28, PageID 334.) They acknowledge that due process protections have long-shielded access to higher education and that their disenrollment deprived Mr. Christensen of his protected interest. (*Id.*) The Parties dispute the second element: whether Defendants afforded Mr. Christensen adequate process.

Generally, there are two basic due process requirements: (1) notice and (2) an opportunity to be heard. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 634 (6th Cir. 2005). In *Mathews v. Eldridge*, the Supreme Court instructed courts to look at three factors when determining the due

process required: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. 319, 335 (1976). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

When evaluating due process claims in the context of expulsions, courts "conduct a more searching inquiry" when the case involves "a disciplinary expulsion, rather than an academic one." *Flaim*, 418 F.3d at 634 (citing *Missouri v. Horowitz*, 435 U.S. 78, 86 (1978)). "In the school-disciplinary context, an accused student must at least receive the following pre-expulsion: (1) notice of the charges; (2) an explanation of the evidence against him; and (3) an opportunity to present his side of the story before an unbiased decisionmaker." *Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016). By contrast, students dismissed for academic reasons are entitled to "notice that his or her academic performance was not satisfactory and a 'careful and deliberate' decision regarding their punishment," but "the university need not provide a hearing." *Mares v. Miami Valley Hosp.*, 96 F.4th 945, 953 (6th Cir. 2024) (quoting *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 549 (6th Cir. 2013); *J. Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 298 (6th Cir. 2019)).

Mr. Christensen argues that the process he received was deficient for several reasons, including: (1) Defendants did not establish that he was disenrolled for academic reasons, such that fewer due process protections are required, (2) Mr. Christensen did not receive a pre-expulsion hearing, which he was entitled to, (3) even assuming Mr. Christensen could be

expelled without a hearing, it would require a dire emergency, which was not present in this case, and (4) Mr. Christensen's post-expulsion opportunity to petition for re-enrollment did not constitute a meaningful opportunity to be heard, as demonstrated by Defendant Shivers's rejection of his petition for attempting to defend himself. (ECF No. 8, PageID 101; ECF No. 32, PageID 757–65.)

For their part, Defendants argue that Mr. Christensen received the proper amount of process because he was "administratively disenrolled" under Section 3335-23-21 of the Code, which "is separate and distinct from disciplinary suspensions or disenrollments." (ECF No. 28, PageID 333.) Defendants assert that "[a]n administrative disenrollment is not punitive in nature; it is a process used in exigent circumstances to ensure the safety of the student in question, other students, and the campus community." (*Id.* PageID 335–36.)

As an initial matter, Defendants do not explicitly argue that Mr. Christensen was dismissed for academic reasons, which would require less process under the Fourteenth Amendment. Instead, they use the term "administrative disenrollment," but the Court does not view Defendants' ipse dixit assertion that Mr. Christensen's disenrollment was not disciplinary as a sufficient reason to disregard the constitutional notion that "[a] student faced with expulsion has the right to a pre-expulsion hearing before an impartial trier-of-fact." *Newsome v. Batavia Loc. Sch. Dist.*, 842 F.2d 920, 927 (6th Cir. 1988); *Ashiegbu v. Williams*, No. 97-3173, 1997 WL 720477, at *1 (6th Cir. Nov. 12, 1997).

Next, the record supports concluding that the process Mr. Christensen received for his disenrollment was insufficient. He received notice of the disenrollment at the same time that the disenrollment took effect (May 30, 2025) and learned that he could petition for re-enrollment once his disenrollment was already in effect. (ECF No. 8-2, PageID 139–40.) In other words, Mr.

24

Christensen did not receive notice or an opportunity to be heard before his dismissal. To be sure, Mr. Christensen received notice of his interim suspension before his disenrollment, on May 25, 2025 (ECF No. 8-2, PageID 129), but he did not receive notice of his disenrollment until May 30, 2025 (*id.* PageID 139–40), when the disenrollment was in effect. A meeting had been scheduled related to Mr. Christensen's interim suspension under Section 3355-23-01 of the Code, but that meeting was cancelled because it was not part of OSU's process for disenrollments under Section 3355-23-21 of the Code. (ECF No. 8-1, ¶¶ 40–41; ECF No. 8-2, PageID 147–48.)

Mr. Christensen's post-deprivation opportunity to petition for re-enrollment only afforded him the opportunity to argue that the circumstances giving rise to his disenrollment had dissipated, not that those circumstances failed to justify disenrollment in the first instance. (ECF No. 8-2, PageID 166–67 (denying Mr. Christensen's petition for re-enrollment because it "amounts to a disagreement on what 'clear and convincing evidence' of conduct that constitutes a significant risk of substantial harm to health or safety is instead of providing evidence of a change in conditions supporting the reasons that Mr. Christensen should be re-enrolled at the university").) Aside from the chance to petition for re-enrollment, Mr. Christensen did not receive any other opportunity to be heard.

Further, for the same reasons that a substantial disruption was unlikely to result from Mr. Christensen's speech, the evidence does not support concluding that emergency circumstances existed such that Defendants' failure to hold a hearing before Mr. Christensen's disenrollment was justified. Schools have afforded students pre-expulsion hearings in situations more dire than the one presented in this case. *See, e.g.*, *C.Y. ex rel. Antone v. Lakeview Pub. Schs.*, 557 F. App'x 426, 427–28 (6th Cir. 2014) (explaining that the school conducted a pre-expulsion hearing when

a counselor reported that a student had brought a knife to school and was threatening to stab another student). And the fact that OSU had already suspended Mr. Christensen from "university premises and property as well as participation in all university activities, whether on or off campus property," casts doubt on whether OSU's decision to disenroll Mr. Christensen was necessary to address or alleviate emergency circumstances, to the extent they existed. (ECF No. 8-2, PageID 129.)

Finally, the *Mathews* factors support concluding that the process related to Mr. Christensen's disenrollment was constitutionally deficient. First, Mr. Christensen's private interest is "significant" because his disenrollment could "interfere with later opportunities for higher education and employment." *Flaim*, 418 F.3d at 638 (quoting *Goss v. Lopez*, 419 U.S. 565, 575 (1975)). Second, the process posed a high risk of error because OSU disenrolled Mr. Christensen without giving him an opportunity to explain his own statements, which formed the basis of the disenrollment decision. A pre-disenrollment hearing would lessen the risk of erroneous deprivation by generating information from multiple parties—including the person whose conduct is at issue—for OSU to consider before making a decision. Third, the Court recognizes that OSU has a strong interest in ensuring safety on campus but is not convinced that this interest justified their failure to provide a pre-disenrollment hearing, given that OSU had already suspended Mr. Christensen from campus and Mr. Christensen had left OSU and the state of Ohio and did not intend to return for months. In addition, the fiscal and administrative burden on OSU to hold a pre-disenrollment hearing is minimal: OSU appears to have the capacity to facilitate these hearings and does so for measures less extreme than disenrollment because a similar meeting was scheduled to address Mr. Christensen's interim suspension.

For the reasons set forth above, the Court concludes that Mr. Christensen has demonstrated a strong likelihood of success on the merits of his First Amendment and Fourteenth Amendment claims.

## II.    Irreparable Harm

Next, the Court considers whether Mr. Christensen will suffer irreparable harm absent an injunction. Generally, "[a] plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). "The loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). If a plaintiff "can establish a substantial likelihood of success on the merits of [his] First Amendment Claim, [he] also has established the possibility of irreparable harm as a result of the deprivation of the claimed free speech rights." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

Here, Mr. Christensen has shown a strong likelihood of success on the merits of his First Amendment retaliation claim, as well as his Fourteenth Amendment due process claim. Defendants argue that Mr. Christensen did not establish irreparable harm because he failed to allege an ongoing constitutional violation or prove that the disenrollment notation on his academic record has harmed him or will harm him in any material way. (ECF No. 28, PageID 341.) But the Sixth Circuit explained that "an individual, who has been subjected to direct and intentional retaliation for having exercised the protected constitutional right of expression, continues to suffer irreparable injury even after termination of some tangible benefit." *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989). In addition, absent a preliminary injunction, Mr. Christensen's transcript from OSU will continue to show that he was administratively

disenrolled, despite Mr. Christensen having established a strong likelihood of success on the merits on his claims that this disenrollment was unconstitutional. At his deposition, Mr. Christensen testified that his academic advisor explained to him that the notation on his transcript matters for his academic career. (Christensen Dep., ECF No. 28-2, PageID 648); *Goss*, 419 U.S. at 575 ("If sustained and recorded, those charges [of misconduct] could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment."). Therefore, Mr. Christensen has demonstrated irreparable harm.

## III.    Substantial Harm to Others

Next, the Court must weigh the harm to Mr. Christensen "should the preliminary injunction not be issued" against "the harm to others from the granting of the injunction." *United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 363 (6th Cir. 1998). Defendants argue that an injunction will harm other academic institutions or employers by preventing them from knowing why Mr. Christensen is no longer enrolled at OSU.[4] (ECF No. 28, PageID 343.) The Court is not persuaded that this harm qualifies as substantial or outweighs the irreparable harm Mr. Christensen will incur without a preliminary injunction, discussed above. Indeed, "if the plaintiff shows a substantial likelihood that the

---

[4] Defendants characterize the requested preliminary injunction as "full merits relief," rather than the "preservation of the status quo." (ECF No. 28, PageID 343.) As the Sixth Circuit has noted, "[i]t is often loosely stated that the purpose of a preliminary injunction is to preserve the status quo." *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978). But, when "the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." *Id.* (citations omitted). Here, the last uncontested status between the Parties was when Mr. Christensen's transcript did not include the administrative disenrollment notation, so the Court finds the preliminary injunctive relief requested by Mr. Christensen to be proper.

challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 274 F.3d 377, 400 (6th Cir. 2001). For these reasons, this factor weighs in Mr. Christensen's favor and counsels for granting the preliminary injunction.

## IV. Public Interest

Finally, the Court considers whether issuing the preliminary injunction serves the public interest. It is well-established that "[t]he public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties." *Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009) (quoting *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995)). Therefore, "the determination of where the public interest lies . . . is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because 'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Connection Distrib. Co.*, 154 F.3d at 288 (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)). Here, Mr. Christensen has demonstrated that he is likely to succeed on the merits of his claims arising under the First and Fourteenth Amendments, so a preliminary injunction would serve the public interest by preventing the violation of constitutional rights.

In sum, all four preliminary injunction factors weigh in favor of granting Mr. Christensen's Motion for Preliminary Injunction. (ECF No. 8.)

## V. Bond

Rule 65 of the Federal Rules of Civil Procedure states in relevant part: "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been

29

wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The purpose of the rule is to "protect[] the enjoined party from any pecuniary injury that may accrue [while] a wrongfully issued equitable order remains in effect." *Brown v. City of Upper Arlington*, 637 F.3d 668, 674 (6th Cir. 2011). "While . . . the language of Rule 65(c) appears to be mandatory . . . the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995).

Given the strength of Mr. Christensen's likelihood of success on the merits and Defendants' failure to request security, Mr. Christensen shall post a bond with the Clerk of the Court in the nominal amount of $100.00 no later than 10 days from the date of this Order. *See Moltan Co.*, 55 F.3d at 1176 (finding no bond required due to strength of movant's case and strong public interest involved); *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 713 (S.D. Ohio 2016) (Barrett, J.) (setting Rule 65 bond in nominal amount of $1).

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** (ECF No. 8) Plaintiff's Motion for Preliminary Injunction. The Court **ORDERS** Defendants to expunge any mention of involuntary disenrollment from Mr. Christensen's academic transcript at OSU and **ENJOINS** Defendants from making any equivalent representation through academic records or other means no later than 10 days from the date of this Order. Further, the Court **ORDERS** Plaintiff to post a bond with the Clerk of the Court in the amount of $100.00 no later than 10 days from the date of this Order. This case remains open.

**IT IS SO ORDERED.**

1/14/2026
**DATE**

s/Edmund A. Sargus, Jr.
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**